# IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MARLAND
### GREENBELT DIVISION

| | | |
|---|---|---|
| MS.PATRICIA FLETCHER, | ) | |
| *et al.*, | ) | |
| | ) | Civ. Action No.: RWT-11-3220 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LINDA LAMONE in her official | ) | |
| capacity as State Administrator of | ) | |
| Elections for the state of Maryland; | ) | |
| And ROBERT L. WALKER in his | ) | |
| official capacity as Chairman of the | ) | |
| State Board of Elections, | ) | |
| | ) | |
| Defendants. | ) | |

---

## PLAINTIFF'S MEMORANDUM IN SUPPORT
## OF ITS MOTION FOR PRELIMINARY INJUNCTION
## AS TO COUNT THREE AND SIX OF THE COMPLAINT

The Plaintiffs, Patricia Fletcher, et al., have moved this Honorable Court to enter a

preliminary injunction enjoining the Defendants from relying on, enforcing, or conducting

elections in the congressional districts embodied in SB1 (Doc. 1, Complaint, Ex. C).  Maryland's

current congressional primaries are scheduled for April 3, 2012.  Persons seeking to participate

in the Republican or Democratic primaries must file their qualification papers by January 11,

2012 at 9 p.m.  As a result, speedy resolution is critical to resolving this matter to prevent a

violation of Plaintiffs' rights under the Constitution.[1]

---

[1] As a result of the MOVE Act, 42 U.S.C. § 1973ff *et seq.*, ballots for federal elections must be mailed to overseas
military voters by 45 days in advance of the election.  The current mailing deadline is February 17, 2012 based on
the April 3, 2012 primary date and the representations of Counsel for the Defendants during the status call with the
Court on November 16, 2011.

This preliminary injunction is requested with respect to Count Three (Intentional Discrimination by Violating the equal protection principal of one person, one vote) and Count Six (Violation of Article One, Section Two of the U.S. Constitution) of the Complaint. The facts as to these counts are undisputed, as detailed below, and in the interests of swift adjudication Plaintiffs currently move only on those counts which can be decided as a matter of law. Plaintiffs request the Court enter a preliminary injunction which will remain in effect until such time as all counts and allegations may be heard in this case and either court may, or a special master may be appointed by the Court to, rectify the current constitutional deficiencies, thereby adopting a map for congressional districts that complies with the Constitution.

## I.       SUMMARY OF ARGUMENT.

The use of any number other than total population as determined by the U.S. Census for the apportionment of congressional districts violates Article One, Section Two of the U.S. Constitution.  By relying on an adjusted number that both moves persons within the state and eliminates persons from the state count, as the state of Maryland has done in SB1, the state has breached the boundaries delineated by the U.S. Supreme Court as permissible means to examine population equality issues for congressional districts.

Article One, Section Two of the U.S. Constitution, known as the "Census Clause," provides that the federal government shall conduct a decennial census and that this census shall be used for the apportionment of seats in the U.S. House of Representatives among the states. Decisions of the U.S. Supreme Court detailed below have made clear that congressional districts must be as nearly equal in population as is "practicable."  Further, decisions of the Supreme Court have suggested, and with one exception, unanimous decisions of other federal courts have

held that total population as determined by the U.S. Census must be the basis for determining the population of congressional districts.

Maryland's "adjustment" of the Census for the purposes of determining population distribution among congressional districts, and removal of persons from the federal census count, is in violation of Article One, Section Two of the U.S. Constitution and the Plaintiffs ask that this court enjoin the current plan and enjoin the state of Maryland from using adjusted numbers for any future congressional district plan.[2]

The population deviations resulting when applying the population as determined by the U.S. Census to the lines created by the State in the current map result in malapportionment of congressional districts, also in violation of Article One, Section Two.

## II.    FACTUAL BACKGROUND.[3]

In 2010, the state of Maryland adopted the "No Representation Without Population Act" which required an "adjustment" of population from the U.S. Census for the purposes of redistricting.  Md. Code Ann., [State Gov't] § 2-2A-01(2011).  The statute provides that prison inmates should be assigned to their last known address within the state of Maryland.  *Id.* § 2-2A-01(2).  For those inmates whose last known addresses are outside the state of Maryland, the state simply omits them from the count.  *Id.* § 2-2A-01(1)(i-ii).

A comparison of the U.S. Census Bureau figures to the state's total population figures demonstrates that 1,321 persons were eliminated in the state numbers.  *See* Maryland Department of Planning, *Report of Maryland Precinct Population Data: 2010 Census Adjusted*

---

[2]Plaintiffs do not assert that Article One, Section Two claims apply to state legislative and local jurisdiction redistricting plans.  While New York State has enacted a similar law providing for adjustment of Census data for redistricting purposes, the New York law provides for adjustment of Census data only for state legislative and local districting, not congressional redistricting.  Maryland appears to be the only state in the country currently attempting to use anything other than the actual federal census figures for determining total population of congressional districts.

[3] Facts referenced in this Memorandum in Support of Plaintiffs Motion for a Preliminary Injunction are presented in the Complaint, and are incorporated herein by reference.

