## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MARLAND
## GREENBELT DIVISION

| | | |
|---|---|---|
| MS.PATRICIA FLETCHER, | ) | |
| *et al.*, | ) | |
| | ) | Civ. Action No.: RWT-11-3220 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LINDA LAMONE in her official | ) | |
| capacity as State Administrator of | ) | |
| Elections for the State of Maryland; | ) | |
| And ROBERT L. WALKER in his | ) | |
| official capacity as Chairman of the | ) | |
| State Board of Elections, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION
## TO MOTION FOR THREE-JUDGE PANEL AND OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

_____ /s/ Jason Torchinsky_____

**Law Office of James P Mayes**
James Paul Mayes (Bar No. 10414)
mayesfedlaw@aol.com
Law Office of James P Mayes
4721 Chesterfield Place
Jamestown, NC   27282
Tel: (202) 255-2031
Fax: (336)841-5275

**Holtzman Vogel PLLC**
Jason Torchinsky, *pro hac vice*
jtorchinsky@holtzmanlaw.net
HOLTZMAN VOGEL PLLC
45 North Hill Drive, Suite 100
Warrenton, VA 20186
Tel: (540) 341-8808
Fax: (540) 341-8809

Counsel for Plaintiffs

# TABLE OF CONTENTS

Page

I.     STANDARD OF REVIEW FOR OPPOSITION TO THREE-JUDGE PANEL
       IS DISTINCT FROM STANDARD OF REVIEW FOR 12(b)(6)
       DISMISSAL MOTION....................................................................................................2

       A. Request for a Three-Judge Panel is Determined by an "insubstantial"
          Standard. ......................................................................................................................2

       B.  A Three-Judge Panel Must Decide a 12(b)(6) Challenge. ......................................3

       C.  Standard of Review for a 12(b)(6) Motion to Dismiss. ..........................................4

II.    PLAINTIFFS' CLAIMS ARE SUBSTANIAL AND WELL-PLED. ..............................5

       A.  The Section Two of the Voting Rights Act Claim is Substantial and Is
           Not Dismissible Under Rule 12(b)(6) Standards. (Count 5). .................................5

       B.  Plaintiffs' Claims of Intentional Discrimination are Well-Pled and Substantial
           (Counts One and Two). ......................................................................................11

       C.  Plaintiff's "No Representation without Population Act" Counts Are Substantial
           and Well-Pled (Counts Three, Four and Six). ......................................................17

       D.  Political Gerrymandering Claim is Substantial and Well-Pled
           (Count 7). ...........................................................................................................22

       E.  Disruption of Upcoming Elections is Not a Basis for Dismissal. .........................27

III.   CONCLUSION...........................................................................................................30

**IN THE UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF MARLAND**
**GREENBELT DIVISION**

| | | |
|---|---|---|
| MS.PATRICIA FLETCHER, | ) | |
| *et al.*, | ) | |
| | ) | Civ. Action No.: RWT-11-3220 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LINDA LAMONE in her official | ) | |
| capacity as State Administrator of | ) | |
| Elections for the State of Maryland; | ) | |
| And ROBERT L. WALKER in his | ) | |
| official capacity as Chairman of the | ) | |
| State Board of Elections, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION**
**TO MOTION FOR THREE-JUDGE PANEL AND OPPOSITION**
**TO DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

Plaintiffs Patricia Fletcher, Trevelyn Otts, Donald M. Glover, Janis Hagey, Winnie Mae

Campbell, Michael Harris, Michael Thompson, Julia Williams, and Robina Spruill ("Plaintiffs"),

by and through their undersigned counsel, submit this Reply to Defendants' Opposition to

Plaintiffs Motion for a Three-Judge Panel and Opposition to Defendants' Motion to Dismiss for

failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).

Defendants have joined an Opposition to Plaintiffs' request for a three-judge panel

pursuant to 28 U.S.C. § 2284 with their Motion to Dismiss under Rule 12(b)(6) for failure to

state a claim.  Although Defendants seemingly subsume the three-judge panel opposition into a

Rule 12(b)(6) motion and argue that the standards of review for both motions are the same.  In

fact each motion has a distinct procedure and standard for review.  The Court should distinguish Plaintiffs' Motion for a Three-Judge Panel and the Defendants' opposition to the motion from the Defendants' Motion to Dismiss.  Regardless of the procedural standing, Plaintiffs' Complaint is both substantial and well-pled, and Plaintiffs are entitled to a three-judge panel to hear this matter.

I.    **STANDARD OF REVIEW FOR OPPOSITION TO THREE-JUDGE PANEL IS DISTINCT FROM STANDARD OF REVIEW FOR 12(b)(6) DISMISSAL MOTION**

A.  **Request for a Three-Judge Panel is Determined by an "insubstantial" standard.**

A three-judge panel is required for cases challenging the constitutionality of the apportionment of congressional districts. 28 U.S.C. § 2284(a). It is a jurisdictional statute and thus a single judge is without power to rule on the merits of the underlying claim. *See Backus v. Spears,* 677 F.2d 397, 400-01 (4th Cir. 1982); *Armour v. Ohio*, 925 F.2d 987, 989 (6th Cir. 1991) (en banc); *Kalson v. Paterson*, 542 F.3d 281, 287 (2d Cir. 2008). However, a single judge can review the claim for the limited purpose of whether the claim is "insubstantial." *See Kalson*, 542 F.3d at 287. Therefore, on a motion in opposition to a request for a three-judge panel, the single judge's power of review is limited. *Backus*, 677 F.2d at 400.

A motion requesting a three-judge panel will be denied if the claim is insubstantial. *Goosby v. Osser*, 409 U.S. 512, 518 (1972).  An insubstantial claim is one that is "obviously without merit or clearly concluded by this Court's previous decisions." *McLucas v. De Champlain*, 421 U.S. 21, 28 (1975). Insubstantial claims are those that are "so attenuated and unsubstantial as to be absolutely devoid of merit." *Hagans v. Lavine*, 415 U.S. 528, 536 (1974). Because of this heavy burden to prove insubstantiality, claims that are insubstantial are described as "essentially fictitious" and "obviously frivolous." *Goosby*, 409 U.S. at 518 (1972). The

*Goosby* court continued saying "[a] claim is insubstantial  only if its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject and leave no room for the inference that the questions sought to be raised can be the subject of controversy.' *Id. See also Loeber v. Spargo*, 144 Fed. Appx. 168, 170 (2d Cir. 2005) ("A constitutional question is insubstantial only if prior decisions render the issue inescapably frivolous and leave no room for any *inference* of controversy.") (citing *Goosby*, 409 U.S. at 518) (emphasis added).  Given this heavy burden, the Supreme Court has indicated that the insubstantial standard is rarely met. *Kalson*, 542 F.3d at 288 (citing  *Hagans*, 415 U.S. at 565).

