**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION**

|  |  |
|---|---|
| | * |
| PATRICIA FLETCHER, *et al.*, | |
| | * |
| Plaintiffs, | |
| | * |
| v. | Civil Action No:  RWT 11-3220 |
| | * |
| LINDA H. LAMONE, *et al.*, | |
| | * |
| Defendants. | |
| | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OR,
IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT, AND OPPOSITION
TO MOTION FOR PRELIMINARY INJUNCTION**

DOUGLAS F. GANSLER
Attorney General of Maryland

ADAM D. SNYDER (Bar No. 25723)
STEVEN M. SULLIVAN (Bar No. 24930)
Assistant Attorneys General
Office of the Attorney General
Civil Division
200 St. Paul Place
Baltimore, Maryland  21202
(410) 576-6326
(410) 576-6955 (fax)
asnyder@oag.state.md.us

_____
DAN FRIEDMAN (Bar No. 24535)
KATHRYN ROWE (Bar No. 09853)
Assistant Attorneys General
104 Legislative Services Building
90 State Circle
Annapolis, Maryland 21401
(410) 946-5600 (telephone)
(410) 946-5601 (facsimile)
dfriedman@oag.state.md.us

Attorneys for Defendants Linda H. Lamone and Robert L. Walker

Dated: December 2, 2011

TABLE OF CONTENTS

Page

DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT ..................................... 1

FACTS ............................................................................................................. 1

A.      The "No Representation Without Population Act" .................................... 1

        The Geocoding Process ......................................................................... 2

        The Results of the Adjustments Made Under the Act ............................. 4

B.      The Redistricting Process ...................................................................... 5

        The GRAC Process ................................................................................ 5

        The Legislative Process .......................................................................... 8

        The Enacted Plan ................................................................................. 10

C.      This Litigation ..................................................................................... 12

ARGUMENT ..................................................................................................... 13

I.      THE "NO REPRESENTATION WITHOUT POPULATION ACT" DOES NOT CAUSE
        THE CONGRESSIONAL PLAN TO BE UNCONSTITUTIONAL ......................................... 13

        A.      The Act's Use of Adjusted Census Figures is Constitutionally
                Permissible and Does Not Create Unequal Districts .................................... 13

                1.      The Clear Weight of the Federal Authority Does Not Support
                        the Per Se Rule Against Using Adjusted Census Figures for
                        Congressional Redistricting ............................................................ 15

                2.      The "No Representation Without Population Act" Prisoner
                        Adjustment Was Conducted in an Organized, Systematic, and
                        Thorough Manner .......................................................................... 21

                3.      The Census Bureau's Practice of Counting Prisoners in Their
                        Place of Incarceration is Not Compelled by the Constitution .......... 23

B.     The Allegation that Excluding 1,321 Incarcerated, Non-Maryland Residents that were Excluded from the Adjusted Population Basis fails to State a Claim for Racial Discrimination .......................................... 28

II.     THE MARYLAND PLAN DOES NOT VIOLATE SECTION 2 OF THE VOTING RIGHTS ACT. ........................................................................................................ 29

A.     The Complaint Fails to State a Claim for Violation of Section 2 of the Voting Rights Act .................................................................................... 29

B.     The Plans Proposed by Plaintiffs Do Not Satisfy the Three *Gingles* Factors ........................................................................................................ 38

III.    THE COMPLAINT FAILS TO STATE A CLAIM FOR INTENTIONAL DISCRIMINATION ......................................................................................... 40

IV.     THE PLAINTIFFS' CLAIM OF PARTISAN GERRYMANDERING SHOULD BE DISMISSED OR, IN THE ALTERNATIVE, THE STATE DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ...................................................... 50

*     *     *

RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AS TO COUNTS THREE AND SIX OF THE COMPLAINT ......................................... 59

A.     Plaintiffs Have Not Made a Clear Showing that they are Likely to Succeed on the Merits:  The Maryland Plan Creates Congressional Districts that are as Equal in Population as is Mathematically Possible ...................................................................................................... 61

B.     Plaintiffs Have Not Made a Clear Showing That They Will Be Irreparably Harmed Absent an Injunction .................................................. 62

C.     Plaintiffs Have Not Made a Clear Showing that the Equities Tip in Their Favor ................................................................................................ 65

D.     Plaintiffs Have Not Made a Clear Showing that a Preliminary Injunction is in the Public Interest .............................................................. 69

CONCLUSION ............................................................................................................ 71

## DEFENDANTS' MEMORANDUM IN SUPPORT
## OF MOTION TO DISMISS OR, IN THE ALTERNATIVE,
## FOR SUMMARY JUDGMENT

Plaintiffs challenge the constitutionality of Maryland's 2010 congressional districting in an complaint supported almost entirely by "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" about racially discriminatory impact and intent—a pleading approach that the Supreme Court has held does "not suffice" to "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949-50 (2009). For this and other reasons discussed below, the complaint must be dismissed under Rule 12(b)(6) and (c). But even if plaintiffs had alleged "sufficient factual matter" to support their claims, the defendants, Linda H. Lamone and Robert L. Walker (together, the "State Defendants"), are entitled to summary judgment because the facts of the case establish that Maryland's 2010 redistricting plan is not racially discriminatory, is not an unconstitutional political gerrymander, and meets constitutional standards for "one person/one vote." Accordingly, and in the alternative, the three-judge court should enter summary judgment under Rule 56(a) in favor of the State Defendants on all counts.

## FACTS

### A.  The "No Representation Without Population Act"

The "No Representation Without Population Act" ("the Act") was enacted in 2010 to correct for the distortional effects of the Census Bureau's practice of counting prisoners as residents of their place of incarceration. 2010 Md. Laws, ch. 67 (codified at Md. Code Ann., Art. 24 § 1-111, Election Law ("EL") § 8-701, and State Government

("SG") §2-2A-01). The Act requires that inmates of State or federal prisons located within Maryland be counted as residents of their last known residence before incarceration for all redistricting purposes, and that prisoners who were not State residents prior to their incarceration be excluded from the population count:

> The population count used after each decennial census for the purpose of creating the congressional districting plan used to elect the State's Representatives in Congress:
>
> (1)    may not include individuals who:
>
>> (i)    were incarcerated in State or federal correctional facilities, as determined by the decennial census; and
>>
>> (ii)   were not residents of the State before their incarceration; and
>
> (2)    shall count individuals incarcerated in the State or federal correctional facilities, as determined by the decennial census, at their last known residence before incarceration if the individuals were residents of the State.

EL § 8-701(a). The Act applies to redistricting for the U.S. Congress, the Maryland General Assembly, and local governing bodies. Md. Code Ann., Art. 24 § 1-111 (use of adjusted population count for districts of a governing body of a county or municipal corporation); SG § 2-2A-01 (use of adjusted population count for state legislative redistricting).

The Geocoding Process

The Maryland Department of Planning ("MDP") is designated by the U.S. Census Bureau as the repository and service center for census data and adopted regulations that implement the Act's requirements. *See generally* Code of Maryland Regulations ("COMAR") 34.05.01. The regulations require MDP to ascertain the geographical

2

coordinates of the prisoner's last known residence and use those coordinates to adjust census figures for the State—a process known as "geocoding." COMAR 34.05.01.04.A. If MDP is unable to ascertain the prisoner's address prior to incarceration, it deems the last known address for the prisoner to be the State or federal facility where the prisoner was incarcerated. COMAR 34.05.01.04.C(1); C(2).

In the first step of this process, the Maryland Department of Public Safety and Correctional Services ("DPSCS") prepared a database that contained the records for prisoners housed in the Maryland Division of Correction on April 1, 2010, Declaration of Kevin Combs ¶¶4, 7 (Exhibit 3). Of the 22,064 records initially included within the database, MDP determined that 1,326 prisoners were out-of-state residents at the time of their incarceration and, therefore, deleted from the database as the Act requires. Declaration of James Cannistra, ¶¶ 3, 8 (Exhibit 2). MDE further determined that 3,358 records could not be geocoded because of problems with the data; these records were segregated from the geocoding process. Exhibit 2, ¶8. After MDP corrected 2,337 records in accordance with the regulations, the remaining 18,706 addresses were then processed for geocoding, *id.* ¶7, which produced 17,140 addresses that were geocoded at the prisoner's last known residence. *Id.* ¶¶ 10, 11.[1]

Once MDP had completed the geocoding of the prisoners' last known residences, the State provided the information to the Caliper Corporation ("Caliper"), the State's

---

[1] MDP also filed a Freedom of Information Act request with the Federal Bureau of Prisons for an electronic database that would provide the last known residence of all federal inmates housed in Maryland on April 1, 2010. Exhibit 2, ¶12 (attaching correspondence) The Federal Bureau of Prisons and the Department of Justice denied the request based for security and privacy reasons. *Id.*

3

contractor, to perform the final steps of the population adjustment by determining the placement of prisoners within the appropriate U.S. Census block.  Declaration of Karl Aro ¶3 (Exhibit 4); Exhibit 2, ¶¶16, 17.  After the recategorization of special cases, Caliper assigned 16,988 prisoners to their home address, 3,755 to their correctional facilities, and removed 1,321 prisoners from the database as out-of-state residents. Exhibit 2, ¶17; Exhibit 4, ¶5 (attaching Caliper report at 4).  The resulting database reflected the 2010 Census data, as adjusted under the Act.  On May 3, 2011, MDP, the Maryland Department of Legislative Services ("DLS") and DPSCS certified the Maryland population counts by county and election precinct as the official data for Maryland redistricting and issued the *Report of Maryland Precinct Population Data: 2010 Census Adjusted Maryland Redistricting Data and Unadjusted Census Population Count*.

The Results of the Adjustments Made Under the Act

The adjustments made under the Act were minor:  A total of 1,321 prisoners who reported that their pre-incarceration residences were outside of Maryland were excluded from the database.    Exhibit 2, ¶12.    Other prisoners, who reported that their pre-incarceration residences were within the State of Maryland, were reassigned to those prior residences.  *Id.* In no district did the size of the adjustment exceed 1% of the district's population and in most districts the changes were far smaller.  *See supra* at 10 (Figure 1);  *see also* "Maryland Department of Planning, Maryland Correctional Facilities by 2011 Congressional Districts" (Exhibit 21).  As required by the Act, the adjusted

4

Census figures generated by the geocoding process became the basis for Maryland's 2011 congressional redistricting.

**B.      The Redistricting Process.**

<u>The GRAC Process</u>

The redistricting process began when the Governor appointed the Governor's Redistricting Advisory Committee ("GRAC") on July 4, 2011.  GRAC held twelve public hearings in areas around the State between July 23 and September 12, 2011.  The hearings were well attended, with a number of people testifying about both congressional and legislative redistricting.  Among them were at least two of the plaintiffs in this suit, both of whom testified at hearings held at Prince George's Community College, with Trevor Otts testifying on July 25, 2011, and Robina Spruill testifying on August 24, 2011.  *See, e.g.*, Transcript of GRAC hearing held at Prince George's Community College (July 25, 2011) (Exhibit 18).

Mr. Otts expressed the view that there should be three African American congressional districts.  *See id.* at 15-16.  In advocating this position, he mentioned the factors established in *Thornburg v. Gingles*, 478 U.S. 30 (1986), for evaluating whether a redistricting plan complies with § 2 of the Voting Rights Act, but the six-part test that he applied, while overlapping with *Gingles*, omitted the second *Gingles* factor political cohesion among minority voters.  *Id.*  No other person, not even Ms. Spruill, testified that there should be three African American congressional districts.

In addition to testimony at the various statewide hearings, GRAC accepted proposed plans from third parties.  *See generally* "Governor's Redistricting Advisory

5

Committee, Third Party Submissions" (Exhibit 15).  The plan attached to the complaint

as Attachment A, known as the "Fannie Lou Hamer Plan," was the only one of such plans

to propose three majority African American districts.[2]  Declaration of Bruce Cain  ¶9,

(Exhibit 1).  Robert Kengle, on behalf of the Legislative Black Caucus, submitted two

plans, both of which included only two majority African American congressional

districts.  *See* "Third Party Plans That the Committee Has Received" (available at

http://www.mdp.state.md.us /redistricting/2010/3rdpartyplans.shtml (last visited on Dec.

2, 2011)).  The Legislative Black Caucus submitted supporting documentation stating

that maintaining two majority African American districts was consistent with the

Caucus's stated goals and principles for Maryland's congressional redistricting:

- Achieve population equality between districts using adjusted 2010 census data;

- Maintain the existing opportunity for Black voters to elect candidates of their choice in current District 7, centered in the City of Baltimore. The revised District 7 should include a greater share of the City of Baltimore and a smaller share of Howard County than does the existing district;

- Maintain the existing opportunity for Black voters to elect candidates of their choice in current District 4, centered in Prince George's County. District 4 does not need to extend north through central Montgomery County as it presently does;

---

[2] One other plan—the Marion Stefan plan—purported to have three majority minority districts, but the numbers presented with that plan reflect that the third district was only 21.3% African American.  *See* Marion Stefan's Congressional District Plan Creating Additional Minority-Majority Seat as submitted to the Governor's Redistricting Advisory Committee (available at http://www.mdp.state.md.us/redistricting/2010/3rd partyplans.shtml (last visited Dec. 2, 2011)).

▪ Maintain District 5 as one in which the ongoing growth of the Black population in Southern Prince George's County and Charles County will be fairly recognized over the course of the coming decade;

▪ Unify Prince George's County into Districts 4 and 5. We oppose bringing any additional Congressional districts into Prince George's County, in particular districts that are based on the Eastern Shore or the Baltimore area;

▪ Recognize the growing the Latino and Asian communities in Montgomery and Prince George's Counties; and

▪ Maintain traditional district configurations when feasible.

"Legislative Black Caucus of Maryland Congressional Redistricting Plans" (available at http://www.mdp.state.md.us/PDF/Redistricting/3rdPartyPlan2010/doc091911-CDLegis-lativeBlackCaucus-StatementPop.pdf (last visited Dec. 1, 2011) (Exhibit 14).

After the hearings had concluded, the GRAC developed a proposed Plan and presented it to the Governor on October 4, 2011.  *See* "Advisory Committee Submits Proposed Congressional Redistricting Plan to Governor, Releases Map" (available at http://www.mdp.state.md.us/PDF/Press/PressRlease_GRAC_CongPlanRelease_100411.pdf (last visited Dec. 1, 2011)) (Exhibit 15).  The Governor then posted the proposed Plan online for seven days "to allow for public review and comment."  "Governor O'Malley Receives Proposed Congressional Redistricting Map" (available at http://www.governor.maryland .gov/blog/?p=2137 (last visited Dec. 1, 2011) (Exhibit 11).

On October 15, 2011, the Governor announced that, "[a]fter serious consideration and a review of all input from citizens across the State and discussions with members of our Congressional delegation and the General Assembly," he was submitting to the

7

Legislature a proposed map "substantially similar" to the map proposed by the GRAC. "Statement from Governor Martin O'Malley on the Release of the Proposed Congressional Redistricting Map" (available at http://www.governor.maryland.gov/blog /?p=2338 (last visited Dec. 1, 2011) (Exhibit 12)).

