**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION**

|  |  |  |
|---|---|---|
| PATRICIA FLETCHER, *et al.*, | * | |
| *Plaintiffs*, | * | |
| v. | * | Civil Action No: 8:11-cv-03220-RWT |
| LINDA H. LAMONE, *et al.*, | * | |
| *Defendants*. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**<u>DECLARATION OF BRUCE E. CAIN</u>**

I, Bruce E. Cain, being competent to testify, hereby affirm on my personal knowledge as follows:

1. I am the Heller Professor of Political Science at UC Berkeley and the Executive Director of the UC Washington Center. I have written a book on redistricting (*The Reapportionment Puzzle*), co-authored another (*Congressional Redistricting*) and co-edited a third (*Party Lines*). I have also written numerous articles and book chapters about the Voting Rights Act, racial and ethnic politics, and voting behavior as well as redistricting. I have worked as a redistricting consultant for local and state governments and served as Court Master for a three judge district panel in Arizona in 2002. I have attached a copy of my c.v.

2. I was retained by the Maryland Attorney General's Office to assess the state's obligations under the Voting Rights Act (VRA) of 1965 as amended in 1982. Since Maryland is not covered by Section 5, the relevant part of the VRA is Section 2 which prohibits voting practices and procedures that discriminate on the basis of race, color or membership in a designated language minority group. When the VRA was amended in 1982, the Congress supplemented the previous intent standard established under Mobile v Bolden 446 US 55 (1980) with a totality of circumstances test that asks whether in the context of various considerations a

Exhibit 1

standard, practice or procedure (in this case a redistricting plan) has the effect of denying a protected minority group an equal opportunity to elect a candidate of choice. The Supreme Court reviewing the 1982 revisions developed a three prong test in Thornburg v Gingles 478 US 30 (1986) that all states and local jurisdictions follow when assessing their Section 2 redistricting liability.  Because these tests are empirical, they are usually conducted by political scientists.

     3. According to the 2010 census, African Americans currently constitute 28% of the state's voting age population (VAP). The 2011 Congressional districting plan passed by the Maryland state legislature and signed by the Governor rightly preserves two majority African American VAP districts, one centered in Prince George's County in the DC suburbs and the other in Baltimore area.  This means that 25% of the state's Congressional districts are majority African American VAP.  The central VRA question is whether the state is obliged under the Gingles criteria to create a third majority African American Congressional district linking the residual African American population in the DC area and Southern Maryland to the residual African American population in Baltimore to the north.  This would mean that 37.5 % of the state's Congressional delegation (3/8) would be majority African American VAP.

     4. Section 2 claims normally arise in situations of exclusion or significant under-representation.  Leaving aside the judicial merits of a super-proportionate claim, it is my judgment, after assessing the Gingles test results, that voting along racial lines is neither sufficiently nor consistently polarized as to require such a remedy.  In addition to preserving two majority African American VAP seats, the state's plan provides two coalition districts that can potentially be won by African American candidates given past racial and ethnic voting patterns.

     5. A second and different VRA claim is that because Montgomery is a majority minority county, the state is obliged to create a new majority minority Congressional district there.  But do Non-White  minorities constitute a cohesive voting block and is Non-Hispanic White voting so polarized in Montgomery County that an African American candidate can only win in a majority minority VAP district?  My conclusions with respect to this claim are that Latinos and Asian-Americans are reliable November allies for African Americans but are not part of a cohesive African American voting bloc and that Non-Hispanic White support for African American candidates has been quite high in many instances in Montgomery County.

     6. There are three questions to be answered under the Gingles standard: first, is the protected minority group sufficiently large and concentrated in a

Exhibit 1

reasonably compact area as to constitute a majority of a district; second, is the group politically cohesive; and third, does it face racial polarization by the majority Non-Hispanic White population? To answer the first question, I mapped the voting age population (VAP) concentrations of African Americans, Latino and Asian-Americans using the 2010 Census data, and determined whether there were reasonably compact voting age (VAP) concentrations of those groups sufficient to constitute a majority of the ideal population (721,259) for a Maryland Congressional district.

