UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| COMMITTEE FOR A FAIR AND BALANCED MAP, *et al.*, | ) ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | CASE NO. 1:11-CV-5065 |
| | ) | |
| ILLINOIS STATE BOARD OF ELECTIONS, *et al.*, | ) ) | Hon. John Daniel Tinder Hon. Robert L. Miller, Jr. |
| | ) | Hon. Joan Humphrey Lefkow |
| Defendants | ) | |

## OPINION AND ORDER

Illinois lost one Congressional seat pursuant to the 2010 Census. The Illinois Congressional Redistricting Act of 2011, which became law on June 24, 2011, adopted a map establishing boundaries for the eighteen remaining congressional districts. The plaintiffs in this redistricting challenge contend that the 2011 Map is a product of intentional and illegal vote dilution of Latino voters, particularly in Districts 3, 4, and 5, and an unconstitutional partisan gerrymander against Republican voters statewide, especially in the Chicagoland area and most blatantly in Districts 3 and 11. The defendants are the Illinois State Board of Elections and its members, to which this opinion refers collectively as "the Board of Elections." The plaintiffs are an organization called Committee for a Fair and Balanced Map, six registered voters, and ten incumbent Republican members of Congress, to which this opinion refers collectively as "the Committee." The Board of Elections doesn't dispute the Committee's standing to bring this redistricting challenge.[1]

---

[1] For a plaintiff to have constitutional standing under Article III, "[f]irst, the plaintiff must have suffered an 'injury in fact'-an invasion of a legally protected interest that is (a) concrete and particularized, and (b) 'actual or imminent, not "conjectural" or "hypothetical[.]" Second, there must be a causal connection between the injury and the conduct complained of ....Third, it must be 'likely,' as opposed to merely

Exhibit 8

## A.

The court's jurisdiction is based on 28 U.S.C. §§ 1331, 1343, and 1357. The Board of Elections has moved to dismiss the complaint in its entirety. The court's October 12, 2011 opinion and order set forth the factual background; this opinion assumes the reader's familiarity with that opinion, and adds facts only as needed to discuss the complaint and the motion to dismiss.

The first three counts of the Committee's complaint allege that the 2011 Map violates § 2 of the Voting Rights Act, the Equal Protection Clause of the Fourteenth Amendment, and the Fifteenth Amendment. The complaint alleges that the 2011 Map dilutes the votes of Latino voters (including some of the individual plaintiffs) by wedging a "super-majority" unnecessarily into District 4 while reducing the number of Latino votes in Districts 3 and 5 – in effect, wasting Latino votes in District 4 and diluting the Latino vote in Districts 3 and 5, where Latinos (the complaint

─────────────────

'speculative,' that the injury will be 'readdressed by a favorable decision.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations omitted).

    A plaintiff who satisfies the constitutional standing requirements for a vote dilution claim under the Voting Rights Act also satisfies the constitutional standing requirements for such a claim under the Fourteenth and Fifteenth Amendments. *Parker v. Ohio*, 263 F. Supp. 2d 1100, 1107 (S.D. Ohio 2003), *aff'd*, 540 U.S. 1013 (2003); *see Perry-Bey v. City of Norfolk, Va.*, 678 F. Supp. 2d 348, 362 (E.D. Va. 2009) (collecting cases). To demonstrate injury in fact, a vote dilution plaintiff must show that he or she (1) is registered to vote and resides in the district where the discriminatory dilution occurred; and (2) is a member of the minority group whose voting strength was diluted. *See Perry-Bey*, 678 F. Supp. 2d at 362–65; *Hall v. Virginia*, 276 F. Supp. 2d 528, 531–32 (E.D. Va. 2003); *Ill. Legislative Redistricting Comm'n v. LaPaille*, 782 F. Supp. 1267, 1271 (N.D. Ill. 1991). The Committee has satisfied these requirements. *See* Complt. ¶¶ 11–14. *See Lujan*, 504 U.S. at 560–61.

    The Committee has also satisfied the injury in fact requirement for a racial gerrymandering claim under the Fourteenth Amendment. *See* Complt. ¶ 13; *United States v. Hays*, 515 U.S. 737, 744–45 (1995) ("Where a plaintiff resides in a racially gerrymandered district, however, the plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria, and therefore has standing to challenged the legislature's action.") (citation omitted). According to the Committee, its injuries were caused by a discriminatory redistricting process, the product of which will be implemented by the Board of Elections, and its requested relief is likely to redress the harm. As such, the Committee has standing to bring Counts I–IV. Counts V and VI are discussed *infra*.

alleges) would have no significant influence in choosing primary and general election candidates of their choice.

1.

