DOUGLAS F. GANSLER
ATTORNEY GENERAL

———

KATHERINE WINFREE
Chief Deputy Attorney General

JOHN B. HOWARD, JR.
Deputy Attorney General



DAN FRIEDMAN
Counsel to the General Assembly

———

SANDRA BENSON BRANTLEY
BONNIE A. KIRKLAND
KATHRYN M. ROWE
Assistant Attorneys General

## THE ATTORNEY GENERAL OF MARYLAND

### OFFICE OF COUNSEL TO THE GENERAL ASSEMBLY

October 20, 2011

The Honorable Martin O'Malley
Governor of Maryland
State House
100 State Circle
Annapolis, Maryland   21401-1991

RE:   *Senate Bill 1 of the Special Session of 2011*

Dear Governor O'Malley:

We have reviewed and hereby approve for constitutionality and legal sufficiency Senate Bill 1, an emergency bill creating new districts for congressional elections based on the 2010 census. As always, in reviewing a bill passed by the General Assembly prior to its approval or veto by the Governor, we apply a "not clearly unconstitutional" standard. 93 *Opinions of the Attorney General* 154, 161, n. 12 (2008). This standard reflects the presumption of constitutionality to which statutes are entitled and the Attorney General's constitutional responsibility to defend enactments of the Legislature, while also satisfying the duty to provide the Governor with our best legal advice. *Id.* In reviewing Senate Bill 1, we have considered whether it complies with the one person / one vote requirements of Article I, § 2 of the United States Constitution and Section 2 of the Voting Rights Act, and have found no violation. We also found no reason to believe that Senate Bill 1 constitutes a racial gerrymander in violation of the Fourteenth Amendment as interpreted in *Shaw v. Reno*, 509 U.S. 630 (1993).

Under Article I, § 2 of the United States Constitution, members of the House of Representatives are elected "by the people" from single member districts "founded on the aggregate number of inhabitants of each state," Madison, *The Federalist*, No. 54 at 369. The United States Supreme Court has said that Article I, § 2 requires states to make a good faith effort to achieve precise mathematical equality." *Kirkpatrick v. Preisler*, 394 U.S. 526, 530-531 (1969). Senate Bill 1 does this. Seven of the districts contain 721,529 people, while one district contains 721,528 people. It is not possible to achieve greater population equality.

Exhibit 13

The Honorable Martin O'Malley
October 20, 2011
Page 2

The population figures above have been adjusted as required by the No Representation Without Population Act, Chapter 67 of 2010, which requires that prisoners be counted in the place in which they resided prior to their incarceration, rather than in the place where they are incarcerated. This shift does not violate the equal population requirement of Article I, § 2. Federal courts have generally allowed states to determine the appropriate method by which to calculate population. 94 *Opinions of the Attorney General* 125, 127-129 (2009) (collecting cases). As noted in *Burns v. Richardson*, 384 U.S. 73, 92 (1966), the Supreme Court has never suggested that "the States are required to include aliens, transients, short-term or temporary residents, or persons denied the vote for conviction of crime in the apportionment base by which their legislators are distributed." Nor have we found any basis for the conclusion that it is not permissible to count prisoners at their home districts rather than remove them from consideration altogether.[1]

To pass muster under the Voting Rights Act, the plan, analyzed in light of the totality of the circumstances, must create political processes leading to nomination and election in the State that are:

> equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

42 U.S.C. § 1973(b).

The Supreme Court has created a three part test that plaintiffs must meet in order to bring a successful challenge to a redistricting plan under the Voting Rights Act. *Thornburgh v. Gingles*, 478 U.S. 30, 50-51 (1986). Specifically, it is necessary to show:

---

[1]    This method of enumerating prisoners was apparently used in the 1900 census, Nat'l Research Council, *Once, and Only Once, and in the Right Place: Residence Rules in the Decennial Census* 84-85 [Daniel L. Cork and Paul R. Voss, eds., 2006], and the reasons the Census Bureau counts prisoners where they are incarcerated now are technical rather than constitutional, U.S. Census Bureau Report: Tabulating Prisoners at Their "Permanent Home of Record" Address, pp. 10-13 (February 21, 2006). In fact, the Census Bureau released prisoner and other group quarter numbers early in this round of redistricting "so that states can leave the prisoners counted where the prisons are, delete them from the redistricting formulas, or assign them to some other locale." Director's Blog, United States Census Bureau, posted March 10, 2010.   http://blogs.census.gov/directorsblog/2010/03/so-how-do-you-handle- prisons.html

The Honorable Martin O'Malley
October 20, 2011
Page 3

> (1) that the minority group is sufficiently large and geographically compact
> to constitute a majority in a single-member district; (2) that the minority
> group is politically cohesive; and (3) that the white majority votes
> sufficiently as a bloc to enable it ... usually to defeat the minority's
> preferred candidate.

*Bartlett v. Strickland*, 556 U.S. 1, 21 (2009). Meeting this test is not sufficient to establish a violation, but is necessary before the court will proceed to analyze whether a violation has occurred based on the totality of the circumstances. *Id.* at 21-22. Analysis of a plan under these factors requires complex statistical analysis. For that reason, the State engaged in a nationwide search and hired an expert in the field, Bruce E. Cain, Ph.D., Heller Professor of Political Science, University of California Berkeley, and the Executive Director of the U.C. Washington Center. A copy of Dr. Cain's Curriculum Vitae and a copy of his analysis are attached.

According to Dr. Cain's analysis, the only minority group that has sufficient population to constitute a majority of a congressional district in Maryland is African Americans. While other minorities could form a majority in combination with African Americans, attempts to show cohesion among such coalitions has been difficult across the country. It is the view of the State's expert that political cohesion could not be shown for a coalition district in this State either.

According to the United States Census Bureau numbers non-Hispanic African Americans are found throughout the State and constitute 29% of the State's population. Compact populations of African Americans are found in the Baltimore region, and also in the areas around the District of Columbia.[2] The current plan creates a majority African American district in each of these population centers. Each of these districts has a 53.7% non-Hispanic African American voting age population,[3] and will, based on the analysis of the State's expert, enable African American voters to elect their candidates of choice. Moreover, African American voters are not packed in either district in a way that would

---

[2]   The relevant geographic area for the compactness analysis is a single member district, not a county. Thus, the fact that a county has a significant minority population, or has in the past had a portion of a majority minority district, is irrelevant to this analysis.

[3]   This percentage is based on unadjusted data, Census 2010, P.L. 94-171 Redistricting Data (Maryland). An adjusted total for Hispanic is not available because no Hispanic designation was available for incarcerated persons.

The Honorable Martin O'Malley
October 20, 2011
Page 4

inhibit the creation of an additional district. Even so, the population not included in either of these two districts is not, in the view of the State's expert, sufficiently compact to meet the requirements of the *Gingles* test. In the absence of compactness, the Voting Rights Act does not require the creation of an additional majority minority district simply because it is possible. *Abrams v. Johnson*, 521 U.S. 74, 90 (1997); *Johnson v. DeGrandy*, 512 U.S. 997, 1017 (1994).[4]  For these reasons, it is our view that Senate Bill 1 is in compliance with the Voting Rights Act.

