**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**GREENBELT DIVISION**

PATRICIA FLETCHER, *et al.,*                *

        Plaintiffs                *

Vs.                                        *        Civil Action No. RWT 11-3220

LINDA H. LAMONE, *et al.,*                  *

        Defendants                *

_____

**BRIEF OF C. JAMES OLSON, C. PAUL SMITH**
**RONALD GEORGE, CARL F. MIDDLEDORF, ANTONIO WADE CAMPBELL**
**AND PHILIP J. SMITH AS *AMICI CURIAE***

      This brief is filed by C. James Olson, C. Paul Smith, Ronald George, Carl F. Middledorf,

Antonio Wade Campbell and Philip J. Smith by and through their counsel, C. Paul Smith.  This

brief is being filed pursuant to the Order of this Court which denied the claim of these six

Petitioners to intervene in this case, but allowed them to file an amicus brief in this case by

December 7, 2011.

                              C. Paul Smith
                              308 West Patrick Street
                              Frederick, Maryland 21701
                              (301) 762-0033
                              cpaulsmith@verizon.net

                              Counsel for C. James Olson, C. Paul Smith
                              Ronald George, Carl F. Middledorf,
                              Antonio Wade Campbell and Philip J. Smith

## TABLE OF CONTENTS

**Introduction**                                                                        **2**

**Statement of Facts**                                                                  **3**

**Argument**                                                                            **8**

    **I.**      **Background—Districting Requirements under the United States
Constitution**                                                                          **8**

        **A. The Congressional Districting Plan is excessive political
gerrymandering that violates plaintiffs' Equal Protection rights
under the Fourteenth Amendment.**                                                        **10**

        **B. The Congressional Districting Plan violates the constitutional
guarantees of a republican form of government (Article IV,
Sec. 4) and that Representatives shall be elected by the people,
rather than by state legislatures (Article I, Sec. 2)**                                  **12**

        **C. The Congressional Districting Plan violates plaintiffs' Due
Process rights under the Fourteenth Amendment**                                          **19**

            **1. Section 1-201 of the Elections Article**                              **19**
            **2. Sections 8-701 – 8-709 of the Elections Article**                     **21**
            **3. Article III, Section 4 of the Maryland Constitution**                 **21**

    **II.**     **Districting Requirements under the Maryland Constitution and
Maryland State Election Laws**                                                           **23**

        **D. The Congressional Districting Plan violates Section 1-201 of the
Elections Article of the Maryland Code**                                                 **24**

        **E. The Congressional Districting Plan violates Article III,
Section 4 of the Maryland Constitution**                                                 **25**

**Conclusion**                                                                          **31**

## INTRODUCTION

The "Congressional Districting Plan," which was enacted by the Maryland State Legislature and signed into law by Governor Martin O'Malley on October 20, 2011 [hereafter "Plan"] is a plan in which at least six of its eight congressional districts ignore the principles of compactness and fail to give due regard to sub-political boundaries.  Maps of the Plan demonstrate a total departure from and disregard for neutral principles of districting that would yield district boundaries that would "inspire public confidence and trust," that would "put public interest ahead of partisan interests," that would promote "citizen convenience," that would assure that all persons "are treated fairly and equitably," and maintain "integrity" in the voting system. All of these principles, that the Plan violates, are specific purposes of the Maryland Election laws which apply to congressional elections as well as to state elections.  Section 1-201 of the Election Article, Maryland Code.

Despite the applicability of these broad principles of integrity and fairness, the new Maryland Plan was openly and admittedly drawn for partisan purposes to, if possible, facilitate the loss of at least one Republican congressional seat in the coming election.  The Governor and the State Legislature have taken the position that the there is absolutely no legal requirement that their Plan comply with any principles of compactness nor with any requirement to give regard to sub-political boundaries.  They do not deny that some of the eight districts are not compact, and they do not deny that they have totally disregarded county boundaries in some of the districts. The State's position is that there is nothing that anybody can do about it.

Your *amici* disagree with this position.  Your *amici* submit that the Congressional Districting Plan violates the following federal and state rights and laws, and that therefore the Plan must be invalidated:

1. The Plan is excessive political gerrymandering that violates plaintiffs' Equal Protection rights under the Fourteenth Amendment.
2. The Plan violates the constitutional guarantees of a republican form of government (Article IV, Section 4) and that Representatives shall be elected by the people, rather than by state legislatures (Article I, Section 2).
3. The Plan violates plaintiffs' Due Process rights under the Fourteenth Amendment.
4. The Plan violates Maryland Election laws which require a fair, non-partisan election (Section 1-201 of Election Article).
5. The Plan violates Article III, Section 4 of the Maryland Constitution.

For the reasons set forth hereafter, these laws, rights and guarantees require Maryland congressional districts to be drawn in a way that is as compact as possible and that gives due regard to political subdivision boundaries at the same time as being as equal in population as possible. Because the Congressional Districting Plan violates these laws, rights and guarantees, it must be invalidated.

## STATEMENT OF FACTS

A brief summary of the boundaries of new Districts 1, 2, 3, 4, 6 and 8, as set forth in Maryland's new "Congressional Districting Plan" are as follows:

New, Congressional District 1.  Newly formed District 1 comprises all of Maryland's eastern shore, takes in all of Cecil County, and then extends west over the northern part of the state to pick up most of Harford County, a small section of north Baltimore County (the rural land next to the Pennsylvania border, and then taking in approximately one-half of Carroll County—the northern and eastern rural portions, but excluding the area around Westminster. The previous District 1 did not extend into either Baltimore or Carroll Counties.   A due regard for county boundaries could easily have been done so as to keep most, if not all, of Carroll County within the same district.  The area in Harford County south and east of I-95 could have been included in District 1.  This would have put all of Harford County in District 1, and it would have obviated the need to extend the district west into Carroll County.  The newly drawn

District 1 violates the State policy for compactness with respect to both Carroll County and Harford County.

New, Congressional District 2.  The largest land mass in this district includes most of the land south and east of I-95 and bordering on the western shore of the Chesapeake Bay.   Going southwest from Havre de Grace, it takes in portions of both Harford and Baltimore County. Then, when it reaches the mouth of the Patapsco River at southeast Baltimore, the new district jumps over the river and continues in the southwest direction, taking in a southern portion of Baltimore City, a small part of northern Anne Arundel County, a small section of southern Baltimore County, and continuing southwest it reaches into Howard County, where it expands to pick up most of the area around Columbia.   The district also includes a string of land extending west from White Marsh (in Baltimore County), extending west in a zig-zag fashion to include parts of Owings Mills and Randallstown.  However, this western, zig-zag string of land is the antithesis of compactness, and it divides Baltimore County by adding a narrow, zig-zag strip of a new district between newly created Districts 3 and 7.   District 2 violates the principle of compactness, does not give due regard to either political subdivision boundaries or natural boundaries (i.e., the Patapsco River), and the southwestern portions are separated from the rest of the District by the wide section of  Patapsco River, so that it is technically contiguous (because by definition a body of water cannot disrupt an otherwise contiguous district).   Furthermore, while the northwestern portion is also technically contiguous, it was strung together by some narrow strips of land, such that for all practical purposes, that area is not contiguous with the rest of the district.