*Maryland Redistricting Data and Unadjusted Census Population Count*, 90 (2011) (comparing 2010 Census total population with adjusted total population) (Decl. of Jason Torchinsky, Attachment A).  A comparison of the U.S. Census figures to the state's adjusted numbers shows that 939 known African American persons are eliminated in the state's numbers. *Id.* at 90 and 143.  Additionally, some 368 persons classified by the Census Bureau as white are eliminated from the state's count. *Id.* at 90 and 143. As compared to the total population numbers, the African American population was reduced five times more than whites. *See Id.* at 90 and 143 (comparing percentage losses between adjusted African American population with total population and adjusted white population numbers with the total population). The Census Bureau counts persons of Hispanic descent as white for racial categories, since Hispanic in its view is a national origin and not a race.  See, e.g.,

http://quickfacts.census.gov/qfd/meta/long_RHI705210.htm (Visited November 18, 2011).  It is likely that at least some of these 368 eliminated persons are Hispanic.

As provided in SB1, the total population figures of the congressional districts embodied in the act result in districts with deviations as high as +6919 persons (.96%) and as low as -4667 persons (-.65%), for a total deviation range of 1.61%.

### III.   PLAINTIFFS CAN DEMONSTRATE A LIKELIHOOD OF SUCCESS AND WILL SUFFER IRREPARABLE HARM WITHOUT AN INJUNCTION.

The Court should grant a preliminary injunction where the plaintiff establishes (1) she is likely to succeed on the merits; (2) that she is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in her favor; and (4) that an injunction is in the public interest. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). *See also Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 345 (4th Cir. 2009),

*vacated on other grounds by* 130 S. Ct. 2371, (2010), *and reissued in part*, 607 F.3d 355 (4th

Cir. 2010);  *Doe v. Walker*, 746 F. Supp. 2d 667, 674 (D. Md. 2010).

**A.  Plaintiffs Will Suffer Irreparable Harm If Injunctive Relief Is Not Granted.**

Plaintiffs will suffer irreparable harm if the upcoming congressional elections are

contested using the unconstitutional districts contained in SB1.  The violation of a fundamental

constitutional right unquestionably constitutes irreparable harm. *See Elrod v. Burns*, 427 U.S.

347, 373 (1976). *See also Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011),

*Tepeyac v. Montgomery County*, 779 F. Supp. 2d 456, 471 (D. Md. 2011).

The Supreme Court has recognized the singular importance of the right to vote and the

irreparable harm caused by its abridgement via unconstitutional redistricting stating:

> No right is more precious in a free country than that of having a voice in the
> election of those who make the laws under which, as good citizens, we must live.
> Other rights, even the most basic, are illusory if the right to vote is undermined.
> Our Constitution leaves no room for classification of people in a way that
> unnecessarily abridges this right.

*Wesberry v. Sanders*, 376 U.S. 1, 17-18 (1964). *See also Dixon v. Maryland State*

*Administrative Bd. of Election Laws*, 878 F.2d 776, 781 (4th Cir. 1989) (holding that

right to cast effective vote is of extraordinary importance),  *Doe*, 746 F. Supp. 2d at 676.

In the context of the violation of core constitutional rights the irreparable harm is

"inseparably linked" to the likelihood of success of the plaintiff's claim.  *Tepeyac,* 779 F. Supp.

2d at 472 quoting *WV Association of Club Owners & Fraternal Services., Inc. v. Musgrave*, 553

F.3d 292, 298 (4th Cir. 2009); *Dean v. Leake*, 550 F. Supp. 2d 594, 602 (E.D.N.C. 2008).  Thus,

where likelihood of success is demonstrated irreparable harm is found.  *See Tepeyac*, 779 F.

Supp. 2d at 472; *Newsom ex rel. Newsom v. Albermarle County School Board*, 354 F.3d 249, 261

(4th Cir. 2003); *Elrod*, 427 U.S. at 373.

**B.  Plaintiffs Can Clearly Demonstrate A Likelihood Of Success On The Merits.**

**i.      Article One, Section Two of the Constitution Requires the Use of Total Population as Determined by the U.S. Census for Congressional Districts.**

Only a handful of cases in the history of redistricting law have addressed the precise question of whether a number other than the total population as determined by the Census can be used for congressional reapportionment.[4] The U.S. Supreme Court has implicitly addressed this question on only one occasion, but did not conclusively decide the issue.  *See Kirkpatrick v. Preisler*, 394 U.S. 526, 534 (1969) ("There may be a question whether distribution of congressional seats except according to total population can ever be permissible under Art. I, § 2.").  Every federal court to examine the question since *Kirkpatrick* has found that total population as determined by the U.S. Census is the appropriate basis for apportioning congressional districts within a state. *See, e.g., Karcher v. Dagget*, 462 U.S. 725, 738 (1983) ("Because the census count represents the 'best population data available,' . . . it is the only basis for good-faith attempts to achieve population equality.").