### B.  A Three-Judge Panel Must Decide a 12(b)(6) Challenge.

When a three-judge panel is requested under 28 U.S.C. 2284(a) and challenged by a 12(b)(6) motion, a single judge's power is limited to dismissing the action to when "the complaint does not state a substantial claim for injunctive relief." *Maryland Citizens for a Representative Gen. Assembly v. Governor of Maryland*, 429 F.2d 606, 611 (4th Cir. 1970); *see also Hartmann v. Scott*, 488 F.2d 1215, 1219 (8th Cir.1973) ("If in fact a substantial constitutional question has been presented, the single trial judge has no authority to dismiss the case [for not exhausting state court remedies in a Habeas Corpus action]."). Under the previous version of 28 U.S.C. § 2284, the Supreme Court held that a single district judge's powers are limited when a three-judge court is requested. The single judge's powers are limited to (1) whether the complaint sufficiently alleges a basis for equitable relief; (2) whether the case properly comes within the purview of the three-judge statute; and (3) whether the constitutional question presented is substantial. *Idlewild Bon Voyage Liquor Corp. v. Epstein*, 370 U.S. 713, 715 (1962). While the case was decided under the previous statute, the amended version only reduces the kinds of cases to be heard before a three-judge panel, it otherwise does not affect the

jurisdiction of a three-judge panel. *LULAC v. Texas*, 318 Fed. Appx. 261, 264 (5th Cir. 2009); *Kalson*, 542 F.3d at 287.

This jurisdictional issue creates a dichotomy where a single judge's authority is limited to deciding questions of whether claims are constitutionally substantial, while the three-judge panel decides motions brought under 12(b)(6). *See Duckworth v. State Board of Elections*, 213 F.Supp. 2d 543, 547 (D. Md. 2002). This dichotomy is present so as to prevent "waste and delay inherent in the cumbersome procedure" of convening a three-judge panel. *Maryland Citizens for a Representative General Assembly*, 429 F.2d at 611. The Court, therefore, cannot entertain Defendants' 12(b)(6) Motion to Dismiss until the Court first makes a finding that the Plaintiffs' claims are substantial. If Plaintiffs' claims are substantial then the Court must convene the three-judge panel. Then, and only then, can the Defendants' Motion to Dismiss be properly heard.

**C. Standard of Review for a 12(b)(6) Motion to Dismiss.**

Rule 8(a)(2) of the Federal Rules of Civil Procedure demands that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief...." A 12(b)(6) motion is therefore filed to test the sufficiency of the complaint. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).

When a claim is challenged by a 12(b)(6) motion, the court must assume the truth of all factual allegations made in the complaint. *Accord Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 572 (2007). All allegations must be liberally construed in favor of the plaintiff. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969); *see also Coakley & Williams, Inc. v. Shatterproof Glass Corp*, 706 F.2d 456, 457 (4th Cir. 1983). Additionally, the court must draw all reasonable factual inferences from the facts contained in the complaint in favor of the plaintiff. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). The facts, therefore, must be considered in the manner the plaintiff

can most strongly plead them. *See Coakley & Williams, Inc.*,706 F.2d at 457. While mere conclusory statements are insufficient to survive a motion to dismiss, *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009), the Court must not weigh each allegation in isolation. *Tellabs, Inc. v. Makor Issues and Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007).   Rather, this Court must examine the Complaint as a whole and decide whether, when all of the stated allegations are accepted as true, does the Complaint give a "strong inference of scienter." *Id.*

Furthermore, this Court's review of the Complaint is not limited to the Complaint and the documents submitted with it. Should it be necessary, the Court is permitted to use the Plaintiffs' response brief here to clarify any portions of the Plaintiffs' Complaint. *See Pegram v. Herdrich*, 530 U.S. 211, 230n.10 (2000).

Therefore, unless this Court, after viewing the Complaint in the light most favorable to the plaintiff and granting to the plaintiff all reasonable inferences, finds that the Complaint fails to state a claim that is plausible on its face, the Motion to Dismiss should be denied. *Twombly*, 550 U.S. at 570. This is the reason why 12(b)(6) motions are "granted sparingly and with caution." *See Duckworth*, 213 F.Supp. 2d at 545.

## II.   PLAINTIFFS' CLAIMS ARE SUBSTANIAL AND WELL-PLED

### A.  The Section Two of the Voting Rights Act Claim is Substantial and is Not Dismissible Under Rule 12(b)(6) Standards. (Count 5).

Plaintiffs have pled a claim for violation of Section Two of the Voting Rights Act sufficient for this Court to find it both substantial and well-pled.[1]  Defendants' attack rests on an

---

[1] Plaintiffs note that the Section 2 Count of its complaint is not relevant to the consideration under 28 U.S.C. § 2284 for the purposes of convening the three-judge panel.  A Section 2 claim alone, even when brought to challenge the legality of a statewide redistricting plan, does not give jurisdiction to a three judge panel.  However, as the United States Court of Appeals for the Third Circuit said, "statutory Voting Rights Act challenges to statewide legislative apportionment are generally inextricably intertwined with constitutional challenges to such apportionment, those claims should be considered a single "action" within the meaning of § 2284(a). Thus, when a single district judge is presented with both types of claims, he or she may not resolve the Voting Rights Act issues in isolation while

incorrect assertion that Plaintiffs have not addressed the three preconditions found in *Thornburg v. Gingles*, 478 U.S. 30 (1986), with a particular emphasis on an argument that the maps and compactness analysis pled in, and attached to, the Complaint fail as a matter of law.

It is notable that Defendants have not denied, and in fact have readily admitted the Complaint does in fact plead compactness under the *Gingles* test and contains the maps and compactness analysis sufficient to show that the African American population of Maryland is of a size to create three majority-minority congressional districts.  *See* (Compl. Ex.. D).  This fact is undisputed.  Despite Defendants assertion that the Pipkin map attached to the Complaint is not compact, the measures of compactness attached to the Complaint show that it is more compact than the congressional boundaries in the map as enacted under SB1. (Compl. Ex. D).

Rather, Defendants argue compactness is lacking under the *Gingles* test because the map combines the "isolated minority communities" of the suburbs of Baltimore and Washington D.C. and relies on *League of Latin American Citizens v Perry*, 548 US 399 (2006).  The district at issue in *LULAC* sought to combine urban Latino voters near Austin, Texas, with rural Latino voters more than three hundred miles away near the border with Mexico. *LULAC*, 548 U.S. at 423-24..  Defendants own District 3 links populations in and around Montgomery County with population in Anne Arundel, Howard, and Baltimore Counties and Baltimore City, skirting the border of Prince George's County, often through narrow land bridges.  (Compl. Ex. C). Defendants own District 2 begins just north of the Prince George's County line and winds up as far north as Hartford County, and encompasses parts of Anne Arundel, Howard, and Baltimore Counties as well as parts of Baltimore City, again often through narrow land bridges. (Compl. Ex. E).

---

reserving the constitutional claims to a three-judge district court; rather, the single district judge should adhere to the limitations on his [or her] authority imposed by § 2284(b)(3)."  *Page v. Bartels*, 248 F.3d 175, 190 (3d Cir. 2001).