The Legislative Process

The Governor's map was introduced as House Bill 1 and Senate Bill 1 in the special legislative session that commenced on October 17, 2011, to consider redistricting and other pressing matters.[3]  House Bill 1 was assigned to the House Rules Committee and was never reported out of that committee.  Senate Bill 1, however, was assigned to the Senate Committee on Reapportionment and Redistricting, which held a joint hearing on the bill with the House Rules Committee on October 17, 2011.

At the hearing several prominent African Americans spoke in favor of the bill. Prince George's County Executive Rushern Baker, Montgomery County Executive Isiah Leggett, and Baltimore City Mayor Stephanie Rawlings-Blake all spoke in favor of the bill.  Congresswoman Donna Edwards, members of the Montgomery County Minority Coalition ("MCMC"), and Carletta Fellows of the Fannie Lou Hamer PAC testified against the bill with differing objections to how the bill would affect minorities.  The MCMC also filed written testimony, in which it objected to the division of the Montgomery County minority population into three separate districts.  *See* Montgomery

---

[3]  The legislative history of House Bill 1 and Senate Bill 1 can be found on the General Assembly's website, www.mlis.state.ms.us, under Prior Session Information, 2011 Special Session.

County Minority Coalition Comments on the Governor's Redistricting Plan dated October 16, 2011.

After hearing the testimony provided, the Senate Committee on Reapportionment and Redistricting voted favorably on the bill and returned it to the Senate Floor, where Sen. E.J. Pipkin (R, State Legislative District 36) proposed to amend the bill to include a different plan, namely, the one attached as Attachment D to the Complaint.  Senator Pipkin's amendment was voted down and, after technical amendments, the bill passed and was sent to the House on October 18, 2011.

Once it returned to the House, the bill was voted favorably by the House Rules Committee and sent to the House floor.  The House adopted the favorable report of the committee, then laid the bill over to the next day.  The House took the bill up again on October 19, 2011, when it voted down several amendments, including one by Delegate Neil C. Parrott (R, State Legislative District 2), which purported to be the Fannie Lou Hamer plan attached as Attachment A to the complaint.

After voting down the amendments, the House adopted certain technical amendments and passed the bill on second and third reading on the same day. The bill was then returned to the Senate, which concurred in the technical amendments, and enacted the bill on October 20, 2011.  The Governor signed the bill into law as an emergency bill that same day.  Chapter 1, Laws of the Special Session of 2011.

The Enacted Plan

The State Plan for Congressional Redistricting ("State Plan") creates eight congressional districts that are as equal in population as mathematically possible based on the census data adjusted as required by the Act:

| Dist. | Ideal Adjusted Population | Adjusted Pop. | Devi-ation | Percent Devi-ation | Unadjusted Ideal Population | Unadjusted Population | Deviation from Un-adjusted Ideal | Percent Devi-ation |
|---|---|---|---|---|---|---|---|---|
| 1 | 721,529 | 721,529 | 0 | 0.00% | 721,694 | 722,650 | 956 | 0.13% |
| 2 | 721,529 | 721,529 | 0 | 0.00% | 721,694 | 723,447 | 1753 | 0.24% |
| 3 | 721,529 | 721,529 | 0 | 0.00% | 721,694 | 720,094 | -1600 | -0.22% |
| 4 | 721,529 | 721,529 | 0 | 0.00% | 721,694 | 720,065 | -1629 | -0.23% |
| 5 | 721,529 | 721,529 | 0 | 0.00% | 721,694 | 720,472 | -1222 | -0.17% |
| 6 | 721,529 | 721,529 | 0 | 0.00% | 721,694 | 728,448 | 6754 | 0.94% |
| 7 | 721,529 | 721,529 | 0 | 0.00% | 721,694 | 716,862 | -4832 | -0.67% |
| 8 | 721,529 | 721,528 | -1 | 0.00% | 721,694 | 721,514 | -180 | -0.02% |

**Figure 1.  Deviation from Ideal Adjusted & Unadjusted Population**[4]

The State Plan is largely based on the existing districts as they appear in the plan based on the 2000 census and, like that plan, contains two majority African American districts. District 7, which is centered in the City of Baltimore, has an unadjusted African American voting age population ("VAP") of 53.75%, with an unadjusted white VAP of

---

[4] Plaintiffs include a similar chart in their Memorandum in Support of their Motion for Preliminary Injunction, but the deviations per district and deviation percentages based on total unadjusted population are incorrect. *See* ECF Doc. 13-1 at 11; *see also* Complaint, Exhibit C ("SB 1 Non-Adjusted Population"); Maryland Department of Planning, "Population Change and Variance from Ideal," (available at http://planning.maryland.gov/PDF/Redistricting/2010data/precinct/AppA3_ Adj.pdf (last visited December 1, 2011(Exhibit 19)).  It appears that plaintiffs distributed the 1,321 out-of-state prisoners equally between the eight congressional districts.  However, when using unadjusted Census population totals, the 1,321 out-of-state prisoners have to be counted at their correctional facility—as the Census Bureau does—not distributed evenly across all districts, as plaintiffs appear to have done.

35.75%.[5]   Maryland Department of Planning, 2011 Districts Unadjusted 2010 Non-Hispanic By Race Age 18 and Over (Exhibit 23).   District 4 is centered in Prince George's County and has an unadjusted African American VAP of 53.72%, with an unadjusted white VAP of 28.65%.[6] *Id*; *see generally* Attachment C to complaint.

The State Plan largely met the goals set forth by the Legislative Black Caucus. Specifically, it created congressional districts that are as equal in population as mathematically possible and contains two majority African American districts.   District 5, while not majority minority, contains a racial mix (52% white, 35.31% African American) that makes it a district which, given County voting patterns could be won by an African American candidate. *See* Exhibit 1, ¶27.   Although the State Plan maintains the traditional district configurations as much as feasible, it re-drew District 7 to include less of Howard County, re-drew District 4 to omit the extension up into Montgomery County, and unified Prince George's County into two districts (Districts 4 and 5) where it previously had been split into three districts. In fact, the only goal stated by the Legislative Black Caucus that is not reflected in the State Plan is that of keeping minority communities in Montgomery County together.

---

[5] Although the State Plan is based on census figures adjusted by the reallocation of prisoners under the Act, the racial percentages are provided here on an "unadjusted" basis because the population data provided for Maryland inmates do not specify whether an inmate is Hispanic.

[6] The comparable figures for the other districts are as follows: the first is 83.26% white and 11.05% African American; the second is 59.04% white and 29.58% African American, the third is 66.17% white and 18.74% African American, the sixth is 66.39% white and 11.81% African American, and the eighth is 65.49% white and 11.33% African American.   Only the fourth, sixth and eighth district have higher than 10% Hispanic VAP—at 12.49%, 10.12%, and 12.37% respectively.  Exhibit 23.

C.      **This Litigation**

Plaintiffs filed the complaint in this action on November 10, 2011, alleging that the State Plan's creation of two, instead of three, majority African American districts intentionally discriminates against racial minorities in violation of the Fourteenth and Fifteenth Amendments (Counts 1 and 2), and unlawfully dilutes the voting strength of African Americans in violation of the Voting Rights Act of 1965 (Count 5), and that the adjustment of census data required by the Act malapportions districts by violating Article One, Section Two, of the United States Constitution and the Fourteenth Amendment (Counts 3, 4, and 6).  The complaint also included a claim that the State Plan constitutes a political gerrymander in violation of the Fourteenth Amendment (Count 7).

On November 10, 2011, plaintiffs moved to convene a three-judge panel to hear their claims, pursuant to 28 U.S.C. § 2284.  On November 18, 2011, the State Defendants opposed plaintiffs' motion on the grounds of insubstantiality, citing *Duckworth v. State Administrative Board of Election Laws*, 332 F.3d 769 (4th Cir. 2003), as the controlling Fourth Circuit precedent (ECF Doc. No. 14-1), and moved to dismiss the complaint pursuant to Rule 12(b)(6) for failure to state a claim (ECF Doc. No. 14).  On the same day, plaintiffs filed a motion for a preliminary injunction as to Counts 3 and 6 of the Complaint (ECF Doc. No. 14-1), and on November 21, 2011, plaintiffs replied to defendants' opposition to the motion for a three-judge panel (ECF Doc. No. 16).

On November 21, 2011, the single district judge granted plaintiffs' motion and convened a three-judge panel.  Observing that "the Fourth Circuit has not directly addressed when a constitutional claim has 'substantive merit,'" the single district judge

12

concluded on the basis of other authority that the plaintiffs' "constitutional claims are substantial and that the convening of a three-judge is appropriate."   Memorandum Opinion at 3-4 (ECF Doc. No. 17).   The single district judge "expresse[d] no opinion about the merits of Defendant's Motion to Dismiss."   *Id*.   On November 23, 2011, the Fourth Circuit Court of Appeals appointed a three-judge district court to hear plaintiffs' claims.

## ARGUMENT

I.   **THE "NO REPRESENTATION WITHOUT POPULATION ACT" DOES NOT CAUSE THE CONGRESSIONAL PLAN TO BE UNCONSTITUTIONAL.**

   A.   **The Act's Use of Adjusted Census Figures is Constitutionally Permissible and Does Not Create Unequal Districts.**

Using the "best population data available," *Karcher v. Daggett*, 462 U.S. 725, 738 (1982), Maryland's congressional redistricting Plan divided the State into eight congressional districts that are as equal in population as is mathematically possible. Because the adjusted total population of the State is not divisible by eight, one district has one fewer person than the others:

| District | Population |
|----------|------------|
| District 1 | 721,529 |
| District 2 | 721,529 |
| District 3 | 721,529 |
| District 4 | 721,529 |
| District 5 | 721,529 |
| District 6 | 721,529 |
| District 7 | 721,529 |
| District 8 | 721,528 |

13

It is therefore clear that Maryland has not only "ma[d]e a good faith effort," *Kirkpatrick v. Preisler*, 394 U.S. 526, 530-31 (1969), but has actually achieved "precise mathematical equality" in drawing its congressional districts.  *See id.*

This, then, is not a case in which the State has tried and failed to achieve mathematical equality, or has not tried at all and seeks to excuse a failure to achieve equality through post-hoc rationalization or subterfuge.  Rather, the State has faithfully used the 2010 census data as the basis for its redistricting, and then adjusted those data as required by the "No Representation Without Population Act," a 2010 Maryland law that requires that prisoners be counted "at their last known residence before incarceration if the individuals were residents of the State," and not counted at all if not residents of the State.  EL § 8-701(a).

Plaintiffs do not dispute this.  Instead, their argument rests on a single legal contention, namely, that "for determining congressional districts the *only* number that can be used is the number generated by the U.S. Census."  Plaintiff's Memorandum in Support of its Motion for Preliminary Injunction as to Count Three and Six of the Complaint, ECF Doc. No. 13-1 ("PI Memo") at 7 (emphasis added).  Plaintiffs acknowledge that the U.S. Supreme Court has not held as much; the closest they come is *Kirkpatrick*, in which the Court supposed that "[t]here *may* be a *question* whether distribution of congressional seats except according to total population can ever be permissible under Art. I, § 2."  *Kirkpatrick*, 394 U.S. at 534 (emphasis added); *see* PI Memo at 6.

In the absence of Supreme Court precedent, plaintiffs assert that "[e]very federal court to examine the question since *Kirkpatrick* has found that total population as determined by the U.S. Census is the appropriate basis for apportioning congressional districts within a state," PI Memo at 6, and then proceed to rely entirely on *Karcher* and three district court cases as support for their sweeping assertion.  But plaintiffs misread *Karcher* and ignore several appellate court decisions that specifically uphold a state's ability to base congressional redistricting on adjusted federal census data.

        1.      **The Clear Weight of the Federal Authority Does Not Support the *Per Se* Rule Against Using Adjusted Census Figures for Congressional Redistricting.**

*Karcher* expressly permits adjustments to federal census data for purposes of congressional redistricting.  Although, as plaintiffs note, *Karcher* does state that census data is the "only basis for good-faith attempts to achieve population equality," 462 U.S. at 738, the Court recognized that "[t]he census may systematically undercount population, and the rate of undercounting may vary from place to place," *id.*, and confirmed that the states may "'correct' the census figures," as long as it does "not do so in a haphazard, inconsistent, or conjectural manner."  *Id.* at 732 n.4.[7]  As the Sixth Circuit correctly concluded in *City of Detroit v. Secretary of Commerce*, "*Karcher* did not hold"—as plaintiffs suggest—"that the states must use census figures to reapportion congressional representation."  4 F.3d 1367, 1374 (6th Cir. 1993).

---

[7] *Department of Commerce v. U.S. House of Representatives*, 525 U.S. 316 (1999) is not to the contrary, as plaintiffs suggest.  *See* PI Memo at 7.  In that case, the merely quoted *Karcher* for the proposition that the "only basis for good-faith attempts to achieve population equality," *id.* at 334, without considering—or needing to consider—the exception spelled out in *Karcher* on which the State Defendants here rely.

Federal appellate decisions since *Karcher* have likewise upheld the states' use of adjusted federal Census data for purposes of congressional redistricting.  For example, in *City of Detroit*, the Sixth Circuit concluded that "[n]othing in the [C]onstitution or *Karcher* compels the state or Congress to use only unadjusted census figures" to reapportion congressional representation.  4 F.3d at 1374.  Other appellate decisions have reached the same conclusion.  *See Young v. Klutznick*, 652 F.2d 617, 625 (6th Cir. 1981) ("There is no reason to believe that states would not be free to adjust census figures for redistricting in the census year, as long as the adjustment is 'thoroughly documented' and applied in a 'systematic' manner."); *id*. ("If the Census Bureau had erroneously undercounted the Detroit area by 25%, the Michigan legislature would not be precluded from adjusting the figures for congressional apportionment."); *Assembly of the State of California v. U.S. Dep't of Commerce*, 968 F.2d 916, 919 n.1 (9th Cir. 1992) ("The states are not obliged to use official census data when drawing their state legislative districts . . . or their congressional districts."); *Senate of State of California v. Mosbacher*, 968 F.2d 974, 979 (9th Cir. 1992) ("If the State knows that the census data is underrepresentative, it can, and should, utilize noncensus data in addition to the official count in its redistricting process.").