      7. There has been significant growth in Maryland's minority populations, particularly in Prince George's and Montgomery counties, both of which are now majority minority in population. However, this growth does not directly translate into electoral strength when the rates of non-citizenship and under age 18 population are high in a given minority group. Montgomery County, for instance, is not majority minority in terms of VAP; it is 51.7% Non-Hispanic White VAP. Since there are no reliable estimates of citizenship (CVAP), we must rely on voting age population (VAP) as the best proxy. Based on the 2010 Census data for Maryland, the Latino and Asian-American populations have not yet reached the critical 50% VAP concentration threshold of a size required for a Congressional district, and therefore do not qualify under the first Gingles prong.

      8. The African American case, however, is different. I determined that there were sufficient, reasonably compact African American population concentrations in both the Baltimore and Prince George's/Montgomery County areas to preserve the state's two majority African American VAP Congressional districts. This is reflected in the two 50% plus African American VAP districts (Congressional Districts 4 and 7) in the Governor's 2011 Congressional Redistricting Plan. I further explored whether there was enough African American population concentration in either the Baltimore or Prince Georges/Montgomery counties to create a third majority African American district while preserving the other two majority African American seats. My conclusion was that there was not.

      9. This seems to have been the judgment implicit in all but one of the submitted third party plans, including the Legislative Black Caucus. The exception was the Fannie Lou Hamer PAC Plan #1 that added a new majority African American VAP district by linking African American populations in the Baltimore area in the north with the Prince George's/Montgomery/Anne Arundel areas in the south by means of a narrow corridor through intervening predominantly Non-Hispanic White areas. The same group subsequently produced a second, less contorted version—introduced by Senator Pipkin--which they called District 5 on their maps and characterized in their court documents as compact. It is, however,

clearly an elongated district that sprawls over three regional areas of Maryland (Southern Maryland, DC suburbs and Baltimore) for the sole purpose of connecting two disparate African American areas. The compactness scores for District 5 (the third African-American seat) supplied to prove its compactness are wrong.  On page 12 of Attachment D, containing information about Senator Pipkin's plan (the revised Fannie Lou Hamer plan), they provide computer generated Roeck (i.e. a measure of how spread out a district is) and Polsby-Popper (i.e. a measure of how smooth the boundary is) scores for District 5 of .36 and .31 that are well above the other district scores. The higher the scores, the more compact and smooth the boundaries. When I entered the boundaries, replicating their population scores and boundary shapes, I got scores for District 5 of .15 and .12, far below the plan averages of .34 and .27 and also far below the other two majority African-American seats (District 7 .64/.47 and District 4 .35/.20).  Even without the scores, it is clear that District 5 is elongated, not compact.

      10. Under the Governor's 2011 Redistricting Plan, there is only one district that is over 70% Non-Hispanic White VAP.  Under Fannie Lou Hamer plan #1, there are 4 seats over 70% Non-Hispanic White VAP (including 2 over 80%), and under Fannie Lou Hamer Plan #2, there are 3 over 75% Non-Hispanic White VAP.  In other words, the third seat is created by concentrating Non-Hispanic White voters in other neighboring seats. There are no incumbent, political or good government reasons to draw a seat that extends from Charles County in the south to Baltimore County in the north.  The only rationale for district 6 in the Fannie Lou Hamer plan #1 and district 5 in the Fannie Lou Hamer plan #2 is to create a third majority African American VAP seat. Plaintiffs maintain that the state violated the Voting Rights Act by not adopting either of the Fannie Lou Hamer PAC proposals even though the Governor's plan gives Maryland's African American community a near proportionate share of the state Congressional delegation and several potentially winnable coalition/influence seats.  Their implication is that Non-Hispanic White polarized voting in Maryland is so severe that African American candidates cannot hope to win unless they have a majority African American VAP seat.  The evidence of my cohesion and polarization tests suggests otherwise.