For purposes of § 2 of the Voting Rights Act, vote dilution is the practice of reducing the potential effectiveness of a group's voting strength by limiting the group's chances to translate that strength into voting power. *See, e.g., Shaw v. Reno*, 509 U.S. 630, 641 (1993) (*Shaw I*). Racially polarized voting creates the risk that state legislatures may dilute the voting strength of politically cohesive minority groups by manipulating district lines. *See Voinovich v. Quilter*, 507 U.S. 146, 153-154 (1993). Vote dilution most often is attempted either by scattering the minority voters among several districts in which a bloc-voting majority can outvote them regularly, or by centralizing them into one or two districts and leaving the other districts relatively free from their influence. *See Johnson v. De Grandy*, 512 U.S. 997, 1007 (1994). Intentional vote dilution through the drawing of district lines violates both § 2 of the Voting Rights Act and the Fourteenth Amendment, *see Rogers v. Lodge*, 458 U.S. 613, 617 (1982), and § 2 of the Voting Rights Act also forbids facially neutral districting that has the effect of diluting minority votes. 42 U.S.C. § 1973.

Section 2 provides that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State . . . in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . as provided in subsection (b) of this section." 42 U.S.C. § 1973(a). Subsection (b) provides that a violation of subsection (a) "is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State . . . are not equally open

3

to participation by members of a class of citizens protected by subsection (a) of this section in that

its members have less opportunity than other members of the electorate to participate in the political

process and to elect representatives of their choice." 42 U.S.C. § 1973(b). The 1982 amendments

to section 1973 eliminated the requirement of intentional discrimination by substituting a "results"

test for the "purpose" test previously imposed by the Supreme Court. *See Ketchum v. Byrne*, 740

F.2d 1398, 1403 (7th Cir. 1984).

Generally, a group of plaintiffs must prove three preconditions to prove a § 2 claim: (1) that

their minority group is large enough and geographically compact enough to be a majority in a single-

member district, or in more single-member districts than the redistricting plan created; (2) that their

minority group is "politically cohesive," meaning that its members vote in a similar fashion; and (3)

the majority votes as bloc, allowing majority voters usually to defeat the minority's preferred

candidates. *Thornburg v. Gingles*, 478 U.S. 30, 48-51 (1986). If the plaintiffs satisfy the burden of

proving those conditions, the court moves on to decide, based on the totality of the circumstances,

whether a § 2 violation has occurred, *see De Grandy*, 512 U.S. at 1011, considering (among other

things) the state's history of voting-related discrimination, the degree of racial polarization in voting,

and whether and how the state has used voting practices or procedures that facilitate discrimination

against the plaintiffs' minority group. *Gingles*, 478 U.S. at 44-45.

The Board of Elections says the Committee's § 2 claim should be dismissed because it

doesn't allege the first *Gingles* precondition, which "requires the possibility of creating more than

the existing number of reasonably compact districts with a sufficiently large minority population to

elect candidates of its choice." *League of United Latin Am. Citizens v. Perry,* 548 U.S. 399, 430

(2006) (*LULAC*) (quoting *De Grandy*, 512 U.S. at 1008). The Board of Elections also argues that

the Committee's complaint only parrots the language of *Gingles* with respect to the second and third precondition. Section 2 claims are district-specific, the Board of Elections says, so the Committee's complaint must (but doesn't) allege that the majority votes enough as a bloc to allow it usually to defeat the Latino voters' preferred candidate in each of the Districts 3 and 5. *Gingles*, 478 F.3d at 51. The Board of Elections also contends that the Committee hasn't alleged any facts relevant to the totality of the circumstances analysis, such as a history of discrimination against Latinos affecting voter turnout or a history of electoral discrimination, a lack of proportionality in the citizen voting-age population, or polarized voting specific to Cook County.

The Committee asserts that because it can show intentional discrimination, it doesn't need to follow the *Gingles* test.[2] The Supreme Court has not resolved this issue, but has at least implied that the first *Gingles* precondition may be relaxed where intentional discrimination is shown. In *Bartlett v. Strickland*, 556 U.S. 1, 129 S.Ct. 1231, 1246 (2009), the Court held that a "party asserting § 2 liability must show by a preponderance of the evidence that the minority population in the potential election district is greater than 50 percent." The Court limited its holding by noting that the case did not involve allegations of intentional and wrongful conduct, and therefore, the Court didn't need to resolve whether "intentional discrimination affects the *Gingles* analysis." *Id.* The Court expressly stated that its holding in that case "does not apply to cases in which there is intentional discrimination against a racial minority." *Id.* (Kennedy, J., plurality); *see also Baird v.*

---

[2] Under the Committee's theory, we question whether the standard for addressing their § 2 VRA claim would be any different than the standard applicable to the Fourteenth Amendment vote dilution claim in Count II. In *Barnett v. Daley*, 32 F.3d 1196, 1202 (7th Cir. 1994), the court stated that what role, if any, intent plays under § 2 of the VRA needn't be decided because "[i]f the plaintiffs can prove intent, they don't need the Voting Rights Act; they will have a complete remedy under the equal protection clause." We nevertheless address this issue because the Committee can allege overlapping theories of liability.