It is also our view that nothing in Senate Bill 1 can be deemed an unconstitutional racial gerrymander. As discussed above, the two majority minority districts in the plan cover compact African American populations. While the 7th district is not compact overall, the shape is not due to any predominant focus on race, as prohibited under the holding of *Shaw v. Reno*, 509 U.S. 630 (1993), but to add population to the area of compact minority population and based on other considerations.

As indicated by those who participated in developing and adopting the redistricting plan, including the Redistricting Commission, the Governor, and the General Assembly, the boundaries of the newly adopted Congressional districts reflect a number of considerations, including a preference for joining communities of interest, keeping residents in their current districts, recognizing growth patterns, protecting incumbents, and partisan consideration. These factors have been recognized as permissible considerations under applicable case law. It is our view that Senate Bill 1 is not unconstitutional.

Very truly yours,

Douglas F. Gansler
Attorney General

DFG/KMR/kk

---

[4]  With respect to the other two factors, the analyses performed by the State's expert reflect that while African American voters are generally politically cohesive, there is not significant polarized voting in the areas in question.

Voting Rights Assessment of Governor's Maryland Congressional Redistricting Plan

Professor Bruce E. Cain

A valid Congressional redistricting plan must meet all federal constitutional and statutory standards. Aside from creating equally populated, contiguous districts, the state is required to adhere to the standards of the Voting Rights Act (VRA) of 1965 as amended in 1982. There are of course many other perfectly legitimate political considerations that underlie the construction of districting plans, but they are secondary to the federal criteria.  It is my judgment that the Governor's 2011 Congressional redistricting plan satisfies those federal criteria.

The relevant part of the VRA for Maryland is Section 2 which prohibits voting practices and procedures that discriminate on the basis of race, color or membership in a designated language minority group.  When the VRA was amended in 1982, the Congress supplemented the previous intent standard established under Mobile v Bolden 446 US 55 (1980) with a totality of circumstances test that essentially asked whether in the context of various considerations a standard, practice or procedure (in this case a redistricting plan) has the effect of denying a protected minority group an equal opportunity to elect a candidate of choice. The Supreme Court in reviewing the 1982 revisions developed a three prong test in Thornburg v Gingles 478 US 30 (1986) that all states and local jurisdictions follow when assessing their Section 2 redistricting liability.  Because these tests are empirical, they are usually conducted by political scientists.

There are three questions that need to be answered under the Gingles standard: 1. is the protected minority group sufficiently large and concentrated in a reasonably compact area to constitute a majority of a district; 2. is the group politically cohesive; and 3. does it face racial polarization by the majority population?  To answer the first question, I mapped the voting age population (VAP) concentrations of African-Americans, Latino and Asian-Americans using the 2010 Census data, and determined whether there are reasonably compact voting age (VAP) concentrations of those groups that would be sufficient to constitute a majority of the ideal population (721,259) for a Maryland Congressional district.

There has been significant growth in Maryland's minority populations, particularly in Prince George's and Montgomery counties, both of which are now majority minority in population.  Not all of this growth translates into political strength especially in the Latino population, as non-citizenship and a large Under 18 population share make many ineligible to vote.  Unfortunately, there are no reliable estimates of citizenship, so we must rely on voting age population (VAP) as the best proxy.  In my judgment, despite the impressive growth of the Latino and Asian American populations, neither has yet

reached the critical 50% VAP threshold for Congressional sized districts required by the law although they may in the next census.

The African-American case, however, is different. I determined that there are sufficient, reasonably compact concentrations in both the Baltimore and Prince George's/Montgomery County areas to create two majority black VAP Congressional districts. This is reflected by the creation of two majority African-American VAP districts (CDs 4 and 7) in the Governor's 2011 Congressional Redistricting Plan. But given the growth in the African-American population, I next explored whether there is sufficient population in a reasonably compact concentration to create a third majority black district. My conclusion is that there is not.

I explored a number of possible alternatives but I found there was simply no way to create a third majority black voting age population district in the Prince George's/Montgomery area or Baltimore and its suburbs area while maintaining two other African-American majority VAP seats . With one exception, this seems to have been also the judgment implicit in all the third party plans, including from a former Justice Department official on behalf of the Legislative Black Caucus. The one exception is the Fannie Lou Hamer PAC Plan that addresses the problem with a new barbell district that links black populations in the Baltimore area in the north with the Prince George's/Montgomery/Anne Arundel areas in the south with a narrow corridor through the intervening predominantly white areas. But such solutions substantially raise the risk of a so-called Shaw violation.

Faced with increasingly contorted attempts to maximize minority representation, the Supreme Court in a series of decisions beginning with Shaw v Reno 509 US 630 (1993) put limits on attempts to redistrict affirmatively. The resulting standard from these cases is that race can be taken into consideration but it should not be the exclusive or predominant consideration. Districts like the disputed majority black district in the Shaw v Reno case that link disparate black populations with narrow corridors to avoid white populations have been ruled unconstitutional. Districts drawn predominantly along racial lines invite a strict scrutiny review by the courts and significantly raise the odds of a Congressional plan being overturned on review. Given the geographic distribution of Maryland's African-American community and the heavy and suspect racial tailoring needed to create a potential third majority black VAP district, it is my view that the state was not required to do so.

The second step in the Gingles test is whether groups are politically cohesive. This judgment is based on analysis of past voting and survey returns as well as the scholarly literature on racial and ethnic voting tendencies. The evidence is clear in Maryland and elsewhere that African-Americans are a politically cohesive group. The same is likely true of Latinos based on national data, but the track record in Maryland is not very extensive yet. The national evidence on Asian-Americans is more mixed as a number of studies have revealed important differences based on historical tensions and socio-economic disparities between different Asian-American nationalities. Given that neither the Latino nor Asian-American populations have yet attained the threshold majority VAP level required for Congressional districts, it was not necessary to explore this question with respect to those groups in Maryland further at this time.

I also considered whether the state is compelled to create a new majority-minority VAP coalitional seat. The Governor's plan has already created a number of coalitional seats, including 2 that are already majority minority, 4 that are over 30% minority, 1 of which is over 40% minority and will likely be majority minority by the end of the decade. In short, it is likely that there will likely be a third majority-minority VAP coalitional congressional district before the next redistricting. The relevant legal question with whether the state is compelled to create another one right now.

It is important that we separate the political merits of different types of coalitional seats from the legal requirement to draw an additional 50% majority minority VAP district. The former is a political judgment. The latter requires meeting the Gingles tests. Proving that coalitional groups are sufficiently politically cohesive under the VRA has been difficult across the country. The original framework of the VRA was devised in a primarily biracial setting. The new diversity challenges the old framework in many important ways, particularly when different protected minority groups have competing claims in the same territory. The Gingles framework requires that coalitions have the same levels of cohesion that single minority groups have, and that is typically very hard to prove.