New, Congressional District 3.  New District 3 has the most convoluted shape of all new districts in the "Congressional Districting Plan."  Its shape looks like the configuration one

would see if a bowl of spaghetti sauce were dropped from a table, such that when the bowl hit the floor the sauce bounced out of the bowl and landed indiscriminately outside of the bowl. The district extends from Owings Mills and Towson on the north; then it picks up the Inner Harbor area of Baltimore City; it includes most of the western shore of the Chesapeake Bay in Anne Arundel County, extending down to Annapolis; it goes around a large area in new District 2 bounded on the east by the Marc train tracks, bounded mostly on the south by State Route 32 and bounded on the northwest by I-95 (the surrounded area is partly in Anne Arundel County and partly in Howard County); then the district extends west, south of Columbia and into Montgomery County extending along the Montgomery-Howard County line all the way west to State Route 94; it includes Brookeville, Olney and White Oak in Montgomery County, extending all the way down to I-495 at the New Hampshire Avenue interchange.  The district is the total opposite of compact.  It is barely, technically contiguous:  A narrow strip of land connects the Towson portion to an area in Fullerton, which is in turn connected by another narrow strip of land to the  "Eastern" section of Baltimore City, which is connected to the areas of Montgomery County by a narrow strip of land that runs southwest approximately following I-95; then another narrow strip of land extends east from Montgomery County (just south of Route 32) and then turns north around Telegraph Road (Route 170), and then taking in much of the northern part of Anne Arundel County, but not the northernmost part; from there the district continues east to the western shore of the Chesapeake Bay and extends south, down the shoreline to Gibson Island; then it jumps the Magothy River and takes in the shoreline areas of that peninsula, and then jumps the Severn River and picks up Annapolis.  Admittedly, this is a complicated description; one really must look at a map to see it.  Once again the configuration of this district is the antithesis of a compact district.  It is barely, technically contiguous.   And it gives no regard to

the boundaries of political subdivisions:  It takes in parts of Baltimore County, Baltimore City, Anne Arundel County, Howard County and Montgomery County.

New, Congressional District 4.    Congressional District 4 is comprised of parts of Anne Arundel and Prince George's Counties:  It includes a large area in the middle of Anne Arundel County north and west from Annapolis, and it includes a large and populated area in Prince George's County immediately adjacent to Washington, D. C.; it includes Forest Heights, Morningside, District Heights, Capital Heights, Cheverly, Bladensburg, Hyattsville, University Park, Landover Hills and New Carrollton.   But there is a broad stretch of land in new District 5 separating the main land areas in Prince George's County from those in Anne Arundel County; that large land area starts west of Route 301 near Upper Marlboro on the south, and then extends north along Route 301 to Bowie, and then extends west through Greenbelt and Berwyn Heights, but then stops just prior to the Montgomery-Prince George's County line.   There is a narrow strip of land in Prince George's County along its western border that connects the two larger areas of land in this district.  District 4 is not compact.  It is barely contiguous.  It disregards the county boundary—splitting both counties into multiple voting districts.

New, Congressional District 6.  Frederick County Maryland was formerly entirely within Congressional District 6.  Newly formed District 6 divides into two parts both Frederick County and Montgomery County.   The newly drawn District 6 is strewn out along the western boundary of Frederick County and the western boundary of Montgomery County all the way down to the Capital Beltway (I-495).  The obvious purpose of this newly drawn district is to add more Democrat votes to the district, but in doing so the district configuration sacrifices compactness to accomplish the political goal.  Regardless of the motivation, the newly configured District 6 is not compact.  In addition, the political subdivision boundaries for both Frederick County and

Montgomery County were disregarded in creating the new configuration for Districts 6 and 8. A due regard for these important County boundaries would have been to keep all of Frederick County in one Congressional District and to construct Congressional District 8 from entirely within Montgomery County. The newly drawn Districts 6 and 8 failed to do this.

New, Congressional District 8. Former District 8 was comprised solely of an area within the boundaries of Montgomery County, Maryland, such that it was compact in form and it was totally within the boundaries of a major political subdivision (i.e., Montgomery County). Conversely, new District 8 stretches north out of Montgomery County and takes in approximately three quarters of Frederick County, extending all the way up to Emmitsburg and the Pennsylvania border.  The remaining portion in Montgomery County takes in a narrow part of northern Montgomery County, with a very narrow isthmus that goes by Brookeville and down to Glenmont; then the district expands so that it includes all of southern Montgomery County, from the border with Prince George's County and all of the county border with the District of Columbia, all the way to the Potomac River.  Newly designed District 8 is barely contiguous, as it connects the heavily populated areas of Rockville, Silver Spring, Chevy Chase, Bethesda, Kensington and Takoma Park with the rural areas of Frederick County.  Thus, new District 8 is expanded to take in two counties, where previously it had only encompassed one county.  The newly drawn boundary is expanded, such that most of its land mass is now in Frederick County, and the remaining portion in Montgomery County is not compact, but is strewn out on the northeastern side of Montgomery County, extending south all the way to Chevy Chase and the boundary with the District of Columbia.  The section of new District 8 in Montgomery County looks like a large piece of a jigsaw puzzle, with a very narrow strip connecting Frederick County to the southern, urban areas of Montgomery County.  The new configuration is anything but

geographically compact.  The portion of new District 8 is barely contiguous in Montgomery

County.   At one point there is only a narrow strip of land that connects areas around Chevy

Chase and Silver Spring with Frederick County.  Thus, this barely satisfies the "contiguous"

requirement, but this strung-out district is not compact.

**ARGUMENT**

Maryland's new "Congressional Districting Plan" violates both the United States

Constitution and the Maryland Constitution and Election Laws.

## I.     BACKGROUND--DISTRICTING REQUIREMENTS UNDER THE UNITED STATES CONSTITUTION

Article I, Section 2 of the United States Constitution provides that the number of

Representatives in the House of Representatives "shall be apportioned among the several States

. . . according to their respective numbers."   Section 2 goes on to require an "actual

enumeration" (a census) to be taken every ten years.  The Constitution does not specifically

provide how a state must or may select its Representatives, except that Article IV, Section 4

states that "[t]he United States shall guarantee to every State in this Union a Republican Form of

Government"; and Section 1 of the Fourteenth Amendment extends to every citizen both Due

Process rights and Equal Protection under the laws, which have been interpreted to guarantee

certain voting rights with respect to the designation of congressional districts.  *Reynolds v. Sims*,

377 U.S. 533 (1964); and *Baker v. Carr*, 369 U.S. 186, 218-229 (1962).  The Tenth Amendment

specifically provides that "The powers not delegated to the United States by the Constitution, nor

prohibited by it to the States, are reserved to the States respectively, or to the people."