Furthermore, both the Constitution and the statutory scheme which guides the Census mandates federal control of the population count for congressional district purposes. The Constitution grants Congress the authority to determine the "actual enumeration" of the United States. U.S. Const. Art. 1 § 2. Pursuant to this authority, Congress enacted the Census Act, which grants the Secretary of Commerce the authority to conduct the decennial census in the manner the Secretary deems best. 13 U.S.C. § 141(a). The tabulation arrived at under methods prescribed by the Secretary of Commerce is the required number for the apportionment of congressional districts. *Id.* at § 141(b). Once the President certifies to the House of Representatives the number

---

[4]Numerous cases have addressed the use of some other number for state legislative or local redistricting, but those cases are not applicable here and are generally not addressed in this memorandum.

of congressional districts each state is entitled, the Clerk of the House of Representatives

certifies that number to each state. 2 U.S.C. § 2a(a-b). *See also Department of Commerce v.*

*United States House of Representatives*, 525 U.S. 316, 321-22 (1999) (discussing statutory

framework for determination of population for congressional district purposes). Thus for

determining congressional districts the only number that can be used is the number generated by

the U.S. Census. *See Dep't of Com.*, 525 U.S. at 334 ("Because the census count represents the

'best population data available,' . . . it is the only basis for good-faith attempts to achieve

population equality.") (quoting *Karcher*, 462 U.S. at 738).

In *Kirkpatrick*, on remand, the three-judge panel reviewing the matter provided an

extensive historical examination of the meaning of Article One, Section Two. *See Preisler v.*

*Secretary of State*, 279 F. Supp. 952, 998 (W.D. Mo. 1967).  This historical examination

extensively recounted the framers' discussion of inclusion of a federal census in the Constitution.

Said that court:

> The constitutional history of Art. I, § 2 would seem to make it
> apparent that the Founders included the decennial census in that
> section as a central instrument specifically designed to control and
> adjust the constitutionally required future apportionments of the
> House of Representatives. It would seem historically incongruous
> not to require the use of the constitutional decennial census in the
> establishment of congressional districts within the States. *A*
> *rejection of the federal decennial census as the exclusive*
> *guideline for congressional districting would have grave and*
> *particular significance in future congressional reapportionment*
> *cases….*
> The idea of apportionment of representatives among the States
> based on the federal census and *the notion that the districting*
> *within the States for election of federal representatives may be*
> *based on some sort of state census would seem to be basically*
> *inconsistent with the primary reason for the Founder's insistence*
> *that the constitutionally required decennial census be a federal*
> *census. **The self-interest of at least sectors of particular States to***
> ***manipulate their own local census figures would obviously have***

> ***a drastic impact on the composition of the House of
> Representatives.***

*Preisler*, 279 F. Supp. at 1002-03 (first and third emphasis added).

Since the remand in *Preisler*, only a handful of decisions have addressed squarely the

question of whether the federal census results should be used for congressional apportionment.

In one case, *Young v. Klutznick*, the district court said, "It would be anomalous to conclude that

the framers of the Constitution intended only to insure equality of representation among the

states, but not within the states, and intended to allow the states to independently select some

other means to establish equality." *Young v. Klutznick*, 497 F. Supp. 1318, 1324 (E.D. Mich.

1980) *rev'd on other grounds*, 652 F.2d 617 (6th Cir. 1981).

In a more recent case to address the issue, *Travis v. King*, 552 F. Supp. 554 (D. Haw.

1982) the three-judge panel concluded:

> [W]hile the Supreme Court has never directly addressed this
> particular issue, we note that starting with Wesberry it has
> repeatedly stressed that equal representation for equal numbers of
> people [is] the fundamental goal of the House of Representatives.
> *For these reasons, we hold that pursuant to article I, § 2 of the
> Constitution states must depend on total federal census figures to
> apportion congressional districts within their boundaries.*

*Travis*, 552 F. Supp. at 571 (emphasis added).

In SB1, the state of Maryland "adjusted" its population in two ways.  First, it assigned

some persons from one location within the state to another location within the state.  This

appears to be in direct contravention of the intent of the framers of the Census Clause. *See

Preisler*, 279 F. Supp. at 1002-1003.  Second, it eliminated 1,321 people from its count for the

purposes of congressional districting.  Again, this second error appears to be in direct

contravention of Article One, Section Two with respect to congressional districting.

Even Maryland's Attorney General, in answering questions for the state Senate in the process of passing the initial "No Representation Without Population Act" expressed no opinion as to the ability to adjust census numbers for the purposes of congressional redistricting.  That opinion concluded, "[t]he use of total population figures as the basis for *State legislative redistricting* does not violate the one person-one vote requirement of the Fourteenth Amendment." *See* 94 Op. Att'y Gen. Md. 125 (2009) (emphasis added) (Decl. of Jason Torchinsky, Attachment B).  This opinion was silent as to the use of the adjusted numbers for congressional districts.