As to Defendants contention that the Pipkin map combines "isolated minority communities" Baltimore and the Washington D.C. suburbs in Maryland are routinely combined into one geographic area.  The federal Office of Management and Budget combines the entire Washington/Baltimore metropolitan area into a single statistical unit.  One airport serving the region is called the Thurgood Marshall Baltimore-Washington International Airport.  The MARC Regional Trains run regularly from Baltimore to Washington, D.C. and throughout the Maryland suburbs of both cities.[2]   The highway connecting the suburbs of Washington, D.C. with Baltimore is called the Baltimore-Washington Parkway.  And Baltimore County and Prince George's County are approximately 20 miles apart.  An equivalent comparison to the plan in *LULAC*, which combined communities 300 miles apart, would combine Prince George's County with Durham, North Carolina (approximately 265 miles apart).  Or, an equivalent comparison would be Baltimore and Pittsburgh, PA (approximately 245 miles apart) or Hartford, CT (approximately 300 miles apart).

The rural, low population, "isolated communities" stretching for more than 200 miles which the court in *LULAC* found to destroy compactness simply does not exist in this area of Maryland.  At the very least this Court should not find that the assertion as to compactness contained in the Complaint is insubstantial based on Defendants' argument that Prince George's County is isolated from the suburbs of Baltimore.

As to the two remaining *Gingles* preconditions, the Complaint pleads that the historical and social conditions in Maryland cause an inequality in the opportunity for African American voters to elect representatives of their choice as compared to white voters.  (Compl. ¶ 56).  Further, the Complaint alleges that the plans contained in SB1 dilute the voting strength of

---

[2] *See MARC Train/Commuter Bus and other Regional Connecting Transit Service* (Map) *available at* http://mta.maryland.gov/sites/default/files/MTA_CommuterServicesMap-120109.pdf (visited November 19, 2011).

African Americans in Maryland.  (Compl. ¶ 57).  As Justice O'Connor has explained, "any theory of vote dilution must necessarily rely to some extent on a measure of minority voting strength…."  *Gingles*, 478 U.S. at 84 (O'Connor, J., concurring).

The Complaint is also replete with references to the legislative history of SB1 including amendments to the bill such as the Pipkin Amendment, which was debated in the legislature, the original Fannie Lou Hamer PAC plan presentation as well as testimony the GRAC heard regarding the *Gingles* factors in creating three African American majority-minority districts and testimony from Congresswoman Donna Edwards, an African American member of Congress from Maryland before the legislature.  As Defendants point out, the legislative record, as referenced by Plaintiffs in the Complaint, may be considered by the Court on a motion to dismiss.  (Defs.' Mot. to Dismiss 7 n4.)   The second and third *Gingles* preconditions are thoroughly discussed in the public record as referenced in Complaint.

To quote the Defendants' own expert report – certainly a part of the legislative records Defendants are comfortable relying upon – "The evidence is clear in Maryland and elsewhere that African-Americans are a politically cohesive group." (Pls.' Mot. for Prelim. Inj. Attach. C, 6).  It appears from this that the Defendants have conceded the second *Gingles* precondition requirement.

Even with respect to the third *Gingles* factor, the State's own expert concedes that racial polarization exists in Maryland, and even looking only at the 2008 Presidential general and primary elections, Dr. Cain concluded that polarization is "moderate" and that "certain segments of the white population were considerably and statistically significantly less likely than African-Americans to support Barack Obama." (Pls.' Mot. for Prelim. Inj. Attach. C, 7).

Furthermore, looking simply at primary election results for the 2006 Democratic primary with African American Congressman Mfume running against white Congressman Cardin, the results are starkly different and are based on the racial makeup of the election jurisdiction.  In Prince George's County, where the population is approximately 65% African American, Congressman Mfume won 69.8% of the vote, while Congressman Cardin won only 19.8% of the vote.  By contrast, in Anne Arundel County, where the population is approximately 75% white, Congressman Mfume won only 26.2% of the vote, while Congressman Cardin won 56.9% of the vote.  Congressman Cardin won the statewide primary.

Plaintiffs anticipate that as this matter proceeds, as is the case in most vote dilution cases, expert testimony containing additional analysis of elections in Maryland will be presented in the course of development of the evidence.

The Defendants' Motion to Dismiss cites *Georgia v. Ashcroft* for the proposition that minority influence districts are preferable or permissible in the Section 5 context.[3]  (Defs.' Mot. to Dismiss  14).  The Court's Section 5 holding was overruled by 42 U.S.C. § 1973c(b) because *Georgia v. Ashcroft* used the totality of the circumstances test in determining whether a redistricting plan's retrogressive effect is offset by increasing political influence in other districts. *See LaRoque v. Holder*, 650 F.3d 777, 793 (D.C. Cir. 2011). Congress enacted 42 U.S.C. § 1973c(b) to limit the inquiry to whether a proposed plan will have the effect or was intended to diminish minority voters ability to elect their candidate of choice. *Id.* Thus, the holding in *Georgia*, and certainly the method which arrived at the Section 5 holding in *Georgia* is no longer valid.  During the course of House of Representatives testimony on the renewal of

---

[3] As the Supreme Court has noted in numerous cases, Section 2 and Section 5 standards are dramatically different. Section 5 of the Voting Rights Act is not applicable in Maryland.

Section 5, Tyrone Brooks, President of the Georgia Black Association of Elected Officials

testified and said:

> [M]y testimony today will speak to the issue of Ashcroft and
> Georgia. But also, it will speak to the need for us to be sensitive to
> the idea of inclusion in the body politic, by allowing for the
> creation of majority-Black districts. We have to have that
> protection. Influence districts can never be the substitute for
> majority-Black districts, can never be.

*2006 Voting Rights Act: The Judicial Evolution of the Retrogression Standard*: *Hearing before*

*the H. Comm. on the Judiciary, Subcomm. on the Constitution,*, 109th Cong. 38 (2005)

(testimony of Tyrone Brooks, President of the Georgia Black Association of Elected Officials).[4]

*See also LaRoque v. Holder*, 650 F.3d 777, 793 (D.C. Cir. 2011).

The facts in *Georgia v. Ashcroft* appear to have relevance here, however.  As the Court

described what happened, "[p]art of the Democrats' strategy was not only to maintain the number

of majority-minority districts, but to increase the number of so-called "influence" districts, where

black voters would be able to exert a significant—if not decisive—force in the election process."

*Georgia v. Ashcroft*, 539 U.S. 461, 470  (2003). Here, Maryland's own expert describes four

congressional districts that are "over 30% minority," and one that is "over 40% minority." (Pls.'

Mot. for Prelim. Inj. Attach. C, 7).   So, a state that has only eight congressional districts has two

that are majority-minority, and five other "influence" districts created by a majority white

legislature.  As Justice Kennedy's concurring opinion made clear regarding the maps at issue in

*Georgia*, "[i]f the Court's statement of facts had been written as the preface to consideration of a

challenge brought under the Equal Protection Clause or under § 2 of the Voting Rights Act of

1965, a reader of the opinion would have had sound reason to conclude that the challenge would

succeed." *Georgia, 539 U.S.* at 491 (Kennedy, J., concurring). The facts behind Maryland's

---

[4] *Also available at*  http://commdocs.house.gov/committees/judiciary/hju24504.000/hju24504_0f.htm

congressional districting line up well with what Justice Kennedy described as a successful equal protection and Section 2 challenge.