Plaintiffs do not mention these, or any other, appellate decisions in their explanation of why they believe they will succeed on the merits of this issue for purposes of obtaining a preliminary injunction.  *See* Pl Memo, at 6-9.  Instead, they rest on three district court cases—*Travis v. King*, 552 F. Supp. 554 (D. Haw. 1982), *Young v. Klutznick*, 497 F. Supp. 1318 (E.D. Mich. 1980), and *Priesler v. Secretary of State*, 279

F. Supp. 952 (W.D. Mo. 1967)—none of which are solid authority for the propositions for which plaintiffs cite them.

*Priesler v. Secretary of State* includes an extended bit of *obiter dicta* that plaintiffs quote, *see* PI Memo at 7-8, but explicitly declined to reach the very proposition for which plaintiffs rely on it. 279 F. Supp. at 1003 ("We do not reach the precise question in *Priesler III* of whether any figures other than the federal decennial census may be used in support of a congressional districting plan."). The district court in *Young v. Klutznick* does, as plaintiffs note, appear to support their argument here, PI Memo at 8, but it was reversed on this point by the Sixth Circuit, which held that, "[a]lthough the Constitution prohibits subterfuge in adjustment of census figures for purposes of redistricting, it does not constrain adjustment of census figures if thoroughly documented and applied in a systematic manner." 652 F.2d at 625.[8]

Plaintiffs' favorite case, *Travis v. King*, did hold as plaintiffs describe and was not overruled (it was not appealed), but it relied substantially on the district court decision in *Young v. Klutznick*, which, again, was reversed on this very issue. 552 F. Supp. 554, 570 (D. Haw. 1982). To the State's knowledge, *Travis* has not been cited as governing authority by *any* federal court in the almost 30 years since it was issued. The closest any

---

[8] Given the Sixth Circuit's clear rejection of the district court's reasoning on this point, it is puzzling why plaintiffs would parenthetically note that the district court decision upon which they rely was "rev[erse]d on other grounds." PI Memo at 8. The Supreme Court, at least, does not see it so. *See Department of Commerce v. United States House of Representatives*, 525 U.S. 316, 349 (1999) (Scalia, J., concurring) (citing the district court decision in *Young v. Klutznick* as an example where the Commerce Department had argued against the use of statistical sampling in the census and parenthetically providing its subsequent history as "rev'd 652 F.2d 617 (C.A. 6 1981).")

17

federal court has come to relying on *Travis* is *Cuomo v. Baldrige*, which cited it as "*But cf.*" 674 F. Supp. 1089, 1106 (S.D.N.Y. 1987). The older, lower, and largely discredited cases upon which plaintiffs rely cannot overcome *Karcher* and the appellate decisions discussed above, all of which support the states' ability to redistrict on the basis of adjusted census figures.

The clear weight of authority is that, while the Census count may be the only appropriate "basis" for congressional redistricting, the states are free to adjust that count so long as they do so in way that is not "haphazard, inconsistent, or conjectural." *Karcher*, 462 U.S. at 732 n.4; *Kirkpatrick*, 394 U.S. at 535 (rejecting proposed Missouri adjustments as "ad hoc" and "haphazard" not "systematic"). That rule makes sense. If ad hoc adjustments were permissible, the strict equality rule announced in *Wesberry v. Sanders*, 376 U.S. 1 (1964), and *Kirkpatrick* would be easily circumvented by states willy-nilly moving population here and there to achieve goals other than the constitutional charge of "one person/one vote." This would provide the very "avenue for subterfuge" that *Kirkpatrick* cautioned against when it held that states "may properly consider" population shifts occurring during the 10-year period between counts when redistricting in non-census years. 394 U.S. at 535.

Such concerns are not implicated here, where, as discussed below, the adjustments Maryland has made were carried out pursuant to a statute and regulation specifically and carefully spelling out the process for doing so. Nor is the Act itself the product of an *ad hoc* subterfuge; rather, it is a public policy-based approach to correcting the very real voting weight inequality that occurs when prisoners are counted in the district in which

18

they are incarcerated.  If prisoners are counted at their place of incarceration, the prison population is concentrated in the district in which the prison is located, dramatically increasing the population in that district relative to other districts.  Because the prisoners are not entitled to vote, the votes of the non-prison population of the district where the prison is located are weighed more heavily than those cast in other districts—a result squarely at odds with the "one person/one vote" principle.  By contrast, counting prisoners at their place of residence prior to incarceration spreads the non-voting prison population out over several districts, reducing its distortional impact in any one district. The bill file associated with the enactment of the Act is filled with descriptions of how counting prisoners in their pre-incarceration residences rather than their prison cells will produce fairer, more accurate representational plans.  Declaration of Dan Friedman, ¶1, a, b, d, and e (Exhibit 5).

If the goal of the jurisprudence interpreting Article 1, Section 2, is to ensure that "as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's," *Wesberry*, 376 U.S. at 7-8, the Act achieves that goal precisely where the Census Bureau does not.  And Maryland is not alone in thinking so; legislation similar to the Act is being considered by several other states, *see Little v. New York State Task Force on Demographic Research and Reapportionment*, No. 2310-2011 (N.Y. App. Div. (Dec. 1, 2011) (attached as Exhibit 22), and is being championed by advocacy groups who have made this very issue their central mission.  *See* http://www.prisonersofthecensus.org (last visited November 30, 2011).

19

The constitutional permissibility of adjusting census figures for prisoner populations draws further support from Supreme Court jurisprudence upholding similar population adjustments within the context of state legislative redistricting:

> Neither in *Reynolds v. Sims* [377 U.S. 533 (1964)] nor in any other decision has this Court suggested that States are required to include aliens, transients, short-term or temporary residents, or persons denied the vote for conviction of crime, in the apportionment base by which their legislators are distributed and against which compliance with the Equal Protection Clause is to be measured.  The decision to include or exclude any such group involves choices about the nature of representation with which we have found no constitutionally founded reason to interfere.

*Burns v. Richardson*, 384 U.S. 73, 92 (1966).   Because the constitutional standards regarding equality of congressional districts are more "rigor[ous]" than those that apply in the legislative redistricting context, *Karcher*, 462 U.S. at 732-33, a state may not be able to satisfy the *Kirkpatrick* "equal population" requirement simply by following *Burns*.   But once, as here, a state has met the "thoroughly documented" and "systematic[ally]" applied exception to that requirement carved out by *Karcher* and *Kirkpatrick*, the reasoning of *Burns* provides additional support for the constitutionality of allocating prisoners to the place of residence instead of their place of incarceration. Because Maryland has carried out these policy-based census adjustments pursuant to a statute and regulations that are "thoroughly documented" and "applied throughout the State in a systematic, not an *ad hoc*, manner," the Act passes constitutional muster.

2.      The "No Representation Without Population Act" Prisoner
        Adjustment Was Conducted in an Organized, Systematic, and
        Thorough Manner.

Upon passage of the Act, the State of Maryland set about to create an organized, systematic, and thorough system of adjusting the decennial census data to reallocate prisoners to their pre-incarceration residences.   The State began by adopting a set of administrative regulations that set forth the manner in which the law would be implemented.   *See* COMAR 34.05.01.   Those regulations require MDP to take the prisoner records from the Department of Public Safety and Corrections, COMAR 34.05.01.04A, make best efforts to clean up any defects in the last known address information, COMAR 34.05.01.04B, and geocode the prisoners to their last known address in Maryland.  COMAR 34.05.01.04A.  Prisoners for whom a last known address could not be ascertained are required to be assigned to their prison facilities. COMAR 34.05.01.04C.   Finally, pursuant to the terms of the Act, prisoners whose pre-incarceration addresses were out of state were to be removed from the adjusted census data.  Md. Ann. Code, EL, § 8-701(a)(1)(ii).

As is reported in the attached declarations of Kevin Combs of DPSCS, James Cannistra, Director of the Data Planning Services Group in the MDP, and Karl Aro, Executive Director of the Department of Legislative Services ("DLS"), each of these steps was carefully followed, thoroughly documented, and systematically accomplished. The Department received a database containing the records of 22,064 prisoners under the supervision of the Maryland Division of Corrections as of April 1, 2010.  Exhibit 3, at ¶4;

21

Exhibit 2, ¶¶ 2, 3.[9]   MDP then geocoded, and the State's contractor, Caliper Corporation, assigned 16,988 prisoners to their last known address and 3,755 prisoners to their prison locations, while 1,321 prisoners whose pre-incarceration addresses were out of state were removed from their correctional facility location.  Exhibit 2, ¶17; Exhibit 4, ¶3.  MDP, DLS, and DPSCS certified the Maryland population counts by county and election precinct as the official data for Maryland redistricting on May 3, 2011.  *Report of Maryland Precinct Population Data: 2010 Census Adjusted Maryland Redistricting Data and Unadjusted Census Population Count*.  At that point, adjusted census data information was made available, on the internet for interested parties, county and municipal corporations for local redistricting, and the Governor's Redistricting Advisory Committee when it was formed in July 2011.

As the above discussion makes clear, this is not (nor have plaintiffs alleged) a situation in which the census was adjusted in a "haphazard, inconsistent, or conjectural" way.  *See Karcher*, 462 U.S. at 732 n.4.  Nor is this the type of post hoc rationalization condemned in *Kirkpatrick*.  Rather, it was a thoroughly documented and systematic adjustment of precisely the kind envisioned by the Supreme Court in *Karcher*, and it is being implemented throughout the State, in this congressional redistricting, the state legislative redistricting scheduled for 2012, and local redistricting as well.  *See, e.g.,* CB 64-2011 Prince George's County Council Redistricting Plan (adopted November 1,

---

[9] The Federal Bureau of Prisons refused to provide information regarding federal prisoners.  Exhibit 2, ¶12 (and accompanying documents).  As a result, pursuant to COMAR 34.05.01.04C(1), (2), those federal prisoners were counted in the federal prison at which they were located.  Exhibit 2, ¶12.

2011); Bill No 11-0642 Baltimore City Redistricting Plan (adopted March 30, 2011).  As such, the adjustments required under the Act fall comfortably within *Karcher*'s recognition that the states are free to base congressional redistricting on adjusted census data as long as they do so in a thorough and systematic manner.

3.    **The Census Bureau's Practice of Counting Prisoners in Their Place of Incarceration is Not Compelled by the Constitution.**

Plaintiffs' argument that Maryland is constitutionally obligated to use unadjusted census figures in its congressional redistricting is also rebutted by the fact that nothing in the Constitution requires the Census Bureau to count prisoners in the place in which they are incarcerated.  The only textual mandate for the census comes in Article I, Section 2, which dictates that congressmen "shall be apportioned among the several States . . . according to their respective Numbers," to be calculated by "actual Enumeration." Indeed, Congress has made clear that the "*sole* Constitutional purpose of the decennial enumeration of the population is the apportionment of Representatives in Congress *among* the several states."  Pub. L. No. 105-119, Title II, § 209(a) (1997) (emphasis added).

This, however, is a redistricting case, not an apportionment case, and is thus one step removed from the census mandate of Article I, Section 2.  Although that mandate reflects an important need for national uniformity in the apportionment of districts *among* the several states, there is no commensurate need for uniformity in the drawing of

23

congressional districts *within* each state.[10]  While Arizona—a state with a population similar to Maryland's—may have an interest in an apportionment scheme that awards Arizona and Maryland an equal number of congressional districts, it is not clear what interest Arizona would have in Maryland's use of adjusted census population to create those districts *within* Maryland.[11]  It is important to remember that the Supreme Court expects states to use census data as the beginning "basis" for redistricting, not because it is constitutionally mandated, but because it is "'the best population data available,'" and, therefore, "the only basis for good-faith attempts to achieve population equality." *Karcher*, 462 U.S. at 738.

How the Census Bureau goes about the business of ascertaining place of residence is likewise not of constitutional import.  That is true even within the context of congressional apportionment, to which the "actual Enumeration" charge of Article I,

---

[10]  Plaintiffs ignore this important point, citing haphazardly to congressional reapportionment cases and statutes as if they apply equally within the congressional redistricting context.  One obvious example is plaintiffs' reliance on 13 U.S.C. § 141(b) for the proposition that states must use federal census data.  *See* PI Memo at __.  But 13 U.S.C. § 141(b), on its face, applies only to apportionment of congressional districts between the states, not redistricting within the states.  13 U.S.C. § 141(b) ("The tabulation of total population by States under subsection (a) of this section as required for the apportionment of Representatives in Congress *among* the several States shall be completed within 9 months after the census date." (emphasis added)).

[11]  It is worth remembering that only by remarkable coincidence will the ideal size of a Maryland congressional district be the same as an ideal congressional district size in any other state.  For example, even though Arizona and Maryland are each entitled to eight representatives in Congress, their ideal district sizes differ, with Arizona pursuing an ideal size of 710,224, and Maryland 721,529.  *See* http://www.azredistricting.org /Maps/DraftMaps/CD/Commission%20Approved%20Congressional%20Draft%20Map% 20-%2 0Population%20Data%20Table.pdf (last visited Nov. 27, 2011) (Exhibit 20).

Section 2, applies.  The Supreme Court made this clear in *Franklin v. Massachusetts*, in which it upheld the Census Bureau's decision to count overseas servicemen and servicewomen as residents of their home states as "consonant with, though not dictated by, the text and history of the Constitution."  505 U.S. 788, 805-06 (1992).

The specifics of how the census is carried out is the result of agency action, not constitutional dictate.  As one would expect with respect to agency action, the reasons why prisoners are now counted where they are incarcerated, and not at their last known residence, are technical, not constitutional.  *See* "U.S. Census Bureau Report: Tabulating Prisoners at Their 'Permanent Home of Record' Address," at 10 (Feb. 21, 2006) (describing how counting prisoners at their home of record would involve "collecting information from each prisoner individually," which would cost $250 million, require "an extensive coordination procedure" with correctional facilities, and potentially "represent a serious disruption to prison operations").  And, as with agencies more generally, the Census Bureau has not always counted prisoners the same way.  In the 1900 Census, for example, enumerators were instructed to collect permanent addresses for prisoners and not simply locate them within their place of incarceration.  Nat'l Research Council, "Once, and Only Once, and in the Right Place: Residence Rules in the Decennial Census," 84-85 (Daniel L. Cork & Paul R. Voss, eds., 2006).

That the Census Bureau does not wish to undertake the significant burden of ascertaining the home residence of the approximately "2.6 million adults and juveniles in federal, state, and local correctional facilities" across the country, U.S. Census Bureau Report at 1, does not mean that Maryland is constitutionally precluded from doing so for

25

purposes of improving voter equality within Maryland.   The Census Bureau acknowledges this and has expressly noted that "the 'usual residence' at which it counts people 'is not necessarily the same as the person's voting residence or legal residence.'" *Hayden v. Pataki*, 449 F.3d 305, 329 n. 25 (2d Cir. N.Y. 2006) (quoting U.S. Census Bureau, Plans and Rules for Taking the Census, at §§ 2, 11, available at http://www.census.gov/population/www/censusdata/resid_rules.html)); *see also District of Columbia v. United States Dep't of Commerce*, 789 F. Supp. 1179, 1180 (D. D.C. 1992).   As a result, the Bureau released the 2010 census numbers for prisoners and other inhabitants of "group quarters" early "so that states can leave the prisoners counted where the prisons are, delete them from redistricting formulas, or assign them to some other locale."   Director's Blog, United States Census Bureau (posted March 10, 2010) (available at http://blog.census.gov/directorsblog/2010/03/so-how-do-you-handle-prisons.html (last visited Nov. 27, 2011)); United States Census Bureau, 2010 Census Advance Group Quarters Summary File (available at http://www.census.gov/rdo/data/ 2010_census_advance_ group_quarters_summary_file.html (last visited Nov. 27, 2011)) ("Group quarters population may be beneficial to . . . those in the redistricting community who must consider whether to include or exclude certain populations in redrawing boundaries as a result of state legislation."); *see also Little*, Exhibit 22.   The Census Bureau's accommodation of states wishing to reallocate prisoners for purposes of redistricting underscores what is clear from the cases:   There is no constitutional prohibition on states' adjusting census figures for purposes of congressional redistricting.