      11. The second step in the Gingles test is whether the minority group of concern is politically cohesive.  This judgment is based on analysis of past voting and survey returns as well as the scholarly literature on racial and ethnic voting tendencies. Cohesion measures whether a minority group votes sufficiently as a bloc such that it has a common interest that can be protected by the VRA. Polarization measures whether the Non-Hispanic White majority votes as a cohesive bloc against a particular minority group.  Aside from polling evidence,

the standard test for both cohesion and polarization examines racial voting patterns in political contests between White and Non-White candidates.  Regressing racial VAP numbers against voting outcomes yields a coefficient that measures the strength of the relationship between them. It tells us that for a given percentage of a group's VAP population share, a candidate from that group can expect a certain vote percentage.  Courts across the country have accepted this ecological regression approach as a valid indication of likely polarization. I report only estimates that are statistically significant by conventional standards. Where possible, I refer to survey data as a check on my estimates, bearing in mind that the exit polls survey actual voters while the regressions look at the relation of votes to group VAP share (i.e. potential voters).  Usually, the poll numbers will vary from the VAP coefficients because the latter figures in turnout differences.  VRA assessments for redistricting, however, are based on VAP scores not on registration or voter numbers. A clearly polarized contest would be one in which 90% or more of the African American eligible population voted for the African American candidate (cohesion) while 90% or more of the Non-Hispanic White population chose the Non-Hispanic White candidate (polarization).  Polarization becomes less clear as the numbers drop towards 50%.

      12.  This test was initially developed in a biracial context in the South.  Since that time, America has become more multiracial.  This is true of Maryland as well.  This means that we have to account for the cohesion of more than one minority group and the polarization/cohesion of the Non-Hispanic White majority vote versus each.  Moreover, a claim that a coalition of minority groups is cohesive means that all the other groups in the coalition vote for minority candidates at a level comparable to what would be expected from any single group.  In order to test these new questions raised by a multi-racial and multi-ethnic context, I have altered the basic bi-variable ecological regression to a multivariate model, including Non-Hispanic White VAP, African American VAP, Latino VAP and Asian/other VAP as independent variables.

      13.  Because the model uses voting age population data, the coefficient for a group will be higher if it both turns out and votes for a similar race candidate.  A cohesion score based on VAP makes sense from the standpoint of what the courts want to measure (i.e. giving minority communities an opportunity to elect a candidate of choice), but as I said before, it makes the comparison with polling data less valid.  Even so, the estimates correspond fairly well with what polling data tell us. For instance, the model indicates a 90% African American VAP cohesion score for Obama in the 2008 Primary (with a standard error .5%).  A CNN exit poll (http:/www.cnn.com/ELECTION/2008/results/polls/) estimates that 95% of the African American voters chose Barack Obama over Hilary Clinton.

Either way, we could come to the same basic conclusion that the African American vote was cohesive in this Primary contest.

      14. On balance, the African American vote in Maryland appears to be cohesive, but runs heavily along partisan and ideological lines.  A clear test of the latter point is the 2006 US Senate Race featuring a Non-Hispanic White Democrat (Ben Cardin) against an African American Republican, Michael Steele. My estimate is that approximately 15% of the African American VAP went to Michael Steele. Exit polls suggest that Steele got 25% of actual African American voters. (see David Bositas, *African Americans and the 2006 Midterm Elections*, Joint Center for Political and Economic Center, 2006).  Both estimates lead to the same conclusion: namely, that African Americans voted overwhelmingly for the Non-Hispanic White Democratic candidate, and not the African American Republican candidate.

      15.  I also looked at a number of other state wide, legislative and local races that featured Non-Hispanic White versus African American candidates, and found that African American voters regularly support African American Democratic candidates at high but somewhat variable levels.  Aside from the previously discussed 2006 US Senate General Election, I looked at four other statewide races that featured African American versus Non-Hispanic White candidates: the 2006 Attorney General Democratic Primary (Gansler v Sims), the 2006 US Senate Democratic Primary (Cardin versus Mfume), the 2008 US Presidential Democratic Primary (Obama v Clinton) and the 2008 US Presidential November election (Obama v McCain).  I also disaggregated the models to look at whether voting in the particular counties carved out in the two Fannie Lou Hamer PAC proposals (i.e. Howard, Montgomery, Prince Georges, and Baltimore County) to fashion a third majority African American VAP district were different from the rest of the state.