*Consolidated City of Indianapolis*, 976 F.2d 357, 359 (7th Cir. 1992) (implying that intentional discrimination under § 2(a) doesn't require the same analysis as an effects-based claim under § 2(b)); *see also Voinovich*, 507 U.S. at 158 (stating that *Gingles* "cannot be applied mechanically and without regard to the nature of the claim").

The circuit courts that have addressed this issue have taken varying approaches. The Ninth Circuit in *Garza v. County of Los Angeles*, 918 F.2d 763, 769 (9th Cir. 1990) held that "to the extent that *Gingles* does require a majority showing, it does so only in a case where there has been no proof of intentional dilution of minority voting strength." *Id.*; *see also United States v. Brown*, 561 F.3d 420, 432 (5th Cir. 2009) (indicating that discriminatory intent alone will ordinarily be sufficient to prove a § 2 violation). But "[e]ven where there has been a showing of intentional discrimination, plaintiffs must show that they have been injured as a result." *Garza*, 918 F.2d at 771. The court explained that "[a]lthough the showing of injury in cases involving discriminatory intent need not be as rigorous as in effects cases, some showing of injury must be made to assure that the district court can impose a meaningful remedy." *Id.* Plaintiffs must still show that their members had less opportunity than other residents in the district to participate in the political processes and to elect legislators of their choice. *Id.; see also African Am. Voting Rights Legal Defense Fund, Inc. v. Villa*, 54 F.3d 1345, 1357 n.18 (8th Cir. 1995) (approving this approach).

The Eleventh Circuit in *Johnson v. DeSoto County Bd. of Commissioners*, 72 F.3d 1556, 1561-63 (11th Cir. 1996), citing to *Voinovich*, 507 U.S. at 154-57 and the plain language of § 2, held that intent alone was insufficient to establish a violation. Although intentional discrimination wasn't shown in *Voinovich*, it was alleged, yet, the Court stated that "§ 2 focuses exclusively on the consequences of apportionment. Only if the apportionment scheme has the effect of denying a

protected class the equal opportunity to elect its candidate of choice does it violate § 2; where such an effect has not been demonstrated, § 2 simply does not speak to the matter." 507 U.S. at 155. The Court held that plaintiffs can prevail on a claim under § 2 "only if they show that, under the totality of circumstances, the State's apportionment scheme has the *effect* of diminishing or abridging the voting strength of the protected class." *Id.* at 157 (emphasis added); *see also Barnett v. Daley*, 32 F.3d 1196, 1202 (7th Cir. 1994) (citing to *Voinovich* and stating that it is "no longer clear that intent plays *any* role in a suit under section 2") (emphasis in original).

The *Johnson* court also looked to the plain language of § 2(a) which states that "[n]o voting qualification or prerequisite to voting or standing, practice, or procedure shall be imposed or applied . . . in a manner which *results* in a denial or abridgement of the right . . . to vote on account of race or color . . . ." *Johnson*, 72 F.3d at 1563 (quoting 42 U.S.C. § 1973(a)). The court explained that the "statutory language expressly requires a showing of discriminatory results, and it admits of no exception for situations in which there is discriminatory intent but no discriminatory results." *Id.*.

That doesn't mean, the *Johnson* court reasoned, that intent has no role to play in a § 2 violation. Although the court disagreed that "intent to discriminate lessens the amount of discriminatory results that must be shown[,]" it held that "[i]t is circumstantial evidence of discriminatory results that should be considered in assessing the 'totality of the circumstances.'" *Id.* at 1565. The court explained that "[w]here it can be inferred, as it often can be, that the enactors were in a good position to know the effect their actions would have, the fact that the enactment was motivated by a desire to produce discriminatory results will often be strong, albeit circumstantial, evidence that such results were achieved." *Id.*