The normal method is to look at a number of elections that feature white v nonwhite and nonwhite v nonwhite candidates in primary and nonpartisan elections (to control for the effects of partisanship), and to link this with demographic data. As a preliminary analysis, I mapped the political returns and compared them with the demographic data and then ran multivariate regressions testing for detectable racial patterns in the 2008 Democratic Presidential Primary and for the 2008 General Election controlling for party. They basically confirm what the national survey data showed as well, which is that Hispanics as well as certain segments of the white population were considerably and statistically significantly less likely than African-Americans to support Barack Obama in both the primary and general election. This led me to conclude that it would be very hard to argue that African-Americans and Hispanics vote as a sufficiently cohesive political bloc to satisfy that prong of the Gingles test.

I would also add in California, a state that I have studied extensively, coalitions between African-Americans and Latinos have been quite unstable. When Latinos become sufficiently large to constitute a majority, they have preferred to solidify the prospects of electing a candidate of their choice and not of the African-American community. Tensions between the two groups have also come out in recent LA Mayoral races and in ballot measures over English as a second language and state benefits for undocumented Latinos.

The issue of a multi-racial coalition ties into the third prong of the Gingles test: i.e. whether white voters vote in a racially polarized way against African-American candidates. I base my conclusions on my preliminary examination of voting patterns in Maryland. I also attended the redistricting hearings in Prince George's and Montgomery Counties (areas of the most significant nonwhite racial growth), and the testimony at the October Special Legislative Session on October 17. Based on my own analysis, the testimony I heard, and the relevant academic literature, I believe that there is no simple generalization about white voting behavior in Maryland: white voters as a group are neither universally polarized nor completely post-racial.

The Maryland 2008 returns show high levels of support for Obama in both the primary and general elections in white urban and suburban areas such as Montgomery and Prince George's Counties and lower support in rural areas at the western end of the state and the Eastern shore.  In the testimony I heard, there were numerous individuals in Montgomery County especially (including the African-American who had been elected as the County Executive Isiah Leggett, who believed that there significant numbers of white voters who would support African-American candidates.

From the regressions I have undertaken, I would characterize the level of polarization as moderate: enough to warrant protections but not so great as to exclude many white areas from the multi-racial coalitions. Moreover, as I mentioned before, at least in 2008, Hispanic voting patterns more closely resembled non-Hispanic whites than African-Americans and Asian-Americans.

An additional consideration about the merits of majority minority VAP coalitions versus coalitions that include supportive white populations in Maryland is demographic and relates to the "one person, one vote" rationale that is the reason for undertaking the difficult task of redistricting in the first place. Different coalitional combinations will have varying implications for population growth in the district over the decade.  The spirit of the "one person, one vote" decisions is to try to equalize the weight of every vote by giving all the districts the same population.   Placing faster growing populations together can cause district populations to grow out of balance more quickly over the decade than combining them with slower growing populations.  Thus, a policy of systematically combining fast growing Latino areas in Montgomery County with fast growing African American areas could lead to greater mal-apportionment over the decade.

In sum, for all the reasons stated above, I find the Governor's Maryland Congressional Redistricting Plan meets the conditions of Section 2 of the Voting Rights Act.

**Curriculum Vitae**
**BRUCE EDWARD CAIN**

**Personal:**

Date and Place of Birth:          November 28, 1948
                                  Boston, Massachusetts

Home and Work Address:            UC, Washington Center
                                  1608 Rhode Island Ave. N.W.
                                  Washington, DC 20036

Office Telephone:                 202-974-6202

**Education:**

B.A.                    Bowdoin College, Brunswick, Maine, 1970
B.Phil.                 Oxford University, Oxford, England, 1972
Ph.D.                   Harvard University, Cambridge, Massachusetts, 1976

**Honors and Awards:**

Summa Cum Laude with High Honors in History, Bowdoin College, 1970
Rhodes Scholar, Trinity College, Oxford, England, 1970-1972
Richard F. Fenno Prize, 1988 (co-winner with J. A. Ferejohn and M. Fiorina)
ASCIT Award for Excellence in Teaching, 1988
Elected to the American Academy of Arts and Sciences, 2000
Zale Award for Outstanding Achievement in Policy Research and Public Service, Stanford
       University, 2000
Distinguished Research Mentoring of Undergraduates Award, College of Letters and Science,
       University of California, Berkeley, 2003
The American Political Science Association and Pi Sigma Alpha (The National Political Science
       Honor Society), award for outstanding teaching in Political Science, 2003.

**Academic Experience:**

Heller Professor of Political Science, University of California, Berkeley, 2006-
Executive Director, UC, Washington Center, 9/1/05-present
Director, Institute of Governmental Studies, University of California, Berkeley, California, July,
       1999-2007
Acting Director, Institute of Governmental Studies, University of California, Berkeley,
       California, 1997-99
Robson Professor of Political Science, University of California, Berkeley, California, 1995-2006
Professor of Political Science, University of California, Berkeley, California, 1989-
Associate Director, Institute of Governmental Studies, University of California, Berkeley,
       California, 1989-99

*Bruce E. Cain, Vitae*

Visiting Professor, University of California, Los Angeles, Los Angeles, California, Fall, 1987

Professor of Political Science, California Institute of Technology, Pasadena, California, 1986-1989

Associate Professor of Political Science, California Institute of Technology, Pasadena, California, 1983-1986

Assistant Professor of Political Science, California Institute of Technology, Pasadena, California, 1976-1982

## Government, Media and Consulting Experience:

Expert Witness, *Pasadena at-large election case*, 1980; *Badham v. Eu*, 1984; *Service Employees International Union, AFL-CIO, CLC et al. v. FPCC,* 1990; *City of New York et al. v. U.S. Department of Commerce*, 1992; *Smith v. Regents of the University of California et al.*, 1995; *California Democratic Party v. Bill Jones*, 1997; *California Pro-Life Council, Inc. v. Karen Getman et al. and Bill Lockyer,* 2004; *New York State Board of Elections: Neil W. Kelleher, Carol Berman, Helena Moses Donohue, and Evelyn J. Aquila,* 2004.

Special Consultant, California Assembly Special Committee on Reapportionment, January-December, 1981 (while on leave); Consultant, part time, 1982

Member, Academic Task Force for Southwest Voter Registration Drive, 1983

Election Commentator, KFWB, 1984; KCBS, 1989, 1990, 1992, 1994, 1996, 1998, 2000; KTVU, 1990, 1998, 2000, 2002, 2004, 2006; KQED, 1992, KGO-TV 2008, 2010

Consultant, *Los Angeles Times*, 1986-1988

Redistricting Consultant, Los Angeles City Council, 1986; Attorney General of the State of Massachusetts, 1987-88; U.S. Justice Department, 1989; Los Angeles County, 1991; Oakland City Council, 1993; San Diego Citizens Commission on Redistricting, 2001; City and County of San Francisco, 2002; Special Master for three judge panel, Arizona State Legislative Redistricting, 2002; Maryland Attorney General's Office, 2011.