Writing for the Supreme Court in 1997, Justice Souter stated:

> A State should be given the opportunity to make its own redistricting decisions so long as
> that is practically possible and the State chooses to take the opportunity.  []  When it does
> take the opportunity, the discretion of the federal court is limited except to the extent that

8

the plan itself runs afoul of federal law.

*Lawyer v. Department of Justice*, 521 U.S. 567, 576-7 (1997).  See also, *Voinovich v. Quilter*, 507 U.S. 146, 157:  "[T]he federal courts are bound to respect the States' apportionment choices unless those choices contravene federal requirements.")  The question then, is:  What federal laws or requirements govern a state's redistricting work?

The fundamental, constitutional right to vote includes the right to have properly drawn congressional districts.  This right is derived from multiple sources, including the Due Process and Equal Protection Clauses of the Fourteenth Amendment, and including Article I, Section 2 and Article IV, Section 4 of the United States Constitution.

Initially, Article I, Section 2 was not construed to require a state to select Representatives by the use of election districts.  But recent Supreme Court cases (beginning with *Baker v. Carr*, 369 U.S. 186 (1962) and *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)) appear to make mandatory the formation of congressional election districts.  Regardless of whether districting is mandatory, when a state legislature vests the right to vote for Representatives in its people, it then puts in place fundamental voting rights which are subject to the United States Constitution.  This principle was articulated by the Per Curiam Opinion of the Supreme Court in *Bush v. Gore*, 531 U.S. 104-105 (2000) in the analogous situation of voting for electors for the President of the United States:

> The individual citizen has no federal constitutional right to vote for electors for the President of the United Sates unless and until the state legislature chooses a statewide election as the means to implement its power to appoint members of the Electoral College.  U. S. Const., Art. II, Section 1.  This is the source for the statement in *McPherson v. Blacker*, 146 U.S. 1, 35 (1892), that the Sate legislature's power to select the manner for appointing electors is plenary; it may, if it so chooses, select the electors itself, which indeed was the manner used by State legislatures in several States for many years after the Framing of our Constitution.  *Id.*, at 28-33.  History has now favored the voter, and in each of the several States the citizens themselves vote for Presidential electors.  When the state legislature vests the right to vote for President in its people, the

right to vote as the legislature has prescribed is fundamental; and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter.  The State, of course, after granting the franchise in the special context of Article II, can take back the power to appoint electors.  See *id*., at 35 (“’[T]here is no doubt of the right of the legislature to resume the power at any time, for it can neither be taken away nor abdicated”) (quoting S. Rep. no. 395, 43d Cong., 1st Sess.).

The right to vote is protected in more than the initial allocation of the franchise.  Equal protection applies as well to the manner of its exercise.  Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value of one person’s vote over that of another.  See, *e.g., Harper v. Virginia Bd. of Elections*, 383 U.S. 663, 665 (1966) (“[O]nce the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment”).  It must be remembered that the right of suffrage can be denied by a debasement or dilution of the weight of a citizen’s vote just as effectively as by wholly prohibiting the free exercise of the franchise.”  *Reynolds v. Sims*, 377 U.S. 533, 555 (1964).

531 U.S. 104-105.  Voting rights in electing Representatives to Congress are “fundamental rights.”  The full extent and parameters of such rights are not specifically articulated in the text of the Constitution and its amendments, but the principles attending these rights have been identified by the Supreme Court in various voting rights cases.

**A.  The Congressional Districting Plan is excessive political gerrymandering that violates plaintiffs’ Equal Protection rights under the Fourteenth Amendment.**

The application of the Equal Protection Clause is broader than to just racial discrimination issues.  In  *Gray v. Sanders*, 372 U.S. 368 (1963), the Supreme Court indicated that constitutional districting principles exist to protect voters of all types and groups; the Equal Protection Clause provides that “all who participate in the election are to have an equal vote— whatever their race, whatever their sex, whatever their occupation, whatever their income, and wherever their home may be,”  372 U.S. 368, at 379.   One of these additional applications of the Equal Protection Clause is to “political gerrymandering,” which is permitted if it is not excessive.

Under the Equal Protection Clause some political gerrymandering in the creation of congressional districts is permitted if it would not "degrade a voter's or a group of voters' influence on the political process as a whole." *Davis v Bandemer*, 478 U.S. 109, 143A (1986). In *Davis*, the Supreme Court held that "political gerrymandering cases are properly justiciable under the Equal Protection Clause" 478 U.S. 143A.   In that plurality decision, the standard adopted by the Court would require a plaintiff to prove that political gerrymandering would "degrade a voter's or a group of voters' influence on the political process as a whole" 478 U.S. 143A.  This principle acknowledges that the Equal Protection Clause does allow a state the use of some partisan purposes in redistricting, but that there are limits to political gerrymandering; and if the gerrymandering degrades a group of voters' influence on the political process then the gerrymandering has become excessive.

In this case plaintiffs' contend that the political gerrymandering that shaped the October 20, 2011 Congressional Districting Plan was in fact excessive and violates the standard articulated in *Davis*.  Your *amici* agree with plaintiffs.  A mere look at the redistricting maps for Districts 2 and 3, demonstrates a total departure from neutral districting principles and an overt effort to advance partisan political purposes in order to degrade and diminish the influence of a group (Republicans) on the political process as a whole.  The Congressional Districting Plan far exceeded the permissible extent to which partisan political purposes can manipulate the designation of congressional district boundaries.

One of the most recent application of *Davis* to a Maryland redistricting claim was dealt with in *Duckworth v. State Administration Board of Election Laws*, 332 F.3d 769 (4th Cir. 2003). In *Duckworth,*, the Fourth Circuit upheld the dismissal of a gerrymandering claim filed by Robert Duckworth for failing to state a claim upon which relief can be granted.  Mr. Duckworth

alleged that the congressional districts were not contiguous, but in fact the districts were all technically contiguous.  And Mr. Duckworth did not adequately allege that the districts lacked "compactness and respect for political subdivisions," but merely alleged that their shapes were "bizarre."  In fact, the *Duckworth* complaint was criticized by the Court for being almost word for word identical to a similar complaint filed by Mr. Duckworth ten years earlier (challenging a previous redistricting), which also challenged the "bizarre" shape of the districts, and which was rejected by this court then, and later upheld by the Supreme Court. 504 U.S. 938 (1992).  In the 2003 case, the Court said that it did not reach the question of whether or not a lack of "compactness and respect for political subdivisions" "could be probative of discriminatory political effect" 332 F.3d  769, 778.  Thus, the *Duckworth* case is clearly distinguishable from the instant case, where your *amici* and plaintiffs have alleged that the Congressional Districting Plan lacks compactness and fails to give due regard for political subdivision boundaries.[1]

### B.  The Congressional Districting Plan violates the constitutional guarantees of a republican form of government (Article IV, Sec. 4) and that Representatives shall be elected by the people, rather than by state legislatures (Article I, Sec. 2).