The October 20, 2011 letter issued by the Attorney General (Decl. of Jason Torchinsky, Attachment C) addresses briefly the Article One, Section Two issue by citing the 2009 opinion letter on state legislative redistricting (where Article One, Section Two is inapplicable) and citing the Supreme Court's decision in *Burns v. Richardson*, 384 U.S. 73 (1966). *See Letter from Douglas Gansler, Maryland Attorney General, to Martin O'Malley, Governor of Maryland* Page 2 (October 20, 2011 ).  However, *Burns* solely addresses state legislative districts in Hawaii. Further, we note that Hawaii did not gain its second congressional district until 1971, five years after the decision in Burns, so the question of appropriate population base for congressional districts was not before the Supreme Court in the case cited by the Maryland Attorney General.

In summary, the history of the U.S. Constitution and federal court decisions interpreting it bar the state of Maryland from using adjusted census numbers for congressional districting purposes.

        **ii.**    **Article One, Section Two's Requirement that Congressional Districts be of Equal Population Are Violated in the Maryland Congressional Districting Plan.**

In *Wesberry v. Sanders*, the Supreme Court held that Article One, Section Two requires that "as nearly as is practicable one man's vote in a congressional election is ... worth as much as another's." 376 U.S. 1, 7-8 (1964).  Later, in *Karcher*, the Supreme Court declared:

> Article I, § 2, establishes a high standard of justice and common sense for the apportionment of congressional districts: "equal representation for equal numbers of people." Precise mathematical equality, however, may be impossible to achieve in an imperfect world; therefore the equal representation standard is enforced only to the extent of requiring that districts be apportioned to achieve population equality as nearly as is practicable….Unless population variances among congressional districts are shown to have resulted despite such effort, the State must justify each variance, no matter how small….Article I, § 2, therefore, permits only the limited population variances which are unavoidable despite a good-faith effort to achieve absolute equality, or for which justification is shown.

*Karcher*, 462 U.S. at 730 (internal quotations omitted).  *Karcher* essentially established a two prong test articulated by this court in *Anne Arundel County v. State Administrative Board*, 781 F. Supp. 394 (D. Md. 1991):

> *Karcher* sets forth a two-part test for considering the legal significance of population deviations in a state legislature's apportionment of congressional districts. First, those challenging a redistricting plan for alleged failure to comply with Art. I, § 2 bear the burden of proving that the population differences among districts could have been reduced or eliminated altogether by a good-faith effort to draw districts of equal population. If the opponents of a redistricting plan "can establish that the population differences were not [unavoidable nor] the result of a good-faith effort to achieve equality then the burden shifts to the state. In this second step, the state must prove that "each significant variance between districts was necessary to achieve some legitimate goal. The State's justification for contested numerical disparities must be made with particularity.

*Id.* at 396. The current districts in Maryland, using U.S. Census Bureau total population count rather than the state's adjusted numbers reveals the following deviations in population among the congressional districts (*See* Complaint, Exhibit C):

| District | Deviation | % Deviation |
|----------|-----------|-------------|
| 1 | 1121 | .16% |
| 2 | 1918 | .27% |
| 3 | -1435 | -.20% |
| 4 | -1464 | -.20% |
| 5 | -1057 | -.15% |
| 6 | 6919 | .96% |
| 7 | -4667 | -.65% |
| 8 | -15 | .00% |

In *Karcher*, the Supreme Court rejected the suggestion that it adopt some minimum *de minimus* deviation permissible for congressional districts.  *Karcher*, 462 U.S. at 732 ("appellants argue that a maximum deviation of approximately 0.7% should be considered *de minimis*. If we accept that argument, how are we to regard deviations of 0.8%, 0.95%, 1%, or 1.1%?").  Further, the Supreme Court said:

> [W]e have required that absolute population equality be the paramount objective of apportionment only in the case of congressional districts, for which the command of Art. I, § 2, as regards the National Legislature outweighs the local interests that a State may deem relevant in apportioning districts for representatives to state and local legislatures, but we have not questioned the population equality standard for congressional districts.

*Id.*

Maryland's deviations are beyond what other courts have permitted for congressional redistricting, meeting the first prong of the *Karcher* test as previously articulated by this court. *See Anne Arundel County*, 781 F. Supp. 394; *see*, e.g., *Karcher*, 462 U.S. 725 (striking down a congressional district plan with an overall deviation range of 3,764 people); *White v. Weiser*, 412 U.S. 783 (1973) (striking down a congressional district plan with an average deviation of .745%); *State ex rel. Stephan v. Graves*, 796 F. Supp. 468 (D. Kan. 1992) (striking down a congressional plan with a deviation range of .94%); *Vieth v. Pennsylvania*, 195 F. Supp. 2d 672

(M.D. Pa. 2002) (striking down a congressional plan with an overall range of 19 people);  *Anne Arundel County Republican Central Committee v. State Advisory Board of Election Laws*, 781 F. Supp. 394 (D. Md. 1991) (upholding a deviation of 10 people); *Turner v. Arkansas*, 784 F. Supp. 585 (E.D. Ark. 1991) (accepting a deviation of 0.78 percent); *Hastert v. State Bd. of Elections*, 777 F. Supp. 634 (N.D. Ill. 1991) (approving of a congressional district plan with a deviation of .00017%); *but see DeWitt v. Wilson*, 856 F. Supp. 1409 (E.D. Calif. 1994) (finding a plan with an overall range of .49 percent approved by the California Supreme Court in *Wilson v. Eu*, 823P.2d 545, 607-09 (Cal. 1990)); *Stone v. Hechler*, 782 F. Supp. 1116 (W.D. W.Va. 1992) (upholding that a congressional plan with an  overall range of .09 percent).