In summary, The Complaint clearly alleges sufficient factual claims to sustain a Section 2 claim against a Rule 12(b)(6) dismissal, and the Defendants' Motion to Dismiss should be denied.

### B.   Plaintiffs' Claims of Intentional Discrimination are Well-Pled and Substantial (Counts One and Two).

The Complaint sufficiently alleges intentional discrimination. Paragraph 33 alleges testimony from Congresswoman Donna Edwards where she voiced her objections to the SB1's treatment of African Americans. Congressman Donna Edwards' testimony also, like Plaintiffs' Complaint, stated that these districts were drawn to benefit white incumbents. *See Garza v. County of Los Angeles*, 918 F.2d 763 (9th  Cir. 1990).  *Garza* concluded that in choosing fragmentation of the Hispanic voting population as the avenue by which to achieve self-preservation, the white incumbent Supervisors "[i]ntended to create the very discriminatory result that occurred.  That intent was coupled with the intent to preserve incumbencies, but the discrimination need not be the sole goal in order to be unlawful." *Id.* at 778.  *See also Gomillion v. Lightfoot*, 364 U.S. 339 (1960).

Paragraphs 35 and 36 describe amendments that were introduced and voted on by the Maryland General Assembly. These amendments would have created a third majority African American district and otherwise kept the General Assembly's goals in place. Instead, the plan was rejected by the white majority.  Similarly, Paragraph 29 pleads that the Fannie Lou Hammer PAC introduced a plan also creating a third congressional district that would have been majority African American. Paragraph 53 claims that due to the Maryland plan to remove certain prisoners from the State's adjusted total population numbers, African Americans were harmed

11

significantly more than any other racial group.    Paragraph 38 states that information regarding the demographic data used in formulating the district map was requested and denied to African American members of the General Assembly. Paragraph 56 states that Prince George's County, the most densely populated county by African Americans, was split in half. *See  Shaw v. Reno*, 509 U.S. 630, 635 (1993).  Paragraph 63 claims that African American voters were forced from areas densely populated by African Americans and siphoned into majority white communities. *See Miller v. Johnson*, 515 U.S. 900, 917 (1995).

A plaintiff states a claim of intentional discrimination by alleging that a state's redistricting plan, on its' face, has no rational explanation other than to separate voters on the basis of race. *Miller*, 515 U.S. at 903. (citing, *Shaw v. Reno*, 509 U.S. 630 (1993)). In *Shaw*, the Court held the State violated the Equal Protection Clause of the 14th Amendment because the State created districts which were on their face, extremely irregular. *See Shaw,* 509 U.S. at 641.  How the district is drawn can also be coupled with the district's minority composition to determine whether a claim exists for intentional discrimination. *See Miller v. Johnson*, 515 U.S. 900, 917 (1995).

A *Shaw* claim, as distinct from a voter dilution claim, alleges that the State used race as a basis to distribute minority voters into separate districts.  *Miller*, 515 U.S. at 911.  This claim differs from the traditional intentional discrimination claim alleging voter dilution because here, the claim is that the State used race as the reason for segregating citizens into separate communities. *Id.*

If the plaintiff in *Shaw* could state a claim, then so could Plaintiffs here. The challenged districts in *Shaw* contained "finger-like" extensions which "reache[d] far into the southernmost part of the state" despite being centered in the northeast portion of North Carolina. *Shaw*, 509

12

U.S. at 635. The Court described the second district as "snakelike" winding through rural, suburban and urban communities "gob[ling]" up "enough enclaves of black neighborhoods." *Id.* at 635-36. Of the ten counties that comprised Congressional District 12—the district at issue in that case—five counties were divided into three different congressional districts. *Id.* at 636. Of North Carolina's plan, the Court said "[the] plan resembles the most egregious racial gerrymanders of the past." *Id.* at 641.

Likewise the challenged district in *Miller* was composed of "narrow land bridges." *Miller*, 515 U.S. at 917. Given both the odd shape and the population densities, the Court determined the Georgia legislature did this to snatch as many minority voters and to impermissibly absorb them into the challenged district. *Id.* ("[T]ogether with the relevant racial demographics [it is exceedingly obvious] that the drawing of narrow land bridges to incorporate within the District outlying appendages containing nearly 80% of the districts total black population was a deliberate attempt to bring black populations into the district.").

Similarly here, Congressional District Three is centered in the suburbs, well to the North of Baltimore. Then, however, a "finger-like" extension reaches far down and fractures the geographically compact and cohesive African American community in the city of Baltimore to "gobble" several enclaves of minority neighborhoods.  Congressional District Three also contains a narrow land bridge that fractures a minority neighborhood. *See* (Compl. Ex. E). The City of Baltimore is 63.7% African American.[5]  If such narrow land bridges were sufficient for the plaintiff in *Miller* to receive a trial, then certainly Plaintiffs here are entitled to survive a Motion to Dismiss.

---

[5] *See* U.S. Census Bureau *State and County Quick Facts: Baltimore City, Maryland*, available at http://quickfacts.census.gov/qfd/states/24/24510.html, visited November 20, 2011.

Likewise, Congressional District Five, located in Prince George's County, also racially gerrymanders. Prince George's County's population is 64.5% African American.[6] Here, the district bizarrely hooks left splitting off minority neighborhoods into three separate districts (Congressional Districts 3, 4 and 5). Similar to Congressional District 12 in *Shaw*, the geographically compact and cohesive African-American community in the area where Prince George's County, Howard County and Montgomery County come together are splintered among five congressional districts. *See* (Compl, Ex. C).

Furthermore, Donna Edwards, Fannie Lou Hammer PAC, and several other African Americans, including Plaintiffs here, opposed SB1. In *Voinovich*, the Court ruled that the Ohio plan did not intentionally discriminate in part because the enacted plan there incorporated several portions of the plans offered by organizations that were "wholly unlikely to engage in or tolerate intentional discrimination against black voters...." *Voinovich*, 507 U.S. at 160. Here, Maryland explicitly *rejected* plans supported by these organizations and did not adopt any amendments proposed by these organizations.

Defendants also mistakenly view the allegations made in the Plaintiffs' Complaint in isolation. Defendants cite *Bush v. Vera* for the proposition that irregularly shaped districts are not sufficient alone for proof of intentional discrimination. (Defs.' Mot. to Dismiss 10). This overstate's the Court's ruling in *Bush*. The Court there only held that irregularity of shape, standing alone, was not sufficient to receive strict scrutiny review. The Court there was not expressing a view as to whether, standing alone, irregularity of shape was sufficient to state a claim. *Bush v. Vera*, 517 U.S. 952, 962 (1996). More importantly, even if the Court did so hold, Plaintiffs' Complaint alleges much more than simply Maryland's congressional map contains

---

[6] *See* U.S. Census Bureau *State and County Quick Facts: Prince George's County*, available at http://quickfacts.census.gov/qfd/states/24/24033.html, visited November 20, 2011.