26

The obverse, of course, is also true:  There is no constitutional requirement that a state *must* revise the federal census count for congressional redistricting as Maryland has. Thus, a recent challenge to Texas' congressional redistricting plan based on its *failure* to reallocate prisoners to their home districts was also rejected.  *Perez v. Texas*, 11-CA-360-OLG-JES-XR (W.D. Tex. Sept. 2, 2011) (Exhibit 9).   The court did not, however, hold that the State could not use adjusted census figures.  To the contrary, it held that "the State *could* enact a constitutional amendment or statute that modifies the count of prisoners as residents of whatever county they lived in prior to incarceration," just that "there is no federal requirement to do so."  The reason for this flexibility is, as the Fourth Circuit extensively discussed in *Daly v. Hunt*, to allow for each state "to cho[o]se its own apportionment base, provided that such method yields acceptable results."  *Daly v. Hunt*, 93 F.3d 1212, 1225 (4th Cir. 1996).  These are political decisions about the nature of representation, to which federal judicial deference is appropriate so long as the underlying one person/one vote principle is respected.

In sum, *Karcher* and the appellate court cases that have followed have answered the "question" posed by *Kirkpatrick* and establish that the states are free to base congressional redistricting on adjusted census data as long as they do so in a thorough and systematic manner, as Maryland has done here.[12]

---

[12] Even if it were not constitutionally permissible for states to adjust total census population by means of "thoroughly documented" and "systematic[ally]" applied criteria, *Kirkpatrick*, 394 U.S. at 534, and total census population were the constitutional standard—a conclusion that *Karcher* and the appellate cases discussed above conclusively rebut—the population variations from the total census at issue here would still be justified by Maryland's "legitimate state objective" to achieve greater equality

**B.     The Allegation that Excluding 1,321 Incarcerated, Non-Maryland Residents that were Excluded from the Adjusted Population Basis fails to State a Claim for Racial Discrimination.**

Plaintiffs have also alleged that, of the 1,321 incarcerated non-Maryland residents who were excluded from the population basis, 71.08% are African-American, and this fact, they claim, amounts to a constitutional violation.   Complaint ¶¶ 49-53, 70.   Under established Supreme Court precedent, plaintiffs have failed to allege a *prima facie* case of racial discrimination.   To make such a case, plaintiffs must show more than just a disparate impact.   Rather, to trigger strict scrutiny, a plaintiff must plead and prove that there was a "discriminatory purpose."   *E.g.*, *Washington v. Davis*, 426 U.S. 229, 239 (1976).   "This burden of proof is simply one aspect of the basic principle that only if there is purposeful discrimination can there be a violation of the Equal Protection Clause."   *Mobile v. Bolden*, 446 U.S. 55, 66 (1980).[13]   "[T]his principle applies to claims of racial discrimination affecting voting just as it does to other claims of racial discrimination."   *Id.*, 446 U.S. at 67.

There is no truth to plaintiffs' charge that the Act was designed and intended to harm the voting rights of African Americans.   The Act is a small but significant triumph for voting rights, including those of African Americans.   Introduced by Senator Catherine

---

across its electorate.   *Karcher*, 462 U.S. at 740 (the fact that district populations do not achieve strict census population equality does not end the inquiry; instead, "the burden shift[s] to the State to prove that the population deviations in its plan were necessary to achieve some legitimate state objective").   Here, the state has carried that burden.

[13] Although Congress subsequently amended § 2 of the Voting Rights Act to reject the intent requirement announced in *Mobile*, intent remains a necessary element of a discrimination claim under the U.S. Constitution.   *See Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 481-82 (1997).

E. Pugh in the State Senate (SB 400), and Delegate Joseline Peña-Melnyk in the House of Delegates (HB 496), these bills were a top legislative priority for the Legislative Black Caucus of Maryland and were co-sponsored by nearly every member of that caucus. Exhibit 5, ¶1, j.  At the bill hearing, support was universal and included statements from civil rights organizations including the NAACP of Maryland, the ACLU of Maryland, and Common Cause of Maryland.  *Id.* at ¶1, d, h , and j.  The advocates were particularly united in their opinion that the existing system of "prison-based gerrymandering" overwhelmingly had a negative effect on African American voters.  *Id.* at ¶1, d, n.  The Act was adopted to fix that problem, not to undermine African American voting power, and unquestionably represents a legitimate State effort to achieve more completely the goal of "one person/one vote."  Because there is no plausible basis for the allegation that the Act is the result of intentional discrimination, Count 4 must be dismissed.

## II.   THE MARYLAND PLAN DOES NOT VIOLATE SECTION 2 OF THE VOTING RIGHTS ACT.

### A.   The Complaint Fails to State a Claim for Violation of Section 2 of the Voting Rights Act.

Count 5 of plaintiffs' complaint purports to assert a claim under the Voting Rights Act ("VRA"), 42 U.S.C. § 1973, but contains nothing more by way of allegation other than restating a portion of § 2 of the statute itself.  This general allegation cannot be read to state the basic elements necessary to state a § 2 violation; "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim.  *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949-50 (2009).  "To

29

survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.*, 556 U.S. 662, 129 S. Ct. at 1949 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This "plausibility" standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S. Ct. at 1949.  That is, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 557).

The Court should dismiss Count 5 because the plaintiffs' allegations fail to state a plausible claim under the Voting Rights Act.  As the Fourth Circuit has instructed, when faced with a motion to dismiss a Section 2 challenge to redistricting, the district court must "consider whether the complaint states a valid claim under Section 2" in light of "the concepts that give meaning" to such a claim and "the standards that keep it 'within principled legal bounds.'" *Hall v. Virginia*, 385 F.3d 421, 427 (4th Cir. 2005) (affirming dismissal of Section 2 vote dilution redistricting challenge for failure to state a claim)(citation omitted).  More specifically, the Court tests first whether the allegations in the complaint state facts sufficient "to satisfy all of the 'necessary preconditions' for a Section 2 claim established by the Supreme Court in *Thornburg v. Gingles*, 478 U.S. 30 (1986)." *Hall*, 385 F.3d at 426.  Those preconditions are as follows:

(1) the plaintiffs' minority group is "sufficiently large and geographically compact to constitute a majority in a single member district,"

(2) the group is "politically cohesive"; and

(3) the "white majority votes sufficiently as a bloc to enable it – in the absence of special circumstances … – usually to defeat the minority's preferred candidate."

*Gingles*, 478 U.S. at 50-51.  Although "[p]roof of the *Gingles* preconditions is not alone sufficient to establish a claim of vote dilution under Section 2," the failure "to satisfy all of the *Gingles* preconditions means that [plaintiff members of the minority group] cannot sustain a claim under Section 2. . . ."  *Hall*, 585 F.3d at 426; *see id.* at 431 (explaining that the complaint failed to state a Section 2 claim due to its failure to satisfy the first of the three *Gingles* factors).

Here, the Section 2 claim in the complaint consists of no more than a conclusory allegation that merely restates a portion of § 2 of the statute itself.  Complaint ¶¶ 71-73. This general allegation cannot be read to state facts sufficient to establish a plausible claim that § 2 has been violated; such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim.  *Iqbal*, 129 S. Ct. at 1949-50.  Similarly, Paragraph 73 of the complaint cites *Gingles* and acknowledges, in a parenthetical, that the elements of a VRA § 2 violation include the three *Gingles* preconditions, but the complaint does not allege well-pled facts sufficient to show that these three preconditions are satisfied.

The broad unsupported statement that "historical and social conditions in Maryland cause an inequality in the opportunity for African American voters to elect representatives of their choice as compared to white voters," Reply at 7, without well-pled factual support, cannot make up for this failure.  Nor does the allegation that witnesses testified about the *Gingles* factors at the GRAC hearings, *id.* at 8, constitute a

31

well-pled fact supporting the claim that African American voters are "politically cohesive" or that voting patterns in Maryland are so polarized that white majority votes are able to defeat African American candidates.

Since filing the complaint, the plaintiffs have attempted to excuse their deficient pleading with respect to the first *Gingles* factor by pointing to their description of the maps attached to their pleading as containing three compact African American districts, and asserting that those districts are, in fact, "sufficient to show that the African American population of Maryland is of a size to create three majority-minority congressional districts," and that those districts are "compact[]."  Plaintiffs' Reply to Defendants' Opposition to Motion for Three-Judge Panel and Opposition to Defendants' Motion to Dismiss for Failure to State a Claim" (ECF Doc. No. 16) ("Reply") at 6.  That attempt by plaintiffs does not suffice, however, because the first *Gingles* condition "refers to the compactness of the minority population, not to the compactness of the contested district."  *League of United Latin American Citizens (LULAC) v. Perry*, 548 U.S. 399, 433 (2006).  Unless plaintiffs produce a district that contains a "geographically compact population of the racial group, where that district sits, there neither has been a wrong nor can be a remedy."  *Id.* at 430 (internal quotation marks omitted).

Even if plaintiffs had sufficiently pled a violation of the three *Gingles* factors, the districts they put forth have the very same features that the district court found statutorily infirm in *LULAC*.  Both of plaintiffs' plans take population from Baltimore City and the Washington D.C. suburbs—two culturally distinct areas—and tie them together with a narrow connection in the same invalid way that the discrete populations at issue in

*LULAC* were connected.  One of plaintiffs' two maps (Attachment A) does this in so blatant a manner that it is obvious from the face of the map itself that nothing but race drives the creation of the district.  The second plan (Attachment D) draws a finger between the two populations, rather than a thread, but still does not demonstrate the existence of a third geographically compact minority population located in the district. This second plan shows only that it is possible to stretch a district far enough to include two distinct geographically compact populations, neither of which is sufficiently large to constitute a majority in a single member district.[14]  *See* Exhibit 1, ¶9.

Because plaintiffs' plans reach out to combine wholly separate minority communities, they fail to heed the admonition in *Gingles* that districts should take into account "traditional districting principles such as maintaining communities of interest and traditional boundaries."  *Abrams v. Johnson*, 521 U.S. 74, 91-92 (1997).  As the Court explained in *LULAC*:

> The recognition of nonracial communities of interest reflects the principle that a State may not "assum[e] from a group of voters' race that they think alike, share the same political interests, and will prefer the same candidates at the polls."  In the absence of this prohibited assumption, there is no basis to believe a district that combines two farflung segments of a racial group with disparate interests provides the opportunity that §2 requires or that the first *Gingles* condition contemplates.  "The purpose of the Voting Rights

---

[14]  It is true, as Plaintiffs note, that the distances involved in *LULAC* are larger than those at issue here, but that is because Texas is larger and more diffusely populated than is Maryland.  It is also worth noting that the situation causing the need for a remedy in *LULAC* was Texas' decision to dismantle an *existing* majority minority district because voters in that district "threatened to oust" an incumbent who was not their candidate of choice.  *Id.*, 548 U.S. at 423.  In contrast, the State's Plan retains both of the existing African American districts and does not "threaten to oust" protecting the African American candidates of choice who now hold those seats.

Act is to prevent discrimination in the exercise of the electoral franchise and to foster our transformation to a society that is no longer fixated on race." We do a disservice to these important goals by failing to account for the differences between people of the same race.

\*       \*       \*

Legitimate yet differing communities of interest should not be disregarded in the interest of race. The practical consequence of drawing a district to cover two distant, disparate communities is that one or both groups will be unable to achieve their political goals. Compactness is, therefore, about more than "style points"; it is critical to advancing the ultimate purposes of §2, ensuring minority groups equal "opportunity . . . to participate in the political process and to elect representatives of their choice.

*LULAC*, 548 U.S. at 433-34 (citations omitted).

There is no basis whatsoever to consider Baltimore and Washington D.C. as a single "community of interest," as plaintiffs have attempted to do in this litigation. To support this remarkable argument, plaintiffs pointed to the Thurgood Marshall Baltimore-Washington International Airport, the Baltimore-Washington Parkway, the fact that trains run between the two cities, and the combination of the area into a single statistical unit by the federal Office of Management and Budget. *See* Reply at 7.

That one of the three airports accessible to residents of Washington, D.C. is located just south of Baltimore is, of course, not relevant to whether the entire area is a single community of interest for redistricting purposes. Neither is the marketing decision to include both areas in the airport's name, or the fact that the road that runs between them is named for the cities at either end. Trains regularly run between Baltimore and New York City, yet it could not be claimed that it is a single community of interest. Nor would the fact that the federal Office of Management and Budget evaluates Baltimore

34

and Washington as a "single statistical unit," Reply at 7, even if true, be relevant to this issue.   What is more relevant is that the Maryland Department of Planning puts Baltimore, the Washington, D.C. suburbs, and Southern Maryland in *separate* regions. *2008 Maryland Statistical Handbook*, Maryland Department of Planning (June 2009).

Regardless of what classifications different administrative agencies may employ, the simple fact is that Baltimore and Washington D.C. are very different communities. They have separate media markets, with separate television stations, separate local news channels, and separate newspapers.   They have separate professional baseball and football teams and separate arts communities.   And they have separate occupational and professional communities as well.   Whereas Washington, D.C. is largely centered on the federal government and its contractors, the Baltimore economy has traditionally been industrial and maritime.   Baltimore and the D.C. suburbs are simply not part of the same "community of interest" within the meaning of *LULAC*.

Finally, plaintiffs' combination of minority populations from separate urban areas would itself be evidence of unconstitutional racial gerrymandering under the 14th Amendment to the U.S. Constitution.   *See Shaw*, 509 U.S. at 647; *Miller v. Johnson*, 515 U.S. 900, 908 (1995) (citing the combination of African American neighborhoods of Atlanta with those in Chatham County as evidence that the drawing of the district was race-based when the two areas were "260 miles apart in distance and miles apart in culture").   As a result, the plans proposed by the plaintiffs, which link the two separate African American communities in the area of Washington, D.C. and Baltimore, are likely unconstitutional to begin with.   In any event, the plans fail to demonstrate that it is

35

possible under constitutional and legal standards to construct three compact African American districts in Maryland, as required under the first *Gingles* factor.

While the Complaint fails to allege a plausible claim under the first *Gingles* criterion, it alleges nothing whatsoever about the other two, namely, that the two African American communities they strain to combine into a third majority African American district are "politically cohesive," and that the voting habits of whites and African Americans are sufficiently polarized that, without the new district, the preferred candidate of African Americans would be defeated. *Gingles*, 478 U.S. at 51. This pleading failure is grounds for dismissal—even if plaintiffs had alleged a sufficiently compact alternative district—because all three factors are necessary preconditions for establishing a vote dilution claim under the Voting Rights Act. *Johnson v. DeGrandy*, 512 U.S. 997, 1011 (1994); *Hall*, 385 F.3d at 426.