      16. My estimates are a 90% African American VAP cohesion score for Barack Obama in the 2008 Presidential primary, 91%  for Obama in the 2008 November General, 88% for Mfume in the 2006 US Senate Primary, and 74% for Simms in the 2006 Attorney General Primary.  There was no significant variation in the estimated African American cohesion scores for the separate counties in the cases of the Obama or Mfume contests, but there was some variation in the Simms race, with African American cohesion scores ranging from 50% and 60% in Prince Georges and Montgomery counties to 83% and 85% in Baltimore County and City respectively, reflecting perhaps the respective geographic bases of the two candidates.

17. Data from the legislative races that featured African American versus Non-Hispanic White candidates in a Democratic primary show a similar pattern of high but somewhat variable levels of African American cohesion. In the 2004 Congressional District 4, the African American cohesion score was 94%. The 2010 Legislative Delegate District 43 Democratic Primary featured two African American candidates against two Non-Hispanic White candidates.  I aggregated the totals of the African American and Non-Hispanic White candidates and ran the basic model. The estimated African American cohesion level was 68%. However, in the 2010 Democratic Primary for House Delegate District 14, the cohesion score for the two African American candidates was 23%.  In the 2006 Montgomery County Executive Democratic Primary election, the African American candidate Leggett received an estimated 81% cohesion score.  In a 2006 Montgomery County Council Race for District 4, the African American VAP cohesion score was 97%.

18.  While evidence for consistent African American cohesion is strong, the claim for cohesion across all of the racial and ethnic minority population is not. Support for African American candidates among Asian-Americans and Hispanics is far less cohesive than African Americans as a group.  In the 2006 AG Democratic primary, it appears that the African American candidate got 11% of the Asian-American VAP, and no measurable support from Latinos. In the 2006 US Senate Democratic primary, Mfume got 40% of the Asian American VAP and 41% of the Hispanic VAP. In the 2008 Democratic Presidential primary, Asians supported Obama at the 80% level but Latinos supported him at the 46% level. The estimates of Asian and Hispanic support in most of the state legislative local races were not statistically significant (possibly the numbers are too low in most cases), and we can draw no inference from them. The estimates for the 2006 Montgomery County Executive Primary election, however, were statistically significant, revealing that Asian-American support for Leggett, the African American candidate, was 25% and Latino support was 47%.  In short, Asian-American and Latino voters appear to be partisan allies in November elections, but do not achieve African American levels of cohesiveness scores for African American candidates.

19. The third prong of the Gingles test is the racial polarization test; namely does Maryland's Non-Hispanic White population vote as a bloc against African American and other minority candidates.   The logic behind the polarization prong is that if a cohesive Non-Hispanic White majority is highly polarized against minority candidates, then under normal simple majority electoral rules, it could systematically block a minority group from ever electing a candidate of its own choice.  The remedy of a majority minority seat solves this problem.  In the early days of the Voting Rights Act, the law was applied to a predominantly one party Democratic south where Non-Hispanic Whites could block the election of African

American candidates.  The situation in contemporary Maryland is more complex: there are rapidly growing Asian and Latino populations, and the Non-Hispanic White vote is much more heavily divided along partisan and ideological lines than it was in 1965.

20.  Not surprisingly, the Non-Hispanic White group that votes most cohesively against African American Democrats is Republican.  The Maryland Republican party is over 90% Non-Hispanic White (http://www.cnn.com/ELECTION/2008/primaries/results/epolls/).  In the 2008 Presidential election, Non-Hispanic White   Democrats and Non-Hispanic White Republicans constituted almost equal shares of the electorate (26% and 24% respectively).  83% of the Non-Hispanic White Democrats voted for Barack Obama compared to only 10% of all Non-Hispanic White Republicans.  (http://www.cnn.com/ELECTION/2008/results/polls/).  44% of Non-Hispanic White Independents voted for Obama.  Overall, 47% of Maryland's Non-Hispanic White voters supported Barack Obama versus 49% for John McCain.