While the Ninth and Eleventh Circuits disagree as to the extent of discriminatory results that must be shown when there is discriminatory intent, both agree that even if there is such intent, there still must be some showing of discriminatory effect. Considering these concepts in tandem is a solid form of analysis under the VRA. A showing that the drafters of the plan intended to discriminate very well may lead to the conclusion that the plan had its intended effect, but the other factors in the totality of circumstances test are still relevant in resolving the issue. Therefore, the first *Gingles* factor is appropriately relaxed when intentional discrimination is shown, but the Committee will nevertheless have to show that the plan lessened the Latinos' opportunity to elect a candidate of its choice. We believe for the Committee to show discriminatory effects they will have to prove that the second and third *Gingles* preconditions are established – that the minority group is politically cohesive and that the majority votes as a bloc, allowing the majority voters usually to defeat the minority's preferred candidates. *Gingles*, 478 U.S. at 50-51. It must make this showing on a district specific basis. *Id.*

If the Committee merely proves what is alleged in their complaint, it will face an uphill battle. For starters, it hasn't alleged that the third *Gingles* precondition is established on a district-wide basis, nor have they identified how the Latinos' opportunity to elect a candidate of their choice in Districts 3 and 5 has been affected by the reduction of Latino voting-age population in those districts as a result of an increase in District 4. As the Seventh Circuit has said, "because of both age and the percentage of noncitizens, Latinos must be 65 to 70 percent of the total population in order to be confident of electing a Latino." *Barnett v. City of Chicago*, 141 F.3d 699, 703 (7th Cir. 1998) (citing *Ketchum*, 740 F.2d at 1415). "[T]he plaintiff must show that there *is* a feasible alternative to the defendant's map, an alternative that does a better job of balancing the relevant factors, although

the fine-tuning of the alternative can be left to the remedial stage of the litigation." *Barnett*, 141 F.3d at 702 (emphasis in original).

Further, we agree with the Board of Elections that the more appropriate inquiry in this case for the proportionality factor, which is analyzed on a statewide basis, is citizen voting-age population. The Seventh Circuit stated in *Barnett* "that the proper benchmark for measuring proportionality is citizen voting-age population." 141 F.3d at 705. The court reasoned that "citizen voting-age population is the basis for determining equality of voting power that best comports with the policy of [§ 2]." *Id.* at 704. The court further explained that "[n]either the census nor any other policy or practice suggests that Congress wants noncitizens to participate in the electoral system as fully as the concept of virtual representation would allow." *Id.* "The right to vote is one of the badges of citizenship. The dignity and very concept of citizenship are diluted if noncitizens are allowed to vote either directly or by the conferral of additional voting power on citizens believed to have a community of interest with the noncitizens." *Id.*

This position seems to have support from the Supreme Court's decision in *LULAC*, 548 U.S. at 429. When determining whether District 23 created a Latino opportunity district for purposes of the first *Gingles* condition, the Court stated that the relevant inquiry was citizen voting-age population, not merely voting-age population. *Id.* The Court reasoned that "[t]his approach fits the language of § 2 because only eligible voters affect a group's opportunity to elect candidates." *Id.* Similarly, when discussing proportionality under the totality of circumstances, the Court looked to the citizen voting-age population. *Id.* at 436.

We recognize that it may be difficult for the Committee to make this showing because the 2010 census doesn't include citizenship, but citizen voting-age population can be shown through

expert testimony; census data is not required. We also recognize that proportionality is just one factor to consider in the totality of circumstances. This test allows us to consider both census voting-age population data and evidence deducing citizen voting-age population.

Despite these infirmities in the Committee's complaint, we don't believe that it must be dismissed under Rule 12(b)(6). The Board of Elections demands more of the Committee's complaint than the law requires. A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Detailed factual allegations aren't required, but the complaint must contain enough factual matter "to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 538 (7th Cir. 2011); *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). To plead a plausible claim, a complaint must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949; *see also Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) ("[T]he plaintiff must give enough details about the subject-matter of the case to present a story that holds together."). "Threadbare recital of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949.

But a complaint needn't specifically plead every element the pleader must prove at trial. *See Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1147 (7th Cir. 2010) ("[A]lthough the plaintiff is required to plead more than bare legal conclusions to survive a motion to dismiss, once the plaintiff pleads sufficient factual material to state a plausible claim – that is, sufficient to put the defendant on notice of a plausible claim against it – nothing in *Iqbal* or *Twombly* precludes the plaintiff from

10

later suggesting to the court a set of facts, consistent with the well-pleaded complaint, that shows that the complaint should not be dismissed."); *see also Bausch v. Stryker Corp.*, 630 F.3d 546, 560 (7th Cir. 2010) (holding that since plaintiffs usually lack enough pre-filing information to identity the precise defect with a product, the precise defect needn't be pleaded in the complaint), *cert. denied*, __ S. Ct. __, 2011 WL 3047772 (U.S. Oct. 31, 2011). A plaintiff, then, must put enough specifics in the complaint to keep the complaint from being "implausible." The complaint must contain enough in the way of factual allegations to make it more than a "sheer possibility" that the defendant has acted unlawfully. *Iqbal*, 129 S. Ct. at 1949; *accord*, *In re Text Messaging Antitrust Litigation*, 630 F.3d 622, 629 (7th Cir. 2010), *cert denied*, 131 S. Ct. 2165 (Apr. 25, 2011) ("[T]hat the allegations undergirding a claim could be true is no longer enough to save a complaint from being dismissed; the complaint must establish a nonnegligible probability that the claim is valid; but the probability need not be as great as such terms as 'preponderance of the evidence' connote.").