Polling Consultant, Fairbank, Canapary and Maullin, 1985-86

Member, Contra Costa Charter Commission, 1997-98

Political Analyst, Mornings on Two, KTVU, 1998-2006, KGO-TV 2007-

Advisor, American Law Institute (ALI) Project on Resolution of Election Disputes 2011-

## Courses Taught:

Introduction to American Politics (undergraduate)

Congress (undergraduate and graduate)

American Electoral process (undergraduate and graduate)

Justice and Obligation (undergraduate)

Democratic Theory (undergraduate)

California Politics (undergraduate)

Campaign and Elections (undergraduate)

Ethics and Politics (undergraduate)

Political Regulation (undergraduate and graduate)

## Professional Activities/Memberships:

Member, APSA 1976-present

Member, American Academy of Arts and Sciences 2000-present

Member, AFTRA 1996-present

*Bruce E. Cain, Vitae*

Editorial Board, American Journal of Political Science, 1985
Editorial Board, Legislative Studies Quarterly, 1989-1991
Editorial Board, Election Law Journal 2005-present
Editorial Board, American Politics Research, 2006-present

**University Service:**
- **Caltech**

Upperclass Admissions Committee, 1977-78
Undergraduate Academic Standards and Honors Committee, 1979-1983
Health Committee, 1979-1985; Chairman, 1980-1985
Athletics Committee, 1982-1989; Chairman, 1985-1989
Faculty Board, 1983-1986
Steering Committee, 1984-1986
Nominating Committee, 1984; Chairman, 1985
Accreditation Committee, 1984
Advisory Committee on SURF Fellowships, 1984-1989
Freshman Admissions, 1985; Vice Chairman, 1986-87
Ad Hoc Committee on Admissions Procedures, Chairman, 1985
Faculty Advisory Committee for Selection of Caltech President, 1986-87
Academic Freedom and Tenure Committee, 1986-87
Vice Chairman of the Faculty Board, 1987-1989
Administrative Committee on Affirmative Action, Chairman, 1988-89
Freshman Advisor, 1978-1989
SURF Advisor, 1980, 1984, 1986-1988


- **University of California at Berkeley**

Academic Freedom Committee, 1990; Chairman, 1991
Committee on Academic Planning and Resource Allocation, 1992; Chairman, 1993-1995
Resource Generation Working Group, 1992-93
Academic Planning Board, 1993-1995
Business and Administration Services Working Group, Co-Chairman, 1993-1995
Economics Review Panel, Chairman, 1993
U.C. Press Editorial Board, 1996-1998
U.C.T.V., 2007-present


**General Areas Of Interest:**
Fields: American Politics; Democratic Theory; State and Local Government
Topics: Representation in Anglo-American systems; electoral institutions, legislatures, and
  parties; normative issues related to representation, political reform and regulation


**Grants Awarded:**
National Science Foundation, *Voting Behavior in Contemporary Legislative Elections* (with John
  A. Ferejohn and Morris P. Fiorina), July, 1978, to July, 1980.
National Science Foundation, *Voting Behavior in Contemporary Legislative Elections* (with John
  A. Ferejohn and Morris P. Fiorina), August, 1980, to August, 1982.
Seaver Foundation, *Ethnic Minorities in California: The New Coalitional Politics* (with
  D. Roderick Kiewiet), January, 1984, to December, 1985.

California Policy Seminar (Technical Services Grant), *Improving Data Collection on City Expenditures*, January-August, 1990.

Research Services Grant from Assembly Committee on Elections, *Reapportionment and Constitutional Amendments*, May 1, 1991, to January 31, 1992.

California Policy Seminar, *California Constitutional Reform*, 1993-1995.

State Assembly, *Statewide Database*, 1993-present.

Bay Area Library and Information Systems, *Determinants of Library Referendums*, 1995.

Public Policy Institute of California, *Race Relations and Neighborhood Context in California*, 1997.

Bipartisan Commission, *A Review of the Political Reform Act,* 1999-2000.

California Policy Seminar (Technical Services Grant)-Term Limits, 2001.

Pew Charitable Trusts, Center for Campaign Leadership, 2001-2003.

Public Policy Institute of California, *Adaption to Term Limits: Recent Experiences & New Directions*, 2002-2003.

James Irvine Foundation, "Redistricting Reform in California," 2005.

JEHT Foundation, "State Legislative Redistricting Reforms," 2005

Russell Sage Foundation, "Learning, Civic Engagement: Political Socialization in Mexican–Origin Families with Mixed Citizenship Status," 2006.

California Secretary of State, "State-wide Survey of Poll Workers on Training Needs," 2006.


## PUBLICATIONS

### Books and Monographs:

*The Reapportionment Puzzle*. Berkeley: University of California Press, 1984.

*The Personal Vote* (with John A. Ferejohn and Morris P. Fiorina). Cambridge: Harvard University Press, 1987.

*Congressional Redistricting* (with David Butler). New York: Macmillan, 1992.

*Developments in American Politics*, co-edited with Gillian Peele and Christopher Bailey. Houndmills: Macmillan, June, 1992.

*Developments in American Politics II,* co-edited with Gillian Peele, Christopher Bailey, and B. Guy Peters. Houndmills: Macmillan, 1994.

*Constitutional Reform in California: Making State Government More Effective and Responsive,* co-edited with Roger Noll. Berkeley: IGS Press, 1995.

*Governing California: Politics, Government and Public Policy in the Golden State*, co-edited with Gerald Lubenow. Berkeley: IGS Press, 1997.

*Developments in American Politics III,* co-edited with Gillian Peele, Christopher Bailey and B. Guy Peters. Houndmills: Macmillan, 1998.

*Racial and Ethnic Politics in California*, Vol. II, co-edited with Michael Preston and Sandra Bass. Berkeley: IGS Press, 1998.

*Ethnic Context, Race Relations and California Politics*, with Jack Citrin, and Cara Wong, San

Francisco: Public Policy Institute of California, 2000.

*Voting at the Political Fault Line: California's Experiment with the Blanket Primary*, co-edited with Elisabeth R. Gerber, The University of California Press, 2002.

*Developments in American Politics IV*, co-edited with Gillian Peele, Christopher Bailey, and B. Guy Peters, Houndmills: Palgrave Macmillan, 2002.

*Democracy Transformed?: Expanding Political Opportunities in Advanced Industrial Democracies*, co-edited with Russ Dalton and Susan Scarrow, Oxford University Press, 2003.

*The Season of Our Discontent: Voters' Views on Improving California Elections*, Mark Baldassare, Bruce E. Cain, D. E. Apollonio, and Jonathan Cohen, Public Policy Institute of California, monograph, 2004.

*Adapting to Term Limits*, Bruce E. Cain, Thad Kousser, Public Policy Institute of California Monograph, 2004.

*Party Lines: Competition, Partisanship and Congressional Redistricting*, Thomas Mann, Bruce E. Cain, eds., Washington, DC, Brookings Institution, 2005.

*Developments in American Politics V*, co-edited with Gillian Peele, Christopher Bailey, B. Guy Peters, Houndmills: Palgrave Macmillan, 2006.

*Clicker Politics: Essays on the California Recall*, Shaun Bowler and Bruce E. Cain, eds., New Jersey: Pearson Prentice Hall, 2006.