Article IV, Section 4 of the Constitution.  The first clause of Article IV, Section 4 of the United States Constitution states:  "The United States shall guarantee to every State in this Union a Republican Form of Government."   Historically, this section of the Constitution has not played a major role in the enforcement of voting rights.  However, its relevance has been recently acknowledged by the Supreme Court.  And though the full extent of its application has yet to be defined by the Court, it clearly is one of the bases for the plaintiffs' fundamental right to vote.  To the extent that plaintiffs have fundamental, federal voting rights in elections, Article IV,

---

[1] The specific complaint that your *amici* sought to bring before this court through intervening, would have focused primarily on problems relative to the requirements for "compactness" and giving "due regard to political subdivision boundaries."  Though plaintiffs' complaint may not have alleged these shortcomings as thoroughly as your *amici* would have preferred, your *amici* submit that through this brief, they should be allowed to provide those additional allegations and arguments.

Section 4 provides one of the links to the authority and jurisdiction of federal courts to hear and decide cases that pertain to congressional election processes in the selecting of representatives from the states.

Beginning with *Luther v. Borden*, 7 How. 1 (1849) for many years the Supreme Court interpreted the Guarantee Clause (Article IV, Section 4) in a narrow fashion, as it found some politically-related claims to be nonjusticiable.  Until recently, the Guarantee Clause has been only rarely invoked.  However, that it does have some meaning and application to districting questions was pointed out by Justice Sandra O'Conner in her majority opinion in *New York v. United States*, 505 U.S. 144, 184-185 (1992), where she stated:

> More recently, the Court has suggested that perhaps not all claims under the Guarantee Clause present nonjusticiable political questions.  See *Reynolds v. Sims*, 377 U.S. 533, 582 (1964) ("[S]ome questions raised under the Guarantee Clause are nonjusticiable").  Contemporary commentators have likewise suggested that courts should address the merits of such claims, at least in some instances.

505 U. S. 144, 185.   Justice O'Connor's citation of *Reynolds v. Sims* is most significant because that case involves redistricting, including the issues of both "compactness" and "due regard for political sub-boundaries."

While historically, Article IV, Section 4 has been rarely invoked and its meaning and impact have never been fully explored, the plain meaning of its words connect it with the associated guarantees of Article I, Section 2 and with fundamental voting rights that are found in the Due Process and Equal Protection Clauses of the Fourteenth Amendment.  The effect of Article IV, Section 4 is to establish that voting and election procedures are part of the democratic representative government guaranteed to the people by Articles I and IV.

Article I, Section 2 of the Constitution.  The first clause of Article I, Section 2 of the United States Constitution states:  "The House of Representatives shall be composed of

Members chosen every second year by the People of the several States."  The meaning and

application of these few words are profound, and the meaning underpins the fundamental voting

rights that attend the election of Representatives in Congress.   The Maryland Court of Appeals

acknowledged the relationship between fairly apportioned districts and the representative form of

government as they introduced their opinion in *Matter of Legislative Districting,* 370 Md. 312,

805 A.2d 292, 295 (Md. 2002):

> A fairly apportioned legislature lies at the very heart of representative democracy.
> That is the message behind the Supreme Court's landmark decisions in *Baker v. Carr*,
> 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), *Gray v. Sanders*, 372 U. S. 368, 83
> S.Ct. 801, 9 L.Ed.2d 821 (1963), and *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362,
> 12 L.Ed.2d 506 (1964).

805 A.2d.292, 295.

An excellent discussion of the application of Article I, Section 2 to districting issues is

found in Judge Niemeyer's dissent in *Anne Arundel County Republican Central Committee v.*

*State Administrative Board of Election Laws*, 781 F.Supp. 394 (D. Md. 1991).  Portions of that

opinion are included here because they succinctly discuss the parameters of that section with

respect to redistricting:

> Article I, . . . clearly establishes the House of Representatives, not only as a means
> for ensuring a distribution of political power on the federal level which corresponds
> to the relative populations of the states, but also as the body that is intended to represent
> the people and not the state.

781 F.Supp.394, 403.  Judge Niemeyer further explained:

> [T]he founders carefully bypassed state legislatures and tied the right to vote to the
> provisions in each state constitution providing voting rights for its largest legislative
> house. . . . In the end it was determined that the right of suffrage must be left
> ultimately to neither state nor federal legislatures, but to the people.
> . . .
> Only in setting the time place and manner of elections did the framers expressly
> defer to state legislatures, and then only with the reservation to the federal government
> of ultimate power on the issue.

781 F.Supp. 394, 404.

Judge Niemeyer described the holding of the Supreme Court in *Davis v. Bandemer*, 478

U.S. 109 (1986) to the mean that

> The Fourteenth Amendment guarantees that a State, in dividing itself into geographical
> voting districts, may not identify voters of one political party with the intent and effect
> of diluting the vote of another party.
> . . . The criteria to be applied by the states in discharging this responsibility can be
> based only on policies which secure the direct and equal representation of the people—
> not of legislators, interest groups, or perceived interests of the state as a whole—in order
> to assure representation without vote dilution for a particular interest.  Accordingly, it
> must be conceded that the right of the people to elect directly their Representatives to
> the larger House of the federal legislature means nothing if the Constitution does not
> forbid the states from manipulating the boundaries of congressional districts in attempts
> to influence the outcome of the people's congressional elections.

781 F.Supp. 394, 406.

> But to conclude that the nonexistence of totally neutral districting criteria means that
> no limits may be placed on any attempt by the States to alter the outcome of the election
> of the people's representatives in Congress in tantamount to concluding that the Article I
> debates at the Constitutional Convention had no meaning.
> . . .
> Naturally, the strict one-person, one-vote requirement can only be applied after the
> districting process is begun using neutral criteria.  Otherwise, the required precision
> of the apportionment limitation would lead to an apparent justification for affecting
> the outcome of the people's election.