Article One, Section Two and the examination of constitutional history contained in *Preisler*, 279 F. Supp. at 998, makes clear that the framers of the Constitution believed that the federal census was to be the absolute standard for apportioning congressional districts within a state. *See Preisler*, 279 F. Supp. at 998-99.

Here, while the state might have some policy arguments for assigning persons to locations inside the state other than where the Census Bureau determined them to reside, the constitutional command of equal population on the basis of the Census prohibits this action with respect to congressional districts.

Furthermore, there is even less justification for the state to have eliminated from its population count prisoners whose last known address was outside of the state.  *See Travis v. King*, 552 F.Supp at 571.  ("We note additionally that the presence of this large military population certainly aided the state in achieving its two congressional seats. Equity alone argues that it therefore should be included in the base used to draw the congressional districts within the state.").  Certainly persons residing in Maryland were used by the federal government to

apportion eight congressional seats to Maryland.  The state's action here disregards those persons for the purposes of drawing the district lines.

This Court can take judicial notice of the federal government's refusal to provide last known addresses for persons residing in federal prisons within the state of Maryland.  *See* Press Release, Maryland Department of Planning, *Maryland Redistricting Population Count Released* (March 22, 2011) (Decl. of Jason Torchinsky, Attachment D).

If this Court were to permit Maryland to assess population equality on the basis of any number other than the total population as determined by the U.S. Census, it runs the risk of opening the door to adjustments both within a state and by excluding persons from equal population determinations whose last known residence or permanent legal residence is outside of the state.  According to the Census Bureau, Maryland has some 339,000 students enrolled in degree granting institutions.  *See* U.S. Census Bureau, *Statistical Abstract of the United States 2012*, Education, Page 178 (2012) (Decl. of Jason Torchinsky, Attachment E). Additionally, Maryland has some 29,160 active duty military personnel at installations within the state.  *See* U.S. Census Bureau, *Statistical Abstract of the United States 2012*, National Security and Veterans Affairs, Page 334 (2012) (Decl. of Jason Torchinsky, Attachment F). Should adjustments be permissible for prisoners nothing would bar the state from adjusting its population for students or military personnel – both by moving some students or military personnel within the state and excluding out of state students or out of state military personnel.

Additionally, this reassignment of some prisoners in the state and elimination of certain prisoners Census has assigned to the state, but only a select group of these persons (namely those residing in state facilities but not the federal facility), raises the probability of a violation of equal protection under the Fourteenth Amendment.

These aggregate adjustments produce population counts that deviate substantially from federal census numbers. These deviations make this case distinct and distinguishable from *Duckworth v. State Board of Elections*, 213 F. Supp. 2d 543, 552-553 (D. Md. 2002) for several reasons.  First, the absolute overall variation at issue in *Duckworth* was two persons.   *Id.* at 551. Here, the overall deviation range contained in SB1 is 11,586. Additionally, unlike *Duckworth*, there are plans now available that can correct for this deviation. *See* Map and Plan Stats for Modified Pipkin Plan (Decl. of Jason Torchinsky, Attachment G),   Second, while *Duckworth* suggested that alternative plans must be in the record, Plaintiffs in this case could not do so.  The state law required that congressional redistricting plans use the state adjusted numbers, so there was no opportunity to submit plans using unadjusted U.S. Census figures – in violation of state law in effect at the time.

While adjustments of population within a state may be permissible for redistricting purposes below the federal level, Article One, Section Two prohibits such state by state determinations of adjustments for equal population assessments of congressional districts. Maryland's implementation of its law mandating the use of adjusted numbers for Congressional districts results in population inequalities based on the federal census that are clearly avoidable and not justified under Article One, Section Two of the Constitution and the standards outlined by the Supreme Court.

### C.  The Balance of the Equities and the Public Interest Weigh in Favor of Granting a Preliminary Injunction.

Where it has been demonstrated that Plaintiffs are likely to succeed on the merits and the irreparable harm is the violation of a core constitutional right, the remaining two factors for granting a preliminary injunction are also established.  *See Tepeyac*, 779 F. Supp. 2d at 472.  The state of Maryland has no interest in enforcing constitutionally impermissible congressional

district boundaries.  The state is "in no way harmed by issuance of a preliminary injunction

which prevents the state from enforcing restrictions likely to be found unconstitutional. If

anything, the system is improved by such an injunction." *Giovani Carandola, Ltd. v. Bason*, 303

F.3d 507, 521 (4th Cir. 2002). *See also Newsom*, 354 F.3d at 261; *Legend Night Club*, 637 F.3d

at 302-303; *Tepeyac*, 779 F. Supp. 2d at 471-472.