14

irregularly shaped districts. *See Miller*, 515 U.S. at 917 (ruling that irregularity of shape plus minority composition is sufficient to demonstrate intentional discrimination).

The Defendants also conflate *Bush* by arguing that intentional discrimination claims must claim that racial reasons predominated the state's planning. (Defs.'Mot. to Dismiss 10). This conflates *Bush* because *Bush* only said that "*for strict scrutiny* to apply, traditional districting criteria must be subordinated to race." *Bush*, 517 U.S. at 962.  Plaintiffs' Complaint alleges much more than just irregularity of shape, such as alleging the irregularity of shape effectively fractures majority-minority communities. (Compl. ¶¶ 60, 63 and 64). *See Miller*, 515 U.S. at 917 (ruling that irregularity of shape plus minority composition is sufficient to demonstrate intentional discrimination). Furthermore, even if the Complaint did not allege anything other than irregularity of shape, *Bush* only speaks to that being insufficient to require strict scrutiny review, not stating a claim.

Additionally, Defendants claim that Plaintiffs concede that race was not a "predominate factor" (Defs.'Mot. to Dismiss 10). Defendants cite paragraphs 42, 44 and 77 in support of this assertion. However, those paragraphs neither concede nor indicate that race was not a predominate factor. In the partisan gerrymandering claim, where paragraph 77 is located, Plaintiffs incorporated all facts previously stated into that claim. When taken as a whole, paragraph 77 does not concede anything but continues the theme that race was a predominate factor in Maryland's carving minority neighborhoods and splicing them into majority districts. Furthermore, paragraphs 42 and 44 allege that minority communities were fractured for the benefit of white voters. How this concedes that race was not a predominant factor eludes Plaintiffs.

More importantly, Defendants take *Easely v. Cromartie* (*Cromartie I*) completely out of context.  In that case, the Court found that North Carolina engaged in a political activity that was not on the basis of race, but rather was political and put minority groupings together. *Easely v. Cromartie*, 532 U.S. 234, 255-57 (2001).  In *Cromartie I*, the state was actually assembling additional majority-minority districts, and the allegation was that this was impermissibly being done on the basis of race.  See *Id*.  By contrast, in Maryland, we have the opposite.  Here, the Complaint alleges that Maryland ripped apart compact minority communities to benefit white incumbents and politicians. The facts as alleged in the Complaint are strikingly more like *Garza* than like *Cromartie.  Garza*, 918 F.2d 763.  In *Garza*, the map drawn by the white majority county board was overruled in part because they were intentionally carving up Hispanic communities to preserve the districts of white incumbents.  This is strikingly similar to the actual fact pattern here in Maryland.

Moreover, Defendants' attempt to distinguish *Gomillion* from their own districts is unavailing. There, *Gomillion* stated a claim for intentional discrimination because the bizarrely shaped district excluded nearly all African Americans. (Defs.' Mot. to Dismiss 12).  The Defendants argue that no such claim is made here, and as a result Plaintiffs fail to state a claim. This argument misses the point. Paragraph 41 alleges that 41.6% of the state's population is minority. Because of the State's policy of splicing as many African American communities throughout several districts, this significant minority of the population has a majority in only two districts. Enough minority voters were excluded from otherwise majority-minority communities that they were deprived from being the majority in at least one additional district.

Therefore, the Plaintiffs have stated a claim that the State violated the 14th Amendment because it drew districts with bizarre shapes in areas with dense minority population.

Additionally, the state fractured minority populations into several different congressional districts. Therefore, the only rational explanation for Maryland's actions is for impermissible racial gerrymander.  Therefore, when viewed as whole, Plaintiffs' allegations are taken as true and Plaintiffs are granted all reasonable inferences from those allegations, Plaintiffs do state substantial and well-pled claims for relief.

### C.  Plaintiff's "No Representation without Population Act" Counts Are Substantial and Well-Pled (Counts Three, Four and Six).

It is undisputed that the "No Representation without Population Act" changed Maryland law to require the use of adjusted population numbers for redistricting both the State legislative boundaries and congressional boundaries.  Plaintiffs are not challenging the State legislative boundaries in the Complaint. Plaintiffs only challenge that the adjustment made pursuant to the Act for congressional boundaries is unconstitutional under Article One Section Two of the United States Constitution.

Given the case law on this point, this claim is both substantial and well-pled and clearly states a claim arising under the U.S. Constitution.  Plaintiffs have filed a Motion for Preliminary Injunction on this point which is incorporated herein by reference.  *See* (Pls.' Mot. for Prelim. Inj. Docket #13).

In summary, every federal court to examine this issue since 1969 has found that total population as determined by the U.S. Census is the appropriate basis for apportioning congressional districts.  The U.S. Supreme Court has implicitly addressed this question on only one occasion, but did not conclusively decide the issue.  *See Kirkpatrick v. Preisler*, 394 U.S. 526, 534 (1969) ("There may be a question whether distribution of congressional seats except according to total population can ever be permissible under Art. I, § 2.);  *see, e.g., Karcher v. Dagget*, 462 U.S. 725, 738 (1983) ("Because the census count represents the 'best population

data available,' . . . it is the only basis for good-faith attempts to achieve population equality.");

*Department of Commerce v. United States House of Representatives*, 525 U.S. 316, 321-22

(1999) (discussing statutory framework for determination of population for congressional district

purposes stating "because the census count represents the 'best population data available,' . . . it is

the only basis for good-faith attempts to achieve population equality.") (quoting *Karcher*, 462

U.S. at 738).

> In *Travis v. King*, 552 F. Supp. 554 (D. Haw. 1982) the three-judge panel concluded:

> > [W]hile the Supreme Court has never directly addressed this
> > particular issue, we note that starting with *Wesberry* it has
> > repeatedly stressed that equal representation for equal numbers of
> > people [is] the fundamental goal of the House of Representatives.
> > *For these reasons, we hold that pursuant to article I, § 2 of the
> > Constitution states must depend on total federal census figures to
> > apportion congressional districts within their boundaries.*

*Travis*, 552 F. Supp. at 571 (emphasis added).  We also note that Defendants' Motion to Dismiss

makes no mention or attempt to distinguish this case – which is the only prior federal court

decision to rule directly on this specific issue.

> On the issue of population disparity between a state's population totals as compared to

the U.S. Census population count for that state, the Court in *Karcher* developed a two part test

that plaintiffs must prove. The first step in the analysis is whether there is a disparity between the

state's population count and the count generated by the U.S. Census which the state could have

reduced or eliminated all together by a good faith effort to achieve districts with equal

population. *Karcher*, 462 U.S. at 730. The Court in *Kirkpatrick* then held that once this initial

showing is made, the burden shifts to the state to justify the differential. *Kirkpatrick*, 394 U.S. at

531-32. The plaintiff's initial burden is light as *Karcher* ruled that all the plaintiff must show is a

"*de minimis* population variation." *Karcher*, 462 U.S. at 734. *Karcher* dealt with deviations that

amounted to 0.1384%, while *Kirkpatrick* dealth with deviations of 0.19%. *Karcher*, 462 U.S. at

728, 734; *Kirkpatrick*, 394 U.S. at 529-30n1. In both cases, the Court ruled that these deviations

were not *de minimis*.