Plaintiffs have previously attempted to cover for their pleading failures by asking the Court to "clarify" the allegations of their complaint with the statements made in their legal briefs. ECF Doc. 16 at 5. Yet, substantive deficiencies in the complaint cannot be cured or overlooked under the guise of "clarification": "If a complaint fails to state a claim even under the liberal requirements of the federal rules, the plaintiff cannot cure the deficiency by inserting the missing allegations in a document that is not either a complaint or an amendment to a complaint." *Harrell v. United States*, 13 F.3d 232, 236 (7th Cir. 1993)). Though the case cited by plaintiffs to justify their reliance on the argument in their brief, *Pegram v. Herdrich*, allows courts to use a plaintiff's "brief to clarify allegations in her complaint whose meaning is unclear," 530 U.S. 211, 230 (2000),

"there is a distinction between 'clarifying' unclear allegations, and recasting the complaint to cure omissions," *United States SEC v. Geswein*, 2011 U.S. Dist. LEXIS 111906, 48-49 (N.D. Ohio Aug. 5, 2011), or raising "entirely new arguments." *Gulf Coast Hotel-Motel Ass'n v. Miss. Gulf Coast Golf Course Ass'n*, 2010 U.S. Dist. LEXIS 81211, 20 (S.D. Miss. Aug. 10, 2010).   "Although the court may look to a party's memorandum of law in opposition to a motion to dismiss in order to 'clarify allegations in . . . [a] complaint whose meaning is unclear,' here the Complaint is not lacking in clarity; rather, it is lacking in factual statements that" the State Plan runs afoul of the three elements of a § 2 VRA claim.  *Field v. Tonawanda City Sch. Dist*., 604 F. Supp. 2d 544, 560 (W.D.N.Y. 2008).

Plaintiffs may, however, resort to the legislative history of the State Plan, and have previously argued that the legislative report prepared by Prof. Bruce E. Cain—the State Defendants' expert on this issue—establishes that African American voters are "politically cohesive," *Voting Rights Assessment of Governor's Maryland Congressional Redistricting Plan* ("Cain Legislative Report") at 2, and that, therefore, they meet the second *Gingles* criterion.[15]   The report does make the general statement that African Americans in Maryland and elsewhere are a politically cohesive group, but the burden on plaintiffs is to show political cohesion among the minorities *in the district they seek to create*.  *LULAC*, 548 U.S. at 430; *Shaw v. Hunt*, 517 U.S. 899, 917 (1996).  Section 2

---

[15]   A copy of Professor Cain's report is publicly available as an exhibit to the bill review letter provided for Senate Bill 1 at http://mlis.state.md.us/2011s1/ag_letters/sb0001.pdf (last visited November 18, 2011).

"does not assume the existence of racial bloc voting; plaintiffs must prove it," and generalized statements about statewide or nationwide voting patterns do not suffice. *Growe v. Emison*, 507 U.S. 25, 41-42 (1993).

Plaintiffs would also rely on Professor Cain to cure their failure to plead polarized voting.   As they have conceded, Professor Cain's preliminary report finds only "moderate" polarization in Maryland.  Cain Legislative Report at 4.   Again, a general statement about the existence of some polarization statewide does not state a claim under *Gingles*.  Instead plaintiff must show polarization, in the area where an additional district is sought, "sufficient to enable the white majority, 'in the absence of special circumstances . . . usually to defeat the minority's preferred candidate.'"  *Gingles*, 478 U.S. at 51.  A finding of "moderate" polarization, statewide, does not begin to reach this standard.  The Court should therefore dismiss Count 5 of the complaint.

### B.     The Plans Proposed by Plaintiffs Do Not Satisfy the Three *Gingles* Factors.

Even if plaintiffs had pled a violation of § 2 VRA violation with specificity sufficient to withstand a motion to dismiss under *Iqbal*, the State Defendants are entitled to summary judgment because the plaintiffs cannot show that the third majority African American district they propose would meet the three *Gingles* factors.  As demonstrated in Professor Cain's Declaration, the additional majority minority districts in Attachments A and D do not contain a "large and geographically compact" minority group, as needed to satisfy the first *Gingles* factor, but instead combine portions of two separate and distinct minority groups to create a district in which African Americans are in the majority.

38

Exhibit 1, ¶9.  The additional African American district in Attachment A links "African American populations in the Baltimore area in the north with the Prince George's/Montgomery/Anne Arundel areas in the south by means of a narrow corridor through intervening predominantly Non-Hispanic White areas."  *Id.*  Attachment D shows "an elongated district that sprawls over three regional areas of Maryland (Southern Maryland, DC suburbs and Baltimore) for the sole purpose of connecting two disparate African American areas."  *Id.*  In both cases, the compactness score for the third African American district are significantly lower than those for other districts in the plans, indicating that these districts are less compact.  *Id.*

Nor can plaintiffs show that the white electorate in the proposed district votes "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate," as required by the third *Gingles* factor.  *Id.*, 478 U.S. at 51.  Professor Cain's analysis shows that Non-Hispanic White Democratic voters do not vote as a consistently cohesive bloc against Non-Hispanic African American candidates in statewide races, "particularly in the central Maryland counties that are affected by the Fannie Lou Hamer PAC proposals."  Exhibit 1, ¶24.  Professor Cain's analysis of local and state legislative races also failed to reveal any significant level of polarization, much less enough to "usually defeat the minority's preferred candidate."  Exhibit 1, ¶¶25-26.  In fact, the analysis shows that an African American candidate could win in "several of the states coalitional seats (i.e. seats in which African Americans are a significant minority but not a majority)," including the 5th and the 2nd districts.  Exhibit 1, ¶27.

Plaintiffs' discussion of the results of the 2006 Democratic primary for United States Senate with African American Congressman Mfume running against Congressman Cardin does not establish the contrary.  Reply at 9.  Plaintiffs simply compare the votes in a majority African American county (Prince George's) to the votes in a seemingly randomly chosen majority white county (Anne Arundel) and conclude that African Americans voted for Mfume and whites voted for Cardin.  Plaintiffs did not, however, engage in the regression analysis necessary to separate African American votes from white votes within the two counties.  When such an analysis is done on a statewide basis, it does reveal a relatively high level of polarization for this particular race, Exhibit 1, ¶24, but the primary for Attorney General in the same election—again pitting an African American candidate (Stuart Simms) against a white candidate (Douglas Gansler)— showed a significantly lower level of polarization, suggesting "that [the] difference is accounted for by something other than the race of the candidates."  *Id.*

Professor Cain's Declaration establishes that plaintiffs cannot meet the third *Gingles* criterion.  Because all three criteria are necessary to establish a case under the Voting Rights Act, *Johnson v. DeGrandy*, 512 U.S. at 1011; *Hall*, 385 F.3d at 426, the State is entitled to summary judgment on plaintiffs' Count 5 VRA claim.

## III.   THE COMPLAINT FAILS TO STATE A CLAIM FOR INTENTIONAL DISCRIMINATION.

Pleading a claim of racial discrimination under the 14th and 15th Amendments to the U.S. Constitution requires well-pled facts that meet the "demanding" burden on

plaintiffs to support such claims.[16]  *Easley v. Cromartie*, 532 U.S. 234, 241 (2001).

Plaintiffs must show that race was not simply "'*a* motivation for the drawing of a

majority-minority district,' but 'the "*predominant* factor" motivating the legislature's

districting decision,'" *id.* (quoting *Bush v. Vera*, 517 U.S. 952, 959 (1996), and *Hunt v.*

*Cromartie*, 526 U.S. 541, 547 (1999) (emphasis in original)), and that other, legitimate

districting principles were subordinated to race.  *Bush v. Vera*, 517 U.S. at 959.  Plaintiffs

claim that they meet this standard "by alleging that a state's redistricting plan, on its face,

has no rational explanation other than to separate voters on the basis of race."  Reply at

12.  Because such an allegation does not come close to meeting the standard set in *Iqbal*

and *Twombley*, Counts 1 and 2 must be dismissed.

  The State Plan is the product of the careful consideration of a variety of legitimate

districting principles, including ensuring equality of population, maintaining the core of

existing districts, protecting communities of interest, respecting existing representational

relationships, recognizing growth patterns, and, as plaintiffs claim, partisan

considerations.  *See* Complaint ¶¶ 42, 44, and 77. Consideration of each of these factors

played a role in the configuration of the districts in the State Plan. For example, the State

---

[16]  The Supreme Court has not yet determined whether the 15th Amendment applies to a claim of vote dilution. *Voinovich v. Quilter*, 507 U.S. 146, 159 (1992); *Committee for a Fair and Balanced Map v. Illinois State Board of Elections*, 2011 U.S. Dist. LEXIS 126278, slip. op. at 23-25 (N.D. Ill. November 1, 2011); *Perez v. Texas*, slip. op. at 17 (Civ. Action No. 11-CA-360-OLG-JES-XR, W.D. Tex. August 31, 2011). Plaintiffs argue that their claim is not a vote dilution claim, but a claim that the "State used race as a basis to distribute minority voters into separate districts," citing *Miller v. Johnson*, 515 U.S. at 911.  Plaintiffs' complaint is not, however, that minority voters were collected together into districts as they were in *Miller v. Johnson*, but that they were divided over multiple districts.  In short, they are arguing vote dilution.

Plan was designed to keep the majority of the residents of the State in the same district. As a result, districts under the new State Plan tend to reflect the shape they had under the former state plan, though they may have become more, or less, compact.  Similarly, the pursuit of partisan goals can affect the shape of districts.  Where, as is the case in Maryland, the minority is largely associated with a single party, Exhibit 1, ¶23, that can also affect the distribution of minority voters.

The presence of partisan motivations among others does not, however, establish a violation of the 14th or 15th Amendments.  To the contrary, a showing of partisan considerations rebuts the conclusion that race was the predominant motive for the drawing of the districts.  Thus, where, as in Maryland, race "correlates closely with political behavior," evidence of partisan intent "does not show that racial considerations predominated in the drawing of District 12's boundaries."  *Easley v. Cromartie*, 532 U.S. 234, 258 (2001); *see also Hunt v. Cromartie*, 526 U.S. 541, 551 (1999) (observing that "a jurisdiction may engage in constitutional political gerrymandering even if so happens that the most loyal Democrats happen to be black Democrats and even if the State were conscious of that fact"); *Bush v. Vera*, 517 U.S. 952, 967 (1996) (plurality) ("In some circumstances, incumbency protection might explain as well as, or better than, race a State's decision to depart from other traditional districting principles, such as compactness, in the drawing of bizarre district lines.").

Plaintiffs do not dispute that the plan was driven, to a large extent, by the desire to make an additional district more politically competitive while protecting the other current incumbents, including one Republican.  Although plaintiffs claim that the State Plan

42

moves African Americans to protect white incumbents, Complaint ¶¶ 42 and 44, any such movement may more easily be explained by partisanship or other motives, as *Easley* and *Hunt* both observe.  In the absence of any allegation sufficient under *Iqbal* that racial, not partisan, considerations were the *predominant* motive behind the State Plan, this acknowledgement dooms plaintiffs' claim.

*Garza v. County of Los Angeles*, 918 F.2d 763 (9th Cir. 1990)—which plaintiffs rely upon for their claim that dispersal of African Americans throughout the districts is sufficient to demonstrate intentional discrimination, Complaint ¶61—does not revive that claim.  *Garza* made detailed historical findings regarding the districting of the Board of County Supervisors and concluded that the county supervisors who drew the districts had "intentionally fragmented Hispanic population among the various districts in order to dilute the effect of the Hispanic vote in future elections and preserve incumbencies of the Anglo members of the Board of Supervisors."  918 F.2d at 768.  This finding was based, in part, on exhaustive documentation of discriminatory motives in the redistricting of the Board going back to the 1950's.  *Id.* at 767 n. 1.  The claim was not "merely one alleging disparate impact of a seemingly neutral electoral scheme," but "one in which plaintiffs have made out a claim of intentional dilution of their voting strength."  *Id.* at 770.

Plaintiffs have made no allegation here of a similar link between the alleged fragmentation of minority communities and an alleged intent to preserve "white incumbents," or at least not one that amounts to anything more than the type of "conclusory statement" found insufficient to state a claim in *Iqbal*.  "Without that correlation, intentional discrimination cannot be inferred."  *Fund for Accurate &*

43

*Informed Representation, Inc. v. Weprin*, 796 F. Supp. 662, 670 (N.D.N.Y. 1992).

Moreover, the decision in *Garza* preceded the Supreme Court's decision in *Hunt*, 526

U.S. 541 (1999), and *Easley*, 532 U.S. 234 (2001), in which the Court made clear that

race, not politics, must be shown to be the "predominant factor." As a result, there was

no discussion in *Garza* of whether Hispanic voters were associated with one party or

another. However *Garza* would be decided if it arose today, it does not support the

conclusion that any division of a minority population is unconstitutional, even if the

division results from a focus on party affiliation or other non-racial considerations.

Not only must plaintiffs bear the burden of demonstrating discriminatory intent—

which they have not even sufficiently alleged—they must also propose a map that

satisfies the other traditional goals of the State Plan:

> In a case such as this one where majority-minority districts (or the
> approximate equivalent) are at issue and where racial identification
> correlates highly with political affiliation, the party attacking the
> legislatively drawn boundaries must show at the least that the legislature
> could have achieved its legitimate political objectives in alternative ways
> that are comparably consistent with traditional districting principles. That
> party must also show that those districting alternatives would have brought
> about significantly greater racial balance.

*Easley*, 532 U.S. at 258. Plaintiffs have not proposed a map that meets the legitimate

political objectives of the State, and therefore have not met their burden.

Plaintiffs' other claims concerning intentional discrimination are equally

unavailing. That a district has an "extremely irregular" shape is not alone sufficient to

state a claim; it must be accompanied by a demonstration that race was the *predominant*

factor motivating the drawing of district lines. *Bush v. Vera*, 517 U.S. at 962 ("The

Constitution does not mandate regularity of district shape"; for strict scrutiny to apply, "traditional districting criteria must be *subordinated to race*." (emphasis in original)); s*ee also Kimble v. Willis*, 2004 U.S. Dist. LEXIS 10835 (D. Md. 2004), *affirmed by Kimble v. State Bd. of Elections*, 120 Fed. Appx. 466 (4th Cir. 2005).[17]

The Supreme Court has described cases where "the effect of government action is a pattern unexplainable on grounds other than race" as "rare." *Miller v. Johnson*, 515 U.S. at 913. "In the absence of a pattern as stark as those in *Yick Wo* or *Gomillion*, 'impact alone is not determinative, and the court must look to other evidence' of race-based decision making." *Id.* In *Yick Wo v. Hopkins*, consent for the operation of a laundry in the City and County of San Francisco was uniformly denied to Chinese applicants, and uniformly granted to applicants of other races. 100 U.S. 356, 374 (1886). In *Gomillion v. Lightfoot*, on which plaintiffs rely, Complaint ¶61, the boundaries of a city were redrawn to exclude as many African American communities as possible, dramatically lowering the number of African Americans entitled to vote in municipal elections. 364 U.S. 339 (1960). While the resulting shape was relevant to the Court's consideration of the discrimination claim, it was the resulting exclusion of all but "four or

---

[17] Plaintiffs' attempt to distinguish *Bush* on the grounds that it relates only to the showing needed to trigger strict scrutiny, and not that needed to state a claim, ECF Doc. 16 at 14, ignores the fact that a discrimination claim under the 14th or 15th Amendment requires a showing of intent. Intent is a precondition to the claim; when a plaintiff meets this requirement, the defendant's action must survive strict scrutiny. *Miller v. Johnson*, 515 U.S. at 916, 920. Without a showing of intent, there is no scrutiny. Thus, the showing required to state a claim and the showing required to trigger strict scrutiny are identical, and the statement in *Bush v. Vera* that more than a showing of irregular shape is required to trigger strict scrutiny is the same thing as saying that the showing of irregular borders is insufficient to state a claim.

five" of the African American voters from the city—"while not removing a single white voter or resident"—that was "essential" to a finding of intentional discrimination. *Id*. at 341. No similar showing has been made or can be attempted here.