21.  The 2008 Presidential race allows for a comparison between Maryland and other states. Maryland's 47% Non-Hispanic White support for Obama puts it near the top third of all US states, and well above southern states such as Alabama (10% White  vote for Obama), Mississippi (11%), Louisiana (14%), Georgia (23%), South Carolina (26%) and Texas (26%) where the Voting Rights Act has been an important tool of minority empowerment  (National Journal, "Where Obama's White  Vote Matters Less in 2012," April 1, 2011).

22.  While the evidence is clear that Maryland's Non-Hispanic White voters vote in nearly even proportions along partisan and ideological lines in General Elections, the next question is whether Non-Hispanic White voters in Democratic primary elections are so polarized against minority candidates that African American and other Non -White candidates can only win if they run in majority minority districts.  This might be a problem if Non-Hispanic Whites constituted an overwhelming majority of the Democratic electorate and voted as a highly cohesive bloc against Non-White candidates.  In fact, neither condition applies.

23. Under the Governor's Congressional Redistricting plan, Non-Hispanic Whites are in the minority in two Congressional seats (Districts 4 and 7), a bare majority of 52% in District 5 and a 59% majority in District 2.  Since African American voters are overwhelming registered as Democrats and some fraction of the Non-Hispanic White VAP in these districts are Republican, it is quite likely that Non-Hispanic Whites will not be the majority racial group in the Democratic primaries for Districts 2, and possibly District 5 as well.  Consider for instance,

that although African Americans constitute 28% and Non-Hispanic Whites 57% of the state's total VAP, African Americans were 37% and Non-Hispanic Whites were 53% of Democratic electorate in the 2008 Democratic Presidential Primary (http://projects:washingtonpost.com/2008-presidential-candidates/primary/exit-polls/). In areas of significant African American population concentration, the African American share of the electorate in a Democratic primary will tend to be higher than its overall share of a district's VAP because African-Americans are disproportionately Democratic, and the Non-Hispanic White share will be lower because Non-Hispanic whites are more evenly divided between the parties and independents.

24. Even more importantly, Non-Hispanic White Democratic voters do not vote as a consistently cohesive bloc against Non-White candidates, particularly in the central Maryland counties that are affected by the Fannie Lou Hamer PAC proposals. Non-Hispanic White polarization scores vary significantly. There were three statewide Democratic primary races this past decade that featured Non-Hispanic White versus African American candidates: the 2006 Attorney General, the 2006 US Senate and the 2008 Presidential Democratic primaries. In the 2006 AG contest, my estimates indicate that the African American candidate, Stuart Simms, got 36% of Non-Hispanic White VAP. Both Non-Hispanic White and African American voting patterns in this contest varied by county more than most races I examined. Non-Hispanic White support for Simms rose to 49.7% and 42% in Baltimore city and county respectively just as it had for African American voters. In the 2006 US Senate primary, Mfume got only 12% of the Non-Hispanic White VAP, the clearest case of a polarized contest and a considerably lower share than for the other African American candidate, Simms, who was running in the same election. This suggests that difference is accounted for by something other than the race of the candidates. In the 2008 Democratic primary against Hilary Clinton, Barack Obama got 39.6% of the Non-Hispanic White VAP statewide, with some of the highest levels of support coming from the very counties that would be affected by the proposed third majority African American district (Montgomery 54% and Howard 47%). Exit polls suggest that Non-Hispanic White Democrats gave Barack Obama 42% of the actual Non-Hispanic White voters. Clearly, Non-Hispanic White support for African American candidates varies with the particular candidate and campaign. Mfume falls on the low end of the range and Obama at the high end. African American cohesion is consistently high but the Non-Hispanic White vote is variable.