Given the specific allegations in the Committee's complaint, we see nothing implausible about the possibility that the Committee could prove each allegation in the complaint and, consistent with the complaint's allegations, further prove that enough Latino voters could be reassigned within the three districts to create two reasonably compact districts that provide Latinos with an opportunity to elect a candidate of their choice, that there's about as many Latino citizen voters as voting age Latinos, that Latinos are politically cohesive in the challenged area, and that the majority votes as a bloc in the challenged districts to defeat the Latino voter's preferred candidate.

More facts might be alleged, but the Committee's complaint states a § 2 claim that rises above implausibility and gives the Board of Elections ample notice of the nature of the claim. We deny the Board of Election's dismissal motion insofar as it is directed toward Count I of the

Committee's complaint.

2.

Count II of the Committee's complaint purports to state a claim for vote dilution under the Fourteenth Amendment, which requires a showing that the redistricting was "conceived or operated as [a] purposeful devic[e] to further racial discrimination.." *City of Mobile v. Bolden*, 446 U.S. 55, 66 (1980) (Stewart, J., plurality opinion) (quoting *Whitcomb v. Chavis*, 403 U.S. 124, 149 (1971)), "by minimizing, cancelling out or diluting the voting strength of racial elements of the voting population." *Rogers*, 458 U.S. at 617 (quoting *Whitcomb*, 403 U.S. at 149). Courts use a totality of the circumstances analysis in deciding whether a challenged redistricting plan violates either the Fourteenth Amendment or § 2 of the Voting Rights Act. *See Gingles*, 478 U.S. at 36-37; *Rogers*, 458 U.S. at 620-622 and n.8.

The Board of Elections says Count II is insufficient for the same reasons Count I is insufficient. We disagreed with the Board of Elections as to Count I, for reasons we have already discussed. Because the Board of Elections advances no new reasons to dismiss Count II, we deny the Board of Elections' motion to the extent it is directed to the Fourteenth Amendment vote dilution claim in Count II.

3.

Count III of the Committee's complaint seeks to state a vote dilution claim under the Fifteenth Amendment, section 1 of which provides, "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color,

12

or previous condition of servitude." In its motion to dismiss, the Board of Elections contends that the Fifteenth Amendment "prohibits only purposefully discriminatory denial or abridgment by government of the freedom to vote," *Bolden*, 446 U.S. at 65 (plurality opinion), and doesn't apply to vote dilution. (*See* Doc. No. 40, pp. 8-9) (citing *Rice v. Cayetano*, 528 U.S. 495, 513-514 (2000); *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 334 n.3 (2000); *Bolden*, 446 U.S. at 65; *Beer v. United States*, 425 U.S. 130, 142 n.14 (1976); *Osburn v. Cox*, 369 F.3d 1283, 1288 (11th Cir. 2004)).

The law isn't as straightforward as the Board of Elections sees it. The language of § 2 of the Voting Rights Act, which forbids intentional vote dilution, "track[s], in part, the text of the Fifteenth Amendment." *Bartlett*, 129 S. Ct. at 1240; *see, e.g., Northcross v. Bd. of Educ. of Memphis City Schs.*, 412 U.S. 427, 428 (1973) (stating that the similarity in language of two statutes is "a strong indication that the two statutes should be interpreted *par passu*."). The Supreme Court hasn't decided whether the Fifteenth Amendment applies to vote dilution claims. *Voinovich*, 507 U.S. at 159. The language the Board of Elections cites in *Bossier Parish Sch. Bd.*, 528 U.S. at 334 n.3, doesn't resolve the issue; it simply keeps the issue undecided. As one court of appeals said, "We simply cannot conclude that the [Supreme] Court's silence and reservation on these issues clearly forecloses Plaintiffs' Fifteenth Amendment claim." *Page v. Bartels*, 248 F.3d 175, 193, n.12 (3d Cir. 2001). Intentionally discriminatory redistricting can violate the Fifteenth Amendment "if done with the purpose of depriving a racial minority group of the right to vote." *Id.* at 193; *see also Hastert v. State Bd. of Elections*, 777 F.Supp. 634, 645 (N.D. Ill. 1991). The record doesn't tell us why the Committee wants to proceed to trial on what it contends are two identical counts, but that's not what we have to decide today.