*Institutional Change in American Politics: The Case for Term Limits*, Karl T. Kurtz, Bruce E. Cain, Richard G. Niemi, eds., Ann Arbor: University of Michigan Press, 2007.

*Democracy in the States: Experiments in Election Reform*, co-edited with Todd Donovan and Caroline Tolbert, Washington D.C: Brookings Press, 2008.

*Racial and Ethnic Politics in California: Continuity and Change*, Volume 3, co-edited with Sandra Bass, Berkeley: Berkeley Public Policy Press, 2008.

*Developments in American Politics VI*, co-edited with Gillian Peele, Christopher Bailey, B. Guy Peters, Houndmills: Palgrave Macmillan, 2010.

**Articles and Chapters:**

"Dynamic and Static Components of Political Support in Great Britain," *American Journal of Political Science*, Vol. 22, No. 4, November, 1978.

"Strategic Voting in Great Britain," *American Journal of Political Science,* Vol. 22, No. 3, August, 1978.

"Modes of Rationality and Irrationality," (with W. T. Jones), *Philosophical Studies*, November, 1979.

"The House is Not a Home: MPs and Their Constituencies," (with John A. Ferejohn and Morris P. Fiorina), *Legislative Studies Quarterly*, November, 1979.

"Challenges and Responses in British Party Politics," *Comparative Politics*, Vol. 12, No. 3, April, 1980.

"A Comparison of Party Identification in Great Britain and the United States," (with John A. Ferejohn), *Comparative Political Studies*, Vol. 14, No. 1, April, 1981.

"Assessing Constituency Involvement:  The Hemel Hempstead Experience," (with David B. Ritchie), *Parliamentary Affairs*, Vol. 35, No. 1, Winter, 1982.

"Blessed Be the Tie that Unbinds: Constituency Pressures and National Party Forces in Great Britain," *Political Studies*, Vol. 31, 1983.

"The Constituency Component: A Comparison of Service in Great Britain and the United States," (with John A. Ferejohn and Morris P. Fiorina), *Comparative Political Studies*, Vol. 16, No. 1, April, 1983.

"The Constituency Service Basis of the Personal Vote for U.S. Representatives and British MPs," *American Political Science Review*, Vol. 78, 1984, pp. 110-125; reprinted in *Controversies in American Voting Behavior*, Rev. Edition (with John A. Ferejohn and Morris P. Fiorina), Richard Niemi and Herbert Weisberg, eds.  Washington, D.C.: Congressional Quarterly Press, 1984.

"Ethnicity and Electoral Choice: Mexican-American Voting Behavior in the California 30th Congressional District," *Social Science Quarterly*, Vol. 65, No. 2, June, 1984; reprinted in *The Mexican-American Experience:  An Interdisciplinary Anthology* (with D. Roderick Kiewiet), de la Garza et al., eds., Austin, Texas: University of Texas Press, 1985.

"Assessing the Partisan Effects of Redistricting," *American Political Science Review*, Vol. 79, No. 2, June, 1985, pp. 320-333.

"The Efficacy of Registration Drives," (with Ken McCue), *The Journal of Politics*, Vol. 47, No. 4, November, 1985.

"Simple Versus Complex Criteria for Partisan Gerrymandering," *UCLA Law Review*, Vol. 33, October, 1985.

"A Comparison of British and American Redistricting," (with David Butler), *Electoral Studies*, Vol. 4, No. 3, 1985, pp. 197-213.

"Constituency Service in the United States and Great Britain," (with John Ferejohn and Morris Fiorina) in *Congress Reconsidered*, 3rd Edition, Dodd and Oppenheimer, eds., Washington, D.C.: Congressional Quarterly Press, 1985.

"Implementing Representation: A Framework and Comparison," (with W. T. Jones) in *Readings in Social and Political Philosophy*, Robert Stewart, ed., New York: Oxford University Press, 1986.

"California's Rainbow Coalition," (with D. Roderick Kiewiet), *Public Opinion*, February/March, 1986, pp. 50-52.

"Predicting Partisan Congressional Redistricting Plans:  The 'Jupiter' Effect," (with Janet Campagna), *Legislative Studies Quarterly*, Vol. 12, No. 2, May, 1987, pp. 265-274.

"Redistribution," in *The Blackwell Encyclopedia of Political Institutions*, Vernon Bogdanor, ed., Oxford:  Blackwell, 1987.

"Latinos and the 1984 Election: A Comparative Perspective," (with D. Roderick Kiewiet) in *Ignored Voices*, Rudy O. de la Garza, ed., Austin, Texas: University of Texas Press and CMAS, 1987.

"Constituency Service and Electoral Independence: An Anglo-American Comparison," in *International Yearbook for Studies of Leaders and Leadership*, Vol. 3, Harold Clarke and Moshe Czudnowski, eds., DeKalb, Illinois:  Northern Illinois University Press, 1987.

"Political Participation, Race and Ethnicity," (with Carole Uhlaner and D. Roderick Kiewiet), *Political Behavior*, Vol. II, August, 1989, pp. 195-231.

"Strategy and Choice in the 1988 Presidential Primaries," (with Douglas Rivers), *Electoral Studies*, Vol. 8, No. 1, 1989, pp. 23-48.

"Madison's Theory of Representation," (with W. T. Jones) in *The Federalist Papers and The New Institutionalism*, B. Grofman and D. Wittman, eds.,  New York:  Agathon Press, 1989.

"British MPs in Their Constituencies," (with J. Vincent Buck), *Legislative Studies Quarterly*, Vol. XV, February, 1990, pp. 127-144.

"Perspectives on *Davis v. Bandemer*:  Views of the Practitioner, Theorist and Reformer," in *Toward Fair and Effective Representation:  Political Gerrymandering and the Courts*, B. Grofman, ed., New York: Agathon Press, 1990.

"Redistricting: Public Policy or Just Politics" in *California Policy Choices*, John Kirlin, ed., Los Angeles: University of Southern California School of Public Administration, 1990.

"The Evolution of Partisanship Among Immigrants," (with Carole Uhlaner and D. Roderick Kiewiet), *American Journal of Political Science*, Vol. 35, No. 2, May, 1991, pp. 390-422.

"The Contemporary Context of Racial and Ethnic Politics in California," in *Racial and Ethnic Politics in California*, Byran O. Jackson and Michael B. Preston, eds.,  Berkeley:  Institute of Governmental Studies Press, 1991.

"Lessons from the Inside," in *California Votes:  The 1990 Governor's Race*, G. Lubenow, ed. Berkeley:  Institute of Governmental Studies Press, 1991.

"Voting Rights and Democratic Theory: Toward a Color-Blind Society?," in *Controversies in Minority Voting*, Bernard Grofman and Chandler Davidson, eds.,  Washington:  Brookings, 1992. Reprinted in *The Brookings Review*, Winter, 1991-92.

*Bruce E. Cain, Vitae*

"The American Electoral System," in *Developments in American Politics*, Gillian Peele, Christopher Bailey and Bruce Cain, eds., Houndmills: Macmillan, 1992.