781 F.Supp. 394, 407.

Judge Niemeyer ends his analysis by concluding that redistricting plans made by state

legislatures:

> must begin with neutral criteria, such as natural barriers or city and county lines, and
> then modified to the extent necessary to achieve numerical equality of population.
> . . . If the plan forms compact and contiguous districts which largely follow county,
> municipal, or identifiable geographic boundaries, then the court can presume, absent
> direct evidence to the contrary, that the districting plan is neutral.  On the other hand,
> where the final plan includes shapes that look more like characters on a Saturday
> morning television program than compact voting districts, the court should look
> behind the plan to question how the legislature arrived at its final decision.

781 F.Supp. 394, 408.

Judge Niemeyer's approach was not the majority view in *Anne Arundel County*. But without disputing or distinguishing Judge Niemeyer's analysis of the meaning and impact of Article I, Section 2, the majority nevertheless held that the redistricting in that case did not violate the Constitution. However, Judge Niemeyer's dissent did lead the majority to acknowledge that there are limits upon gerrymandering. The majority then went on to state the following:

> We do not, as the dissent suggests, believe that there are no limits upon gerrymandering. We do not hold that the State is correct in conceding
>> that under its interpretation of Article I, Section 2, would not be violated by a district line drawn to snake through the alleys and cul-de-sacs of 23 different counties in order to match two white people for each black, or two democrats for each republican, for the purpose of advancing the chances that the favored class would win an election while diluting the vote of the unfavored class.
> Dissenting Op. at 402. We do not have that specific example before us and therefore do not reach it.

781 F.Supp. 394, 400. The unmistakable inference of the Court's holding in *Anne Arundel County* is that if the Maryland State Legislature presents a gerrymandered redistricting plan that is excessively convoluted, then it could be stuck down as unconstitutional. Your *amici* submit that Districts 2, 3, 4 and 8 of the Maryland Redistricting Plan are so excessively convoluted that they would satisfy the majority's view in *Anne Arundel County*. Especially does new District 3 violate the required standard; its shape is indeed just like a winding snake, as it stretches in multiple directions to take in certain voters and to exclude others. And District 2 is almost as bad as District 3. Accordingly, at the very least District 3 is so excessive in appearance that it satisfies the improper limits acknowledged by the Court in Anne Arundel County to exceed the limits of tolerable gerrymandering.

Furthermore, the holding of the three-judge panel in Anne Arundel County was based primarily upon the Supreme Court case of *Davis v. Bandemer*, 478 U.S. 109 (1986). But the

Court's decision in that case was based upon the Equal Protection Clause of the Fourteenth Amendment as applied to *partisan gerrymandering*, which is only one of the bases for the relief requested by plaintiffs' in this case.   Voter right protections under the Equal Protection Clause extend to more situations than merely partisan gerrymandering, and your *amici* submit that Maryland's  Congressional Redistricting Plan violates those protections.  In addition, your *amici* submit that the Congressional Redistricting Plan is so radical and egregious that on its face it violates Article I, Section 2 of the United States Constitution.

Equal Protection Clause of the Fourteenth Amendment.  One of the most obvious parts of the fundamental right to vote is the "one person, one vote" right (or the "equal population principle"), which is required by the Equal Protection Clause of the Fourteenth Amendment and which requires that election districts within a state be "as nearly of equal population as is practicable." *Reynolds v. Sims*, 377 U.S. 533, 577 (1964).   This federal right to vote guarantees an equal right to vote to all who participate—the fundamental voting right is broader than merely a prohibition against racial discrimination. The Supreme Court stated in *Gray v. Sanders*, 372 U.S. 368 (1963):

> Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote—whatever their race, whatever their sex, whatever their occupation, whatever their income, and wherever their home may be in that geographical unit.  This is required by the Equal Protection Clause of the Fourteenth Amendment.

372 U.S. 368, at 379.  The Supreme Court stated that a state may deviate to some extent from creating districts that are perfectly equal in population in order to create districts that are compact and contiguous and to "maintain the integrity of various political subdivisions." *Reynolds v. Sims,* 377 U.S. 533, at 579.   The implicit meaning of these statements by the Court is that it is important for a state to provide compact districts of contiguous territory, giving due regard to

political subdivisions.   The necessity of states to recognize and honor these principles are a part

of the voters "fundamental" voting rights.   The Supreme Court went on to explain the importance

of these considerations as follows:

> A State may legitimately desire to maintain the integrity of various political
> subdivisions, insofar as possible, and provide for compact districts of contiguous territory
> in designing a legislative apportionment scheme.   Valid considerations may underlie such
> aims.   Indiscriminate districting, without any regard for political subdivisions or natural
> or historical boundary lines, may be little more than an open invitation to partisan
> gerrymandering.

*Id.*, 377 U.S. at 579.   The Court stated more about the importance of recognizing political

subdivision boundaries:

> A consideration that appears to be of more substance in justifying some deviation
> from population-based representation in state legislatures is that of insuring some voice to
> political subdivisions, as political subdivisions.   Several factors make more than
> insubstantial claims that a State can rationally consider according political subdivisions
> some independent representation in at least one body of the state legislature, as long as
> the basic standard of equality of population among districts is maintained.   Local
> governmental entities are frequently charged with various responsibilities incident to the
> operation of state government.   In many States much of the legislature's activity involves
> the enactment of so-called local legislation, directed only to the concerns of particular
> political subdivisions.   And a State may legitimately desire to construct districts asking
> political subdivision lines to deter the possibilities of gerrymandering.

*Id.*, 377 U.S. at 580-81.   The principles of compactness, contiguousness and the honoring of

political subdivision boundaries are so important that the Supreme Court has said that these three

considerations justify some departure from a state's having to establish perfectly equal

congressional districts.   The Supreme Court stated that each of these principles is important to

apply in order to avoid the problems of partisan gerrymandering.   Each of these principles is

important to establish fair voting districts that protect the individual's fundamental voting rights.

Failure to employ and honor these principles undermines the entire process of using election

districts to elect Representatives.

Your *amici* submit that the Maryland Redistricting Plan is so radical and egregious that on its face it violates the guarantees and rights provided by Article I, Section 2 and Article IV, Section 4 of the United States Constitution, and the rights guaranteed under the Equal Protection Clause of the Fourteenth Amendment.

### C.  The Congressional Districting Plan violates plaintiffs' Due Process rights under the Fourteenth Amendment.

Plaintiffs' Due Process rights under the Fourteenth Amendment require the State to comply with State laws and rights.  Thus, there is a relationship between plaintiffs' state and federal rights that must be recognized and determined in this case.  Part of plaintiffs' fundamental right to vote is that the State cannot ignore or depart from the mandates of State law in administering elections.  This includes redistricting.  Thus, the State must honor and follow the principles of fair and non-partisan elections, as provided in Section 1-201 of the Election Article, in redistricting.  Failure to do this or departure from these principles violates plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment.  See *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 432 (1982).  See also, *Bush v. Gore*, 531 U.S. 98, 104-105 (2000).