Such an action is also in the public interest.  It is well recognized that "upholding

constitutional rights surely serves the public interest." *Carandola*, 303 F.3d at 52; *Tepeyac* 779

F. Supp. 2d at 472.  Issuing the preliminary injunction will further the public interest because

constitutional maps can be created before the next congressional election is held.   Given the

rapidly approaching deadline required by the MOVE Act, this Court should retain jurisdiction

and rectify all constitutional deficiencies contained in Maryland's current congressional map.

The map then adopted by the Court can remain in effect until the Maryland legislature can adopt

a constitutionally sound redistricting plan.

## IV.    THE COURT HAS THE POWER TO RECTIFY CONSTITUTIONALLY DEFICIENT REDISTRICTING PLANS.

Courts have the remedial power to adopt a redistricting plan. *See  Maryland Citizens*

*Committee for Fair Congressional Redistricting, Inc. v. Tawes*, 253 F. Supp. 731, 732 (D. Md.

1966) ("We do not doubt the power of the court in these circumstances to adopt a redistricting

plan to remain in force till the General Assembly adopts its own constitutionally valid plan.").

When the legislature is incapable of producing a redistricting plan that conforms to constitutional

mandates, the responsibility falls on the district court to ameliorate the plan's constitutional

deficiencies. *See Chapman v. Meier*, 420 U.S. 1, 27 (1975). *See also McGhee v. Granville*

*County*, 860 F.2d 110, 115 (4th Cir. 1988) (stating that the duty to devise a constitutional

redistricting plan belongs to the district court if the legislature is unable to respond satisfactorily).

V.   **PLAINTIFFS' OTHER CLAIMS AND ALLEGATIONS WILL REQUIRE ADJUSTMENT TO THE CURRENT CONGRESSIONAL BOUNDARIES.**

Although Plaintiffs do not move for a preliminary injunction on the remaining claims and allegations contained in the Complaint in the interest of judicial expediency, these claims have merit and will necessitate additional changes to the congressional boundaries contained in SB1 by this Court.

A.  **Intentional Discrimination in the Splitting of Minority Communities (Count One).**

Defendants diluted Plaintiffs' votes because Congressional Districts Three, Four and Five fracture and graft minority communities into majority districts. *See* (Complaint, Exhibits E and F). The shapes of these districts demonstrate an intentional dilution of voting power on the part the Defendants. *See Gomillion v. Lightfoot*, 364 U.S. 339, 341 (1960) (finding that, assuming the allegations were true, that drawing an "uncouth" figure with 28 sides is sufficient evidence to demonstrate that the legislature intended to dilute minority community's votes). *See also* Comparison of Gomillion District with SB1 Districts (Decl. of Jason Torchinsky, Attachment H).

In *Gomillion*, the plaintiffs there alleged intentional discrimination on the basis that the newly drawn district had the effect of diluting minority voters of their right to vote. *Id.* Because of the new district lines, four hundred minority voters were displaced and unable to participate in municipal elections. *Id.*

Similarly here, the Third Congressional District contains finger-like district lines. These lines reach down into Baltimore City snatching minority voters, effectively grafting them into a majority district within the suburbs. (Complaint, Exhibit E). This displacement dilutes minority

voter strength seizing their voting potential. *See Mobile v. Bolden*, 446 U.S. 55, 66 (1980)

(finding it unconstitutional for a state to enact a district plan that "minimize[s] or cancels out the

voting potential of racial or ethnic minorities").

### B. Intentional Discrimination in the Creation of Districts with Bizarre Shapes and Racial Percentages on the Basis of Race (Count Two).

The State violates the Equal Protection Clause of the 14th Amendment when it creates

districts which are, on their face, extremely irregular, such that it can only be rationally viewed

as an impermissible racial gerrymander.  *See Shaw v. Reno*, 509 U.S. 630, 641 (1993).  Even if

the districts could be viewed as anything other than an impermissible racial gerrymander, the

minority composition, in conjunction with the shape of the district, can be used to demonstrate

an impermissible racial gerrymander.  *See Miller v. Johnson*, 515 U.S. 900, 917 (1995).

The challenged districts in *Shaw* contained "finger-like" extensions which "reache[d] far

into the southernmost part of the state" despite being centered in the northeast portion of North

Carolina. *Shaw*, 509 U.S. at 635. The Court described the second district as "snakelike" winding

through rural, suburban and urban communities "gob[ling]" up "enough enclaves of black

neighborhoods." *Id.* at 635-36. Of the ten counties that comprised Congressional District 12—the

district at issue in that case—five counties divided into three different congressional districts. *Id.*

at 636. Of North Carolina's plan, the Court said "[N]orth Carolina's plan resembles the most

egregious racial gerrymanders of the past." *Id.* at 641.

Likewise the challenged district in *Miller* was composed of "narrow land bridges."

*Miller*, 515 U.S. at 917. Given both the odd shape and the population densities, the Court

determined that the Georgia legislature did this to snatch as many minority voters and to

impermissibly absorb them into the challenged district. *Id.* ("[T]ogether with the relevant racial

demographics that the drawing of narrow land bridges to incorporate within the District outlying

appendages containing nearly 80% of the districts total black population was a deliberate attempt to bring black populations into the district.").