Similarly here, Maryland has congressional districts with deviations of minus .67% and

plus .94% (Compl. ¶ 47) with an overall deviation range of 1.61%. Furthermore, the Complaint

has pled that Defendants did not act a good faith in attempting to draw districts that would have

reduced or eliminated the deviations. (Compl. ¶¶ 24, 33, 34, 38) If the deviations at issue in

*Karcher* and *Kirckpatrick* were not *de minimis* then the districts in Maryland cannot be

considered *de minimis*. The Court therefore must deny Defendants Motion to Dismiss because

Plaintiffs have met the threshold question of demonstrating substantial population deviations.

This therefore requires defendants to justify the State's actions.

Defendants improperly rely on *Burns v. Richardson*, 284 U.S. 73 (1966).  That case dealt

with state legislative redistricting.  Citation to *Meeks v. Avery*, 251 F.Supp 245 (D. Kan. 1966)

which was decided before *Kirkpatrick v. Preisler,* discussed above, is equally inapplicable as the

court improperly relied  on *Burns v. Richardson* as the basis for its decision.  *See Preisler v.*

*Secretary of State*, 279 F. Supp. 952, 1003 (W.D. Mo. 1967) (questioning *Meeks v. Avery*

because it cited *Burns v. Richardson* which "was significantly limited to state apportionments

and should not be indiscriminately read as the establishment of a principle applicable to

congressional apportionment cases").  The discussion cited by Defendants in *Detriot v. Franklin*,

4 F.3d 1367 (6th Cir. 1993), is for the basis of determining standing of plaintiffs to sue about

alleged undercounts in the Census.  And Defendants citation to *Daly v. Hunt*, 93 F. 3d 1212 (4th

Cir. 1996), is entirely inapposite because the redistricting at issue there was done by a county in

contravention of the population basis chosen by the State of North Carolina. The question of whether a county must follow the method of redistricting chosen by the state is not at issue here.

Congressional reapportionment is based on a uniform national policy of population assignment both intra-state and inter-state. If states were to use divergent methods of redistricting within their own borders, this would destroy the national uniformity required to ensure the equal representation principal. The three-judge panel in *Preisler* said:

> [T]he notion that the districting within the States for election of federal representatives may be based on some sort of state census would seem to be basically inconsistent with the primary reason for the Founder's insistence that the constitutionally required decennial census be a *federal* census. The self-interest of at least sectors of particular States to manipulate their own local census figures would obviously have a drastic impact on the composition of the House of Representatives.

279 F. Supp. at 1002-03. (emphasis in the original).

That would be particularly true where a state simply eliminated persons from the redistricting equation such as Maryland has done with 1,321 prisoners, and moved several thousand people around inside the state (namely those prisoners in state prisons whose last known address was within the state of Maryland). Defendants appropriately cite *Kirkpatrick* for the principle of achieving mathematical equality. Defendants ignore, however the inconvenient and obvious result of their policy, namely, eliminating people wholesale from the count. This would result in widely disparate representation figures across the United States due to inconsistent removal of population thereby destroying the mathematical equality required by *Kirkpatrick*.

Moreover, those 1,321 people are not counted in another state as a result of their elimination from Maryland. They are simply discarded altogether for purposes of representation within the state, after aiding Maryland for purposes reapportionment between the states. *See*

*Travis*, 552 F. Supp. at 571 (in rejecting state's removal of military personnel for purposes of congressional redistricting it would also be inequitable to do so as the removed persons aided the state in the national reapportionment process.).

The Complaint properly pleads the requirements of the two prong test from this Court's decision in *Anne Arundel County v. State Administrative Board*, 781 F. Supp. 394, 396 (D. Md. 1991) (*citing Karcher,* 462 U.S. 725.).   Under *Karcher*, once Plaintiffs have pled that a deviation exists, it is sufficient to state a *prima facie* case, and the burden shifts to the state to defend its deviation.   The assertion of deviation backed by the U.S. Census alone is sufficient to state a claim.   The "No Representation without Population Act" unconstitutionally caused population differences that were readily avoidable.   *See* (Compl. ¶ 45-54).   Further, Plaintiffs discrimination claim related to the removal of 1,321 people, where more than 70% of those people were African American is well-pled.   Defendants' cites  cases examining the 14th Amendment whereas this claim arises out of Article One, Section Two of the Constitution.

The complaint alleges the deviation in population between districts is also evidence of intentional discrimination. While a three judge panel ultimately disagreed with the plaintiffs on the merits of an equal protection claim with respect to a deviation of 72 persons in a Congressional districting plan, this was sufficient for the case to be adjudicated on the merits. *Larios v. Cox*, 300 F. Supp. 2d 1320, 1335 (N.D. Ga. 2004).

Here, Maryland has a population deviation range of over 11,000, or a deviation percentage of 1.61%. (Compl. ¶ 47). A deviation of 72 may not have been sufficient to prevail in *Larios*, but it was sufficient to state a claim.   Therefore, a deviation range of over 11,000 persons using the unadjusted Census numbers is sufficient to state a substantial claim.

It appears from footnote 7 of Defendants' Motion that they misunderstand Count 6 of the Complaint.(Defs.' Mot. to Dismiss 15).  Count 6 alleges that both methods the State of Maryland used to deviate from the U.S. Census figures – namely the reassignment of persons within the state and the removal of persons from the state – violate Article One, Section Two.  When applying the U.S. Census figures without adjustment to the lines imposed by SB1, both the ideal populations of the districts differ from the state's baseline, and the deviations from the ideal are constitutionally significant.  Furthermore, as noted in the Motion for Preliminary Injunction, the state's methodology raises equal protection issues in that not all persons in "group quarters" within the state are treated equally, and not even all prisoners within the state are treated equally.

In summary, the Plaintiffs' claims with respect to the "No Representation Without Population Act" are well-pled and substantial.

### D.  Political Gerrymandering Claim is Substantial and Well-Pled (Count 7).

Maryland's congressional districting map appears to have been driven by a partisan desire to harm Republican voters in Western and Northern Maryland and intentionally deny them the ability to elect their preferred candidate.  In order to accomplish this, geographically compact minority communities in the center of the state had to be fractured and combined with more rural, conservative voters who do not share any community of interest.