Nor does plaintiffs' statement that 41.6% of the State's population is minority, but African Americans have only 25% of the districts, PI Memo at 16, suffice to carry their burden of establishing discriminatory intent. Neither the Constitution nor the Voting Rights Act has ever been held to guarantee proportional representation based on race. In fact, the VRA itself disavows any such guarantee. *See* 42 U.S.C. § 1973(b) ("[N]othing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population."). But even if the law were as plaintiffs envision it, plaintiffs' simplistic statistical analysis compares apples to oranges. The proper comparison between the percentage of majority African American districts (25%) and the overall percentage of *African American* voting age population (28%) reveals that the State Plan achieves the closest possible proportional representation. Cain Declaration ¶3.

That some members of the African American community opposed the State Plan is likewise not enough to support plaintiffs' claim of intentional discrimination. Although Congresswoman Donna Edwards, representatives of Fannie Lou Hamer, and "several other African Americans" opposed the plan, many other prominent African Americans testified in favor of the plan, including Prince George's County Executive Rushern Baker, Montgomery County Executive Isiah Leggett, and Baltimore Mayor Stephanie Rawlings Blake. The Black Legislative Caucus proposed two plans, each of which had

46

*two*, not three, majority African American districts.  In fact, eight out of nine African American senators and 31 of 34 African American delegates voted for the State Plan. Plaintiffs' bare allegation that the State had a discriminatory motive, without more, does not mean that a discriminatory motive was present.  *Voinovich v. Quilter*, 507 U.S. 146, 160 (1992).[18]

Plaintiffs make a variety of other allegations relating to the splitting of Prince George's County, the splitting of communities, and the inclusion of African Americans in white districts. Complaint ¶¶ 42, 44, 60, 63; Reply at 11-14.  The splitting of Prince George's County is inevitable, because the County is larger than the ideal congressional district.  In addition, there are 24 jurisdictions in the State, but only eight congressional districts, each of which must have equal population. Accordingly, the larger jurisdictions are likely to be split among districts.  This is geography, not evidence of discriminatory intent.

Moreover, plaintiffs' objections to split communities, for the most part, do not appear to relate to any particular community other than the African American community as a whole.  African Americans are found in all of the districts in the State—not as a result of intentional discrimination, but because African Americans *live* in all parts of the

---

[18]  Plaintiffs allege that their plans "would have created a third majority African American district and otherwise kept the General Assembly's goals in place," but offer no facts in support of that statement.  If anything, it is plaintiffs' plan that runs afoul of constitutional protections, not the State's.  As Professor Cain describes in his Declaration, had the State adopted the third majority minority district proposed in plaintiffs' plan, it would have been exposed to the risk of a suit for racial gerrymandering under *Shaw v. Reno*.  Cain Legislative Report, Exhibit 13, at 2.  The State's desire to avoid this risk and to adopt a plan that complies with the Voting Rights Act while serving its other legitimate objectives is not evidence of intentional discrimination.

State.   But absent a VRA violation, this dispersal does not violate the rights of any person, and even with a showing of a VRA violation, it would not give any particular African American resident the right to be included in a majority African American district.  *Shaw v. Hunt*, 517 U.S. at 917 n. 9.

In those instances in which they allege specific actions that allegedly split *specific* communities, Complaint ¶60, plaintiffs fail to carry their burden of proof to show that various divisions of African American communities reflect intentional discrimination. The only facts plaintiffs allege about these claims are the maps attached as Attachments E and F to the complaint.  These maps are themselves insufficient factual allegations of intentional discrimination.  The line drawn in Attachment F could easily be explained by any number of legitimate redistricting goals.   That the boundary of a district approximates a "horizontal line" says nothing about whether race was a factor, much less the "*predominant* factor" required in order to sustain such an intentional discrimination claim.  *Easley*, 532 U.S. at 241.

Plaintiffs further argue that the State Plan creates minority influence districts, and that the intentional creation of such districts constitutes racial discrimination in violation of the 14th and 15th Amendments.  Complaint ¶64.  Contrary to plaintiffs' arguments, the Supreme Court has held that the United States Constitution allows the creation of influence and crossover districts:

> Assuming a majority-minority district with a substantial minority population, a legislative determination, based on proper factors, to create two crossover districts may serve to diminish the significance and influence of race by encouraging minority and majority voters to work together

toward a common goal.  The option to draw such districts gives legislatures
a choice that can lead to less racial isolation not more.

*Bartlett v. Strickland*, 556 U.S. 1, 129 S.Ct. 1231, 1248 (2009) (plurality opinion of

Kennedy, J., joined by Roberts, C.J. and Alito, J.).[19] The cases on which the plaintiffs

rely, *Miller v. Johnson* and *Georgia v. Ashcroft*, do not say otherwise.  The Court in

*Miller* invalidated the connection of "four discrete, widely spaced urban centers that have

absolutely nothing to do with each other, and stretch the district hundreds of miles across

rural counties and narrow swamp corridors," to create a majority minority district, but did

not address the creation of minority influence districts in areas that naturally have

relatively high African American populations.  *Miller*, 515 U.S. at 908.

The State in *Georgia v. Ashcroft*, 539 U.S. 461 (2003), challenged the denial of

preclearance for a redistricting plan for the Georgia State Senate that retained the same

number of majority minority districts, but lowered the percentage of minorities in each

district from around 60% to just over 50%, and built multiple influence districts.  The

Court held that Section 5 of the Voting Rights Act allows the states to decide "that it is

better to risk having fewer minority representatives in order to achieve greater overall

representation of a minority group by increasing the number of representatives

sympathetic to the interests of minority voters."  *Id.* at 483.  The Court observed further

that "various studies have suggested that the most effective way to maximize minority

voting strength may be to create more influence or coalitional districts."  *Id.* at 482 (citing

---

[19] While only two justices joined this portion of Justice Kennedy's plurality
opinion, four dissenting judges would have gone further, and hold that crossover districts
could be required under the Voting Rights Act.  *Bartlett*, 129 S.Ct. at 1250-51.

studies).  Thus, far from suggesting that minority influence districts are unconstitutional, the Supreme Court has specifically held that such districts are both constitutional and potentially beneficial.[20]

In the end, the Complaint cannot meet the standard set in *Iqbal* simply by repeating that the State Plan intentionally discriminates on the basis of race; it must aver "sufficient factual matter" to support that conclusory statement.  *Iqbal*, 129 S.Ct. at 1949. This it has failed to do.  Accordingly, Counts 1 and 2 must be dismissed or summarily resolved in the State Defendants' favor.

## IV. PLAINTIFFS' CLAIM OF PARTISAN GERRYMANDERING SHOULD BE DISMISSED OR, IN THE ALTERNATIVE, THE STATE IS ENTITLED TO SUMMARY JUDGMENT.

Count 7 of the Complaint makes a mere conclusory allegation that "[t]he state of Maryland's Enacted Congressional District plans is the result of gross partisan gerrymanders, which violate the United States Constitution's Fourteenth Amendment equal protection guarantee by fragmenting cohesive communities of interest and political subdivisions between districts in support of no legitimate, consistently applied state policy."  Complaint ¶78.  This Count patently fails to state a plausible claim because it

---

[20] In their reply to the State defendants' Opposition to the Three Judge Panel, plaintiffs incorrectly represented that the State defendants cited *Georgia v. Ashcroft* "for the proposition that minority influence districts are preferable or permissible in the Section 5 context," and then assert that the case, or at least its holding as to Section 5, has been overruled.  Reply at 9.  The State agrees that Congress altered the test announced in *Georgia v. Ashcroft* for the consideration of Section 5 claims in the Voting Rights Act Reauthorization and Amendments Act of 2006, Pub. L. No. 109-246, § 4, 120 Stat. 577, 580.  The State cited *Georgia v. Ashcroft* in its Opposition to the Three Judge Panel (ECF Doc. 14-1 at 13-14), as it does here, to rebut plaintiffs' claim that the case held that influence and crossover districts were constitutionally invalid, which it clearly does not. See *Bartlett v. Strickland*, 129 S.Ct. at 1249 (plurality) (citing *Georgia v. Ashcroft*).

contains no "factual matter" to support the conclusory allegation. *Iqbal*, 129 S. Ct. at 1949. The claim also lacks any legal substance because, in stating what constitutes the alleged "partisan gerrymander," the Complaint merely recites a version of previously proposed standards that the Supreme Court has deemed unacceptable. As a matter of law, there is no judicially approved definition of what constitutes unlawful partisan gerrymandering.

Indeed, the elusive cause of action known as "political gerrymandering" or "partisan gerrymandering" is now, more than ever, the Flying Dutchman of American jurisprudence. *See* Exhibit 7, Opinion and Order, *Radogno, et al. v. Illinois State Board of Elections, et al.*, No. 11-4884 (N.D. Ill. Nov. 22, 2011) (three-judge court) (unpublished), *id.* at 9 (dismissing partisan gerrymandering claims and observing that "no such ship has yet found this narrow path" to steer any proposed test for partisan gerrymandering between "the Scylla of administrability and the Charybdis of non-arbitrariness"). Since the redistricting that followed the 2000 Census, the Supreme Court has determined that, although such claims may be conceptually justiciable, there are "no judicially discernible and manageable standards for adjudicating political gerrymandering claims. . . ." *Vieth v. Jubilirer*, 541 U.S. 267, 281 (2004) (plurality opinion of Scalia, J., joined by Rehnquist, C.J., O'Connor, J., and Thomas, J.); *see id.* at 307-08 (Kennedy, J., concurring)[21] ("Because there are yet no agreed upon substantive

---

[21] Though there was no majority opinion in *Vieth*, this Court may look to Justice Kennedy's concurrence, which agreed with the plurality that there was no reliable standard for partisan gerrymandering but provided the critical fifth vote in favor of the proposition that such claims remain justiciable. "When a fragmented Court decides a

principles of fairness in districting, we have no basis on which to define clear, manageable, and politically neutral standards for measuring the particular burden a given partisan classification imposes on representational rights."). The Supreme Court subsequently reaffirmed that conclusion in *LULAC*, 548 U.S. at 447 (opinion of the Court by Kennedy, J.) (again finding no "reliable measure of impermissible partisan effect"); *see id*. at 511 (Scalia, J., concurring in the judgment in part and dissenting in part) (noting that "no party or judge has put forth a judicially discernible standard by which to evaluate" political gerrymandering claims).

The Supreme Court's acknowledgment that courts lack any meaningful, workable definition of partisan gerrymandering followed a long history of futility in lower courts, which have repeatedly rejected partisan gerrymandering claims. As the district court recognized in the case that reached the Supreme Court under the name *LULAC v. Perry*, federal courts have decided "an unbroken line of cases declining to strike down a redistricting plan as an illegal partisan gerrymander." *Henderson v. Perry*, 399 F. Supp.2d 756, 761 (E.D. Tex. 2005) (citing seven such cases); *see Vieth*, 541 U.S. at 279-80 (surveying the known partisan gerrymandering cases and observing that "in *all* of the cases" involving redistricting "relief was denied" (emphasis in original)).[22]

---

case and no single rationale explaining the result enjoys the assent of five justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977) (citation omitted).

[22] In *Vieth*, the Supreme Court was able to identify only one instance of any relief being granted based on a theory of partisan gerrymandering, but it involved "merely temporary relief" and the case "did not involve the drawing of district lines." *Id*., 541

All district courts that have thus far applied the Supreme Court's rulings in *Vieth* and *LULAC* to redistricting have uniformly dismissed partisan gerrymandering claims or granted judgment for defendants on the pleadings. *See* Exhibit 7, *Radogno* slip op. at 9 (dismissing amended partisan gerrymandering claims under Rule 12(b)(6) on the ground that "Plaintiffs have not identified a workable standard for partisan gerrymanders"); Opinion and Order, *Committee for a Fair and Balanced Map, et al. v. Illinois State Board of Elections, et al.*, No. 11-5065 (N.D. Ill. Nov. 1, 2011) (three-judge court)(unpublished) (Exhibit 8), *id.* at 19 (dismissing partisan gerrymandering claim under Rule 12(b)(6) "because, with no workable standard yet in existence, the court can't say that its allegations give rise to a plausible claim upon which relief can be granted"; Order, *Perez, et al. v. State of Texas, Rick Perry, et al.*, No. 11-360 (W.D. Tex. Sept. 2, 2011) (three-judge court) (unpublished) (Exhibit 9),   *see id.* at 22, 21 (dismissing partisan gerrymandering claims "on the pleadings pursuant to Rule 12(c)" because the plaintiffs "failed to enunciate a reliable standard" by which "to measure the redistricting plan's alleged burden on their representational rights").