25. The local and state legislative races I looked at also do not indicate consistent and strong polarization. The 2010 State Legislative Delegate District 43 race featured five candidates, two African American and three Non-Hispanic

White candidates. The African American candidates, Anderson and Washington, received an estimated support level of 68% from the African American voting age population and 63% of the Non-Hispanic White VAP, and both went on to the General election. In the 2010 State Legislative Delegate Democratic Primary Race 14, the African American candidates, Newsome and Roper, received 23% of African American VAP and 12% of the Non-Hispanic White VAP (and statistically indistinguishable from the Asian and Hispanic vote). In the 2010 State Senate District 18 Democratic Primary, the African American candidate, Griffiths, got 32% of African American VAP and 10% of Non-Hispanic White VAP.

26. Since Montgomery County is of particular interest, I examined a number of local contests there that featured Non-Hispanic White versus ethnic and racial minority candidates. In the 2004 Congressional District 4 Democratic primary, the incumbent African American candidate, Wynn, received an estimated 94% of the African American VAP and 73% of the Non-Hispanic White VAP. In the Democratic Primary for 2006 Montgomery County Executive, Ike Leggett, the African American candidate received an estimated 65% of Non-Hispanic White VAP compared to 81% of African American VAP, and went on to win in November. In the race for County Council Delegate District 4, the African American candidate, Ervin, got 54% of Non-Hispanic White VAP and 97% of African American VAP. The Non-Hispanic VAP was also split and varied with respect to Latino candidates. Latinos supported Gutierrez in the 2006 democratic primary for the 18th legislative district at about 22% of Hispanic VAP versus 12% of Non-Hispanic White VAP with no statistically significant differences between Non-Hispanic Whites, African Americans and Asians. In 2010, Gutierrez support rose to 30% of Latino VAP versus 16% of African American VAP and 24% of Non -Hispanic White VAP. Given the varying patterns in Non-Hispanic White, Asian and Latino support in Montgomery County, it is not clear that minority candidates would fare better in majority minority VAP districts.

27. The data suggest that African American candidates can win in several of the state's coalitional seats (i.e. seats in which African Americans are a significant minority but not a majority). Consider Congressional District 5 in the state's recently passed plan for instance. Assuming an open seat, the evidence suggests that it is reasonable to expect a qualified African American candidate to get 80% of the 35% African American VAP in the primary (bearing in mind that African American candidates often get 90% of African American VAP and that African American VAP in a Democratic Congressional District 5 primary is almost certainly higher than 35%), yielding a predicted vote of 28% (.8 x .35 x 100). Assume that the African American candidate's appeal to Non-Hispanic White voters falls in the range between Stuart Simms and Barack Obama (.36 to .40).

Given a Non-Hispanic White VAP in District 5 of 52%, it would add between 18.7% and 20.8% percent to the total.  If the candidate can win at least half of the Asian and Latino VAP (i.e. 5%), that yields a total between 51.7% and 53.8%.  If the African American candidate attains 90% of the African American VAP and 36% of Non-Hispanic White VAP, the margin for the African American candidate in District 5 goes up further and District 2 is also winnable (i.e. 52%). Again, these projections are likely under-estimates of African-American opportunities in both seats since the Non-Hispanic White VAP in both District 2 and 5 will almost certainly be lower in a Democratic primary and the African American VAP will be higher, as discussed previously.  Moreover, the Non-White Population in the State's Plan District 5 is growing very rapidly in the Southern Maryland portion: it is project to grow from 31% to 35% of the region's total population according to projections on the Maryland Department of Planning website.

     28. As the decade progresses, both Non-Hispanic White and African American Democratic candidates will need to reach out to Latino and Asian voters, as these populations are likely to grow the fastest.  The plan signed by the Governor has invested in coalitional seats that will foster more cross-racial alliances between groups while respecting the two natural African American communities of interest in Baltimore and Prince Georges Counties.   The state's plan creates the most closely proportional share of majority African American seats and reasonable prospects for African American candidates in two other seats.

I declare under the penalty of perjury that the forgoing is true and correct.

    Executed on November 30, 2011

*[signature: Bruce E. Cain]*

_____

    Bruce E. Cain

Exhibit 1