The Committee's complaint, the Board of Elections argues, doesn't assert a plausible claim that the 2011 Map denies the Latino plaintiffs the right to vote. We disagree with the premise of this argument: Fifteenth Amendment plaintiffs needn't allege a complete denial of their right to vote. The Fifteenth Amendment also prohibits a purposefully discriminatory abridgment of the freedom to vote. *See Mobile v. Bolden*, 446 U.S. at 65 (plurality opinion). The Committee's complaint alleges that the 2011 Map intentionally discriminates against Latino voters and effectively "denies or abridges the right of the Racial Dilution Plaintiffs to vote" by packing District 4 with more Latino voters than necessary to elect their candidate of choice and by reducing the number of Latino voters in Districts 3 and 5. It alleges that Latino voters traditionally and consistently vote cohesively in Cook County; that "[m]any Latino voters in proposed District 4 will see their votes wasted because the Plan intentionally makes those votes unnecessary to elect a candidate of their choice," and that the intentionally diminished numbers in Districts 3 and 5 will keep Latino voters in those districts from having any significant influence in choosing primary and general election candidates. Those allegations amount to a plausible claim under the Fifteenth Amendment of intentional abridgment of some of the plaintiffs' right to vote through vote dilution.

We deny the Board of Elections' motion to dismiss to the extent it seeks dismissal of Count III of the Committee's complaint.

4.

Count IV of the Committee's complaint alleges racial gerrymandering in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. A plaintiff proves an Equal Protection Clause violation in redistricting by showing that race was the

legislature's predominant motive in drawing district lines. *Shaw v. Hunt*, 517 U.S. 899, 905 (1996) (*Shaw II*); *Miller v. Johnson*, 515 U.S. 900, 916 (1995). The Board of Elections says Count IV isn't pleaded sufficiently because the Committee's complaint doesn't make enough factual allegations to support its claim that racial considerations trumped traditional districting principles; the complaint even alleges that the redistricting after the 1990 Census created a district shaped and located similarly to the 2011 Map's District 4. Again, the Board of Elections asks more of the complaint than the law requires.

One way a plaintiff can state a claim under the Equal Protection Clause is by alleging that a state redistricting plan, on its face, has no rational explanation except as an effort to separate voters on the basis of race. *Shaw v. Reno*, 509 U.S. 630, 649 (1993) (*Shaw I*). The Committee's complaint makes those allegations with respect to District 4 in ¶¶ 3, 59-68, and 125. The Committee's complaint also alleges in ¶¶ 59-62 that previous litigation "established that race — that is, Latino ethnicity — was the predominant consideration in the creation of" a predecessor district that had a very similar shape and was in the same location as the newly adopted District 4. Those allegations are sufficient to state, and put the Board of Elections on notice of, a claim upon which relief plausibly can be granted.

The Board of Elections' motion to dismiss is denied to the extent it is directed toward the Fourteenth Amendment racial gerrymandering claim in Count IV.

5.

The Board of Elections also argues that the Committee has pleaded itself out of court on the first four counts, each of which asserts that intentional discrimination against Latino voters was the primary motive behind the 2011 Map, by including the last two counts, which allege that intentional discrimination against Republican voters was the primary motive behind the 2011 Map. We disagree. Rule 8(d)(3) specifically provides that "[a] party may state as many separate claims or defenses as it has, regardless of consistency." FED. R. CIV. P. 8(d)(3); *see also Brown v. United States*, 976 F.2d 1104, 1108 (7th Cir. 1992).

6.

Counts V and VI allege discrimination, not against Latino voters, but rather against Republican voters statewide, and as noted, especially in the Chicagoland area and most blatantly in Districts 3 and 11. In those counts, the Committee's complaint alleges that the 2011 Map "intentionally and unreasonably dilutes the votes of Republican voters in a manner that gives Republicans a far smaller chance of electing candidates of their choice than would result from traditional, non-partisan redistricting" in violation of the First Amendment (Count V) and Equal Protection Clause of the Fourteenth Amendment (Count VI). The Board of Elections argues that partisan gerrymandering claims are nonjusticiable political questions, and that the Committee hasn't identified a manageable standard for adjudicating its claims. The Committee responds that partisan gerrymandering claims are justiciable, and that the Board of Elections (as the party seeking dismissal) should have to identify the standard under which it contends these counts are insufficient.

The Committee also says its complaint states viable Constitutional claims because it sets forth extensive factual detail about how the 2011 Map discriminates against Republican voters.