"Coalitional Prospects in a Multi-Racial Society: African-American Attitudes Towards Other Minority Groups," (with Elisabeth Gerber and Byran Jackson), *Political Research Quarterly*, Vol. 47, No. 2, June, 1994, pp. 277-294.

"Developments in Racial and Ethnic Politics," in *Developments in American Politics II*, co-edited with Gillian Peele, Christopher Bailey, and B. Guy Peters, eds., Houndmills: Macmillan, 1994.

"Legislative Redistricting," in *Encyclopedia of the American Legislative System*, Joel H. Silbey et al., eds., New York: Scribner, 1994.

"Congressional Redistricting," in *The Encyclopedia of the United States Congress*, Donald C. Bacon, Roger H. Davidson and Morton Keller, eds., New York: Simon & Schuster, 1995.

"Constitutional Change: Is It Too Easy To Amend Our State Constitution?," (with Sara Ferejohn, Margarita Najar, and Mary Walther) in *Constitutional Reform in California: Making State Government More Effective and Responsive*, Berkeley: IGS Press, 1995.

"Creating an Accountable Legislature: The Parliamentary Option for California Government," (with Nathaniel Persily) in *Constitutional Reform in California: Making State Government More Effective and Responsive*, Berkeley, IGS Press, 1995.

"Introduction," *Constitutional Reform in California: Making State Government More Effective and Responsive*, Berkeley: IGS Press, 1995.

"Principles of State Constitutional Design," (with Roger Noll) in *Constitutional Reform in California: Making State Government More Effective and Responsive*, Berkeley: IGS Press, 1995. Reprinted in part in *Madison Review*, Vol. 3, No. 1, Fall, 1997, pp. 7-11.

"Moralism and Realism in Campaign Finance Reform," *The Legal Forum*, Vol. 1995, Spring, 1996, pp. 111-140.

"The Varying Impact of Legislative Term Limits," in *Legislative Term Limits: Public Choice Perspectives*, Bernard Grofman, ed., Boston: Kluwer Academic Publishers, 1996.

"Term Limits and Local Governments in California," in *Legislative Term Limits: Public Choice Perspectives*, Bernard Grofman, ed. Boston: Kluwer Academic Publishers, 1996.

"Foreword," in *Ethnic Ironies: Latino Politics in the 1992 Elections*, Rodolfo de la Garza and Luis DeSipio, eds., Boulder: Westview Press, 1996.

"Epilogue: Seeking Consensus Among Conflicting Electorates," in *Governing California: Politics, Government and Public Policy in the Golden State*, Gerald Lubenow and Bruce Cain, eds., Berkeley: IGS Press, 1997.

"La Question Raciale et al Politique des Portis Aux Élections Présidentielles de 1996," *Hérodote*, (with Karin Mac Donald) No. 85, 2 Trimestre, 1997, pp. 93-108.

"The Politicization of Race and Ethnicity in California," in *Racial and Ethnic Politics in California*, Vol. II, Michael Preston, Bruce Cain, and Sandra Bass, eds., Berkeley: IGS Press, 1998.

"Voting Rights Mismatch: The Challenge of Applying the Voting Rights Act to Other Minorities," (with Ken Miller), in *Voting Rights and Redistricting in the United States*, Mark E. Rush, ed., Westport: Greenwood Publishing, Inc. 1998.

"Nativism, Partisanship and Immigration: An Analysis of Prop 187," ☐(with Karin Mac Donald), in *Racial and Ethnic Politics in California II*, Michael Preston, Bruce E. Cain and Sandra Bass, eds., Berkeley: IGS Press, 1998.

"Developments in Electoral Politics," (with Allison Wegner), in *Developments in American Politics III*, Gillian Peele, Christopher Bailey, Bruce Cain, eds., Houndmills: Macmillan, 1998.

"Race and Party Politics in the 1996 Presidential Election," (with Karin Mac Donald) in *Racial and Ethnic Politics in California II*, Michael Preston, Bruce E. Cain, and Sandra Bass, eds., Berkeley: IGS Press, 1998.

"Term Limits," (with Marc A. Levin), *Annual Review of Political Science*, 1999, 2, pp.163-188.

"Equity and Efficacy in the Enforcement of Campaign Finance Law," (with Todd Lochner), *Texas Law Review*, June 1999, Vol 77:7, pp. 1891-1942.

"Election Law as a Field: A Political Scientist's Perspective," *Loyola Law Review*, June, 1999, Vol. 32, No. 4.

"Garrett's Temptation," *University of Virginia Law Review*, November, 1999, Vol. 85, No. 8, pp 1589-1603.

"Positive Discrimination," in *The International Encyclopedia of Elections*, Washington: CQ Press, 2000.

"Legislative Redistricting and African-American Interests: New Facts and Conventional Strategies," in *Immigration and Race,* Gerald Jaynes, ed., New Haven: Yale University Press, 2000.

"The Enforcement Blues: Formal and Informal Sanctions for Campaign Finance Violations," with Todd Lochner, *Administrative Law Review*, Vol. 52, No. 2, Spring, 2000.

"The Legal Status of Political Parties: A Reassessment of Competing Paradigms,"with Nate Persily, *Columbia Law Review*, April, 2000.

"Asian-Americans as the Median Voters: An Exploration of Attitudes and Initiative Vote Patterns," with Wendy Tam Cho, in Gordon Chang, ed., *Asian-Americans and Politics: An Exploration*, Stanford University Press, 2001.

"The Populist Legacy," with Ken Miller in *Dangerous Democracy?: The Battle Over Ballot Initiatives in America,* Larry J. Sabato, Howard R. Ernst, and Bruce A. Larson, eds., Lanham: Roman & Littlefield, 2001.

9

*Bruce E. Cain, Vitae*

"Introduction: Exploring the Last Taboo of US Politics," in *Fair and Effective Representation: Debating Electoral Reform and Minority Rights*, ed., Mark Rush, Lanham: Rowman & Littlefield, 2001.

"Party Autonomy and Two Party Electoral Competition," *University of Pennsylvania Law Review*, Vol. 149, No. 3, January, 2001.

"The Internet in the (Dis)Service of Democracy," *Loyola Law Review,* Volume 34, Issue 3, June, 2001.

"Beyond the Recounts," (Special Issue: "Elections 2000: La Constitution Dans Les Urnes"), *Revue Francaise D'Etudes Americaines* #80, October, 2001.

"Citizens in the Federal System: Locating Accountability in a Dispersed System," *Nation, Federalism and Democracy: the EU, Italy and the American Federal Experience*, ed. Sergio Fabbrini, Bologna: Editrice Compositori, 2001.

"Explorations at the Fault Line: California's Blanket Primary Experiment," in *Voting at the Political Fault Line: California's Experiment With the Blanket Primary,* Bruce E. Cain and Elisabeth R. Gerber, eds., Berkeley: University of California Press, 2002.

"Conclusion," (with Elisabeth R. Gerber), in *Voting at the Political Fault Line: California's Experiment With the Blanket Primary,* Bruce E. Cain and Elisabeth R. Gerber, eds., Berkeley: University of California Press, 2002.