1. Section 1-201 of the Election Article.  Once the State of Maryland sets up a system to elect its Representatives by geographic districts, then federal voting rights and Maryland State voting rights come into play with such elections.  Foremost under Maryland law is the Election Article of the Maryland Code.  The stated purpose of the election law governs the more particular parts.  The Statement of purpose is found in Section 1-201 of  the Election Article, which states the following:

> The intention of this article is that the conduct of elections should inspire public confidence and trust by assuring that:
>> (1) all persons served by the election system are treated fairly and equitably;
>> (2) all qualified persons may register and vote and that those who are not qualified do not vote;

> (3) those who administer elections are well-trained, that they serve both those who vote and those who seek votes, and that they put the public interest ahead of partisan interests;
> (4) full information on elections is provided to the public, including disclosure of campaign receipts and expenditures;
> (5) citizen convenience is emphasized in all aspects of the election process;
> (6) security and integrity are maintained in the casting of ballots, canvass of votes, and reporting of election results;
> (7) the prevention of fraud and corruption is diligently pursued; and
> (8) any offenses that occur are prosecuted.

This section applies to the entire State election law, including the defining of congressional voting districts in Sections 8-701 through 8-709. Fundamental principles in this election process are that the setting up of congressional districts "should inspire public confidence and trust"; that "all persons served by the election system are treated fairly and equitably"; that those who administer elections, including defining election districts "put the public interest ahead of partisan interests"; that "citizen convenience is emphasized in all aspects of the election process"; that "integrity [is] maintained"; and that "prevention of . . . corruption is diligently pursued."

The establishment of compact and contiguous districts giving due regard to natural and political subdivision boundaries are policies that promote the state purposes of establishing an election process that inspires public confidence and prevents infection with partisan interests. Conversely, disregard for compact and contiguous districts and disregard for natural boundaries and the boundaries of political subdivisions subverts the stated Maryland fundamental election purposes; disregard of these things makes a mockery of the districting process—it does not treat voters fairly and equitably; it puts partisan interests ahead of the public interest; it is inconvenient for voters; it compromises the integrity of the voting process; and it infects the entire election process with corrupt partisan elements.

2. <u>Sections 8-701 – 8-709 of the Elections Article</u>.  Sections 8-702 – 8-709 of the Election Article define in words the boundaries of each congressional election district.  But without looking at the maps of such defined areas it is difficult to comprehend the convoluted shapes of many of the districts.  On the other hand, merely a quick glance at a map of the new election districts immediately shows how the shape of at least the six districts that are the subject of this law suit (a) are not compact; (b) are barely, technically contiguous; and (c) disregard the county boundaries in many instances.  These characteristics are flaws in the districting process, and these flaws violate the fundamental, federal voting rights.   The shape of Districts 2, 3 and 4 are so convoluted that they violate the very meaning of the word "district."  District implies a geographic area that is relatively compact and contiguous.   An example of proper districting would be the outline of the 23 counties in Maryland and Baltimore City.   The "Congressional Districting Plan" is so infected with disjointed and disconnected areas, frequently connected only by narrow threads of land that they are an affront to the word "district" as well as an affront to the stated purpose of Maryland's election law.  The Governor and the Legislature might just as well have assigned district numbers to a list of voters in the state without regard to any geographic areas; the plan is a total repudiation of geographic election districts.  But the Maryland election law requires election districts.   And once the state law requires election districts and bestows voting rights, the protection of fundamental, state and federal voting rights kick in.   The new "Congressional Districting Plan" violates plaintiffs' Due Process rights under the Fourteenth Amendment of the Constitution.

3. <u>Article III, Section 4 of the Maryland Constitution</u>.  Article III, Section 4 of the Maryland Constitution states:  "Each legislative district shall consist of adjoining territory, be compact in form, and of substantially equal population.  Due regard shall be given to natural

boundaries and the boundaries of political subdivisions."   Defendant contends in this case that Article IV, Section 3 of the Maryland Constitution sets a standard that applies to the creation of State election districts, but that this section was not intended to apply to the creation of congressional election districts.  Assuming this were true, does this then leave us with no standards to govern the creation of congressional election districts in Maryland?  The answer is no, because as was previously discussed, federal, constitutional rights do impose certain requirements with respect to the defining of congressional voting districts.  And those federal rights impose certain requirements with respect to contiguousness, compactness and due regard to the boundaries of political subdivisions.   The question is to what extent do these three apportionment principles affect the voting rights of Maryland citizens if the State Constitution does not specifically answer the question.  The Defendant's position that these principles have no application is clearly not correct.  The question, again, is to what extent they do apply.

It is important to note that Article IV, Section 3 does not state that its principles do not apply to congressional districting.  This is an important factor because although the principles were intended to apply to the State, non-congressional districting, nowhere does the State Constitution prohibit such application, and nowhere is any different set of standards set forth for the congressional districting.  The Maryland Constitution then does not specifically give the parameters to the principles that should govern congressional districting, and therefore in this case the Court must determine what those parameters are.  From this point, when we turn to the Legislature's stated purposes of its election laws, as found in Section 1-201 in the Election Article, we find explicit statements of principles and purposes that underpin election rights and laws in Maryland.  As these principles are applied to the rights that plaintiffs assert in this case,

the inescapable conclusion is that the districting principles that explicitly apply to state districts

in Article IV, Section 3 also apply implicitly to congressional districts.

## II.  DISTRICTING REQUIREMENTS UNDER THE MARYLAND CONSTITUTION AND MARYLAND STATE ELECTION LAWS

<u>Consideration of Maryland law questions under pendent jurisdiction</u>.  Preliminarily, it is

pointed out that this part of the Argument addresses the applicable Maryland law, Constitutional

and statutory, that confers rights on plaintiffs and which are an independent legal basis for the

relief plaintiffs request.  Some of the Maryland laws referenced in this section have implications

to federal Due Process rights, as discussed above.  But, again, the rights and laws discussed in

this section are presented because of the independent basis they provide for the relief requested

by plaintiffs.

28 U.S.C. Section 1367 gives supplemental (or pendent) jurisdiction to this Court to

consider and address state claims "that are so related to claims in the action within such original

jurisdiction that they form part of the same case or controversy under Article III of the United

States Constitution."  See also, *United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1996).

The purpose for this rule is to encourage the economy of litigation and to eliminate the need for

separate federal and state trials of the same facts, yet potentially reaching different results.  This

rationale certainly applies in the instant case.  And the issues with respect to Maryland law are

clearly extremely important.   Accordingly, it is proper for this Court to consider the Maryland

legal claims as well as the federal, Constitutional claims.