Similarly here, Congressional District Three is centered in the suburbs of Baltimore. Then, however, a "finger-like" extension reaches far down into the city of Baltimore to "gobble" several enclaves of minority neighborhoods.  Congressional District Three also contains a narrow land bridge that fractures a minority neighborhood. (*See* Complaint, Exhibit E).

Likewise, Congressional District Five, located in Prince George's County, also racially gerrymanders.  Prince George's County's population is 64.5% African American.  Here, the district bizarrely hooks left splitting off minority neighborhoods into three separate districts (Congressional Districts 3, 4 and 5) creating a district that is approximately 38% African American.  Similar to Congressional District 12 in *Shaw*, Prince George's County is splintered among three congressional districts. *See* (Complaint, Exhibit G).

Therefore, the state violated the 14th Amendment because it drew districts with bizarre shapes in areas with dense minority population. Additionally, the state fractured minority populations into several different congressional districts. Therefore, the only rational explanation for Maryland's actions is for impermissible racial gerrymander.

### C.  Intentional Discrimination by Adjusting Population Numbers to Omit Persons Disproportionately By Race (Count Four).

Pursuant to the "No Representation Without Population Act" outlined above the State of Maryland removed 1,321 persons from the U.S. Census Bureau numbers to come up with adjusted numbers used for congressional redistricting.  Of those 1,321 persons we know from official Maryland state documents (Decl. of Jason Torchinsky, Attachment B) that 939 of the eliminated persons were African American, or 71% of the total number of eliminated persons.  In

addition because persons of Hispanic decent are categorized as white at least some of those additional 368 persons eliminated from the redistricting count are Hispanic.

Plaintiffs can show that these eliminations from the redistricting count were not simply the effect of an otherwise facially neutral statute but are the result of a racially discriminatory intent in large part because of the racial impact of the numbers that were likely known during the debate over the No Representation without Population Act.  *See Orgain v. City of Salisbury*, 305 Fed. Appx. 90, 98 (4th Cir. 2008) ("Equal Protection Clause does not require Plaintiffs 'to prove that the challenged action rested solely on racially discriminatory purposes.' Rather, Plaintiffs need only establish that racial animus was one of several factors…") (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)).

### D.  Section 2 of the Voting Rights Act (Count Five).

The facts surrounding the adoption of the congressional boundaries in SB1 will meet the preconditions for a Section 2 claim found in *Thornburg v Gingles*, 478 U.S. 30 (1986).  As outlined above and can be seen from the congressional boundaries contained in SB1 the African American population of Maryland has been "cracked" through use of irregular shaped districts to dilute African American voting strength across multiple districts.  *See Marylanders for Fair Representation v. Schaefer,* 849 F. Supp. 1022, 1044 (D. Md. 1994) (vote dilution under Section 2 of the Voting Rights Act occurs "in a single-member district system, where the minority voters are 'cracked,' i.e., fragmented and dispersed into two or more districts where they constitute an ineffective minority of the electorate….").

It is undisputed that the African American population of Maryland is such that three compact majority minority districts could have been drawn instead of the two contained in SB1. The legislature debated and voted down one such plan.  See Complaint, Exhibit D.  The map

rejected by the legislature shows three compact African American congressional districts and avoids the gerrymandering resulting in obscure and strange shapes contained in the adopted map.

Furthermore, through expert testimony Plaintiffs will be able to show political cohesiveness of the African American community in Maryland and white majority bloc voting sufficient to defeat the minority preferred candidate. *See U.S. v. Charleston County*, 365 F.3d 341, 345 (4th Cir. 2004) citing *Gingles*, 478 U.S. at 50-51 ("First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single member district. . . .Second, the minority group must be able to show that it is politically cohesive. . . .Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate.").

The history of litigation in Maryland has found that Maryland African American populations meet the *Gingles* requirements and totality of the circumstances sufficient to find Section 2 violations. *See Cane v. Worcester County*, 35 F.3d 921 (4th Cir. 1995) (African American Population of Worcester County met the *Gingles* preconditions and totality of the circumstances); *Marylanders for Fair Representation v. Schaefer*, 849 F. Supp. 1022, 1061 (D. Md. 1994) (finding the *Gingles* preconditions met by the African American population of Maryland's eastern shore including discussion of the history of official discrimination in voting in Maryland in finding the totality of the circumstances supported creating an additional black state legislative district); *See also Cane v. Worcester County*, 840 F. Supp. 1081 ("Maryland and its political subdivisions bear a  history of official racial discrimination against African-Americans.").

Since *Marylanders for Fair Representation* was decided, the Supreme Court issued its opinion in *LULAC v. Perry*, 548 U.S. 399 (2006).  In this opinion, the Supreme Court said, "The

changes to [the challenged district] undermined the progress of a racial group that has been

subject to significant voting-related discrimination and that was becoming increasingly

politically active and cohesive." *Id.* at 439. In this case, the map promulgated by the state puts

obstacles in the way of increased African-American population in the state of Maryland. The

court continued:

> In essence the State took away the Latinos' opportunity because
> Latinos were about to exercise it. This bears the mark of
> intentional discrimination that could give rise to an equal
> protection violation. Even if we accept the District Court's finding
> that the State's action was taken primarily for political, not racial,
> reasons the redrawing of the district lines was damaging to the
> Latinos in District 23. The State not only made fruitless the
> Latinos' mobilization efforts but also acted against those Latinos
> who were becoming most politically active, dividing them with a
> district line through the middle of Laredo.