Todd Eberly, a professor from St. Mary's College of Maryland recently produced a public analysis highlighting some of the most salient portions of Plaintiffs' argument:

> The concentrated nature of the African-American population creates a problem for Democrats when redistricting - African-Americans are the most reliable Democratic voting bloc, but the concentration in the central part of the state makes it difficult to offset more conservative voters in western, southern and northern Maryland and on the eastern shore.  The only way to dilute those areas is to create districts that divide the African-American communities and join them with sometimes far-flung conservative

areas.…To counter that Republican advantage, the new map drops most of Frederick county as well as all of Carroll and the sections of Baltimore and Harford counties from the district. They are replaced with a sizable chunk of Montgomery county to create a marginally Democratic district. Much of the rest of Montgomery county is then used to offset the addition of Frederick and Carroll county to the 8th district - with a smidge of Montgomery going to the 3rd district as well.The net effect of all of this being a new congressional map that will yield 7 Democratic members of Congress (including 2 African-American members) and 1 Republican. Not bad for a state where Republicans routinely receive about 40% of the statewide vote.*But it comes at a cost to minority voters.*

Todd Eberly, *Race, Redistricting, and a More Reasonable Option?,* The FreeStater Blog,

October 6, 2011 *available at*   http://freestaterblog.blogspot.com/2011/10/race-redistricting-and-

more-reasonable.html (visited November 20, 2011).

In *Bandermer*, the Supreme Court ruled that political gerrymandering does present a

justiciable issue under the Equal Protection Clause of the Fourteenth Amendment. *Davis v.

Bandemer*, 478 U.S. 109, 143 (1986). In deciding this, six judges also analogized the political

gerrymandering line of cases to those involving racial discrimination. *Id.* at 124-25. The Court

then developed standards for adjudicating such cases in the future, and in this case we have

political gerrymandering that harms both minority voters in more urban portions of the state and

conservative voters in more rural parts of the state.

To succeed on the merits, a plaintiff must prove both "intentional discrimination against

an identifiable political group and an actual discriminatory effect on that group." *Id.* at 127.

Given the partisan nature of redistricting anyway, the Court noted that the first element would

not be difficult to prove. *Id.* at 129. In this case, we have both minority communities and more

conservative voters in the rural areas.  Relevant to the inquiry is how the legislature configured

the districts and whether the legislature used acceptable methods in drawing the lines. *Id.* at 141.

Justice Stevens' concurrence in *Karcher* indicates that districting "without regard for political subdivisions or natural historical boundary lines, may be little more than an open invitation to partisan gerrymandering." *Karcher*, 462 U.S. at 758 (quoting *Reynolds* v. *Sims,* 377 U.S. 533, 578-79 (1964)). Justice Powell and Justice Stevens both agreed that the observation of political subdivisions and historical boundaries is demonstrative of intent in partisan gerrymandering cases. *Bandemer*, 478 U.S. at 173.

Finally, to state a claim for partisan gerrymandering it must be pled that the district lines are established in such a way as to "consistently degrade a...group of voters' influence on the political process as a whole." *Republican Party v. Martin*, 980 F.2d 943, 957 (4th Cir. 1992). Here, it is obvious that majority white Democrats are cynically fracturing minority communities and diluting their voting strength to accomplish a partisan goal – namely diminishing the ability of conservative votes in the western and northern portions of the state.  The maps drawn in SB1 speak for themselves.  Professor Eberly continued his analysis:

> [State Senator] Miller's peculiar statements continued as he argued "Maryland is a small state ... and it doesn't have many rural, conservative areas that would vote for Republicans that could comprise a district of 700,000 people." This is of course wrong, especially if you include the suburban areas that Republicans often carry. Has Miller reviewed election returns from Baltimore county? Garrett, Allegheny, Washington, Frederick and Carroll counties? St. Mary's, Calvert, and Anne Arundel county? The entire Eastern shore and Harford county? The reason the proposed map is so gerrymandered is because Maryland is full of regions that would and do vote Republican and these regions surround four counties and Baltimore City that vote Democratic. Democrats are the clear majority party in Maryland - but its hardly a one party state.
>
> Finally, Miller defended the proposed map, arguing "the change is quite modest." It's hard to reconcile that claim with the fact that only 174,000 Marylanders actually needed to be moved in order to create districts with equal populations. The Commission's plan

would move over 1.5 million Marylanders - nearly a third of the state's residents.

Todd Eberly, *Race, Redistricting, and a More Reasonable Option?,* The FreeStater Blog, October 6, 2011 *available at*  http://freestaterblog.blogspot.com/2011/10/race-redistricting-and-more-reasonable.html (visited November 20, 2011).

Public statements of GRAC members and state legislators can be considered by this court.  Furthermore, as was noted earlier, the Defendants' own expert admitted that African Americans are a "political cohesive group."(Pls. Mot. for Prelim. Inj. Attach. C, 6).  The Complaint alleges at several points that African American neighborhoods were split apart fracturing majority African American communities and sprinkling them into other districts, entrenching them as a minority despite minorities comprising 40% of Maryland's population. *See*, *e.g.,* (Compl.¶ 62).

Moreover, Defendants' Motion to Dismiss confidently asserts that a similar comparison of the map in *Perry* and the map in *Vieth* would demonstrate that Maryland's map is not any less constitutionally suspect than the maps there. (Defs.'Mot. to Dismiss  22). According to the Defendants the GOP, in *Vieth* gained 11% more of the congressional seats despite decreasing 3% in percentage of votes cast. (Defs.' Mot. to Dismiss 22). Here, however African Americans as a group are a majority in Prince George's County and in Baltimore, yet congressional districts fracture and disperse these large majorty-minority communities and make them minorities in other districts. This causes minorities to be entrenched in minority status, and cynically uses minority voters to diminish the electoral choices of more conservative voters in rural areas as noted by Eberly.

The Complaint alleges the breaking of political subdivisions between districts. (Compl.¶ 78). This is evidence of intent. *Karcher*, 462 U.S. at 758; *Bandermer*, 478 U.S. at 173 (Powell,

J., concurring and dissenting). Furthermore, the Complaint alleges the debasement of Plaintiffs voting rights, thus, if proven, meets the actual discriminatory affect prong of *Bandermer*. (Compl. ¶ 80).  The facts alleged for this prong are enumerated throughout the Complaint. African American voters' strength was diluted in Baltimore and Prince George's County by splitting their neighborhoods and dividing them into other districts reducing their population by half. (Compl. ¶ 64).  939 African Americans were removed from the Census, 70% more than any other racial group. (Compl.¶¶50 and 53).  Congresswoman Donna Edwards testified that SB1 would have a discriminatory effect. (Compl.¶ 33). Her testimony supplies the evidence for the claim. Congresswoman Edwards' testimony specifically cited Montgomery County as being politically gerrymandered. (Compl. ¶ 77). As noted in the motion for preliminary injunction, this map as it stands would likely leave the 40% of the state who are Republican voters with only 12.5% of the state's members of Congress being of their party.

Furthermore, the bizarre shapes of the districts are also alleged in Paragraphs 62. This goes the intent element ruled in *Bandermer*. *Bandermer*, 478 U.S. at 141; *see also Bandermer*, 478 U.S. at 173 (Powell, J., concurring and dissenting). Therefore, the paragraphs comprising Count 7 of the Complaint are far from conclusory allegations. The complaint demonstrates how a group of voters are degraded because minorities are more than 40% of the population and yet there are only two majority African American congressional districts.