"To illustrate concretely the enormity of th[e] challenge" faced by plaintiffs claiming partisan gerrymandering, the three-judge panel in *Radogno* reviewed the applicable precedent "to identify the standards that a majority of the Supreme Court has rejected." *Id*. at 5.  At pages 5-7 of its Opinion and Order, the *Radogno* court identified

---

U.S. at 279 (emphasis in original) (referring to *Republican Party of N.C. v. Martin*, 980 F.2d 943 (4th Cir. 1992) (preliminary injunction granted in case challenging state's system for electing trial court judges that yielded a judiciary whose members were disproportionately from one political party)).

as many as *seven* proposed standards that the Supreme Court has deemed unacceptable,

including

1. whether evidence shows "intent to discriminate, plus denial of a political group's chance to influence the political process" (standard "rejected by a majority in *Vieth*, 541 U.S. at 281 (plurality opinion))");[23]

2. whether "boundaries were drawn for partisan ends to the exclusion of fair, neutral factors" (standard "rejected by a majority in *Vieth*, 541 U.S. at 290-91 (plurality opinion)");

3. whether "mapmakers acted with the 'predominant intent' to achieve partisan advantage and subordinated neutral criteria," *e.g.*, "where the map 'packs' and 'cracks' the rival party's voters and thwarts the ability to translate a majority of votes into a majority of seats" (standard "rejected by a majority in *Vieth*, [541 U.S. at 284-90]");

4. whether "at a district-to-district level, a district's lines are so irrational as to be understood only as an effort to discriminate against a political minority" (standard "rejected by a majority in *Vieth*, *id*. at 292-95 (plurality opinion)"):

5. "a five-part test requiring a plaintiff to show (1) that he is a member of a cohesive political group; (2) that the district of his residence paid little or no heed to traditional districting principles; (3) that there were specific correlations between the district's deviations from traditional districting principles and the distribution of the population of his group; (4) that a hypothetical district exists which includes the plaintiff's residence, remedies the 'packing' or 'cracking' or the plaintiff's group, and deviates less from traditional districting principles; and (5) that the defendants acted intentionally to manipulate the shape of the district in order to pack or crack his group" (standard "rejected by a majority in *Vieth*, *id*. at 295-98 (plurality opinion)");

6. whether "a statewide plan results in unjustified entrenchment, such that a party's hold on power is purely the result of partisan manipulation and

---

[23] The court in *Radogno* noted that, "[a]lthough Justice Kennedy did not join the *Vieth* plurality," because "he did concur in the conclusion that no reliable standard had been identified and that the claim should be dismissed," it is "appropriate to conclude that a majority of the Justices found all the standards discussed in the *Vieth* plurality insufficient. . . ." *Radogno*, slip op. at 5 n.2.

not other factors" (standard "rejected by a majority in *Vieth*, *id*. at 298-301 (plurality opinion)"); and

7.  whether "the sole intent of a redistricting plan is to pursue partisan advantage" (standard "effectively rejected by a majority in *LULAC*, [548 U.S. at 416-20 (Kennedy, J., announcing the judgment of the Court)").[24]

Like the other unsuccessful plaintiffs who have preceded them, the plaintiffs in this case fail to satisfy the indispensable requirement that "a successful claim . . . of partisan gerrymandering must . . . show a burden, *as measured by a reliable standard*, on the complainants' representational rights."   *LULAC*, 548 U.S. at 418 (opinion of Kennedy, J.) (emphasis added).  To the extent the plaintiffs here identify any standard for their partisan gerrymandering claim, it consists of principles that the Supreme Court has deemed either unacceptable, or irrelevant to a redistricting challenge.  The Complaint's allegation that the district configurations "support . . . no legitimate, consistently applied state policy," Complaint ¶78, evidently refers to a requirement that is found nowhere in the Constitution, pertinent statutes, or applicable precedents. *See Vieth*, 541 U.S. at  295 (rejecting standards that "are not discernible in the Constitution" and have "no relation to Constitutional harms").   The plaintiffs' allegation appears to suggest a variant of the "drawn solely for partisan ends to the exclusion of 'all other neutral factors'" test, which the Supreme Court considered and rejected in *Vieth*, 541 at 290-91.  If, as the Supreme

---

[24]   The *Radogno* court noted that "[a]lthough Justice Kennedy wrote only for himself in the section of the opinion discussing and rejecting the appellants' 'sole motivation' theory, four other Justices effectively concurred in that conclusion.  *LULAC*, 548 at 492-93 (Roberts, C.J., concurring in part, concurring in the judgment in part, dissenting in part); id. at 511-12 (Scalia, J., concurring in the judgment in part and dissenting in part)." *Radogno*, slip op. at 7 n.3.

Court has determined, a plan's exclusion of "*all*" other neutral factors does not suffice to show an unconstitutional partisan gerrymander, then it follows that the Constitution is not offended by the failure to apply a "legitimate, consistently applied state policy," which is merely one possible subset of "all other neutral factors."

The Complaint's allegation that Maryland's plan "fragment[s] cohesive communities of interests and political subdivisions," Complaint ¶78, does not state any basis for a finding of partisan gerrymandering, or any other cognizable claim.   No provision of the United States or State Constitution, or federal or State law, *requires* the State to preserve particular communities of interest in the drawing of Congressional districts.   Although both the Supreme Court and the Maryland Court of Appeals have recognized communities of interest as a legitimate factor that a legislature *may* consider in redistricting, *Miller*, 515 U.S. at 920; *Matter of Legislative Districting of the State*, 370 Md. 312 (2002) (holding districts may be drawn to preserve communities of interest only where it does not interfere with the accomplishment of a constitutional requirement), neither court has required such consideration.   Therefore, an allegation of a failure to preserve communities of interest necessarily fails to state a claim on which relief can be granted.   Similarly, though a State's plan may attempt to honor the boundaries of political subdivisions, the rigid one person-one vote mandate tends to result in Congressional districts crossing the boundaries of political subdivisions.   *See, e.g., Reynolds*, 377 U.S. at 578-79 (noting that, although a "State may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible . . . the overriding objective must be substantial equality of population among the various districts"); *Connor v. Finch*, 431

56

U.S. 407, 419 (1977) ("Recognition that a State may properly seek to protect the integrity of political subdivisions or historical boundary lines permits no more than 'minor deviations' from the basic requirement that legislative districts must be 'as nearly of equal population as is practicable.'" (citations omitted)).

Therefore, the plaintiffs have failed to identify "a reliable standard," *LULAC*, 548 U.S. at 418, and this Court should follow the example of the three-judge district courts convened elsewhere, which have dismissed partisan gerrymandering claims on that ground.

To confirm that dismissal is the appropriate disposition of the partisan gerrymandering claim, this Court may also do as the Supreme Court has done in such cases. "In the absence of any . . . workable test for judging partisan gerrymanders," *LULAC v. Perry*, 548 U.S. at 420, the Supreme Court has resorted to a simple comparison as a means of confirming the implausibility of a plaintiff's claim. Thus, in that case, the Court showed that the challenged redistricting plan in Texas was "fairer than the [Pennsylvania] plan that survived in *Vieth*," which had "led to a Republican majority in the congressional delegation despite a Democratic majority in the statewide vote." *LULAC v. Perry*, 548 U.S. at 419. The Texas plan could be deemed "fairer" on its face than the plan upheld in *Vieth*, and, therefore, not constitutionally suspect, because "a congressional plan that more closely reflects the distribution of state party power," as the Texas plan did, "seems a less likely vehicle for partisan discrimination than one that entrenches an electoral minority," as the Pennsylvania plan did. *LULAC v. Perry*, 548 U.S. at 419.

The lower court in *LULAC* performed an even more telling comparison, showing that with the adoption of the plan approved in *Vieth*, the Republican share of Pennsylvania Congressional seats increased 11% over the next two election cycles (from 52% of seats to 63%), even as Republicans' average percentage of votes cast in major statewide elections decreased during that same period by 3% (from 49% to 46%). *Henderson v. Perry*, 399 F. Supp.2d at 769-70 and n.58. That is, in *Vieth*, "the party that garnered, on average, less than half the vote in statewide races was able to capture nearly two-thirds of Pennsylvania's congressional seats." *Id*. at 770. "In contrast, the plan passed by the Texas legislature resulted in the election of twenty-one Republicans and eleven Democrats to the House of Representatives in 2004," resulting in a 66% to 34% ratio of representation, "when the Republican Party carried 58% of the vote in statewide races and the Democratic Party carried 41% of the vote." *Id.* From this comparison, the court concluded that "if the effects of the Pennsylvania plan did not provide a basis to find excessive partisanship in redistricting, it is hard to see how the effects of the Texas plan make it constitutionally offensive." *Id.*

Using that same form of comparison in this case, this Court can easily confirm that the plaintiffs have not stated a plausible claim of partisan gerrymandering. The Complaint contains no allegation that could possibly be construed to demonstrate or suggest that Maryland's newly adopted Congressional districting will yield electoral opportunities or results that are less fair, or any less representative of the State's electorate, than those produced by either the Pennsylvania plan upheld in *Vieth* or the Texas plan in *LULAC v. Perry*, where the Supreme Court affirmed the rejection of a

58

statewide partisan gerrymandering challenge.   Indeed, the Complaint contains no allegation to suggest how Maryland's plan may determine or affect the success of candidates from any political party in future Congressional elections.   The Complaint does not allege that Maryland's plan involves what has been called the more "likely vehicle for [objectionable] partisan discrimination," because there is no suggestion that the plan "entrenches an electoral minority," as the Pennsylvania plan did.   *LULAC v. Perry*, 548 U.S. at 419.   Toward the other extreme, even if the plaintiffs had alleged—as they have not—that Maryland's plan may possibly improve the chances for success of candidates from the political party that claims the majority of Maryland's registered voters, the plan could not plausibly be construed to effect a change that favors the majority party to a degree greater than the Republican party benefitted from either the plan in Texas, where Republicans claim a majority of voters, or the plan in Pennsylvania, where they do not.

For these reasons, plaintiffs' claims of partisan gerrymandering fail to state a claim upon which relief can be granted, and must be dismissed or summarily resolved in the State Defendants' favor as a matter of law.

\* \* \*

## RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AS TO COUNTS THREE AND SIX OF THE COMPLAINT

A preliminary injunction is an extraordinary remedy never awarded as of right."
*Winter v. Natural Resources Defense Council, Inc*., 129 S. Ct. 365, 376 (2008).  In order to obtain such relief, plaintiffs "must demonstrate by 'a clear showing'" that they satisfy

*all* four requirements for injunctive relief:  (1) "that it will likely succeed on the merits at trial"; (2) "that it is likely to be irreparably harmed absent preliminary relief"; (3) "that the balance of equities tips in [their] favor"; and (4) "that an injunction is in the public interest."  *Real Truth About Obama, Inc. v. Federal Election Comm'n*, 575 F.3d 342, 345-47 (4th Cir. 2009) (quoting *Winter*, 129 S. Ct. at 376, 374, 375-77 (2008)), *vacated on other grounds by Real Truth About Obama*, *Inc. v. Federal Election Comm'n*, 130 S.Ct. 2371 (Apr. 26, 2010), *decision reinstated in relevant part on remand*, 607 F.3d 355 (4th Cir. June 8, 2010).  After *Winter*, "[t]he standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success."  *Winter*, 129 S. Ct. at 381.

   As the Fourth Circuit recently explained, *Winter* effectively abrogates the Fourth Circuit's prior standard for preliminary injunctive relief and precludes the "'flexible interplay' among all the factors considered," *Blackwelder v. Furniture Co. of Statesville v. Seilig Manufacturing Co*., 550 F.2d 189, 196 (4th Cir. 1977), which formerly allowed the requirements for a preliminary injunction "to be conditionally redefined as other requirements [were] more fully satisfied."  *Real Truth*, 575 F.3d at 347.   Unlike *Blackwelder* and its progeny, which permitted a plaintiff to obtain an injunction by making a strong showing as to one or more factors but a relatively weak showing as to other factors, *Winter* now requires each of its four requirements to be proven independently.  *Real Truth*, 575 F.3d at 347.  Thus, while preliminary injunctions have always been "extraordinary remedies involving the exercise of very far-reaching power to

60

be granted only sparingly and in limited circumstances," *Microstrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (internal quotation marks omitted), the test for the exercise of that "power" is now more exacting under *Winter* and *Real Truth*.

Rather than satisfy each requirement, plaintiffs, relying almost exclusively on First Amendment cases, contend that their argument as to the first prong—likely success on the merits—obviates the need to make an independent showing with respect to "irreparable harm," Motion at 5, or "the remaining two factors for granting a preliminary injunction." *Id*. at 14. This Court should deny plaintiffs the extraordinary relief they seek because they misapply the post-*Winter* standard, have little likelihood of success on the merits, and because temporarily enjoining the use of the State Plan will cause significant disruption to the upcoming election cycle, preparations for which must begin by December 14, 2011.

**A.      Plaintiffs Have Not Made a Clear Showing that they are Likely to Succeed on the Merits:  The Maryland Plan Creates Congressional Districts that are as Equal in Population as is Mathematically Possible.**

As discussed at pages 13-29 above, plaintiffs cannot prevail on the merits of Counts 3 and 6, the only two claims for which they have moved for preliminary injunctive relief. *Karcher* and the subsequent appellate cases have answered the "question" posed by *Kirkpatrick*, and establish that the states are free to base congressional redistricting on adjusted census data as long as they do so in a thorough and systematic manner, as Maryland has done here. But even if *Karcher* had not come out as it did and there still "may be a question whether distribution of congressional seats

61

except according to total population can ever be permissible under Art. I, § 2," *Kirkpatrick*, 394 U.S. at 534, a plaintiff seeking preliminary relief must now do more than just raise "a grave or serious question." *Real Truth*, 575 F.3d at 347. And while it may be theoretically possible that this Court could become the first federal court to conclude that *Travis v. King*, despite its many flaws and the weight of countervailing authority, nevertheless captures the law of the land, a plaintiff seeking preliminary relief must show more than "only a *possibility* that it will eventually prevail." *Real Truth*, 575 F.3d at 349 (emphasis in original). Rather, under *Winter*, a plaintiff must "clearly demonstrate that it will *likely succeed* on the merits," *id.* at 347—a standard that is "far stricter" than the traditional *Blackwelder* standard. *Id.* Because plaintiffs have not met that standard, this Court should withhold the extraordinary relief plaintiffs' seek, particularly when any "possibility" that they may prevail at trial is far outweighed by the disruption that an injunction would cause to Maryland's electoral process.

**B.  Plaintiffs Have Not Made a Clear Showing That They Will Be Irreparably Harmed Absent an Injunction.**

Under *Winter*, the plaintiff must make a "clear showing" that it will suffer harm that is irreparable; no longer is it sufficient, as it might have been under *Blackwelder*, merely to show that the plaintiff's injury will outweigh the defendant's, or that harm to the plaintiff is only a "possibility." *Real Truth*, 575 F.3d at 347. Plaintiff makes no effort to show—much less make a "clear showing," *Real Truth*, 575 F.3d at 351—that they will suffer irreparable harm if the 2012 Presidential primary is conducted using the State Plan. Instead, plaintiffs argue simply that, "where likelihood of success is

demonstrated irreparable harm is found."  PI Memo at 5.  It is precisely this sliding-scale approach to the preliminary injunction analysis that the Fourth Circuit repudiated in *Real Truth*.  575 F.3d at 345-47.

Even if satisfying one portion of the preliminary injunction test did ease the plaintiffs' burden on the others, all but one of the cases plaintiffs cite for the proposition that likelihood of success equals irreparable harm relate to "'[t]he loss of First Amendment freedoms [which], for even minimal periods of time, unquestionably constitutes irreparable injury.'"  *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also, e.g., Tepeyac v. Montgomery County*, 779 F. Supp. 2d 456, 472 (D. Md. 2011).  The one exception is *Dean v. Leake*, 550 F. Supp. 2d 594 (E.D.N.C. 2008), which is a redistricting case, but on this point, the only two cases it relies upon—*Elrod v. Burns* and *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507 (4th Cir. 2002)—are themselves First Amendment cases.

The case law makes clear that First Amendment cases are different.  The Eleventh Circuit has addressed this point directly:

> Plaintiffs also contend that a violation of constitutional rights always constitutes irreparable harm.  Our case law has not gone that far, however. . . .  The only areas of constitutional jurisprudence where we have said that an on-going violation may be presumed to cause irreparable injury involve the right of privacy and certain First Amendment claims establishing an imminent likelihood that pure speech will be chilled or prevented altogether.