The Committee is correct that the Supreme Court, a quarter century ago, rejected the argument that partisan gerrymandering claims are not justiciable, *Davis v. Bandemer*, 478 U.S. 109, 118-127 (1986), that the Court had ample opportunity to revisit and reject that position in *Vieth v. Jubelirer*, 541 U.S. 267 (2004), and that while four justices rejected the justiciability of such claims, no majority embraced the opportunity, *see LULAC*, 548 U.S. at 414. The Board of Elections argues that no plaintiff has prevailed in a partisan gerrymandering case during that quarter century, but what other plaintiffs might have (or might not have) accomplished tells us nothing about the sufficiency of the Committee's complaint.

We look to Justice Kennedy's concurrence in *Vieth* for resolution of this issue. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977) (internal quotations marks omitted). Although Justice Kennedy's concurring opinion left open the possibility that such claims may be justiciable, *see Vieth*, 541 U.S. at 306 (Kennedy, J., concurring) ("I would not foreclose all possibility of judicial relief if some limited and precise rationale were found to correct an established violation of the Constitution in some redistricting cases."), he agreed that the Court's previously announced standards in *Bandemer* (including Justice Powell's "fairness standard" set forth in his concurrence), the standard proposed by the plaintiffs in that case, and those standards set forth by the dissenters, were all unworkable. *Id.* at 308 (acknowledging that the plurality "demonstrate[d] the shortcomings of the other standards that have

been considered to date"). Justice Kennedy concluded that a complaint will fail to state a claim if the plaintiffs cannot articulate a justiciable standard. *Id.* at 313 ("[A]ppellants' complaint alleges no impermissible use of political classifications and so states no valid claim on which relief may be granted. It must be dismissed as a result."). That is the narrowest ground for the Court's ruling and the one we are bound to follow.

Generally, as the Committee says in response, a complaint needn't plead a legal theory. *See*, *e.g.*, *Hatmaker* v. *Memorial Medical Center*, 619 F.3d 741, 743 (7th Cir. 2010) (*Twombly* and *Iqbal* "do not undermine the principle that plaintiffs in federal courts are not required to plead legal theories."), *cert. denied*, 131 S. Ct. 1603 (2011); *Aaron v. Mahl*, 550 F.3d 659, 666 (7th Cir. 2008); *O'Grady v. Village of Libertyville*, 304 F.3d 719, 723 (7th Cir. 2002). But a different approach prevails in the field of partisan gerrymandering because courts haven't been able to agree on the constituent elements of a claim. In its two most recent decisions addressing partisan gerrymandering claims, the Supreme Court lent strong support to the Board of Elections' argument that without an existing workable standard by which to measure such claims, partisan gerrymandering claims are subject to dismissal. *See LULAC*, 548 U.S. at 418 (Kennedy, J., for 3 justices) ("[A] successful claim attempting to identify unconstitutional acts of partisan gerrymandering must...show a burden, as measured by a reliable standard, on the complainants' representational rights"); *Vieth*, 541 U.S. at 313 (Kennedy, J., concurring) (absent "a standard by which to measure the burden [plaintiff] claim has been imposed on their representational rights, [they] cannot establish that the alleged political classifications burden those same rights").

The Committee notes that *Vieth* was decided before the Supreme Court modified the pleading standard in *Iqbal* and *Twombly*. But that argument gets the Committee nowhere because

18

if anything, *Iqbal* and *Twombly* heightened the pleading standard, *see Twombly*, 550 U.S. at 563 (retooling federal pleading standards; and retiring the oft-quoted formulation that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"), so those decisions only reinforce Justice Kennedy's view that the plaintiffs must set forth a standard by which to judge the plausibility of the plaintiffs' factual assertions.

The Committee's Fourteenth Amendment partisan gerrymandering claim must be dismissed because, with no workable standard yet in existence, the court can't say that its allegations give rise to a plausible claim upon which relief can be granted. *See Perez v. Texas*, No. 11-CA-360-OLG-JES-XR, slip op. at 19-22 (W.D. Tex. Sep. 2, 2011) (Exh. A to the Board of Election's reply [Doc. No. 78-1]) (finding that such claims are justiciable, but "are viable only if there is a reliable legal standard that can be applied in determining the issues," and that the political gerrymandering claims should be dismissed because the plaintiffs "failed to enunciate a reliable standard"); *see also Radogno v. Illinois State Bd. of Elections*, No. 1:11-cv-4884, 2011 WL 5025251, *6 (N.D. Ill. Oct. 21, 2011) (dismissing political gerrymandering claim with leave to refile upon finding that such claims are justiciable, but that plaintiffs failed to articulate a workable standard by which to assess that claim).