"Strategies and Rules: Lessons from the 2000 Presidential Primary," with Megan Mullin, *Voting at the Political Fault Line: California's Experiment With the Blanket Primary,* Bruce E. Cain and Elisabeth R. Gerber, eds., Berkeley: University of California Press, 2002.

"The U. S. in Evolution," *Developments in American Politics, IV* , co-edited with Gillian Peele, Christopher Bailey, and B. Guy Peters, eds., Houndmills: Palgrave, 2002.

"Political Reform," *International Encyclopedia of the Social and Behavioral Sciences,* Oxford: Elsevier Science Limited, 2002.

"Competing for Attention and Votes: The Role of State Parties in Setting Presidential Nomination Rules," (with Megan Mullin) in *The Parties Respond: Changes in American Parties and Campaigns*, 4th Edition, L. Sandy Maisel, ed., Boulder, CO: Westview Press, 2002.

"Mapmaking at the Grassroots: The Legal and Political Issues of Local Redistricting," with David A. Hopkins, *Election Law Journal*, vol.1, no. 4 (2002), pp. 515-530.

"Toward More Open Democracies: The Expansion of Freedom of Information Laws," with Patrick Egan and Sergio Fabrinni, in *Democracy Transformed?: Expanding Political Opportunities in Advanced Industrial Democracies*, (op. cit.), 2003.

"New Forms of Democracy? Reform and Transformation of Democratic Institutions," with Russell J. Dalton and Susan E. Scarrow, in *Democracy Transformed?: Expanding Political Opportunities in Advanced Industrial Democracies*, pp 1-20, (op. cit.), 2003.

"Cheap Talk Citizenship: The Democratic Implications of *Voting with Dollars*," *University of Richmond Law Review*, May 2003, Volume 37, Number 4, pp 959-978.

"Advanced Democracies and the New Politics,"with Russell J. Dalton and Susan Scarrow, *Journal of Democracy*, January, 2004, Volume 15, Number 1, pp 124-138.

"La trasparenza, la advocacy democratica e l'amministrazione dello stato," *Rivista Italiana di Politiche Pubbliche,* Numero 1, Aprile, 2004, pp 5-22.

"Reasoning to Desired Outcomes: *Making Sense of McConnell v. FEC*," *Election Law Journal*, Vol. 3, No. 2, Spring, 2004, pp 217-221.

"Is the Democratic Deficit a Deficiency:  The Case of Immigration Policy in the US and EU," in *On Restructuring Territoriality: Europe and North America*, Chris Ansell and Giuseppe Di Palma, eds., Cambridge University Press, 2004, pp 188-204.

"City Caesars?  Institutional Structure and Mayoral Success in Three California Cities," with Megan Mullin and Gillian Peele, *Urban Affairs Review*, Vol. 40, No. 1, September, 2004, pp 19-43.

"California: Low-Tech Solutions Meet High-Tech Possibilities," with Karin Mac Donald, in *Election Reform,* Daniel J. Palazzolo and James W. Ceaser, eds., Lanham: Lexington Books, 2005.

"Citizens in American Federalism: Locating Accountability in a Dispersed System," *Democracy and Federalism in the European Union and the United States*, Sergio Fabbrini, ed., New York: Routledge, 2005, pp 104-116.

"An Ethical Path to Reform: *Just Elections* Considered," *Election Law Journal*, Vol. 4, No. 2, 2005, pp 134-138.

"Constitutional Revision in California," in *State Constitutions for the 21st Century*, v. 1, G. Alan Tarr, ed., State University of New York Press, 2006.

"From Equality to Fairness: The Path of Political Reform since *Baker v. Carr*," with Karin Mac Donald, Michael P. McDonald, in *Party Lines: Competition, Partisanship and Congressional Redistricting*, Bruce E. Cain, Thomas Mann, eds., Washington, DC, Brookings Institution, 2005.

"America after the 2004 Elections: Bold Policies and Political Quicksand," Sergio Fabbrinni, ed., *The United States Contested. American Unilateralism and European Discontent*, London: Routledge, 2006.

"The Impact of Dual Nationality on Political Participation," with Brendan Doherty, in *Transforming Politics, Transforming America:  The Political and Civic Incorporation of Immigrants in the United States*, Taeku Lee, Karthick Ramakrishnan, and Ricardo Ramírez, eds., University of Virginia Press,  2006.

"Barriers to Recalling Elected Officials: A Cross-State Analysis of the Incidence and Success of Recall Petitions," with Melissa Cully Anderson and Annette K. Eaton in *Clicker Politics:*

*Essays on The California Recall*, Shaun Bowler and Bruce E. Cain, eds., New Jersey: Pearson Prentice Hall, 2006.

"Term Limits: A Recipe For More Competition?," with John Hanley and Thad Kousser, in *The Marketplace of Democracy: Electoral Competition and American Politics*. Michael McDonald and John Samples editors, Washington: Brookings University Press, 2006

"Parties in an Era of Renewed Partisanship," with Darshan Goux, in *Developments in American Politics V*, co-edited with Gillian Peele, Christopher Bailey, B. Guy Peters, Houndmills: Palgrave Macmillan, 2006.

"Voting Rights Act Reinforcement: Navigating Between High and Low Expectations," with Karin Mac Donald, in *The Future of the Voting Rights Act*, David Epstein et al, editors, New York: Russell Sage, 2006.

"Introduction," with Shaun Bowler in *Clicker Politics: Essays on the California Recall*, Shaun Bowler and Bruce E. Cain, eds., New Jersey: Pearson Prentice Hall, 2006.

"Committees and Term Limits," with Gerald Wright, in *Institutional Change in American Politics: The Case of Term Limits*, Karl Kurtz, Bruce E. Cain and Richard Niemi, eds., Ann Arbor: University of Michigan Press, 2007.

"Conclusion and Implications" with Karl Kurtz and Richard G. Niemi, in *Institutional Change in American Politics: The Case for Term Limits*, Karl Kurtz, Bruce E. Cain and Richard G. Niemi, eds, Ann Arbor:University of Michigan Press, 2007.

"Institutional Imbalance: The Effects of Six-Year Limits in California, with Thad J Kousser and Karl T. Kurtz, *Legislating Without Experience: Case Studies in State Legislative Term Limits*, Rick Farmer, Christopher Z. Mooney, Richard J Powell and John C. Green eds, Lanham: Lexington Books, 2007.

"Venturing onto the Path of Equal Representation: The Warren Court and Redistricting," with Melissa Cully Anderson, *Earl Warren and the Warren Court: The Legacy in American and Foreign Law - A Half-Century Retrospect*, Harry Scheiber, ed., Berkeley: Public Policy Press, 2007.

Le Paradoxe Multiculturel de la California" with Frederick Douzet in *Politique Americaine* No 9, Hiver, 2007-8, pp13-32.

"The Governator's Comeback Victory in California," *The Sixth Year Itch*, Larry Sabato ed., London: Longman, 2008.

"Conflict of Interest Legislation in the United States: Origins, Evolutions and Inter-Branch Differences," with Alison Gash and Mark J. Oleszek, *Conflict of Interest and Public Life*: *Cross-National Perspectives*, Christine Trost and Alison Gash, eds, Cambridge: Cambridge University Press, 2008.