<u>Maryland election laws regarding compactness and due regard for political subdivision</u>

<u>boundaries</u>.  The boundaries and configuration of new districts 1, 2, 3, 4, 6 and 8 are barely

contiguous, and none is compact, and none is drawn with due regard for the county boundaries in

and around them.  This result violates Maryland law.

As an Introduction to its ruling in *Matter of Legislative Districting*, 370 Md. 312, 805

A.2d 292 (2002), the Court of Appeals stated the following:

> A fairly apportioned legislature lies at the very heart of representative democracy. That is the message behind the Supreme Court's landmark decisions in *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), *Gray v. Sanders*, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), and *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). . . . Because it involves redrawing the lines of legislative districts, the process of reapportionment is an intensely political process. But it is also a legal one, for there are constitutional standards that govern both the process and the redistricting plan that results from it.

805 A.2d 296.

### D.  The Congressional Districting Plan violates Section 1-201 of Election Article the Maryland Code.

In Part I, Section C, above, we previously discussed Section 1-201 of the Election Article

as a part of the discussion of plaintiffs' Due Process rights under the Fourteenth Amendment.

For the Court's convenience, we will restate Section 1-201 here:

> The intention of this article is that the conduct of elections should inspire public confidence and trust by assuring that:
> (1) all persons served by the election system are treated fairly and equitably;
> (2) all qualified persons may register and vote and that those who are not qualified do not vote;
> (3) those who administer elections are well-trained, that they serve both those who vote and those who seek votes, and that they put the public interest ahead of partisan interests;
> (4) full information on elections is provided to the public, including disclosure of campaign receipts and expenditures;
> (5) citizen convenience is emphasized in all aspects of the election process;
> (6) security and integrity are maintained in the casting of ballots, canvass of votes, and reporting of election results;
> (7) the prevention of fraud and corruption is diligently pursued; and
> (8) any offenses that occur are prosecuted.

Not only does this section guarantee rights and protections to the plaintiffs through the

Fourteenth Amendment's Due Process Clause, but this state law independently applies to the

entire State election processes, including the defining of congressional voting districts in

Sections 8-701 through 8-709.   Pursuant to Section 1-201, fundamental principles that govern the congressional election process includes setting up of congressional districts that "should inspire public confidence and trust"; that "all persons served by the election system are treated fairly and equitably"; that those who administer elections, including defining election districts "put the public interest ahead of partisan interests"; that "citizen convenience is emphasized in all aspects of the election process"; and that "integrity [is] maintained."

This state policy puts neutrality over partisanship, in order to treat all voters fairly and equitably.  By implication the state policy articulated in Section 1-201 embraces and implies that Article III, Section 4 of the State Constitution governs congressional elections as well as state elections.

The Congressional Districting Plan disregards the principle of compactness and the requirement to give due regard to political subdivision boundaries, which principles are implicitly mandated by Section 1-201.

This disregard for compact districts and disregard for the boundaries of political subdivisions subverts the stated Maryland fundamental election purposes; disregard of these things makes a mockery of the districting process—it does not treat voters fairly and equitably; it puts partisan interests ahead of the public interest; it is inconvenient for voters; it compromises the integrity of the voting process; and it infects the entire election process with corrupt partisan elements. These flaws in the districting process violate Section 1-201 of the Election Article.

> **E.  The Congressional Districting Plan violates Article III, Section 4 of the Maryland Constitution.**

Article III, Section 4 of the Maryland Constitution states:  "Each legislative district shall consist of adjoining territory, be compact in form, and of substantially equal population.  Due

regard shall be given to natural boundaries and the boundaries of political subdivisions." The newly drawn congressional districts do not comply with the requirements that Article III, Section 4 impose on state legislative districts. Defendant takes the position that it does not have to comply with those state requirements. For the reasons stated below, this brash position not only conflicts with Maryland's policy on districting, but it violates the fundamental voting rights under the Maryland Constitution.

The organization of Section 4, within Article III, implies that Section 4 applies to the State election districts, and therefore some argue that it has no applicability to the congressional districts. The Court of Appeals endorsed such a view in dicta in *Matter of Legislative Districting*, 370 Md. 312, 805 A.2d 292 (2002). But that dicta did not involve any party who had reason to dispute that conclusion. For the reasons stated herein, that narrow reading of Maryland State congressional districting requirements should be reexamined.

First, Section 4 articulates a state policy regarding the creation of proper election districts. The language in Section 4 does not state that it does not apply to congressional districts. The plain language of Section 4 does not distinguish between districts for State legislators versus congressional legislators. Rather it states that those principles apply to State districts, and the congressional districts **are** State districts just as much as the districts for State Senators and State Delegates. A fair interpretation of Section 4 is that the principles required to make a proper state election district should also apply to congressional election districts. It is true that Article III deals primarily with the State Senators and State Delegates, but nowhere does it state in Article III that the scope of each section is limited or must be limited only to the election of State officers. And, in any event, once a State districting policy is articulated, the State would be required to justify any deviation from that policy in other election districting

contexts, if the State is to contend that those principles and rights do not apply to congressional districting and voting.  But the State has not done this.

Second, the stated purpose of the State election laws and procedures is to "inspire public confidence and trust," to see that "all persons served by the election system are treated fairly and equitably," to "put the public interest ahead of partisan interests," to promote "citizen convenience," and to ensure that "integrity [is] maintained."   Section 1-201 of the Election Article, Maryland Code.  The election districting requirements of Article III, Section 4 of the Constitution are in harmony with the mandates of Section 1-201.  But the configuration and definition of the new "Congressional Districting Plan" violate the purposes of Maryland election laws as stated in Section 1-201.  Those purposes apply to all the State districting, including the congressional districting in Sections 8-701 through 8-709.  When the Legislature and the Governor adopted a congressional districting plan that totally disregards the principle of compactness and totally disregards the need to keep political subdivisions (i.e., counties) in the same district as much as possible—this disregard is a violation of State election policies.  The Governor and Legislature have taken the position that unless they pass a law that specifically requires them to honor principles of compactness and due regard for political subdivision boundaries, then they do not have to follow them at all.  But this position assumes that the "compactness" and "due regard" principles can only apply to Maryland voting rights **IF** the Legislature and Governor enact a law that requires them to apply these principles.  But this is where the Legislature and Governor have gone astray.  The Supreme Court in *Reynolds v. Sims* described both of these principles as being of such importance that they can justify a State from varying from the fundamental voting right that mandates perfect equality of population in congressional voting districts.   Only a fundamental voting right could have the power to

27

diminish and modify another fundamental voting right. Thus, once Maryland confers voting rights on its citizens in the process of selecting Representatives, the principles of compactness and due regard for political subdivision boundaries are triggered, whether or not a state law specifically provides for these principles. But the applicability of these principles is also triggered in Maryland by virtue of the fact that the Maryland law recognizes these principles in its state legislative districts. Maryland law does not exclude the application of these principles to congressional districting, and the fact that the State acknowledges the importance of these principles in state districting gives the implication that they should also apply in congressional districting, unless there is some competing valid principle that would be affected. But there is none. In other words, Article III, Section 4 articulates a State policy that election districts should be compact and should give due regard for the boundaries of political subdivision. Therefore, absent some statement and justification that these principles should not apply to congressional districts, there exists a state policy that these are important principles that protect the fundamental voting rights of Maryland citizens, including voting rights in connection with congressional districting. If the Governor and Legislature take the position that the principles and rights that it specifically guarantees for electing state representatives do not apply to the election of congressional Representatives, then Maryland must specifically state and justify why it affords lesser voting rights to its citizens in the congressional elections. Failing to do so, the stated policy for voter rights in state elections would also apply to voter rights in congressional elections.