*Id.* at 440. (internal citations omitted). Furthermore, in *Garza v. Los Angeles County*, 918 F.2d

763 (9th Cir. 1990), *cert. denied* 498 U.S. 1028 (1991), the court stated:

> Although the [district] court noted that "the Supervisors appear to
> have acted primarily on the political instinct of self-preservation,"
> the court also found that they chose fragmentation of the Hispanic
> voting population as the avenue by which to achieve this self-
> preservation. Finding No. 181. The supervisors intended to create
> the very discriminatory result that occurred. That intent was
> coupled with the intent to preserve incumbencies, but the
> discrimination need not be the sole goal in order to be unlawful.

*Id.* at 771. In the instant case, the State drew a line through the middle of Prince George's

County where African-American voters are increasing in numbers and becoming more politically

active. This significantly impacts the totality of the circumstances test and weighs in favor of a

finding in favor of the Plaintiffs.

With the ability to demonstrate the presence of the *Gingles* pre-conditions and the totality

of the circumstances test and the information outlined herein, Plaintiffs have a viable Section 2

claim that should be considered by this court as it considers imposing a plan to be used in the upcoming congressional elections.

### E. Political Gerrymandering in Violation of the Fourteenth Amendment (Count Seven).

Opinions of Supreme Court Justices and other commentators have outlined numerous potential standards against which to assess partisan gerrymandering claims.  Justice Stevens, for example, believes that that the judicial analysis of districts would be to determine if the legislature allowed the partisan interests to dominate the map-drawing to the point that all neutral criteria for redistricting were ignored.  *Vieth v. Jubiler*, 541 U.S. at 339 (Stevens, J., dissenting).  In order to prove this type of claim, a plaintiff would have to make an affirmative showing that no neutral criteria were used in drawing the plans, and that the only possible explanation for the district's shape was to increase partisan strength.  *Id.* As an Equal Protection challenge, the partisan interest is not a rational basis to explain the difference, and the plan would violate the Constitution.  *Id.*  Here, there are numerous statements and analysis in publicly available news articles that the overriding goal of SB1 was to reduce the number of Republican members of Congress from Maryland from two to one.  In addition, Justice Stevens (now obviously retired), called Maryland Congressional District map "outrageously unconstitutional" in a recent news interview.  See http://www.scotusblog.com/2011/11/an-interview-with-justice-stevens/ (visited November 18, 2011).

Professor Bernard Grofman has also concluded that a majority of the Justices on the Supreme Court are at least open to the idea of using partisan symmetry analysis as an option.  Grofman, *Criteria for Districting: A Social Science Perspective,* 33 UCLA L. REV. 77 (1985).  In his analysis after *LULAC*, Professor Grofman makes a detailed proposal for use of partisan symmetry, and ways that courts could use it to set a *prima facie* threshold for determination of

partisan gerrymandering claims. Bernard Grofman and Gary King, *The future of partisan symmetry as a judicial test for partisan gerrymandering after LULAC v. Perry,* Election Law Journal 6(1): 2. (2007).

An examination of recent presidential election results demonstrates that Republican Presidential candidates consistently receive at least 36% of the statewide vote[5]  As noted by legislators and commentators examining SB1, it is expected to allow only a single Republican to hold a congressional seat in Maryland which is precisely 12.5% of the state's congressional districts.  This demonstrates remarkable consistency with the standards of partisan gerrymandering analysis put forth by both Justice Stevens and Professor Grofman.

## VI.      CONCLUSION

As a result of the foregoing, the Plaintiffs respectfully ask that this court enter an injunction declaring the congressional boundaries set forth in SB1 are not constitutionally valid and take other such steps necessary to resolve constitutionally infirm portions of Maryland's congressional map as outlined in the attached proposed order, including holding its own hearings or appointing a special master to take evidence and assist this Court in creating an appropriate Maryland congressional map, as well as retain jurisdiction over this matter to provide such other further relief as is necessary.

Respectfully submitted,

_____/s/ Jason Torchinsky_____

Law Office of James P Mayes
James Paul Mayes (Bar No. 10414)
mayesfedlaw@aol.com
Law Office of James P Mayes
4721 Chesterfield Place

---

[5] Senator McCain received 36.5% of the statewide vote in 2008, President Bush received 43% of the statewide vote in 2004, and then Governor Bush received 40% of the statewide vote in 2000.

Jamestown, NC   27282
Tel: (202) 255-2031
Fax: (336)841-5275

Holtzman Vogel PLLC
Jason Torchinsky, *pro hac vice*
jtorchinsky@holtzmanlaw.net
HOLTZMAN VOGEL PLLC
45 North Hill Drive, Suite 100
Warrenton, VA 20186
Tel: (540) 341-8808
Fax: (540) 341-8809

Counsel for Plaintiffs