The political gerrymandering – the desire to gerrymander Republicans down to one congressional district – necessitated the knowing gerrymandering of minority voters.  Under *Garza*, this is intentional, invidious discrimination that violates the Fourteenth Amendment.  The court's extensive focus on the relevance of incumbency to the issue of intent in *Garza* led Judge Kozinski to make the following prescient observation:

> The record before us strongly suggests that political gerrymandering tends to strengthen the grip of incumbents at the expense of emerging minority communities. Where, as here, the record shows that ethnic or racial communities were split to assure a safe seat for an incumbent, there is a strong inference--indeed a presumption--that this was a result of intentional discrimination, even absent the type of smoking gun evidence uncovered by these plaintiffs. State and local officials nationwide might well take this lesson to heart as they go about the task of decennial redistricting.

*Garza*, Id. at 779 (Kozinski, J., concurring and dissenting). This case in particular, with the view of the maps explained by Professor Eberly, it is clear that minority communities were split to assure a safe seat for an additional Democrat to win election to Congress.

Republicans in *Republican Party* were 27% of the population and they had one judgeship out of 220. *Republican Party*, 980 F.2d at 956. Here, the minority population is 40%, Republican voters are 40% of the state, and yet Maryland drew a map, opposed by African American political leaders and civil rights organizations, where only two congressional districts are majority African American, and only one is likely to election a Congressman from the minority party in the state.

If the plaintiffs in *Republican Party* could state a claim, so can Plaintiffs here. When the Complaint is taken as a whole, with all facts alleged to be true and all reasonable inferences granted to the Plaintiffs, the claim is substantial and sufficient facts are alleged to state a plausible claim upon which relief can be granted.

### E.  Disruption of Upcoming Elections is Not a Basis for Dismissal.

Defendants' final argument for insubstantiality is that Plaintiffs have so delayed in filing suit that as a result, upcoming elections will be disrupted and therefore such equitable relief should not be granted. Defendants rely on *Simkins v. Gressette*, 631 F.2d 287 (4th Cir. 1980), and *Maryland Citizens for a Representative General Assembly v. Governor of Maryland*, 429

F.2d 606 (4th Cir. 1970). (Defs.'Mot. to Dismiss 26).  In both cases however the challenged

maps had been in place for years prior to the filing of suit.  In *Simkins*, the plaintiffs waited three

years to file suit two days before the filing period for the election opened and provided no good

reason for delay.  *Simkins*, 631 F.2d att 295-96.  In *Maryland Citizens* the maps had been in

place for five years prior to plaintiff's lawsuit.  *Maryland Citizens*, 429 F.2d at 607.

Of course, that is not the case here.  The congressional maps challenged by Plaintiffs

have been in effect only since October 20, 2011.  The State of Maryland's redistricting data was

released by the Federal Government on February 9, 2011.[7] The Governor did not announce the

members of the GRAC until July 4, 2011[8] (a five month delay).  The GRAC did not complete its

work until October 4, 2011. (Compl. ¶ 30). SB1 was not introduced in the legislature until

October 17, 2011.  SB1 was signed by the Governor on October 20, 2011. (Compl. ¶ 39).

In the end, it was the State of Maryland's choice to enact congressional district maps only

four months before military and overseas voters' absentee ballots must be mailed.  Further as

noted in the Complaint, the State was well aware of the constitutional infirmities complained of

by the Plaintiffs when they passed the plan.  The Maryland legislature voted down the Pipkin

Amendment, and ignored the complaints of minority voters expressed during the GRAC hearings

and before the legislature. (Compl. ¶¶ 29, 33, 34, 38).   It would seem to strain the edges of

reasonableness to argue that a plaintiff sat on their rights because they took three weeks to

prepare and file a complicated federal constitutional lawsuit.  Furthermore, had Plaintiffs filed

this lawsuit prior to October 20, 2011, the Defendants would have been well within rights to seek

---

[7] *See*, Maryland Department of Planning Press Release, *Data from 2010 Census Released for Maryland*, February 9, 2011, available at  http://www.mdp.state.md.us/PDF/Press/Press_Release_Census2010localdata_020911.pdf, visited November 20, 2011.
[8] *See*, Office of Governor Martin O'Malley Press Release, *Governor Martin O'Malley Announces Members of the Governor's Redistricting Advisory Committee*, July 4, 2011, available at http://www.gov.state.md.us/pressreleases/110704.asp visited November 20, 2011.

dismissal on ripeness concerns. *See, e.g., Carter v. Virginia State Board of Elections*, 3:11-CV-7, 2011 U.S. Dist. LEXIS 14940 (W.D. Va. February 15, 2011) (*sua sponte* dismissal of equal protection claim brought while legislature was in session).

The State has no appropriate interest in holding elections using an unconstitutional map. *See Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) ( The state is "in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional.  If anything, the system is improved by such an injunction."); *see also Desena v. Maine*, NO. 1:11-cv-117, 2011 U.S. Dist. LEXIS 66028 *15 (D. Me. June 21, 2011) (three-judge panel) ("Constitutional violations, once apparent, should not be permitted to fester; they should be cured at the earliest practicable date."). The court in *Desena*, held that Maine must not hold their 2012 congressional elections until the map is redrawn. *Id.*

Each of the dates cited by Defendants can be changed by this court.  Just two weeks ago, a three judge panel of the District Court for the Western District of Texas in *Perez v. Texas*, Case No.: 11-CV-360-OLF-JES-XR, November 7, 2011, changed filing dates for the State of Texas' upcoming primary. This was in response to Voting Rights Act and constitutional challenges against Texas' federal and state maps.  And, as this Court is aware, accommodations can be made to give proper effect to the dates related to absentee and overseas military voters.  *See Doe v. Walker*, 746 F. Supp. 2d 667 (D. Md. 2010) (extending the deadline for absentee ballots to be received in Maryland).

Plaintiffs have made substantial claims, well-pled in their complaint and equitable relief should not be barred where suit was filed within three weeks of ripeness of their claim.

## III.    CONCLUSION

As a result of the foregoing demonstration of substantial and well-pled claims, the Plaintiffs respectfully ask that this court grant the Motion for the Three Judge Panel, and refer the Defendants' Motion to Dismiss to the three-judge panel for consideration.

Respectfully submitted,

_____/s/ Jason Torchinsky_____

**Law Office of James P Mayes**
James Paul Mayes (Bar No. 10414)
mayesfedlaw@aol.com
Law Office of James P Mayes
4721 Chesterfield Place
Jamestown, NC   27282
Tel: (202) 255-2031
Fax: (336)841-5275

**Holtzman Vogel PLLC**
Jason Torchinsky, *pro hac vice*
jtorchinsky@holtzmanlaw.net
HOLTZMAN VOGEL PLLC
45 North Hill Drive, Suite 100
Warrenton, VA 20186
Tel: (540) 341-8808
Fax: (540) 341-8809

Counsel for Plaintiffs