*Siegel v. LePore*, 234 F.3d 1163, 1177-78 (11th Cir. 2000) (citations omitted).  And even if within the unique context of free speech, "the assertion of First Amendment rights does not *automatically* require a finding of irreparable injury, thus entitling a plaintiff to a

63

preliminary injunction if he shows a likelihood of success on the merits." *Hohe v. Casey*, 868 F.2d 69, 72-73 (3d Cir. 1989) (emphasis added). The cases plaintiffs cite simply do not establish that they are exempt from the need to demonstrate irreparable harm, particularly after *Winter* raised the bar for issuance of a preliminary injunction.

Even assuming that plaintiff could somehow prove that the No Representation Without Population Act is unconstitutional, these plaintiffs—or at least eight of the nine of them—cannot show irreparable injury because they have not been harmed at all. Courts are uniform in holding that, to demonstrate constitutional harm, a voter must reside in an overpopulated (and thus underrepresented) district not an underpopulated (and thus overrepresented) district. *See, e.g.,Wright v. Dougherty County, Georgia*, 358 F.3d 1352, 1355 (11th Cir. 2004) (because plaintiffs resided in overrepresented districts, they "have not suffered any harm or injury by the malapportioned voting districts; in fact they have benefitted from it"); *League of Women Voters of Nassau County v. Nassau County Board of Supervisors*, 737 F.2d 155, 161 (2d Cir. 1984) (voters in overrepresented municipalities suffered no cognizable harm from challenged weighted voting system); *Fairley v. Patterson*, 493 F.2d 598, 603 (5th Cir. 1974) (in one person, one vote case, "injury results only to those persons domiciled in the under-represented voting districts"); *Skolnick v. Board of Commissioners of Cook County*, 435 F.2d 361 (7th Cir. 1970) (same).

Thus, if the Court accepts plaintiffs' argument that the districts are not of equal population, it must follow that those plaintiffs who reside in underpopulated (and thus overrepresented) districts are not harmed by the alleged malapportionment. Plaintiffs

Fletcher, Otts, Glover, Hagey, Harris, Thompson, Williams, and Spruill allege that they are residents of, variously, the 4th, 5th, 7th, and 8th Districts, Complaint ¶¶ 6-9, 11-14, all of which they allege to be *under*populated (and thus overrepresented).  Complaint at Exhibit C.  As a result, none of these eight plaintiffs can allege irreparable harm.  And while one plaintiff, Winnie Mae Campbell, does reside in an allegedly underrepresented district (District 2), that cannot overcome the fact that the larger plaintiff group overwhelmingly benefits from the No Representation Without Population Act—a fact that comes into bold relief when balancing the equities.

### C.   Plaintiffs Have Not Made a Clear Showing that the Equities Tip in Their Favor.

Any harm to the one plaintiff who resides in a district that would be benefitted by counting prisoners at their place of incarceration is more than outweighed by the serious disruption that an injunction would cause to the electoral process.  The State's Plan was enacted during a special session of the General Assembly and signed into law as an emergency measure on October 20, 2011.  The deadline for candidates to register for the April 3, 2012 primary election is January 11, 2012, less than six weeks away.  Md. Code Ann., Election Law § 8-201(a)(2)(ii).  Early voting begins on March 24, 2012—just sixteen weeks from now.

More importantly, the State must mail absentee ballots to absent uniformed services and overseas voters by Friday, February 17, 2012, in accordance with the MOVE Act. 42 U.S.C. § 1973ff-1(a)(8).  "Voting by absentee ballot provides these men and women with their only meaningful opportunity to vote in state and federal elections while

they are deployed." *Doe v. Walker*, 746 F. Supp. 2d 667, 679 (D. Md. 2010).  Thus, any delay that does not give military personnel deployed overseas sufficient time to receive, fill out, and return their absentee ballots "imposes a severe burden on absent uniformed services and overseas voters' fundamental right to vote." *Id*. at 680; *see also* Declaration of Donna J. Duncan (Exhibit 6).

In addition to the potential burden it places on overseas military personnel, this suit imposes a substantial burden on the State and local boards of election. As described by the Director of Election Management for the Maryland State Board of Election, the State and local election boards must perform a number of necessary tasks to implement a new redistricting plan in preparation for the upcoming election. Exhibit 6 ¶¶10-17. Redistricting involves substantial manual changes to the State's various election databases, as well as review and modification of election plans relating to staffing, equipment, voting supplies, and site selection for any new polling places required— typically facilities, such as schools, that require significant advance notice to reserve. *Id.* ¶¶10-17. To implement a redistricting plan, election officials must mark new lines on a map, determine new districts, and verify their accuracy in the voter registration database. *Id.* ¶13. Elections officials must then identify which precincts are affected by the new lines and design new precincts based on all the multiple districts (congressional, legislative, council, board of education, and election districts) to be assigned to the newly reconfigured precincts. *Id.* ¶13.

The tasks involved are extensive and the time reasonably necessary for the State and local boards to analyze, plan, and implement new precincts and polling places to

conform to a redistricting plan may be as long as five or six weeks. *Id.* ¶12. In addition, election officials must verify and change, where necessary, office and candidate databases impacted by the newly configured districts, and notify any filed candidates about the changes. *Id.* ¶11. Should new lines be drawn near an election, the increase in workload would happen at a time when elections officials and staff are already involved in election preparations and other ongoing responsibilities. *Id.* ¶19. At a minimum, drawing new lines in January 2012 would create additional risks to the preparation and orderly conduct of the primary elections in compliance with the MOVE Act. *Id.* ¶21.

The Fourth Circuit has stated that the potential for "great disruption in the election process in Maryland" provides a basis for withholding the injunctive relief plaintiffs seek here, particularly, but not exclusively, when the plaintiff has delayed filing suit. *See Maryland Citizens for a Representative General Assembly v. Governor of Maryland*, 429 F.2d 606, 611 (4th Cir. 1970); *Simkins*, 631 F.2d at 295. The Supreme Court has gone further, making it clear on several occasions that injunctive relief may be inappropriate in a redistricting case even where a violation has been *shown* if the election is too close for the State to realistically be able to adopt and implement a new plan before the election:

> [U]nder certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid. In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles. With respect to the timing of relief a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make

> unreasonable or embarrassing demands on a State in adjusting to the
> requirements of the court's decree.

*Reynolds v. Sims*, 377 U.S. at 585; *see also Wells v. Rockefeller*, 394 U.S. 542, 547

(1969); *Kilgarin v. Hill*, 386 U.S. 120, 121 (1967). And in *Whitcomb v Chavis*, the

Supreme Court permitted an election to be held in Indiana even though the District Court

had found the Indiana apportionment statute to be unconstitutional.  396 U.S. 1055

(1970); *Whitcomb v. Chavis,* 396 U.S. 1064 (1970); *see also Chavis v. Whitcomb* 305 F.

Supp. 1364 (D. Ind.1969).   In that case, the federal court's plan was announced

December 15, 1969, over two months before the beginning of the period for filing of

declarations of candidacy, yet the Court stayed the order of the lower court, and later

refused to dissolve the stay, thus allowing the election to proceed as planned.  The Fourth

Circuit has once before applied *Chavis* to deny a preliminary injunction in a case with

more than passing resemblance to this one:

> We believe that the same considerations which are present in *Chavis* are
> present in this case, and that here, as in *Chavis*, the federal courts should
> withhold relief regardless of the merits of the plaintiffs' claim.  In *Chavis*,
> as here, the validity of the plaintiffs' claim for relief turns on legal
> questions, the answers to which are not clearly or determinatively
> established.  In *Chavis*, as here, reapportionment prior to the 1970 elections
> would be particularly disruptive of legislative stability and continuity.  In
> *Chavis*, a reapportionment plan was not approved until three months prior
> to the filing deadline for the 1970 elections.  Here a reapportionment plan
> could not possibly have been approved earlier than a few weeks before the
> filing deadline.  In *Chavis*, where, unlike here, the suit was brought long
> before the election, the state refused to undertake reapportionment even
> though there had been a judicial determination that the existing
> apportionment was invalid and the court had given the state an opportunity
> to act.  Here, as we pointed out above, the state has in no way been
> recalcitrant in not reapportioning.  We can only conclude that if relief was
> appropriately withheld in *Chavis*, *a fortiori*, it must be withheld in this case

*Maryland Citizens*, 429 F.2d at 610-11.  Thus, even if plaintiffs' claims here had merit, *Chavis*, and the Fourth Circuit's conclusions about it, establish that plaintiffs cannot satisfy the third necessary component for the award of injunctive relief.

### D.  Plaintiffs Have Not Made a Clear Showing that a Preliminary Injunction is in the Public Interest.

Whereas the public interest requirement sometimes received little more than *pro forma* consideration under *Blackwelder*, *see Real Truth*, 575 F.3d at 347, *Winter* emphasizes the public interest and insists that a court of equity should "'pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'"  *Winter*, 129 S. Ct. at 376-77 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).   As further explained in *Romero-Barcelo*, if the requested preliminary injunction "'will adversely affect a public interest . . . the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff.'"  *Id.*, 456 U.S. at 312 (quoting *Yakus v. United States*, 321 U.S. 414, 440 (1944)).

Special public considerations apply in the elections context when a claimant comes before a court seeking injunctive relief.  In such cases, the court is "required to weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases."  *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).  The Supreme Court observed that lower court orders affecting elections can "result in voter confusion and consequent incentive to remain away from the polls."  *Id.* at 4-5.

The "considerations specific to election cases" recognized by the Supreme Court in its opinion are not new.  Indeed, in *Reynolds v. Sims,* the Court said: "In awarding or

69

withholding immediate [injunctive] relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles." 377 U.S. at 585. The Court elaborated on the equitable considerations that bear on the timeliness of an election challenge, stating: "[A] court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree." *Id.*; *see also Wells*, 394 U.S. at 547; *Kilgarin*, 386 U.S. at 121. Following this rationale, courts have denied or dismissed claims for injunctive relief on equitable principles based on the nearness of the elections and the harm to the State, candidates, and citizens from the disruption of the electoral process. *See, e.g., Purcell*, 549 U.S. 1; *White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990); *Knox v. Milwaukee County Bd. of Elections Comm'rs*, 581 F. Supp. 399, 402 (E.D. Wis. 1984). Given the close proximity of the upcoming elections, the public interest weighs heavily in favor of withholding such relief here.

*   *   *

Even if the balance of harms and public interest weighed in their favor, plaintiffs cannot meet the *Winter* standard for issuance of a preliminary injunction on the grounds that there "may be a question whether distribution of congressional seats except according to total population can ever be permissible under Art. I, § 2." *Kirkpatrick*, 394 U.S. at 534. While raising "a grave or serious question" may have sufficed under the now-repudiated *Blackwelder* standard, a plaintiff seeking preliminary relief must now

70

make a "clear showing" that he will ultimately prevail at trial.

Plaintiff cannot meet this standard. *Karcher* and the appellate cases that have been decided in the years since *Kirkpatrick* make clear that the states are free to base congressional redistricting on adjusted census data as long as they do so in a thorough and systematic manner, as Maryland has done here. But even if that were not the case, even if it were plaintiffs that had the upper hand on the merits of Counts 3 and 6, that would not be enough to justify the extraordinary relief plaintiffs seek here. As the Supreme Court made clear in *Winter*, "[a]n injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." 129 S. Ct. at 381. Accordingly, even if the Court does not dismiss the complaint outright or grant the State summary judgment, it should still stand its hand, deny plaintiffs' motion, and allow the Maryland electoral process to proceed without further delay.

## CONCLUSION

For the reasons set forth above, plaintiffs' motion for preliminary injunction should be denied and the Complaint dismissed or, in the alternative, summary judgment should be entered in favor of the State Defendants.

Respectfully submitted,

DOUGLAS F. GANSLER
Attorney General of Maryland

/s/

_____
DAN FRIEDMAN (Bar No. 24535)
KATHRYN ROWE (Bar No. 09853)
Assistant Attorneys General
104 Legislative Services Building

71

90 State Circle
Annapolis, Maryland 21401
(410) 946-5600 (telephone)
(410) 946-5601 (facsimile)
dfriedman@oag.state.md.us

ADAM D. SNYDER (Bar No. 25723)
STEVEN M. SULLIVAN (Bar No. 24930)
Assistant Attorneys General
Office of the Attorney General
Civil Division
200 St. Paul Place
Baltimore, Maryland  21202
(410) 576-6326
(410) 576-6955 (fax)
asnyder@oag.state.md.us

Attorneys   for   Defendants   Linda   H.
Lamone and Robert L. Walker

Dated: December 2, 2011

72

## EXHIBIT LIST

Exhibit 1:            Declaration of Bruce Cain

Exhibit 2:            Declaration of James Cannistra

Exhibit 3:            Declaration of Kevin Combs

Exhibit 4:            Declaration of Karl Aro

Exhibit 5:            Declaration of Dan Friedman

Exhibit 6:            Declaration of Donna Duncan

Exhibit 7:            *Radogno, et al. v. Illinois State Board of Elections, et al.*, No. 11-4884 (N.D. Ill. Nov. 22, 2011) (three-judge court) (unpublished)

Exhibit 8:            *Committee for a Fair and Balanced Map, et al. v. Illinois State Board of Elections, et al.*, No. 11-5065 (N.D. Ill. Nov. 1, 2011) (three-judge court) (unpublished)

Exhibit 9:            *Perez, et al. v. State of Texas, Rick Perry, et al.*, No. 11-360 (W.D. Tex. Sept. 2, 2011) (three-judge court) (unpublished)

Exhibit 10:           Press Release, Maryland Department of Planning, Advisory Committee Submits Proposed Congressional Redistricting Plan to Governor, Releases Map
October 4, 2011

Exhibit 11:           Press Release, Governor O'Malley Receives Proposed Congressional Redistricting Map, October 4, 2011

Exhibit 12:           Press Release, Statement from Governor Martin O'Malley on the Release of the Proposed Congressional Redistricting Map
October 15, 2011

Exhibit 13:           Attorney General's Bill Review Letter regarding Senate Bill 1, October 20, 2011

Exhibit 14:           Third Party Plan Submission, Legislative Black Caucus of Maryland Congressional Redistricting Plans, supporting documentation.

| | |
|---|---|
| Exhibit 15: | Governor's Redistricting Advisory Committee, Third Party Plan Submissions |
| Exhibit 16: | Federal Bureau of Prisons denial letter to Secretary Hall, October 7, 2010 |
| Exhibit 17: | Department of Justice denial letter to Secretary Hall, March 2011 |
| Exhibit 18: | Transcript of the Governor's Redistricting Advisory Committee hearing, July 25, 2011 |
| Exhibit 19: | Maryland Department of Planning, Adjusted 2010 Census Population – Ideal District Population |
| Exhibit 20: | Arizona Redistricting Commission Congressional Map Population Table |
| Exhibit 21: | Maryland Department of Planning, Correctional Facilities by 2011 Congressional Districts |
| Exhibit 22: | *Little v. New York State Task Force on Demographic Research and Reapportionment*, No. 2310-2011 (N.Y. App. Div., Dec. 1, 2011) |
| Exhibit 23: | Maryland Department of Planning, 2011 Districts Unadjusted 2010 Non-Hispanic By Race Age 18 and Over |
| Exhibit 24: | Maryland Department of Planning 2011 Districts Adjusted 2010 Population By Race |