We surmise that amendment might be futile in light of today's understanding of the law under the Equal Protection Clause. A majority of the Court in *Vieth* rejected all proposed standards (the standards in *Bandemer*, the standard proposed by the plaintiffs in that case, and those standards set forth by the dissenters). *See Vieth*, 541 U.S. at 284-94; *see also id.* at 308 (Kennedy, J., concurring). We too must reject the same standards denounced in *Vieth*. The plurality stated that "the

19

fact that partisan districting is a lawful and common practice means that there is almost *always* room for an election-impeding lawsuit contending that partisan advantage was the predominant motivation." *Id.* at 286 (emphasis in original). The plurality further noted that "a person's politics is rarely readily discernible – and *never* as permanently discernible – as a persons' race. Political affiliation is not an immutable characteristic, but may shift from one election to the next; and even within a given election, not all voters follow the party line." *Id.* at 287 (emphasis in original). Such facts, the plurality found, "make it impossible to assess the effects of partisan gerrymandering, to fashion a standard for evaluating a violation and finally to craft a remedy." *Id.; see also LULAC*, 548 U.S. at 417, 423, 483 (no majority opinion for any single criterion of impermissible political gerrymander and thus, no reliable standard to judge claim even though evidence showed that redistricting was done with sole purpose of political gain).

Even under the now rejected *Bandemer* standard, the *Vieth* Court noted that in only one case had a court granted relief on a partisan gerrymandering claim and that was preliminary relief in a case that didn't involve the drawing of district lines. *See Vieth*, 541 U.S. at 279. In *all* other cases addressing such claims, relief has been denied. *See id.* at 279-80 and n.6 (citing cases).

Nevertheless, heeding Justice Kennedy's pronouncement in *Vieth*, "[t]hat no such standard has emerged in this case should not be taken to prove that none will emerge in the future," *id.* at 311, we will give the Committee until November 7, 2011 to amend its complaint in an effort to articulate a workable and reliable standard for adjudicating their partisan gerrymandering claim and sufficient factual allegations to demonstrate plausibility.

The political gerrymandering claim under the First Amendment found in Count V of the Committee's complaint falls to a different obstacle. The complaint alleges in ¶¶ 131-133 that the

2011 Map "intentionally and unreasonably dilutes the votes of Republicans voters [statewide and in Districts 3 and 11] in a manner that gives Republican voters a far smaller chance of electing candidates of their choice than would result from traditional, non-partisan redistricting," and "burdens and penalizes the Partisan Gerrymander Plaintiffs' exercise of their freedom of association, their right to express political views, and their right to petition the government for redress of grievances," in violation of the First Amendment. The Committee's complaint adds no facts that would make those allegations plausible. The Committee's complaint doesn't make plausible a finding that the 2011 Map infringes Republican voters' rights to associate with each other or with anyone else, or a finding that the 2011 Map burdens Republican voters' rights of free expression, or that the 2011 Map affects Republican voters' rights to petition the government. The Committee's complaint contains a considerable number of allegations to the effect that the 2011 Map will make it more difficult for Republican voters to elect Republican candidates, but that doesn't implicate a First Amendment right. *See Washington v. Finlay*, 664 F.2d 913, 927-28 (4th Cir. 1981) ("The first amendment's protection of the freedom of association and of the rights to run for office, have one's name on the ballot, and present one's views to the electorate do not also include entitlement to success in those endeavors."); *see also Radogno v. Illinois State Bd. of Elections*, 2011 WL 5025251, *8 (N.D. Ill. Oct. 21, 2011)(dismissing First Amendment political gerrymandering claim, reasoning that the "effects of political gerrymandering on the ability of a political party and its voters to elect a member of the party to a seat . . . implicates no recognized First Amendment right") (quoting *Kidd v. Cox*, No. 1:06-CV-997-BBM, 2006 WL 1341302, at *19 (N.D. Ga. May 16, 2006)).

Counts V and VI of the Committee's complaint presently state no claims upon which relief plausibly could be granted. The Board of Elections' motion to dismiss is granted with respect to

those counts.

## B.

For all of these reasons, the court GRANTS IN PART and DENIES IN PART the defendants' motion to dismiss (Doc. No.39). The motion is granted with respect to Counts V and VI, and denied with respect to Counts I, II, III, and IV. The plaintiffs may file an amended complaint with respect to their partisan gerrymandering claims on or before November 7, 2011.

SO ORDERED.

ENTERED:    November 1, 2011


       /s/ John Daniel Tinder
JUDGE JOHN DANIEL TINDER
United States Court of Appeals
for the Seventh Circuit


       /s/ Robert L. Miller, Jr.
JUDGE ROBERT L. MILLER, JR.
United States District Court
for the Northern District of Indiana


       /s/ Joan Humphrey Lefkow
JUDGE JOAN HUMPHREY LEFKOW
United States District Court
for the Northern District of Illinois