"Sorting or Self-Sorting: Competition and Redistricting in California?" with Iris Hui and Karin Mac Donald, *The New Political Geography of California*, Frederick Douzet, Thad Kousser and Kenneth Miller, eds., Berkeley: Public Policy Press, 2008.

"The Promise of Election Reform," with Caroline Tolbert and Todd Donovan, *Democracy in the States: Experiments in Election Reform*," Bruce E. Cain, Todd Donovan and Caroline Tolbert eds., Washington, Brookings Press, 2008.

"From the Last Generation of Reform to the Next," with Caroline Tolbert and Todd Donovan in *Democracy in the States: Experiments in Election Reform*. Bruce E. Cain, Todd Donovan and Caroline Tolbert eds., Washington: Brookings Press, 2008.

"Lobbying Regulation," with Dorie Apollonio and Lee Drutman, *Hastings Law Review*, Volume 36, number 1, Fall 2008.

"Administering the Overseas Vote," with Karin Mac Donald and Mike Murakami, *Public Administration Review*, Volume 68, number 5, Sept/Oct 2008.

"Introduction: Toward Greater Pluralism," in Sandra Bass and Bruce E. Cain, eds, *Racial and Ethnic Politics in California*, volume 3, Berkeley: Berkeley Public Policy Pres, 2008.

"The Skeptical Pluralist: Nelson Polsby's Contributions to the Study of Political Reform," with Jim Desveaux, *Election Law Journal,* 7(4), December 2008, 287-300.

"La Nouvelle Carte Politique des Etats-Unis," with Frederick Douzet and Hugo Lefebvre, *Herodote*, 1er trimester 2009, no 132, 2009.

"Malleable Constitutions: Reflections on State Constitutional Reform," with Roger G. Noll, *University of Texas Law Review*, Vol 87, no 7, June 2009.

"More or Less: Searching for Regulatory Balance," in *Race, Reform and Regulation of the Political Process*, edited Heather Gerken, Guy Charles and Michael Kang, Cambridge University Press, 2011.

"The Electoral System and the Lessons of 2008," in *Developments in American Politics VI*, in Gillian Peele, Christopher Bailey, Bruce Cain, B. Guy Peters, editors, Houndmills: Palgrave Macmillan, 2010.

"The Institutional Causes of California's Budget Problems, with Roger G. Noll, in the *California Journal of Politics and Policy*, vol2, no 3, 2010.

**Miscellaneous Works (Essays, Reviews, Columns):**

"Euro-communism and the Communist Party in Great Britain," prepared for the California Conference on Euro-communism and United States Foreign Policy, April 15-16, 1977.

Review of "New Trends in British Politics: Issues for Research," in *American Political Science Review*, Dennis Kavanagh and Richard Rose, eds, Vol. 73, No. 2, 1979, pp 640-641.

"Why Should Our Republic Have Democratic Elections," (with Daniel J. Kevles), *Los Angeles Times*, April 3, 1979.

Review of "Doctrine and Ethos in the Labour Party," in *American Political Science Review*, H. M. Drucker, ed., Vol. 74, No. 3, 1980, pp 840-841.

*Bruce E. Cain, Vitae*

"The Reapportionment Puzzle," *Engineering and Science*, March, 1982.

Report on "Nuclear Proliferation," to the United National Association, March, 1984.

"Excerpts from Declaration of Bruce Cain in *Badham v. Eu*," *PS*, Vol. 18, No. 3, Summer, 1985, pp. 561-567.

*Minorities in California*, report funded by the Seaver Institute, March, 1986.

"Asian-American Electoral Power: Imminent or Illusory?," *Election Politics*, Spring, 1988, pp. 27-30.

"Can Campaign Finance Reports Create a More Ethical Political Process," (with Dan Lowenstein) in *Public Affairs Report*, Vol. 31, No. 1, January, 1990.

"Redrawing District Lines:  What's Going On and What's at Stake," (with David Butler), *The American Enterprise*, Vol. 2, No. 4, July/August, 1991, pp. 28-40.

"Reading the Returns: How the 1994 Elections Will Affect the University," *California Monthly*, Vol. 105, No. 4, February, 1995.

"Stepping Forward and Stepping Backwards: Twenty-five Years of Political Reform," *California Journal*, Vol. 26, No. 11, November, 1995, pp. 28-30.

"California Library Referenda: The Determinants of Success and Failure," (with Ellyce Cooper, Sara Ferejohn and Corrie Potter), IGS Working Paper 96-7, 1996; reprinted in *The Bottom Line: Managing Library Finances*, Vol. 10, Issue 2, 1997.

"Party Rights and Public Wrongs: The Court's Stand Against Proposition 198," *Sacramento Bee*, Op-Ed piece, June, 2000.

"Ethnic Ironies: Chronic Underinvestment in Minority Politics," *California Politics and Policy*, September, 2000.

*Term Limits-Lessons from California*, NCSL Report, 2001.

"Searching for the Next Pat Brown: California Infrastructure in the Balance," *California's Future in the Balance: Transportation, Housing/Land Use, Public Higher Education, and Water, Four Decades Beyond the Pat Brown Era*, The Pat Brown Institute of Public Affairs and the Institute of Governmental Studies, 2002.

"Flaws Everywhere: A Review of a Badly Flawed Election," review of Ronald Dworkin (ed.), *A Badly Flawed Election: Debating Bush v. Gore, the Supreme Court, and American Democracy*, in *Election Law Journal*, 2003, Volume 2, Number 4, pp. 525-530.

"Introduction-Recalling the Recall: Reflections on California's Recent Political Adventure," with Shaun Bowler, *PS: Political Science and Politics*, Vol. XXXVII, No. 1, January, 2004, pp 7-9.

"An Ethical Path to Reform: *Just Elections* Considered," *Election Law Journal*, Vol. 4, No. 2, 2005, pp 134-138.

*Bruce E. Cain, Vitae*

"Nelson Polsby," *PS: Political Science and Politics*, volume 40, no 3, July 2007, pp 597-99.

"Reform Studies: Political Science on the Firing Line," *PS: Political Science and Politics*, volume 40, no 4, October 2007, pp635-638.

"Election Administration: Still Broken After all these Years," a book review of M Felcher et al, *Voting in America, Election Law Journal*, vol.3, no 8, 219-222.

"Reform Perhaps: Two Studies of the Presidential Nomination Process," *Election Law Review*, vol 9 no 2, 2010.

"Introduction: To Con-Con or Not: California's Constitutional Decision*, " California Journal of Politics and Policy*, vol 2, 2010.

"Foundational Wisdom: the Scholarship of Daniel Lowenstein," *Election Law Journal*, volume 9, number 4, 2010.

"Five Myths about California Politics," *Washington Post,* June 6, 2010.

"Califormula for Dysfunction," *The American Interest*, vol.6, no. 6,, July 2011.

"Shade from the Glare: The Case of Semi-disclosure," *Cato Unbound* (Lead Essay), November 2010.

"Teaching Election Law to Political Scientists," *Saint Louis University Law Journal*, forthcoming.