Third, because congressional elections affect federal elections, Maryland voters have fundamental, Constitutional voting rights that must be honored. Included in those rights is the

requirement that Maryland districts be as compact as possible, contiguous, and that political subdivisions (e.g., counties) be kept together as much as and whenever possible. *Reynolds v. Sims*, 377 U.S. 533, 577-581 (1964). That these federal voting rights apply to state districting was acknowledged by the Court of Appeals in *Matter of Legislative Districting*, 370 Md. 312, 805 A.2d 292 (2002), where this Court stated that "[a]lthough [Article III, Section 4 is] exclusively a state constitutional provision, the rationale underlying Article III's component requirements is well recognized and stated by the United States Supreme Court" 805 A.2d 318, citing *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). The Court of Appeals interpreted *Reynolds v. Sims* to hold "that the Equal Protection Clause requires state legislatures to make an 'honest and good faith effort' to construct districts 'as nearly of equal population as is practicable, . . . and that "maintaining the integrity of political subdivisions and providing compact and contiguous districts . . . . are legitimate considerations. . . . Indiscriminate districting, without any regard for political subdivision or natural or historical boundary lines, may be little more than an open invitation to partisan gerrymandering." *Id.* The Court went on to state "that the state constitutional requirements of Section 4 work in combination with one another to ensure the fairness of legislative representations." *Id.* At 320-321.

The political boundaries that were successfully challenged in *Matter of Legislative Districting* were all boundaries for state legislative districts. But the Court's reasoning in support of its holding that invalidated some of the boundaries in that plan—that reasoning applies equally to congressional boundaries because they are constitutional standards. The Court went on to state:

> But neither discretion nor political considerations and judgments may be utilized in violation of constitutional standards. In other words, if in the exercise of discretion, political considerations and judgments result in a plan in which districts: are non-contiguous; are not compact; . . . or with district lines that unnecessarily cross natural or

> political subdivisions boundaries, that plan cannot be sustained.  That a plan may have
> been the result of discretion, exercised by the one entrusted with the responsibility of
> generating the plan, will not save it.  The constitution "trumps" political considerations.
> Politics or non-constitutional considerations never "trump" constitutional requirements.

*Id.* At 326.

The Maryland Court of Appeals explained that the county boundaries have always been extremely important in Maryland—partly because there are so few counties in Maryland, partly because each year the General Assembly enacts laws applicable to particular counties, and partly because the form of government varies from county to county.  805 A.2d, 292, 318-322.  The Court of Appeals also explained:

> The danger lurking in legislative districts which cross jurisdictional boundaries . . . is
> that representatives from those districts may face conflicting allegiances as to legislative
> initiatives which benefit one of their constituencies at the expense of the other.

805 A.2d 292, 322.  These same policies which the Court of Appeals applied to strike down the Legislature's failure to regard sub-political boundaries in 2002, apply equally today to the Maryland Districting Plan's failure to give due regard to sub-political boundaries.

Consideration of the above analysis shows that neither the Governor nor the Legislature can disregard the requirements of "compactness," "contiguousness" and "regard for political subdivision boundaries" in the congressional districts that it draws.   But, in fact, the Governor and Legislature did just that.  The congressional districts that it concocted for Districts 1, 2, 3, 4, 6 and 8 totally disregard "compactness," and totally disregard the county (political subdivision) boundaries within those new districts.  It is interesting to note that Districts 2, 3, 4 and 8 are barely contiguous; and the map demonstrates an attempt to barely string areas together.  But the resulting contiguousness is a blatant disregard of the requirements to be compact or to honor political subdivision boundaries.

The boundaries of Districts 2, 3, 4 and 8 in particular, are so convoluted that there is no reasonable or sensible area defined to be served by whatever representative would be elected for those areas. The whole concept of having a geographic district is discarded and repudiated by the proposed boundaries in Districts 2, 3, 4 and 8. The Legislature might just as well have dispensed with geographic districts; they might as well have just assigned district numbers to voter rolls and not pretend to have geographic districts. In essence, that is what the recently passed "Congressional Districting Plan" does. It undermines the principle of representative government in geographic areas, and it violates the guarantee of a representative government.

## CONCLUSION

Under federal and State law, congressional election districts must be compact, must be contiguous and must be drawn with due regard to natural boundaries and political subdivision boundaries. The Governor and the State Legislators who drew the boundaries for the newly constructed eight congressional districts in Maryland (in the "Congressional Districting Plan") failed to comply with the requirement of compactness and failed to give due regard to political subdivision boundaries. The implicit message from the Legislators and the Governor is that the congressional districts that they draw can be as "un-compact" as they like, and that similarly, they do not have to give any regard to the boundaries of political subdivisions, and that there's nothing anyone can do about it. For the reasons set forth above, the Governor and Legislature are mistaken in this position. Article I, Section 2 and Article IV, Section 4 of the United States Constitution and the Due Process and Equal Protection Clauses of the Fourteenth Amendment impose limitations on the shape of congressional districts, and where the shaping of a district becomes so convoluted as to impair effective and orderly representative government in the states, that such boundaries can be voided, and that the courts can order them to be redrawn.

Additionally, the purposes and principles of fair elections as set forth in Section 1-201 of the Elections Article of the Maryland Code, and the specific State policy with respect to state election district boundaries (Article III, Section 4) both apply equally to congressional district boundaries.

WHEREFORE, for the reasons stated, the "Congressional Districting Plan" should be struck down and invalidated.

Dated:  December 7, 2011

 /s/  C. Paul Smith_____
C. Paul Smith
308 West Patrick Street
Frederick, Maryland 21701
(301) 762-0033
cpaulsmith@verizon.net

Attorney for  C. James Olson, C. Paul Smith,
Ronald George, Carl F. Middledorf,
Antonio Wade Campbell and Philip J. Smith