**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARLAND
GREENBELT DIVISION**

| | | |
|---|---|---|
| MS.PATRICIA FLETCHER, | ) | |
| *et al.*, | ) | |
| | ) | Civ. Action No.: RWT-11-3220 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LINDA LAMONE in her official | ) | |
| capacity as State Administrator of | ) | |
| Elections for the State of Maryland; | ) | |
| And ROBERT L. WALKER in his | ) | |
| official capacity as Chairman of the | ) | |
| State Board of Elections, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**PLAINTIFF'S RESPONSE MEMORANDUM TO DEFENDANTS' MOTION TO
DISMISS OR IN THE ALTERNATIVE FOR SUMMUARY JUDGEMENT, AND REPLY
TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTION**

___ /s/ Jason Torchinsky_____

**Law Office of James P Mayes**
James Paul Mayes (Bar No. 10414)
mayesfedlaw@aol.com
Law Office of James P Mayes
4721 Chesterfield Place
Jamestown, NC  27282
Tel: (202) 255-2031
Fax: (336)841-5275

**Holtzman Vogel PLLC**
Jason Torchinsky, *pro hac vice*
jtorchinsky@holtzmanlaw.net
HOLTZMAN VOGEL PLLC
45 North Hill Drive, Suite 100
Warrenton, VA 20186
Tel: (540) 341-8808
Fax: (540) 341-8809

Counsel for Plaintiffs

# TABLE OF CONTENTS

Page

I.   Both Standards of Review for Motions to Dismiss and
     Motions for Summary Judgment Demonstrate that the
     Defendants' Motion to Dismiss and Motion for Summary
     Judgment Should be Denied……………………………………………………..2

     A.  Defendants' Rule 12(b)(6) Motion Should be Denied
         Because the Standard Is Relatively High, and is Not Met in
         This Case…………………………………………………………………..2

     B.  The Motion for Summary Judgment Is Applicable Only When
         There Are No Disputed Material Facts………………………………....3

II.  Plaintiffs Have Satisfied All Elements For the Grant of a
     Preliminary Injunction on Counts Three and Six………………………………...6

     A.  Plaintiffs Have Demonstrated Likelihood Of Success on
         the Merits of Counts Three and Six…………………………………….6

     B.  The Plaintiffs are Likely to Suffer Irreparable Harm………………………...6

     C.  The Balance of the Equities Tips in the Plaintiffs' Favor……………………11

     D.  An Injunction is in the Public Interest………………………………………15

III. No Population Without Representation Act Is Not Constitutional
     As Applied to Congressional Districts Because it Violates
     Article One, Section Two…………………………………………………………16

     A.  The Constitution Prohibits Use of State Adjusted Data for
         Congressional  Redistricting…………………………………………………..16

         i.    *City of Detroit v. Secretary of Commerce* Was Dismissed
               on Standing Grounds and Related to an Allegation Not
               Before this Court……………………………………………………17

         ii.   *Young v. Klutznick* Dismissed Claims of Alleged Undercount
               and was not About Removing People from the Census or
               even Around Within a State…………………………………………..18

         iii.  *Assembly Of California v. United States Department Of Commerce*
               And *Senate Of California v. Mosbacher* Were Freedom of
               Information Act Cases and Are Wholly Inapplicable…………………20

iv.     *Daly v. Hunt* Distinguishes Congressional Districting from
Other Types of Redistricting……………………………………...22

v.     *Kirkpatrick v. Preisler*, Prior to Applying Its "Systematic"
and "Documented" Test Requires a Justification for
the Application of Such an Action, as Explained
in *Karcher v. Daggett*…………………………………………23

IV.    Maryland's Congressional Districting Map Violates Section 2
of the Voting Rights Act, and Plaintiffs Have
Properly Pled Their Claim…………………………………………………..26

    A.  Count 5 of the Complaint is Well Pled and States a Claim
Upon Which Relief Can be Granted…………………………………..26

    B.  Defendants Substantive Argument for Summary Judgment
Are Belied by Facts…………………………………………………27

    C.  The Totality of The Circumstances Test Is Satisfied and
Requires the Creation of the Third Majority-Minority
District………………………………………………………………30

    D.  Proportionality Warrants a Third Majority-Minority
District in Maryland…………………………………………………40

V.    Maryland's Congressional Districting Map Violates the
Fourteenth and Fifteenth Amendments, and Plaintiffs Have
Properly Plead Their Claim…………………………………………………44

VI.    Maryland's Congressional Districting Map Is An
Unconstitutional Political Gerrymander, and Plaintiffs
Have Properly Pled Their Claim…………………………………………….50

VII.    Conclusion…………………………………………………………………..54

**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARLAND
GREENBELT DIVISION**

| | | |
|---|---|---|
| MS.PATRICIA FLETCHER, | ) | |
| *et al.*, | ) | |
| | ) | Civ. Action No.: RWT-11-3220 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LINDA LAMONE in her official | ) | |
| capacity as State Administrator of | ) | |
| Elections for the state of Maryland; | ) | |
| And ROBERT L. WALKER in his | ) | |
| official capacity as Chairman of the | ) | |
| State Board of Elections, | ) | |
| | ) | |
| Defendants. | ) | |

---

**PLAINTIFFS' RESPONSE MEMORANDUM TO DEFENDANTS' MOTION TO
DISMISS OR IN THE ALTERNATIVE FOR SUMMUARY JUDGEMENT, AND REPLY
TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION**

Plaintiffs, through Counsel, hereby submit the following Memorandum and

accompanying declarations in reply to Defendants' pleadings filed on December 2, 2011.  As

outlined below, Defendants are not entitled to their Motion to Dismiss on any count, the Motion

for Preliminary Injunction should be granted in the form of a permanent injunction in light of the

upcoming hearing under FRCP 65(a)(2), and the Defendants' Motion for Summary Judgment

should be denied because there are significant material facts in dispute between the parties in this

matter.  The  Plaintiffs hereby incorporate their prior filing, ECF No. 16, filed on November 21,

2011 in response to the Defendant's Motions to Dismiss or in the Alternative for Summary

Judgment and will attempt to wherever possible not repeat those same arguments below.

1

I.   **Both Standards of Review for Motions to Dismiss and Motions for Summary Judgment Demonstrate that the Defendants' Motion to Dismiss and Motion for Summary Judgment Should be Denied.**

   A.  **Defendants' Rule 12(b)(6) Motion Should be Denied Because the Standard Is Relatively High, and is Not Met in This Case.**

Plaintiffs incorporate by reference the standard of review submitted in Plaintiffs' Opposition to the Defendants' Motion to Dismiss (Pls. Opp'n to Defs.' Mot. to Dismiss 4-5, ECF No. 16 ). We have reprinted it here for the Court's convenience.

Rule 8(a)(2) of the Federal Rules of Civil Procedure demands that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief...."  A 12(b)(6) motion is therefore filed to test the sufficiency of the complaint. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).

When a claim is challenged by a 12(b)(6) motion, the court must assume the truth of all factual allegations made in the complaint. *Accord Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 572 (2007).  All allegations must be liberally construed in favor of the plaintiff. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969); *see also Coakley & Williams, Inc. v. Shatterproof Glass Corp*, 706 F.2d 456, 457 (4th Cir. 1983). Additionally, the court must draw all reasonable factual inferences from the facts contained in the complaint in favor of the plaintiff. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). The facts, therefore, must be considered in the manner the plaintiff can most strongly plead them. *See Coakley & Williams, Inc.*,706 F.2d at 457. While mere conclusory statements are insufficient to survive a motion to dismiss, *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009), the Court must not weigh each allegation in isolation. *Tellabs, Inc. v. Makor Issues and Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007).   Rather, this Court

must examine the Complaint as a whole and decide whether, when all of the stated allegations are accepted as true, does the Complaint give a "strong inference of scienter." *Id.*

Furthermore, this Court's review of the Complaint is not limited to the Complaint and the documents submitted with it. Should it be necessary, the Court is permitted to use the Plaintiffs' response brief here to clarify any portions of the Plaintiffs' Complaint. *See Pegram v. Herdrich*, 530 U.S. 211, 230n.10 (2000).

Therefore, unless this Court, after viewing the Complaint in the light most favorable to the plaintiff and granting to the plaintiff all reasonable inferences, finds that the Complaint fails to state a claim that is plausible on its face, the Motion to Dismiss should be denied. *Twombly*, 550 U.S. at 570. This is the reason why 12(b)(6) motions are "granted sparingly and with caution." *See Duckworth*, 213 F.Supp. 2d at 545.

In this case, the complaint and its allegations provided sufficient notice that in granting the Motion to Convene a Three Judge Panel, this Court was able to accurately and succinctly restate the claims.  The Defendants have, in the course of two pleadings now on file with the Court, demonstrated that they generally understand the allegation against them, demonstrating that they are fully aware of the claims alleged against them.  As shown in this filing and Plaintiffs' prior two filings, each count of the complaint is well pled and provides sufficient notice and factual allegations under Fed. R. Civ. P. 8(a)(2).

### B.  The Motion for Summary Judgment Is Applicable Only When There Are No Disputed Material Facts.

Summary judgment should only be granted where "there is no genuine dispute as to *any* material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphasis added).   A genuine issue exists where, upon reviewing the record as a whole, it is determined that a rational trier of fact could find for the nonmoving party. *See Scott v. Harris*,

127 S. Ct. 1769, 1776 (2007). A material fact is defined as fact that might affect the outcome of the suit. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A judge's function when evaluating a summary judgment motion is not to weigh the evidence and determine the truth of the matter, but is limited to determining if a genuine issue exists for trial. *See Anderson*, 477 U.S. at 249.

Summary judgment is a drastic remedy and should not be granted "unless it is *perfectly clear* that there are no genuine issues of material fact in the case." *Accord Ballinger v. North Carolina Agricultural Extension Service*, 815 F.2d 1001, 1004-05 (4th Cir. 1987) (emphasis added). Summary judgment should not be granted where inquiry into the facts is necessary to clarify the application of the law. *Cf. McKinney v. Board of Trustees of Maryland Community College*, 955 F.2d 924, 928 (4th Cir. 1992). Additionally, courts must be "especially cautious" in granting summary judgments where the disposition of the case depends upon a determination of intent. *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979). For cases where a party's state of mind is dispositive, therefore, summary judgment is "seldom appropriate." *See Ballinger*, 815 F.2d at 1005. Even if there are no facts in dispute, summary judgment is still inappropriate where reasonable inferences from those undisputed facts can be drawn in favor of either party. *See Hunt v. Cromartie*, 526 U.S. 541, 552 (1999); *see also Morrison*, 601 F.2d at 141 ("[S]ummary judgment will be inappropriate if the parties disagree on the inferences which may reasonably be drawn from those undisputed facts."). Summary judgment is therefore inappropriate where there is evidence that is susceptible to different interpretations or inferences. *See Hunt*, 526 U.S. at 553.

To obtain a summary judgment, the moving party bears the initial burden of demonstrating to the court that no genuine issue of material fact exists. *See Celotex Corp. v. Catrett*, 477 U.S. 317,

323 (1986); *see also Coleman v. United States*, 369 Fed. Appx. 459, 461 (4th Cir. 2010). Once this is accomplished, the burden then shifts to the nonmoving party to adduce specific facts which show that a genuine issue exists warranting a trial. *See Matsushita Electric Industrial Company v. Zenith Radio Corp.*, 477 U.S. 574, 587 (1986); *see also Coleman*, 369 Fed. Appx. at 461. While it is insufficient for the nonmoving party to simply show that there is "metaphysical doubt" as to the material facts, it is sufficient merely to adduce facts which *could* lead a rational trier of fact to find for the nonmoving party. *See Scott*, 127 S. Ct. at 1776; *see also Matsushita*, 477 U.S. at 587.

In evaluating a motion for summary judgment, the nonmoving party's evidence is to be believed and all justifiable inferences are to be drawn in the light most favorable to the nonmoving party. *Accord Scott*, 127 S. Ct. at 1776. *See also Allstate Financial Corp. v. Financorp*, 934 F.2d 55, 58 (4th Cir. 1991).

Defendants, movants here, do not even attempt to satisfy their initial burden of showing that there are no facts in dispute. This is particularly so because in a case like this, it is clear that there are disputed material facts. In fact, in advance of the Defendants' filing a Motion for Summary Judgment, the Court issued an order requiring each party to submit evidence by affidavit in advance of a trial set in less than two weeks from the date of this filing. (Mem. and Order 1 ECF No. 21) Rather than attempt to demonstrate undisputed facts, Defendants provide substantial factual evidence accompanying their motion for summary judgment. As a result of the clear factual disputes here, granting summary judgment against Plaintiffs on any of the Plaintiffs' claims is inappropriate.

## II.   Plaintiffs Have Satisfied All Elements For the Grant of a Preliminary Injunction on Counts Three and Six.

When the court is presented with a motion for a preliminary injunction, the court, in its discretion, may consolidate the hearing on the preliminary injunction with the trial on the merits. Fed. R. Civ. P. 65(a)(2*). Teva Pharmaceuticals. USA. Inc. v. FDA*, 441 F.3d 1, 3 (D.C. Cir. 2006).  The Court has done so here.

The Court should grant a preliminary injunction where the plaintiff establishes (1) she is likely to succeed on the merits; (2) she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in her favor; and (4) an injunction is in the public interest. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). *See also Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 345 (4th Cir. 2009), *vacated on other grounds by* 130 S. Ct. 2371, (2010), *and reissued in part*, 607 F.3d 355 (4th Cir. 2010); *Doe v. Walker*, 746 F. Supp. 2d 667, 674 (D. Md. 2010).

### A.  Plaintiffs Have Demonstrated Likelihood Of Success on the Merits of Counts Three and Six.

Under this prong, a plaintiff need only show a likelihood of success not a certainty of success. *O'Connor v. Peru State College*, 728 F.2d 1001, 1002-03 (8th Cir. 1984).
 Because of the large amount of prior briefing on this subject and the arguments contained, *infra*, Plaintiffs incorporate by reference the arguments made in Plaintiffs Motion for Preliminary Injunction, Pages 6-14 (ECF No. 13).

### B.  The Plaintiffs are Likely to Suffer Irreparable Harm.

The Defendants' argument that irreparable harm does not occur when they are forced to cast their votes in districts that are unconstitutional is unavailing.  A violation of a fundamental constitutional right unquestionably constitutes irreparable harm. *See Elrod v. Burns*, 427 U.S.

347, 373 (1976). *See also Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011),

*Tepeyac v. Montgomery County*, 779 F. Supp. 2d 456, 471 (D. Md. 2011).  The Supreme Court

has recognized the singular importance of the right to vote and the irreparable harm caused by its

abridgement via unconstitutional redistricting stating:

> No right is more precious in a free country than that of having a
> voice in the election of those who make the laws under which, as
> good citizens, we must live. Other rights, even the most basic, are
> illusory if the right to vote is undermined. Our Constitution leaves
> no room for classification of people in a way that unnecessarily
> abridges this right.

*Wesberry v. Sanders*, 376 U.S. 1, 17-18 (1964). *See also Dixon v. Maryland State Administrative*

*Board of Election Laws*, 878 F.2d 776, 781 (4th Cir. 1989) (holding that right to cast effective

vote is of extraordinary importance), *Doe*, 746 F. Supp. 2d at 676.

There are an entire series of cases where courts have issued injunctions in redistricting

cases, finding irreparable harm. In a state legislative redistricting case—a case decided under a

less rigorous standard—the Supreme Court ruled that it would be "the unusual case" where the

district court would not take the appropriate remedial action in preventing an election from

occurring under a constitutionally infirm map.[1] *Reynolds v. Sims*, 377 U.S. 533, 585 (1964).

Additionally, the Court, in a Section 5 pre-clearance case, enjoined the State's election plan.

*Lucas v. Townsend*, 486 U.S. 1301, 1305 (1988) (Kennedy., J., circuit justice). As part of its

rationale for finding irreparable harm, the Court ruled that to permit the election to go forward

"would place the burdens of inertia and litigation delay on those whom the statute was intended

to protect...." *Id.* The Court noted that this was so despite the diligence of the plaintiffs to litigate

---

[1] Defendants selectively quote from this case making it seem as though *Reynolds* stands for the proposition that it is perfectly reasonable for courts to permit state legislative elections to occur under a constitutionally infirm map. The Court there does not hold as such. Rather, the general rule is that courts should prohibit state legislative elections conducted under a constitutionally infirm map. The Court—in dicta—carves out a narrow circumstance where state elections could conceivably be held under a constitutionally infirm map.  *Reynolds v. Sims*, 377 U.S. 533, 585 (1964). (Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. 67-68, ECF No. 33-1)

before the impending election. *Id.* The plaintiffs were deemed diligent despite the plan at issue there being passed in January, with voting scheduled on May 31, and plaintiffs did not bring their action until late May. *Id.* at 1302-04. The Court also took into account the burdens this placed on the State but faulted the State for its own delay in seeking preclearance. *Id.* at 1305.  If irreparable harm is found for violation of a statutorily based election right, then it should be found here where constitutional rights will be violated, absent an injunction.

U.S. Circuit Courts of Appeal and District Courts have also similarly held.  In *Johnson v. Miller*, where the court considered the redistricting for Georgia, the district court said, "We find irreparable harm in its purest sense will be occasioned by denying this preliminary injunction and by permitting use of a plan violating Plaintiffs' equal protection rights.  Plaintiffs, indeed all citizens of Georgia, should not be denied their right to a constitutional districting plan." *Johnson v. Miller*, 929 F.Supp 1529, 1560 (S.D. Ga. 1996).  *See also*, e.g., *Larios v. Cox*, 305 F.Supp. 2d 1335, 1339 (N.D. Ga. 2004) (three judge court) (denying a stay of injunction pending appeal saying, "his is an Equal Protection, one person, one vote claim -- not a gerrymandering claim…Abridgement of those rights *does* result in unconstitutional harm, and that harm is to the individual voter.") (emphasis in the original); *Smith v. Clark*, 189 F. Supp. 2d 548 (S.D. Miss. 2002) (three-judge court) (enjoining use of a mal-apportioned map and imposing a court drawn plan); and *Bridgeport Coalition for Fair Representation v. City of Bridgeport*, 26 F.3d 271, 274 (2d Cir. 1994) (in upholding preliminary injunction in Section 2 case, saying "[I]f the approved plan governed voter participation for up to two years, African Americans and Latino Americans would be without equal chance to participate for that period of time.") (*vacated and remanded on other grounds*, 512 U.S. 1283 (1994)); *United States v. Village of Port Chester*, 704 F. Supp. 2d 411 (noting issuance of preliminary injunction in 2007 preventing 2007 elections under

districting plan). Finally, a recent decision by the U.S. District Court for the District of Maine ruled on a redistricting map holding it violated Article One Section Two of the U.S. Constitution and the court therefore enjoined the map. *See Desena v. Maine*, NO. 1:11-cv-117, 2011 U.S. Dist. LEXIS 66028 *15 (D. Me. June 21, 2011) (three-judge panel) ("Constitutional violations, once apparent, should not be permitted to fester; they should be cured at the earliest practicable date.").

Defendants additionally cite to a series of cases to establish that persons from under populated districts have no standing to challenge deviations. At least one Plaintiff, as acknowledged by Defendants, resides in an overpopulated district and that is sufficient for standing.[2]

Even if, however, this Court disagrees and finds that irreparable harm is not per se caused to the Plaintiffs absent an injunction prohibiting violations of constitutional rights, under general principles of irreparable harm, this Court should find that the Plaintiffs are irreparably harmed.

The U.S. Supreme Court, when determining irreparable harm looks to the adequacy of remedy at law to find if the harm caused to the plaintiff—absent an injunction—is irreparable. *See Sampson v. Murray* 415 U.S. 61, 90 (1974). Thus, the nature of the harm, as opposed to its gravity, is the issue. *See Id.* ("Mere injuries, however substantial...The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."); *see also Canal Authority of Florida v. Callaway*, 489 F.2d 567, 575 (5th Cir. 1974) ("Assuming that the threatened harm is more than de minimis, it is not so much the magnitude but the irreparability that counts for purposes of a preliminary injunction."); *Bannercraft Clothing Co. v. Renegotiation Board*, 466

---

[2] Counsel for Plaintiffs recently learned that Plaintiff Michael Thompson, originally believed to be a registered voter at the time the complaint was filed, in fact registered to vote on December 7, 2011. He is not the Plaintiff who lives in the overpopulated congressional district.

F.2d 345, 357n9 (D.C. Cir. 1972) (noting similar to *Callaway* and stating "The very thing which makes an injury "irreparable" is the fact that no remedy exists to repair it."); Douglas Laycock, *The Death of The Irreparable Injury Rule*, 103 Harv. L. Rev. 687, 694 (1990) ("[W]hat makes an injury irreparable is that no other remedy can repair it."). Loss of the rights for which the litigation was initiated to protect, absent the injunction, is also considered irreparable harm. For example, here the litigation involves a violation to Plaintiffs constitutional and statutory voting rights. Absent an injunction, Plaintiffs rights will be violated by the holding of the election. *See Lucas,* 486 U.S. at 1305 (ruling that irreparable harm would be found because to protect the existing rights of the plaintiffs, an injunction was necessary).

Irreparable harm is suffered when monetary damages are either difficult to ascertain or are inadequate. *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994); *Blackwelder Furniture Co. v. Seilig Manufacturing Co.*, 550 F.2d 189, 196-97 (4th Cir.1977) ("And, as Learned Hand observed, irreparability of harm includes the "impossibility of ascertaining with any accuracy the extent of the loss."); *see also Legend Night Club,* 637 F.3d at 302. Additionally, other circuits have found irreparable harm occurs when the district court cannot remedy plaintiff's injuries after the court rules on the merits. *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001).

Monetary damages are wholly inadequate to redress the violation of Plaintiffs' rights here. *Legend Night Club*, 637 F.3d at 302. One person, one vote does not have a price tag. Finally, to deny the Plaintiffs' Motion for Preliminary Injunction would be to allow an election to occur with constitutionally infirm congressional districts which violate Plaintiffs' individual rights under Article One, Section Two of the U.S. Constitution. This was prohibited in *Lucas*, a

case protecting statutory rights. This should be prohibited here too, a case protecting constitutional rights.

### C.  The Balance of the Equities Tips in the Plaintiffs' Favor.

The legal standard in this preliminary injunction matter is set forth in *Karcher v. Daggett,* 462 U.S. 725 (1983).  If plaintiff demonstrates a deviation from the Census figures produced by the U.S. Census Bureau then a prima facie case has been stated.  *Id.* at 730-731.  The burden then shifts to the State to justify the deviation by a legitimate, rational state policy that is systematically or consistently applied.  *Id.* at 731.  *See infra.* In this case, the burden has shifted to the Defendants, and the Defendants are incapable of producing a legitimate and rational justification for this policy.  Systematic application of an illegitimate policy is no justification. *See also Graham v. Thornburgh*, 207 F. Supp. 2d 1280 (D. Kan. 2002) (discussing in detail the *Karcher* test).

Defendants consistently blur the distinction between the standards applied in state legislative redistricting cases and congressional districting cases. Congressional redistricting cases are subject to more rigorous scrutiny and thus the Defendants' continual reliance on state legislative cases is inapposite.  As noted in *Larios*, "The Constitution provides that congressional representatives 'shall be apportioned among the several States which may be included within this Union, according to their respective Numbers.' *Larios v. Cox*, 300 F. Supp. 2d 1320, 1353 (N.D. Ga. 2004).  Those representatives are to be chosen 'by the People,' mean[ing] that as nearly as is practicable one man's vote in a *congressional* election is to be worth as much as another's." *Id.* (citing *Wesberry v. Sanders*); *see also Anne Arundel County Republican Central Committee v. State Advisory Board of Election Laws*, 781 F. Supp. 394 (D. Md. 1991).

Defendants erroneously contend that the balance of hardships favors defendants because of the looming election schedule, a schedule that Defendants planned, proposed and implemented. *See generally* (Defs.' Opp'n to Pls.' Mot. for Prelim. Inj, ECF No. 33-1 5-9).  Nearly every single case Defendants cite for this proposition that the election is too close for the court to take further action involves state legislative redistricting. (Defs.' Opp'n to Pls.' Mot. for Prelim. Inj, ECF No. 33-1 67-68) *Reynolds v. Sims* 377 U.S. at 536-37, involved redistricting plans for seats in the two houses of the Alabama legislature; *Kilgarlin v. Hill*, 386 U.S. 120, 120-21 (1967), involved a challenge to a redistricting plan composed of single-member, multi-member and floterial districts in the Texas House of Representatives; *Whitcomb v. Chavis*, 396 U.S. 1064 (1970) (Douglas, J., dissenting) was concerned with multi-member districting provisions contained in the Indiana redistricting statute as they applied to Marion County, Indiana.  The one case that Defendants cite—but do not discuss—that involves a congressional redistricting plan is *Wells v. Rockefeller*. (Defs.' Opp'n to Pls.' Mot. for Prelim. Inj, ECF No. 33-1 68). Even still, however, the Supreme Court held that the district court did not err in permitting the congressional elections to occur because, as the district court noted, "there are enough changes which can be superimposed on the present districts to cure the most flagrant inequalities." *Wells v. Rockefeller*, 394 U.S. 542, 547 (1969). After the district court made that statement, the New York legislature adopted a different plan that was then adopted by the district court, less than a month later. *Id.* Then, the plan was used in congressional elections. Thus, the Court, though permitting the congressional elections to occur, did so because the most "flagrant inequalities" were corrected before the elections.[3]

---

[3]In addition, these cases were decided nearly 40 years ago, before the advent of modern computers and processes for the GIS systems necessary to quickly devise remedies.  With today's technology, such GIS systems are even available on the Internet in applications such as Dave's Redistricting: http://gardow.com/davebradlee/redistricting/launchapp.html and free open source mapping software such as that

Finally, the case that Defendants characterize as having a "more than a passing resemblance with this one" (Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. 68), *Maryland Citizens for a Representative General Assembly v. Governor of Maryland,* 429 F. 2d 606, 607 (4th Cir. 1970), involved a challenge to the Maryland statute which apportioned districts for the Maryland General Assembly. *Id.* Further, it should be noted that the challenge in *Maryland Citizens* was brought two months before the start of the state qualifying period for the 1970 elections based on a districting plan adopted by the Maryland legislature in 1965.  *Id.*

This case involves a challenge to Maryland's statute which apportions *congressional* districts and is analyzed under a more rigorous lens. The Court in *Gaffney* stated the distinction best:

> [T]here are fundamental differences between congressional districting under Art. I and the Wesberry line of cases on the one hand, and, on the other, state legislative reapportionments governed by the Fourteenth Amendment and Reynolds v. Sims, and its progeny. *Noting that the dichotomy between the two lines of cases has consistently been maintained*, we concluded that the constitutionality of [a state's] legislative redistricting plan was not to be *judged by the more stringent standards* that Kirkpatrick and Wells make applicable to congressional reapportionment, but instead by the equal protection test enunciated in Reynolds v. Sims....

*Gaffney v. Cummings*, 412 U.S. 735, 741-42 (1973) (emphasis added) (internal citations and quotation marks omitted).   The Supreme Court therefore is more concerned with protecting the integrity of the one person, one vote principal in congressional elections and permits limited deviations for state elections. Therefore, the fact that the Supreme Court may have permitted state legislative elections to be held despite questionable constitutional validity in the one person,

---

available from the Public Mapping Project available at http://www.publicmapping.org/ exist today and allow for more rapid consideration of these matters.  This has been recognized by courts.  See, e.g., *Vieth v. Jubelirer*, 541 US 267, 312 (2004) (Kennedy, J., concurring) ("Computer assisted districting has become so routine and sophisticated that legislatures, experts, and courts can use databases to map electoral districts in a matter of hours, not months."); *Larios v. Cox*, 305 F.Supp. 2d 1335, 1342 (N.D. Ga. 2004) ("given recent advances in computer technology, constitutional plans can be crafted in as short a period as one day").

one vote Fourteenth Amendment context; relying on cases from 40 years ago; and decided before the advent of modern computer technology is of no consequence here because this case involves the invalidity of Maryland's *congressional* apportionment plan.

Under this prong, the balance is between the harm to the nonmoving party should the injunction be granted, against the threat of irreparable harm to the movant should the injunction not be granted. *Muffley v. Spartan Mining Co.*, 570 F.3d 534, 544 (4th Cir. 2009).

Defendants go to great lengths to explain how Maryland's election process would be disrupted if an injunction were to be granted. (Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. ECF No. 33-1, 65). What is important to remember however, is that the Defendants developed their own schedule and followed it without amendment.  Plaintiffs filed this suit at the earliest possible time available. Had Plaintiffs filed before October 20, 2011, Defendants would have filed a motion to dismiss on ripeness grounds. Now Defendants cloak their actions behind a curtain sounding in laches. This Court should not permit Maryland the ability to insulate their actions behind such an excuse, an excuse Defendants engineered through no fault of the Plaintiffs. *See Generally* (Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. ECF No. 33-1, 5-9). Instead this Court should adopt the posture taken by the U.S. District Court for the Western District of Texas and reschedule any necessary pre-election dates for the 2012 election to permit time to ameliorate the constitutional infirmities of the current redistricting map. *See Perez v. Texas*,  No. 5:11-cv-00360-OLG-JES-XR, slip op. at 4-7  (W.D. Tex. Nov. 7, 2011 ECF No. 489) and slip op. at 4-6 (W.D. Tex. Nov. 4. 2011 ECF No 486) (orders scheduling new dates for the pre-election deadlines).

This Court can adjust the qualifying dates, the MOVE Act dates for both mailing and return of ballots, and even the election date if necessary to accommodate any necessary changes. If the

State desires to hold its congressional and presidential elections on the same date, the time pressures created by the State can be relieved if this Court moves the primary date. States such as Ohio and Utah are holding their joint presidential and congressional primaries in June of 2012. *See* 2012 Presidential Primary Dates and Candidate Filing Deadlines,

www.fec.gov/pubrec/fe2012/2012pdates.pdf (Visited December 7, 2011).

Here, Plaintiffs are alleging dilution of their vote and thousands of other Maryland citizens who are similarly situated. To permit Maryland to hold its elections with this constitutionally infirm map would be to injure Plaintiffs'—and others'—rights under the constitutional principle of one man one vote.

### D. An Injunction is in the Public Interest.

As the three-judge panel said in *Johnson v. Miller*, "the public has a strong interest in having elections conducted according to constitutionally drawn districts, instead of pursuant to racially gerrymandered lines that violate the constitutional rights of all citizens within those districts." 929 F.Supp. at 1560-61.

The Defendants appear to rely on a series of cases where relief was denied in the election context on a number of grounds not present here. In *Purcell*, the Court of Appeals there issued an injunction staying an election law approximately 30 days before the election. *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). While the Supreme Court reversed this injunction, it did so not for reasons stated by the Defendants. Rather, the Supreme Court reversed the injunction out of fear that confusion would result due to the district court's denial of the injunction following by the court of appeals grant of the injunction without deference to the district court's factual findings. *Id.* Therefore, the Court's concern was more focused on the multiple orders issued by both the district court and court of appeals without either court respecting the looming election

date. *Id.*   In *White v. Daniel*, the court actually held the claim for relief to be barred by laches as the claims were not brought until 1988, 17 years after the 1971 redistricting plan being challenged. *White v. Daniel*, 909 F.2d 99, 102-03 (4th Cir. 1990).  Similarly, in *Knox*, the plan at issue had been approved in March of 1982 with an effective date of December 1, 1983, and plaintiffs failed to bring their initial claim until December 30, 1983. *Knox v. Milwaukee County Board of Election Commissioners*, 581 F. Supp. 399, 400, 404 (E.D. Wis. 1984) Again, the court found the claim to be barred by laches. *Knox*, 581 F. Supp. at 407.

With respect to *Reynolds v. Sims*, the State selectively quotes from that case. (Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. 67-68, ECF No. 33-1).  The Court also said, "once a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan." *Reynolds,* 377 U.S. at 585.

Rather, election day itself is more than four months away as of the time of these proceedings, and as noted both above and in the Court's order of December 1, 2011, there is still time to devise remedies and adjust the election schedule as necessary should Plaintiffs prevail on one or more of their claims.

### III.    No Population Without Representation Act Is Not Constitutional As Applied to Congressional Districts Because it Violates Article One, Section Two.

#### A.  The Constitution Prohibits Use of State Adjusted Data for Congressional Redistricting.

Plaintiffs have—in both their Memorandum in Support of Motion for Preliminary Injunction and in their Reply to Defendants' Opposition to Motion for a Three-Judge Panel and Motion to Dismiss—previously laid out the history of cases examining Article One, Section Two and its application to congressional redistricting.

Defendants, and proposed A*mici* Howard University Law Clinic, *et al*., both submit essentially identical analysis of other cases that have mentioned or referred to the Census and congressional redistricting.  However, none of the cases that Defendants and *Amici* cite oppose our analysis of the Constitution on the precise question before this Court at issue.  Below, we briefly examine the broader context of each of the cases on which they rely. As a major note in the series of Census "adjustment" cases cited by both the Defendants and by proposed A*mici*, the Census was *never* adjusted.  Instead, these cases were part of a long 30 year fight which ultimately ended in *Department of Commerce v. House of Representatives*, 525 U.S. 316 (1999), which decided firmly against Census adjustment.

Additionally, Defendants fundamentally miss one of the most important prongs of *Kirkpatrick* and *Karcher* in their analysis of the No Population Without Representation Act as it applies to congressional redistricting.  *Kirkpatrick* holds that once the burden is shifted by the demonstration of deviations, then the burden is on the state to first "justify" the deviations, and then explain how such justifications are implemented in a systematic and orderly way. *Kirkpatrick v. Preisler,* 394 U.S 526, 535 (1969).   Further, under *Larios*, deviations cannot be systematically created for the purpose or advantaging one group over another, *Larios*, 305 F. Supp. 2d at 1338, which is precisely what Maryland's policy does here.[4]

> **i.     *City of Detroit v. Secretary of Commerce* Was Dismissed on Standing Grounds and Related to an Allegation Not Before this Court.**

Defendants cite *City of Detroit v. Secretary of Commerce*, for the proposition that states are permitted to use sources other than census data to reapportion congressional representation.

---

[4] Although *Larios'* discussion on this point related directly to the 14th Amendment, and not Article One, Section Two, it is clear that the same general concept applies in the Congressional redistricting realm where only the minimally practicable deviation is permitted.

(Defs.' Opp'n to Pls.' Mot. for Prelim. Inj 15-16). *City of Detroit*, however, is inapplicable to the circumstances surrounding the case here.

First, the case was decided on standing grounds, not on the merits of the plaintiffs' case. Furthermore, the plaintiffs' underlying case was concerned with persons whom the census allegedly did not count, not whether the Michigan legislature could remove persons from the census for congressional districting purposes.

The plaintiffs in *City of Detroit* argued that persons within Detroit were missing from the census' population count resulting, therefore, in a substantial undercount, particularly among minorities. *City of Detroit v. Secretary of Commerce*, 4 F.3d 1367, 1369 (6th Cir. 1993). The United States Court of Appeals for the Sixth Circuit upheld the district court's decision to dismiss the case on standing grounds. The Court argued that the plaintiffs did not have standing to sue because the Michigan legislature, not the U.S. Census Bureau, creates legislative districts. *Id.* at 1373. Thus, the harm of vote dilution due to an undercount would come not from the U.S. Census but from the Michigan legislature, thus breaking the chain of causation. *Id.*

This case, therefore, supports Plaintiffs' theory more than the Defendants'. The problem that needed to be rectified in *City of Detroit* was that people were not counted in the census. *Id.* at 1369. The court considered the Michigan legislature the proper body to adjust the census to ensure the state counted these individuals. *Id.* at 1374.[5]

Here, the Defendants acknowledge that they are *not* going to count prisoners whose previous known addresses are located outside of Maryland. (Defs.' Opp'n. to Pls.' Mot. for Prelim. Inj. 22). Defendants cavalierly say that those prisoners were, for population adjustment

_____

[5] As a historical footnote, Michigan's post-1990 congressional districts were drawn by a three judge panel in *Good v. Austin*, 800 F.Supp. 557 (E. & W.D.Mich.1992) (three-judge court), using unadjusted census numbers. Despite the existence of the *City of Detroit* and *Klutznick* cases, the court said, "We instructed [the court expert] to design a plan based upon the certified 1990 census data."

purposes, "excluded," "deleted," and "removed" from their incarceration facilities never to be counted in Maryland, or, presumably, anywhere. (Defs.' Opp'n. to Pls.' Mot. for Prelim. Inj. 2, 3, and 4)

*City of Detroit* seems to suggest, though in dicta, that the legislature is tasked with adjusting for populations that are missing from the census count, not adjusting for population by removing individuals from the census count. The latter is precisely what Defendants admit to doing. Detroit endeavored to make sure people who did not appear in the census do appear for redistricting purposes. Defendants here endeavor to ensure that persons who did appear in census counts, disappear for redistricting purposes.

### ii. *Young v. Klutznick* Dismissed Claims of Alleged Undercount and was not About Removing People from the Census or even Around Within a State.

Prior to deciding the *City of Detroit* case, the U.S. Court of Appeals for the Sixth Circuit held that the plaintiffs in *Young* did not have standing to sue because the claimed injury was still hypothetical. *Young v. Klutznick*, 652 F.2d 617, 619 (6th Cir. 1981). In this case, the plaintiffs were demanding that U.S. Census Bureau make adjustments for the undercount among impoverished citizens in Michigan. *Id.* The Census officials were reluctant to make such adjustments due to the unreliability of accounting for similarly situated individuals on a nationwide scale. *Id.* at 621.

Far from deciding the precise issue, the court spoke in terms of hypotheticals to illustrate the standing problem with the claim. Said the court, "*If* the Constitution leaves the Michigan legislature free to adjust the census figures reported by the Census Bureau, then the Michigan legislature might adjust the census data, thereby preventing the anticipated harm." *Id.* at 624 (emphasis added). The court went on to note that in *Kirkpatrick*, the Supreme Court presented a test that could be applied to permit variance in population in congressional districts. *Id.*

19

In discussing a hypothetical, the court, in dismissing the challenge against the conduct of the Census Bureau, stated that *if* there were an undercount in the Detroit area that was approximately 25%, it would be incumbent on the Michigan legislature to adjust those figures for congressional apportionment. *Id.* at 625. Again, therefore, the court was concerned with ensuring that people who simply did not appear in the census, did appear for purposes of congressional apportionment. Maryland, by contrast, wants to make people who did appear in the census count, disappear, and move people designated by the Census Bureau in one location and then relocated throughout the state.

Additionally, Defendants cite *Klutznick*, for the proposition that the State of Maryland can adjust census numbers so long as it is done in a systematic and well documented manner. (Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. 16).  But this argument was made in *Klutznick* to support the Michigan legislature supplementing census numbers because of an alleged 25% undercount in the U.S. Census. *Id.* at 624-25. That conclusion cannot be considered authority for the Maryland legislature to take 1,321 persons who appear in the U.S. Census count and make them disappear, or for moving significant numbers of certain populations around within the state.

    **iii.**    ***Assembly Of California v. United States Department Of Commerce* And *Senate Of California v. Mosbacher* Were Freedom of Information Act Cases and Are Wholly Inapplicable.**

Defendants cite to *Assembly of California v. United States Department of Commerce* is devoid of any connection to this case. (Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. 16).  There, the court was deciding whether the federal FOIA statute mandated the disclosure of certain census records which the Department of Commerce deemed deliberative. *Assembly of California v. United States v. Department of Commerce*, 968 F.2d 916 (9th Cir. 1992). The sentence in the decision that states are not required to solely use census data in their congressional redistricting

is therefore made purely as dicta and is even more diminished as it is placed in a footnote. *Assembly of California*, 968 F.2d at 918 n 1. Furthermore, there, the court cites *Young* for this proposition. *Id.* Defendants, therefore, rely on one case that is not decided on the merits and is concerned solely with compelling the U.S. Census itself to adjust the population totals for undercounts, and then Defendants rely on *Assembly of California's* dicta citing to the same Michigan undercount census case. This is hardly the "clear weight of authority" Defendants claim it to be. (Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. 18). This case cannot be considered as strong authority for the proposition that the State of Maryland can remove persons counted in the census.

The case of *Senate of California v. Mosbacher*, 968 F.2d 974 (9th Cir. 1992), is equally inapposite. (Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. 16). The Senate of California sought a court order compelling the Secretary of Commerce to release tapes containing adjusted census data for California. *Id.* at 975. The court there stated in a single sentence that the California legislature can and should utilize other noncensus data in addition to the census for the redistricting process to adjust for an undercount in the census. *Id.* at 979. Again, however, this case did not address the question at issue here, namely, the ability of a state legislature to adjust the census count of people counted by the census for congressional redistricting purposes.

More importantly, the underlying concern in *Senate of California*, was to ensure that people not counted in the census count were added. *Id.* Maryland, by contrast, seeks to remove persons from their current location—possibly long-term location—and send them to a prior address where it is not clear to Maryland if those persons will in fact return. More importantly, Maryland, by contrast, "deletes" persons from the census count and removes people from their current locations and sends them to previous locations.

iv.    *Daly v. Hunt* **Distinguishes Congressional Districting from Other Types of Redistricting.**

Defendants cite *Daly v. Hunt*, for the proposition that states have the flexibility to choose their own apportionment base. (Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. 27)  But that case too is inapposite. There, the court dealt with a case concerning neither congressional apportionment, nor even state legislative apportionment but the apportionment of electoral districts for the Board of Commissioners and Board of Education in Mecklenburg County, North Carolina. *Daly v. Hunt*, 93 F.3d 1212, 1214 (4th Cir. 1996). Thus, while the court there did provide an extensive discussion of states flexibility in reapportionment, the court also went to great pains to distinguish the different standards applied to state legislative redistricting and congressional redistricting.  *See*, *e.g., Daly*, 93 F.3d at 1217n. 5 ("The Court has repeatedly recognized that congressional apportionment plans…are subject to stricter standards of population equality than are state or local legislative districting plans..."). The court did not disturb the jurisdiction's choice of total population as determined by the U.S. Census as its redistricting base.  *Id.* at 1228.

All of these cases, with the exception of *Daly*, suggest that if the census count is missing persons then the state legislature should supplement census information. What these cases therefore do not suggest is that a state can simply reassign persons who appeared in the census from one area of the state to another. Neither do these cases suggest that the state can make disappear—as Defendants acknowledge doing—those who already appeared in the census counts. While the Defendants are puzzled as to why Plaintiffs did not cite these cases, (Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. 16), the aforementioned should adequately explain why these cases are inapplicable to the circumstances here, and therefore why the Plaintiffs did not cite them. More importantly, these cases establish the importance of counting everyone possible who

may not have been counted, not moving identified persons from one location to another or removing those who have been counted.

     **v.**      ***Kirkpatrick v. Preisler*, Prior to Applying Its "Systematic" and "Documented" Test Requires a Justification for the Application of Such an Action, as Explained in *Karcher v. Daggett*.**

Finally, Defendants rely on *Kirkpatrick* for the proposition that legislatures can adjust census numbers so long as the adjustments are done in a systematic and thoroughly documented manner. (Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. 18).  There, Missouri attempted to adjust for population shifts for congressional redistricting purposes. *Kirkpatrick*, 394 U.S. at 535. The Court, in agreeing with the district court there and rejecting several other state arguments for permitting deviations between districts from total population, held that Missouri's legislature did not adopt a policy for projecting population shifts between censuses and therefore was not adequately documented or done in a systematic way. *Id.*

However, prior to reaching the issue of documentation, the Court said:

> Missouri contends that variances were necessary to avoid fragmenting areas with distinct economic and social interests and thereby diluting the effective representation of those interests in Congress. But to accept population variances, *large or small*, in order to create districts with specific interest orientations is antithetical to the basic premise of the constitutional command to provide equal representation for equal numbers of people….Problems created by partisan politics cannot justify an apportionment which does not otherwise pass constitutional muster….Similarly, we do not find legally acceptable the argument that variances are justified if they necessarily result from a State's attempt to avoid fragmenting political subdivisions by drawing congressional district lines along existing county, municipal, or other political subdivision boundaries. The State's interest in constructing congressional districts in this manner, it is suggested, is to minimize the opportunities for partisan gerrymandering. But an argument that deviations from equality are justified in order to inhibit legislators from engaging in partisan gerrymandering is no more than a variant of the argument, already rejected, that

considerations of practical politics can justify population disparities.

*Kirkpatrick*, 394 U.S. at 533-34 (emphasis added). In this case, Defendants seems to ignore the portion of *Kirkpatrick* that requires a legally justifiable rationale for deviation from total population as determined by the U.S. Census Bureau for congressional districting purposes. Rather, the State of Maryland focused its efforts to adjust population on only one subgroup of persons residing in "group quarters" inside of Maryland, and attempted to reassign those persons within the state. The State did not attempt to adjust for military personnel (29,160 persons) or college students (339,000 persons) *See* (Pls.' Mem. in Supp. of Mot. for Prelim. Inj. ECF No. 13-1, 13) located by the Census Bureau inside the state of Maryland, but who may or may not be legal residents of Maryland, who may or may not be eligible to vote in Maryland, and who may have no intention of remaining in Maryland. However, these persons – prisoners, military personnel, and college students - were used by the federal government in assessing whether Maryland would retain its eight congressional districts.

*Karcher v. Daggett* later established clearly the two part test for consideration of deviations from the ideal population. *Karcher v. Daggett*, 462 U.S. 725, 730 (1983). *See also Graham v. Thornburgh*, 207 F. Supp. 2d 1280 (D. Kansas 2002); *Anne Arundel County Republican Central Committee v. State Administrative Board of Election Laws*, 781 F.Supp. 394 (D. Maryland 1991); and *Travis v. King*, 552 F.Supp. 554 (1982) (relying on *Kirkpatrick* for a similar test). Defendants seems to ignore the test established by *Kirkpatrick* and further clarified in *Karcher*.

This attempt to use only a portion of persons located in non or low voting institutional population for the perceived benefit of a particular part of the state or political party is not a rational justification. It is true that persons in Maryland are not permitted to vote while

incarcerated.  These persons – and other similarly situated persons who may not vote where the Census has located them – will, to paraphrase proposed *Amici's* general argument, impact the perception of the one person, one vote rule, no matter where they are located. Defendants have attempted to impose its own policy judgment that one particular slice of persons – namely those in state prisons – should not count where the Census has found them but rather in the place of their last known residence.  To the same extent these persons, if located where the prison is, "benefit" voters who live near the prisons, reassigning them to a different location where they are not located and are not voting "benefits" voters who live in the area where the prison inmate last lived. Defendants, in short, trade one perceived evil for another.

We should also note, and the Court can take judicial notice, that the largest colleges and universities in Maryland are located in College Park (Prince George's County) and the City of Baltimore.  These are two jurisdictions with generally high minority population, and the highest concentrations of college students in the state.[6]  So, while the Defendants apparently decided that the voting power of rural voters was somehow inappropriately increased by the presence of prison populations, it was not similarly offended that voters in Prince George's County and the City of Baltimore are somehow inappropriately benefited by the assignment of generally non-resident college students to those localities. In essence, by reassigning more people back to these localities, the State is exacerbating the problem of non-voters of voting age by putting these persons back into jurisdictions in Maryland that already have high levels of non-voters of voting age.

---

[6] *See* U.S. Census Bureau *State and County Quick Facts: Prince George's County*, available at http://quickfacts.census.gov/qfd/states/24/24033.html, visited November 20, 2011; *see* U.S. Census Bureau *State and County Quick Facts: Baltimore City, Maryland*, available at http://quickfacts.census.gov/qfd/states/24/24510.html, visited November 20, 2011.

Despite Defendants attempts to extensively demonstrate how its application of this reassignment policy is well documented and systematic, neither in the seventy-seven page memorandum, nor in their attachments cited in the memorandum, do the Defendants point to evidence that suggests prisoners typically return to their previously known addresses or that the legislature considered such evidence when considering the statute.  In fact, the best evidence available of what happens in Maryland appears to be an Urban Institute study focusing on Baltimore, which found that only 27.7% of former prisoners return to their own home on their first night of release.  Nearly 42% stayed with family. *Baltimore Prisoners' Experience Returning Home* (Urban Institute, Washington, D.C.) March 2004 at 5-6.[7] (Decl. of Shawn Sheehy, Attach. L, Exhibit 13).

Maryland's policy is not sufficiently justified, and the most recent federal court case to directly address the issue after *Karcher* is *Travis v. King*.[8]  As previously noted in prior pleadings, *Travis* rejected reasoning similar to that advanced by Defendants and *Amici* for the purposes of congressional districting and squarely held that only the total population as determined by the U.S Census may be used for congressional redistricting.

IV.   **Maryland's Congressional Districting Map Violates Section 2 of the Voting Rights Act, and Plaintiffs Have Properly Pled Their Claim.**

A.   **Count 5 of the Complaint is Well Pled and States a Claim Upon Which Relief Can be Granted.**

---

[7] Admittedly, this study does not specify the geographic orientation of the family home with respect to the released person's pre-incarceration address. It is the duty of the State, however, to justify how they determined that prisoners would return to their previous known address. Speculation will not suffice. *Kirkpatrick v. Preisler*, 394 U.S. 526, 535 (1969) (holding that Missouri cannot adjust for population shifts because Missouri did not make the adjustments using methods with "high degree[s] of accuracy".).

[8] Further, in *Kalson v. Paterson*, 542 F.3d 281, 289n16 (2d Cir. 2008), the court said, in a case addressing procedural matters in a challenge to a state's congressional districting, "The Supreme Court's mandates of equally populous congressional districts began in *Wesberry*, when the Court analyzed Art. I, § 2 in "its historical context."  The Court derived the principle of equally populous districts within a state from the Article I statement that congressional representation be apportioned between states based on the states population. In light of the fact that Article I apportions seats between states based on total population and not on the basis of the number of voters, it would seem to follow that apportionment within a state must also be based on total population."

The Complaint in this case, and the Plaintiffs' original Response to the Defendants' first Motion to Dismiss, demonstrate that Plaintiffs have sufficiently provided Defendants with notice of the facts and circumstances necessary to state a claim for relief under Section 2 of the Voting Rights Act.  Without Plaintiffs repeating previously advanced arguments, the Defendants focus their claim on paragraphs 71-73 of the Complaint, they fail to refer to the rest of the complaint. Specifically, for example, paragraphs 41-44 discuss the fracturing of compact minority communities specifically for the benefit of white incumbents, and the presented attachments – particularly Attachments A and D—demonstrate that cohesive minority communities exist such that they can be a majority in at least three congressional districts.  These factual allegations go directly to the assertions necessary to prove the *Gingles* preconditions.  Paragraph 56 alleges the totality of the circumstances portion of the Section 2 test.  This demonstration that the complaint is well pled allows this Court to deny the Defendants' Motion to Dismiss under Fed. R. Civ. P. 12(b)(6).

**B.  Defendants Substantive Argument for Summary Judgment Are Belied by Facts.**

With respect to the first *Gingles* prong, that population be sufficiently compact to constitute a majority of the population in the number of districts sought, the facts bear this out.  There were at least two plans made public prior to the enactment of SB1 which demonstrate that three compact majority-minority districts can be drawn.  The attached Affidavit of Antonio Campbell provides examples of at least two of configurations of the state's districts that provide for alternative versions of maps containing three compact majority-minority districts.  *See* (Decl. of Antonio Campbell, Exhibit 14).

The attached expert report of Plaintiffs by Professor Keith Gaddie (Exhibit 15), provides a detailed analysis of compactness, looking at the benchmark plan, the enacted plan (SB 1) and both the FLH Map proposed before the GRAC and the Pipkin amendment defeated in the legislature.  According to Professor Gaddie:

> The FLHC map is more compact than the state's baseline map or SB-1 on both conventional measures, including the two most-commonly used measures, the perimeter-to-area score (PTA) and the smallest circumscribing circle (SC). The three majority-minority congressional districts in the FLHC map are more compact than the state's two majority-minority districts on the perimeter-to-area score, and the average compactness of the three FLHC districts on smallest circle score (.39) is higher than the average for the two majority-minority districts in the state plan (.31) or for the top three districts of any demographic composition in the state's map (.35 for the top three districts in the state). The least compact district in the state map is less compact than over 95% of the congressional districts drawn for the 1992 elections, and the average overall scores for compactness are lower than the compactness of some of the least compact congressional districts crafted in the United States in the last 20 years.

(Decl. of Gaddie at 6.1).  Professor Gaddie's compactness analysis is comprehensive, and demonstrates the Plaintiffs' districts focus on compactness as measured by the traditional methods.  By contrast, the Defendants' map is less compact than the maps introduced by Plaintiffs.  Not only is this seen in Gaddie's empirical analysis, but a simple visual comparison of the districts in the Defendants' map to the districts in all of the maps put forward by Plaintiffs demonstrate that all of Plaintiffs' proposed maps are more compact, and contain three majority minority districts.

With respect to racial block voting in Maryland and the ability of white voters to generally defeat African American candidates, Professor Gaddie's analysis is clear that the

preferred candidates of minority voters in Maryland are often defeated in Democratic primaries.[9]

Gaddie declares, "African American political success in Maryland is largely tied to majority-

minority constituencies. The success of the black-preferred candidate in heavily-black districts

coupled with the losses [in] so-called "coalitional" districts demonstrates the importance of

majority-black districts if the African-American voters are to have a reasonable opportunity to

elect their candidates of choice."  (Decl. of Gaddie at 6.3).

   Then, when general elections arise, the Democratic Party candidate generally receives the

support of the African American community in the general election, and wins the general

election because Maryland is "In fact…consistently a 60% Democratic and 40% Republican

state in most statewide elections."  (Decl. of Eberly at 35, Exhibit 16).  In fact, the first African

American elected statewide in Maryland was Michael Steele, elected as Lieutenant Governor as

a Republican in 2002 with a white candidate at the top of the ticket.

   The U.S. Department of Justice recently confronted a situation, albeit in the Section 5

context, where race was a crucial factor in primaries.  The Department, in objecting to a change

from partisan to non-partisan elections, wrote, "Black voters have had limited success in electing

candidates of choices during recent municipal elections.  The success that they have achieved has

resulted from cohesive support for candidates during the Democratic primary (where black

voters represent a larger percentage of the electorate), combined with crossover voting by whites

in the general election." See "Letter to Joseph Cauley from Loretta King, Acting Assistant

Attorney General," available at http://www.justice.gov/crt/about/vot/sec_5/ltr/l_081709.php.

(visited December 6, 2011).

---

[9] Essentially the only exceptions identified in Gaddie's report are the 2008 presidential primary and general elections
where Barack Obama was on the ballot.

This is almost precisely the case in Maryland, except that in Maryland there appears to be very few cases of whites and blacks voting cohesively in primaries where an African American candidate is on the ballot.  Table 8 of Declaration of Gaddie, Exhibit 15, shows the current districts represented by African American elected officials in Maryland, the official, the total population of those districts (prior to redistricting), the minority population of their districts, and the percentage minority of those districts.  There is not one current African American elected official from a single member district from a district that is not majority minority (with the exception of the Lieutenant Governor who runs on a ticket with the Governor).  Like Michael Steele, Anthony G. Brown is the second African American statewide elected official and was significantly assisted as a result of being on a linked ticket with a white candidate (Governor O'Malley) at the top of the ticket.   The only African American elected officials to represent majority white districts are in multi-member districts in the Maryland House of Delegates.  See Table 8 of Declaration of Gaddie (specifically Frank Turner and Alfred Card from multi-member districts).

Professor Gaddie's analysis is sufficient to demonstrate that the second and third *Gingles* factors are present in Maryland.  As a result, this evidence demonstrates that the *Gingles* preconditions are met, and that the Court should not dismiss this claim or grant summary judgment.

### C.  The Totality of The Circumstances Test Is Satisfied and Requires the Creation of the Third Majority-Minority District.

Once the *Gingles* preconditions are satisfied, the Court must turn to the totality of the circumstances test.  As the United States Court of Appeals for the Fourth Circuit has stated the test:

The essence of this inquiry is whether the "electoral ... structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and [majority] voters to elect their preferred representatives." *Gingles,* 478 U.S. at 47, 106 S.Ct. at 2764. Factors relevant to the analysis include, but are not limited to: (1) a history in the state or political subdivision of official voting-related discrimination against the minority group; (2) the extent of racial polarization in the elections of the state or political subdivision; (3) the extent to which the state or political subdivision has used voting practices or procedures that enhanced the opportunity for discrimination against the minority group; (4) the exclusion of minority group members from the candidate slating processes; (5) the extent to which past discrimination in areas such as education, employment, and health hinder the ability of members of the minority group to participate effectively in the political processes; (6) the use of racial appeals in political campaigns; (7) the extent to which minority group members have been elected to public office in the relevant jurisdiction; (8) whether elected officials exhibit a significant lack of responsiveness to the particularized needs of minority group members; and (9) whether the policies offered to justify the challenged voting practice are tenuous. *Id.* at 44-45, 106 S.Ct. at 2763-64 (citing S.Rep. No. 417, 97th Cong., 2d Sess. 28-29 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 206-07). While each of these factors may be probative, no single factor or combination of factors is dispositive.

*Cane v. Worcester County*, 35 F.3d 921, 925 (4th Cir. 1994). In that case, specifically with respect to Maryland, the Fourth Circuit noted, "The [district] court specifically noted that African-Americans were denied the right to vote in Maryland until 1870 and that in the early 1900s the State employed voting prerequisites that enhanced the opportunity for discrimination against African-Americans." *Id.* at 926.

Maryland's history of racism is well documented. Maryland has a history of adopting Jim Crow Laws. (Decl. of Sheehy Attach. N) Maryland also has multiple communities which Professor James Loewen recently profiled in his book *Sundown Towns: A Hidden Dimension of American Racism* (New Press, 2005). A summary from his website of each of the Maryland towns he examined is included here as (Decl. of Sheehy Attach. M). Sundown towns, according

to the book, are towns where African Americans, Jews, and other minority groups were forced (or strongly encouraged) to leave prior to sundown to prevent racial violence threatened and perpetrated by majority white populations. *Id.* This experience is mirrored in the Declaration of Ella White Campbell, Exhibit 10, who described seeing signs posted using racial epithets telling African Americans "don't let the sun go down," and the Declaration of Robina Spruill, Exhibit 3, who described a present day experience of being told not enter certain areas of Southern Maryland for her own safety as an African American. Cortly Witherspoon describes an incident he was involved in recently in Baltimore where an African American teenager, hanging outside his school which was located in a Jewish neighborhood was physically assaulted and told that he did not belong in the neighborhood. *See* (Decl. of Witherspoon, Exhibit 2).

Professor Todd Eberly declares, "It is my opinion that Maryland has a well documented history of racial discrimination. This legacy of discrimination, while not as pervasive as in the states of the old Confederacy, is still relevant and has an impact on racial and ethnic minorities to this day." (Decl. of Eberly at 4).   He details much of Maryland's history of discrimination and racism.  For example, he says, "Maryland was hotbed of southern sympathy and many Marylanders were eager to join the Confederacy." (*Id.* at 7).   Similar history about "black codes" (*Id.* at 9), literacy tests, attempts to subvert the Fifteenth Amendment and institutionalized discrimination in transportation (*Id.* at 10), and historic underrepresentation of black population (*Id.* at 14) abound throughout his declaration.

These vestiges of these factors are still present in Maryland some 17 years after the Fourth Circuit's decision in *Cane*.  In January of 2012, this Court will hold a six week bench trial in *The Coalition For Equity And Excellence In Maryland Higher Education, Inc, v. Maryland Higher Education Commission* based on a complaint brought by a coalition alleging discrimination in the state's educational system.  *The Coalition For Equity And Excellence In*

*Maryland Higher Education, Inc, v. Maryland Higher Education Commission*, No. 06-CV-2773

(D. Md. Nov. 14, 2011, Mem. to Counsel, ECF 270 1) (scheduling six week bench trial on Jan.

3, 2012).  Said Maryland in the Defendant's Statement of the Case, "Maryland has a shameful

history of operating its system of public higher education in a segregated manner….This system

officially ended in 1954 when the United States Supreme Court decided *Brown v. Board of*

*Education*…For a number of years there continued to be, at best, benign neglect of the State's

obligation to desegregate and, at worst, outright hostility and footdragging." *The Coalition For*

*Equity And Excellence In Maryland Higher Education, Inc, v. Maryland Higher Education*

*Commission*, No. 06-CV-2773 (D. Md. Oct. 29, 2010) (ECF 178 2-3).  Clearly, the state has a

significant history of disparities in education between its African American and white residents.

These disparities are lingering even below the higher education area.  For example, the Schott

Foundation for Public Education report from 2010 shows that black males graduated at a rate of

55% while white males in Maryland graduated at a rate of 77%, a 22% disparity.  *Yes We Can:*

*The Schott 50 State Report on Public Education and Black Males* (Schott Foundation for Public

Education, Cambridge, MA) 2010 at 12. (Decl. of Sheehy Attach. E).

The same report shows that only 10% of black males in Maryland's 8th grade classrooms are

reading at or above proficient, while 45% of white males in Maryland's 8th grade classrooms are

reading at or above proficient.  *Id.* at 28.

The testimony of lay witnesses is replete with descriptions of discrimination in the

education arena in Maryland.  There are several stories of white students being treated differently

than black students on account of race.  *See* (Decl. of Patricia Fletcher, Exhibit 1) (describing her

daughter's first grade class being segregated by race and her daughter being made to comb the

hair of her white teacher); (Decl. of Robina Spruill, Exhibit 3) (describing her son and daughter

being treated differently because of race by white teachers); (Decl. of Cortly Witherspoon, Exhibit 2) (describing an incident last year at a Baltimore City School where a white teacher used a racial epithet to describe an African American college while encouraging the African American student not to attend that school).

Several witnesses described the glaring differences in resources and facilities in predominately African American schools versus schools with predominately white students. Thomas Penny III describes substandard conditions at his school without air conditioning, limited options for books and courses, and deplorable conditions of the facilities versus other white schools he visited or that were attended by friends. *See* (Decl. of Thomas Penny III, Exhibit 4). Donald Glover describes his experience attending a predominately African American school versus attending a predominately white school and the lack of resources and poor conditions at the African American school. *See* (Decl. of Donald Glover, Exhibit 7). Julia Williams describes experiences as a teacher in predominately African American schools with no resources, being forced to photocopy one textbook for a class of thirty-six students, and the lack of qualified teachers in predominately African American schools. *See* (Decl. of Julia Williams Exhibit 6). Ella White Campbell describes failing conditions in predominately black and minority schools in Baltimore County witnessed through an extensive personal observation. *See* (Decl. of Campbell Attach. 1). Robina Spruill describes a failing African American school attended by her grandson. *See* (Decl. of Spruill Attach. 2). Patricia Fletcher describes her experience on the Prince George's County School Board witnessing disparity in funding of African American and white schools; the availability of programs for African American children; and discrimination based on race in employment practices on the School Board. *See* (Decl. of Fletcher Attach. 3).

Similarly, there is a history of demonstrated disparities in healthcare in Maryland. Lay witnesses testify regarding their personal decision to drive farther to seek medical attention, sometimes even emergency help, in communities outside their neighborhood because the health care options in African American neighborhoods are poor. *See* (Decl. of Penny) (drives 45 minutes for emergency care instead of 15 minutes to nearest hospital); (Decl. of Williams) (drove to Howard County for treatment instead of hospital in Prince George's County). Sherry Strothers describes her experiences working in the Prince George's County Public Health Department where she witnessed disparity in the infant mortality rate amongst African American children as well as a significantly higher rate of AIDS in the African American community. *See* (Decl. of Strothers Attach. 8). She further describes a lack of resources to handle the disparities and states that "African Americans are losing ground in the health arena." Id. at ¶ 3.

Similarly, African American unemployment in Maryland, prior to the recession, was twice that of white unemployment at 5.9% for blacks versus 2.9% for whites. See (Decl. of Sheehy Attach. O). Even during this current recession, the African American unemployment rate in Maryland was at 8.1% in 2009 while the white unemployment rate was at 6.8%. *Id.*

Professor Gaddie examined the numbers of minority representatives in the state legislature compared to the state population as a whole. His calculations demonstrate that African Americans as significantly underrepresented in the state legislature. Declaration of Gaddie at 5.11. Gaddie reports that both self-reported rates of turnout and actual voter turnout rates show that African American and Hispanic turnout significantly lags white turnout. *Id.* at 5.10.

Racial appeals and racism are an undercurrent, not widely discussed, in Maryland's political history. For example, there is the recent indictment and conviction (on December 6, 2011) of a Maryland political operative for a scheme that "culminated, according to the indictments with

Election Night robo-calls to mostly black neighborhoods in Baltimore and Washington's eastern Maryland suburbs. The calls told tens of thousands of residents to "relax" and not worry about voting, because Democrats had already won." *See* Aaron C. Davis, *Republican Doctrine on Suppressing Black Vote is Key to Md. Case, and maybe 2012*, Washington Post (June 17, 2011) (Decl. of Sheehy Attach. D)

Thomas Penny describes receiving mailings at his house, targeted to African Americans, telling him Election Day was on a different day then actually scheduled. (Decl. of Penny at ¶ 14). Patricia Fletcher describes witnessing Democratic Party operatives making decisions on mailings based on race. (Decl. of Fletcher at ¶ 10). Michael Harris describes his experience seeing signs posted in African American communities with an explicit racial appeal in hopes of swaying votes. (Decl. of Michael Harris, Exhibit 5).

Plaintiff in this case, Patricia Fletcher, has filed a declaration that she has heard first hand during Democratic Party meetings, Maryland Senate President (and GRAC member) Mike Miller use racial epithets and make inappropriate racial comments. (Decl. of Fletcher at ¶¶10-11). This is the same non-Hispanic white public official who referred to Michael Steele as "Uncle Tom" when he was running for office, and later apologized for it. *See 'Party Trumps Race' for Steele Foes*, Washington Times (November 1, 2005) (Decl. of Sheehy Attach. F). And the same public official who in 1989 referred to Baltimore as a "[expletive] ghetto" and then laughed out loud when he thought the television camera wasn't running. (Decl. of Sheehy Attach. P). Ms. Fletcher also describes other incidences she witnessed of Sen. Miller inappropriately racially stereotyping African American elected officials. (Decl. of Fletcher at ¶¶10-11).

Ella White Campbell describes being called a "black b-tch" during a meeting in the Baltimore County Executive's office by a Baltimore Zoning Commissioner.  (Decl. of Campbell at ¶ 6).  Thomas Penny III testifies that racial epithets were hurled at him by the police while being beat up.  (Decl. of Penny at ¶ 3).  Michael Harris testifies he heard African American candidate Michael Steele referred to using racial epithets.  (Decl. of Harris at ¶ 8).

In the Affidavit of Mr. Penny, he relays some of the pleas presented by African American voters before the GRAC, and relays his impression of Senator Miller's stoic reactions. (Decl. of Penny at ¶13). Witnesses Ella White Campbell, Robina Spruill, and Sherry Struthers (Decl. of Struthers, Exhibit 9) echoed that experience.  They understood from their experience before the Commission that their views were not being taken into account and that no attempt to stop dilution of African American voting strength would be undertaken.

News reports indicate that when Michael Steele was a candidate for Lt. Governor in 2001, he was the victim of "attacks against the first black man to win a statewide election in Maryland [such as] pelting him with Oreo cookies during a campaign appearance, calling him an "Uncle Tom" and depicting him as a blackfaced minstrel on a liberal Web log." (Decl. of Sheehy Attach. F)

During the 2006 Senate primary, the following was reported by the Baltimore Sun:

> Senate hopeful Kweisi Mfume said yesterday that unnamed Democratic Party "operatives" were trying to block his nomination by orchestrating which candidates ran against him, and he said the party risked losing traditional support from black voters as a result. "I think there may be some Democratic operatives in and out of the official party that would like to guide the process, much like they have guided other processes in the past," Mfume said in an interview last night.  The party, he said, could lose its long-standing support from minority groups if leaders actively work against the candidacy of a prominent black politician, he said.

David Nitkin and Andrew Green, *Mfume Sees Plot to Block Candidacy*, Baltimore Sun (July 14, 2005) (Decl. of Sheehy Attach. H).  In the Affidavit of Penny, he relays his personal experiences in voting in Prince George's County, and describes the difficulty he and others at his majority African American polling place have experienced. (Decl. of Penny at ¶15).

African American State Senator Muse voiced his concerns about treatment of African American voters in Maryland under this particular plan on the floor of the State Senate.  At one point in his remarks, he says , "50% of the party gets "used" …divvied up…pushed around…MANIPULATED…for the good of the "party."  A complete copy of his remarks are contained in the Declaration of Shawn Sheehy as Attachment I.

In a recent report focusing on Somerset County, MD, the ACLU and NAAPC stated:

> Forever imprinted on Somerset County is that Princess Anne was the site, in 1933, of the State's horrific last lynching, at which "two thousand spectators watched and many cheered the public mutilation, hanging and burning of a black man."5 Indeed, George Armwood, the man lynched by a mob in Princess Anne in 1933 was a relative of former Somerset Commission candidate and NAACP activist Ken Ballard – his mother's cousin. Public school segregation in Somerset County continued through the late 1960s, when the federal government finally intervened to require desegregation. Until ACLU lawsuits forced change in the 1980s and 1990s, at-large election systems and non-resident voting were employed in counties and municipalities throughout the Lower Shore, reducing the chances for African-Americans to be elected to public office. And not so long ago, in 1996, a federal court jury in Baltimore ruled that the Somerset County Board of Education illegally fired School Superintendent H. DeWayne Whittington because of his race, awarding Dr. Whittington a huge monetary verdict -- including punitive damages against individual board members -- because of the School System's blatant discrimination. Among the evidence in that case was testimony from a newspaper reporter that the School Board President openly used racial slurs toward African Americans, including against Superintendent Whittington.

(Decl. of Sheehy Attach. A, 2-3).

38

The experiences reported in Somerset County are mirrored in other areas of Maryland as evidenced by the Declarations of lay witnesses.  Reginald Jones describes being pulled over for pretextual reasons as well as harassment by Police and, subsequently, disrespected by State Court personnel.  (Decl. of Jones, Exhibit 8).  Ella White Campbell describes being denied service at stores and gas stations because she was Black.  (Decl. of Campbell at ¶5).  Cortly Witherspoon describes rampant racism in the Baltimore City Fire Department.  (Decl. of Witherspoon at ¶ 5).  Thomas Penny describes a recent episode on Maryland's Eastern Shore where he was called a "colored guy."  (Decl. of Penny at ¶ 9).  Donald Glover describes several incidents when he was assaulted, had bottles thrown at him, and was chased for being African American.  Decl. of Glover at ¶ 10-13.  Julia Williams describes incidences where her husband is pulled over by the police because he is black.  (Decl. of Williams at ¶10, Exhibit 6).  Marie McCray describes being discriminated in treatment she received in a retail store in Maryland.  (Decl. of McCray, Exhibit 12).  Dawnn McCleary-Evans describes being passed over in her work for racial reasons and the lack of resources in the African American community.  (Decl. of McLeary-Evans, Exhibit 11).

And in 2010, former Baltimore Sun reporter Antero Pietila published a landmark study of Baltimore called "Not In My Neighborhood: How Bigotry Shaped a Great American City." Antero Pietila, *Not In My Neighborhood: How Bigotry Shaped a Great American City* (Ivan R Dee, 2010).  From the author's website, here is a description of the book:

> Baltimore is the setting for one of the most penetrating examinations of bigotry and residential segregation to be published in the United States.  The book tells the story of how discrimination toward African Americans and Jews shaped the cities in which we live. Eugenics, racial thinking, and white supremacist attitudes influenced even the federal government's actions toward housing, dooming American cities to ghettoization. The Federal Housing Administration continued discriminatory

housing policies even into the 1960s. This all-American tale is told through the prism of Baltimore, from its early suburbanization in the 1880s to the consequences of white flight after World War II, and into the first decade of the twenty-first century. The events are real, and so are the heroes and villains.  The narrative centers on residential real estate practices, whose discriminatory tools were the same everywhere: restrictive covenants, red- lining, blockbusting, predatory lending.  After the Supreme Court invalidated residential segregation ordinances in 1917, other cities copied another Baltimore tradition - private agreements that prohibited blacks and Jews from specific neighborhoods. Redlining led to blockbusting.  When the sub-prime mortgage craze began, speculators turned Baltimore into a hotbed of risky lending. It became the first city to sue a bank for alleged targeting of minorities for sub-prime loans that would later be foreclosed. This engrossing story is an eye-opening journey into blocks and neighborhoods, shady practices, and ruthless promoters - the dark side of the American dream of owning your own home.[10]

Maryland has a significant history of racial discrimination.  The State has admitted it in other contexts.  And its most obvious modern day manifestations are in the political context. First, other than Lt. Governors Michael Steele and Anthony Brown, both elected primarily with the support of white voters, no African American has been elected to statewide office in Maryland.  Second, there is no current black elected official from a single member district – in Congress, the state senate or the state house – where the population being represented by a black official is not majority minority.  This significantly undercuts Cain's assertions that blacks or minorities might be able to win in his so-called "coalition" districts.

### D.  Proportionality Warrants a Third Majority-Minority District in Maryland.

Proportionality in Section 2 cases has been a constant issue, in light of the statutory language expressly disclaiming any proportionality guarantee.  Determining the appropriate frame of references has been the subject of Supreme Court discussions.  In *De Grandy*, the Supreme Court was satisfied with the parties agreement that proportionality with respect to

---

[10] http://www.anteropietila.com/books.html

Section 2 can be assessed regionally. *Johnson v. De Grandy*, 512 U.S. 997 (1994)  However, in

LULAC, the Supreme Court concluded that the appropriate frame of reference for

proportionality was the statewide population. *League of Latin American Citizens v. Perry* 548

U.S. 399 (2006).

While the Court discussed proportionality, it also indicated that this consideration must

be combined with a local assessment:

> The question now is whether the absence of that additional district
> constitutes impermissible vote dilution. This inquiry requires an
> intensely local appraisal of the challenged district. A local
> appraisal is necessary because the right to an undiluted vote does
> not belong to the minority as a group, but rather to its individual
> members. And a State may not trade off the rights of some
> members of a racial group against the rights of other members of
> that group. The question is therefore not whether line-drawing in
> the challenged area as a whole dilutes minority voting strength, but
> whether line-drawing dilutes the voting strength of the Latinos in
> District 23.  The role of proportionality is not to displace this local
> appraisal or to allow the State to trade off the rights of some
> against the rights of others. Instead, it provides some evidence of
> whether the political processes leading to nomination or election in
> the State or political subdivision are not equally open to
> participation.

*Id.* at 437 (internal citations omitted).  The Court then went on to criticize the changes to districts

that "undermined the progress of a racial group that has been subject to significant voting-related

discrimination and that was becoming politically active and cohesive." *Id.* at 439.  This is

precisely what is happening in Maryland, where white politicians are breaking up compact

African American communities for the purposes of preserving white Democratic majority

congressional districts.

With respect to the issue of proportionality, the State's expert Bruce Cain uses as his

baseline for determining the equitable representation of African Americans their share of the

single race 2010 VAP, i.e. 28.1%.  Plaintiffs maintain that this is not the proper standard.  In

much of Cain's analysis, however, he combines African Americans with Latinos and Asians. The Plaintiffs believe that an assessment of the state's minority community as a whole is the appropriate measure for assessing proportionality.

The Supreme Court and several circuit courts have addressed the issue of how to address the presence of multiple minority groups and coalition districts under Section 2. The Supreme Court has "[a]ssum[ed] (without deciding) that it was permissible for the district court to combine distinct ethnic and language minority groups for purposes of assessing compliance with Section 2 . . . ." *Growe v. Emison*, 507 U.S. 25, 41 (1993).

Most courts to confront the issue of multiple minority groups have assumed that Section 2 claims apply on behalf of coalitions of minority voters. For example, in *Campos v. City of Baytown*, the Fifth Circuit held that "nothing in the law . . . prevents the plaintiffs from identifying the protected aggrieved minority to include both Blacks and Hispanics." 840 F.2d 1240, 1244 (5th Cir. 1988). Instead, noting "the proper standard is the same as in Gingles," the court opined: "The key is the minority group as a whole." Id.

In *Concerned Citizens of Hardee County v. Hardee County Board of Commissioners*, 906 F.2d 524, 526 (11th Cir. 1990), the Eleventh Circuit held that "[t]wo minority groups . . . may be a single section 2 minority if they can establish that they behave in a politically cohesive manner." The Second Circuit has also applied the *Gingles* tests to a claim brought by a coalition of Black and Hispanic voters in *Bridgeport Coalition*, 26 F.3d at 275-76. *But see Nixon v. Kent County*, 76 F.3d 1381 (6th Cir. 1996) (en banc) (Section 2 does not support a claim of vote dilution by a coalition of minority groups).

If this Court considers the non-Hispanic white share of the Maryland VAP, which is 57.2%, then non-Hispanic whites' proportionate share of the congressional delegation is 4.58

seats.  With 3 of 8 seats, African American overrepresentation would be 9.4 percentage points greater than their share of the VAP.  If non-Hispanic whites held 5 of 8 seats their overrepresentation would still be 5.3 percentage points.  If non-Hispanic whites have 6 of 8 seats then their overrepresentation is 17.8 percentage points.  Overall, in Maryland, the non-Hispanic white share of the total population has dropped from 64% in the 2000 Census to 54.2% in the 2010 Census,[11] yet under SB1 non-Hispanic whites would continue to dominate 6 of the 8 districts.  And, as demonstrated in Dr. Peter Morrison's report, this trend towards non-Hispanic whites being a smaller share of Maryland's population is only expected to continue. (Decl. of Peter Morrison at 17, Exhibit 17).

Figure 1 of Declaration of Morrison visually demonstrates Maryland's minority population growth.  As Morrison notes, "With proper adjustment, the 2010 American Community Survey (ACS) shows that Blacks (alone or in combination) together with Hispanics constitute 32.7% of CVAP Statewide."  (Decl. of Morrison at 17).

Furthermore, the Declaration of Peter Morrison shows the trendline for the African American population being such that the African American population of Maryland is one of the leading factors of the state's population growth.  His report points out the youthful nature of the African American population, and how those now under 18 and African American will become persons of voting age; and shows how the non-Hispanic white population is concentrated among older persons.  These two factors alone show that minority population of Maryland will continue to grow.  As Morrison concluded, "when voters go to the polls in November 2012 (2½ years following the April 2010 census), I estimate that Blacks and Hispanics combined will constitute 34.2% of Maryland's CVAP, up from 32.7% as of April 2010—closer to 3/8 than 2/8 of

---

[11] http://quickfacts.census.gov/qfd/states/24000.html last visited December 6, 2011; compare with http://factfinder.census.gov/servlet/QTTable?_bm=y&-geo_id=04000US24&-qr_name=DEC_2000_SF1_U_DP1&-ds_name=DEC_2000_SF1_U last visited December 6, 2011.

Maryland's population.  By 2014, their share of Maryland's CVAP will have reached 35.4% of

Maryland's CVAP.  By 2016, their share of CVAP will have reached 36.6%, which is three-

eighths of the all eligible voters in Maryland."  (Decl. of Morrison at 28 and 29).

　　　To the extent that the Defendants rely on a proportionality defense, this argument is

undercut severely when looking at the overall minority population of the state, and helps to

demonstrate how white politicians are essentially using minority population to perpetuate a white

majority political leadership.  In addition, *LULAC* requires that this court engage in an "intensely

local analysis" to look specifically at voters in the areas where plaintiffs claim minority

communities have been intentionally fractured at the same time giving consideration to

proportionality.  *LULAC*, 548 U.S. at 437.

### V.　　Maryland's Congressional Districting Map Violates the Fourteenth and Fifteenth Amendments, and Plaintiffs Have Properly Plead Their Claim.

　　　Fourteenth amendment cases have essentially the same elements of proof as a Section 2 case,

but require the additional proof of invidious discriminatory intent.  See *Mobile v. Bolden*, 446

U.S. 55 (1980); *Village of Arlington Heights v. Metropolitan Housing Development Corp*, 429

U.S. 252 (1977) and *Gomillion v. Lightfoot*, 364 U.S. 339 (1960).

　　　While the intent proof can often be difficult, it is not hard to prove in this case.  The *Garza*

evidence is overwhelming, as is the direct evidence of racial animus present in Maryland politics.

The legitimate inferences to be drawn from the totality of the circumstances factors outlined

above, and the direct evidence of the actual maps present in this case are sufficient to clearly

prove invidious discriminatory intent.  *See Rodgers v. Lodge*, 458 U.S. 613, 621 (1982) ("The

task before the fact finder is to determine, under all the relevant facts, in whose favor the

'aggregate' of the evidence preponderates. This determination is peculiarly dependent upon the

facts of each case.") (quoting *Nevett v. Sides*, 571 F.2d 209, 224 (5th Cir. Ala. 1978));

*Gommillion*, 364 U.S. 339.  While the Fourteenth Amendment claims can be more difficult to prove, the Fourteenth Amendment can reach claims beyond the scope of Section 2.  *See Gommillion*, 364 U.S. 339.  If you drew a map in central Maryland using the traditional compactness and community interest criteria of Maryland, you would in all likelihood draw three majority minority districts or two majority minority districts and a third that would almost certainly become majority minority within the first half of the decade.  See Declarations of Morrison and Gaddie.

What the State has clearly done in this case is through the intentional use of bizarrely shaped districts which obey no traditional districting criteria, *See* (Decl. of Gaddie), the Defendants have divided up and fragmented that population with the specific intent of preventing the development of a third majority minority district in central Maryland.  This is essentially the original Fourteenth Amendment violation found by the United States Supreme Court in *Gomillion v. Lightfoot*.   This is the same basic cause of action which the United States Supreme Court did apply in a different context in its *Shaw* line of cases.  As Justice Kennedy wrote for the Court in *Miller v. Johnson*, "Shape is relevant not because bizarreness is a necessary element of the constitutional wrong or a threshold requirement of proof, but because it may be persuasive circumstantial evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines."  *Miller v. Johnson*, 515 U.S. 900, 913 (1995); *See also Georgia v. Ashcroft*, 539 U.S. 461, 491 (2003) (Kennedy, J., concurring).

Because the three districts would be generated without reference to racial categorization – but simply reflecting traditional districting criteria – these three districts can be drawn without reference to the concerns of proportionality under Section 2 when devising a remedy.  Racial

categorization does not occur until the state uses its bizarrely shaped lines to intentionally fragment the compact, cohesive African American communities in order to achieve specific racial quotas in adjoining districts.  It is this use of bizarre lines that can be explained in no other manner (See Declaration of Eberly), to intentionally racially categorize and achieve specific quotas that constitutes the violation.  *See Miller v. Johnson*, 513 U.S. at 900; *Georgia,* 539 U.S. at 491 and *Gomillion*, 364 U.S. 339

Defendants once again attempts to distract from the circumstances present in Maryland by trying to use cases that were brought to challenge districts drawn under a set of factual circumstances not present in Maryland.  Namely, in cases such as *Easly v. Cromartie*, 532 U.S. 234 (2001),   *Hunt v. Cromartie*, 526 U.S. 541 (1999), *Bush v. Vera*, 517 U.S. 952 (1996), the plaintiffs in those cases were challenging very bizarre shaped majority-minority districts.  In those cases, it was generally non-minority voters bringing challenges to the creation of the majority-minority districts.

Here, by contrast, minority plaintiffs are essentially challenging the creation of bizarrely shaped majority white districts that were intentionally designed to fracture minority population. This case is much more like *Garza v. County of Los Angeles*, 918 F.2d 763 (9th Cir. 1990), than it is like the cases brought to challenge bizarrely shaped majority minority districts.

To the extent that the Defendants argue that *Garza* is somehow cast in doubt by the *Cromartie* cases, the state appears to disregard the context of these decisions and how they are about scenarios that near polar opposites.  As the Supreme Court made clear in citing *Garza* in *Bartlett v. Strickland*:

> We therefore need not consider whether intentional discrimination affects the *Gingles* analysis….see also *Garza v. County of Los Angeles*, 918 F.2d 763, 771 (CA9 1990). Our holding does not

> apply to cases in which there is intentional discrimination against a
> racial minority.

*Bartlett v. Strickland*, 556 U.S. 1, 36-37 (2009). So to the extent the Defendants are claiming that

cases from ten years ago in a different context cast some doubt on the validity of *Garza*, the

Supreme Court's approving citation of *Garza* in 2009 demonstrates its continued viability in

cases where there are claims of intentional discrimination.

An entire series of court cases has arisen in the area of race and politics, and many courts

have held similar to the district court in *Black Political Task Force v. Galvin*, 300 F. Supp. 2d

291 (D. Mass 2004), where the court said:

> We have left for last a final factor, to which we attach great
> importance. After having heard the testimony and reviewed the
> evidence, we find that incumbency protection played a significant
> role in the Committee's redistricting decisions…. Here, the
> Committee made African-American incumbents less vulnerable by
> adding black voters to their districts and made white incumbents
> less vulnerable by keeping their districts as "white" as possible. Its
> actions evinced a willingness to move district lines simply to
> safeguard incumbents' seats, without regard to other objectives.
> This course of conduct sacrificed racial fairness to the voters on
> the altar of incumbency protection.    That sacrifice lends
> considerable luster to the plaintiffs' case.

*Id*. at 313-14. *See also Bush*, 517 U.S. at 968 ("To the extent that race is used as a proxy for

political characteristics, a racial stereotype requiring strict scrutiny is in operation."); *Clark v.*

*Putnam County*, 293 F.3d 1261, 1271-72 (11th Cir. 2002) ("Incumbency protection achieved by

using race as a proxy is evidence of racial gerrymandering"); *Ketchum v. Byrne*, 740 F.2d 1398,

1408 (7th Cir. 1984) ("We think there is little point for present purposes in distinguishing

discrimination based on an ultimate  objective of keeping certain incumbent whites in office

from discrimination borne of pure racial animus.").

In the *Cromartie* cases, the situation was one where the jurisdiction was looking at the politics even though it knew that politics correlates with race. *See Easley,* 532 U.S. at 258. But in *Garza*, the jurisdiction was given specific knowledge that using politics in that manner would result in a disproportionate dilution of minority voting rights. *Garza v. County of Los Angeles*, 756 F.Supp. 1298, 1318 (C.D. Cal. 1990) ("The Court finds, however, that the Supervisors also intended what they knew to be the likely result of their actions and a prerequisite to self-preservation -- the continued fragmentation of the Hispanic Core and the dilution of Hispanic voting strength."). In *Cromartie*, the use of the politics did not dilute minority voting strength, but instead empowered it even through it violated traditional districting criteria.  Maryland was confronted with maps that drew compact majority minority districts using traditional districting criteria.

The facts of this case, as succinctly analyzed by Professor Eberly are that:

> The concentrated nature of the African-American population creates a problem for Democrats when redistricting - African-Americans are the most reliable Democratic voting bloc, but the concentration in the central part of the state makes it difficult to offset more conservative voters in western, southern and northern Maryland and on the eastern shore.  The only way to dilute those areas is to create districts that divide the African-American communities and join them with sometimes far-flung conservative areas.

(Decl. of Eberly at 24).  Plaintiffs in this case do state a claim, but rather it is the opposite of the claims brought in the *Cromartie* cases.  The bizarre shapes of districts running through otherwise compact minority communities are what gives rise to the allegation of intentional discrimination.  The showing of the shape of these districts and how they slice up, cut through, and run very narrow land bridges (some as wide as only a single census block) through minority communities gives rise to the same concerns raised in *Garza* – namely that white incumbents are using the

breaking up of minority communities to maintain or enhance their power at the expense of the

minority communities.

Recent comments by the Delegate Aisha Braveboy, Redistricting Chair of the Maryland

Legislative Black Caucus echo Professor Eberly's analysis.  As recently reported:

> The Black Caucus did not join the lawsuit brought by nine African
> American citizens in Maryland opposing O'Malley's congressional
> redistricting plan. But [Delegate Aisha] Braveboy pointed to
> weaknesses in the new congressional map and is hoping current
> and projected minority growth will be better represented in the
> legislative redistricting plan.  "In Montgomery County in
> particular, we saw dilution of every major minority group,"
> Braveboy said, pointing out that Congressional Districts 4 and 8
> were both majority-minority prior to redistricting. "All of those
> groups saw their populations broken up and dispersed into three
> majority white congressional districts."  "I'm not opining on the
> legality of the congressional map," Braveboy said. "That will
> ultimately be determined in a court of law, but I think at some
> point the argument will be that the populations were diluted and
> split up in order to create these majority white districts."

(Decl. of Sheehy, Attach. Q, Exhibit 13). Professor Eberly further detailed this division of

compact minority communities saying:

> The only way to dilute those areas is to create districts that divide
> minority communities and join them with sometimes far-flung
> conservative areas. In the state's new map one can see that this has
> been done in the 2nd, 3rd, 4th, 5th, 6th, 7th, and 8th districts.
> Baltimore City's 620,000 residents are divided among 3
> congressional districts - they help to create the majority-minority
> 7th congressional district, but so called "surplus" voters are then
> used to dilute more conservative suburbs in Anne Arundel and
> Baltimore counties and rural areas of Harford and Baltimore
> counties… [T]he state's new map would continue to spread the
> City's 400,000 black voters across the 2nd, 3rd, and 7th
> congressional districts. A single, compact and cohesive majority-
> minority district could be created by joining all of Baltimore City
> with its southwest suburbs in Baltimore county - home to much of
> the county's black population….Prince Georges county, home to
> 840,000 Marylanders, including 560,000 black residents is divided
> among the 4th and 5th districts. The 4th district is a majority-
> minority district oddly joined with Anne Arundel county.

Declaration of Eberly at 25-27.  His analysis neatly summarizes how the minority communities were intentionally divided to benefit white Democrats.

With respect to the Defendants' claim about the permissibility of the creation of influence districts, Plaintiffs do not generally dispute that position.  However, where Plaintiffs disagree with the state is that by intentionally targeting the creation of the large number of so called "influence" or "coalition" districts it created with SB1, it frustrates the ability of a large and growing minority community in the state of Maryland to elect an additional candidate of choice to the U.S. Congress.  This is precisely the scenario where the Supreme Court found liability in LULAC, albeit under Section 2.  LULAC, 548 U.S. at 439.  (the proposed map "undermined the progress of a racial group that has been subject to significant voting-related discrimination and that was becoming increasingly politically active and cohesive.")  Instead, what is clear once again is that this division of minority communities into multiple majority white districts for the purpose of preserving or increasing the number of white Democratic incumbents is the exact intentional discrimination that plaintiffs alleged in the complaint and continue to maintain violates the Fourteenth and Fifteenth Amendments.

## VI.   Maryland's Congressional Districting Map Is An Unconstitutional Political Gerrymander, and Plaintiffs Have Properly Pled Their Claim.

The Plaintiffs in this case pose a claim of unconstitutional gerrymandering in violation of the Constitution.  There is little doubt from the record that at least part of the intent behind SB1 was to reduce the number of Republicans in the Maryland congressional delegation to one.  Said Professor Eberly, "The reason the state's adopted map is so racially gerrymandered is because Maryland is full of regions that would and do vote Republican and these regions surround four counties and Baltimore City that are compact minority communities and vote Democratic."

(Decl. of Eberly at 35).  He continued "Maryland is a 60/40 Democrat/Republican state (Eberly 2011) and state with a minority population in excess of 45 percent. As such a congressional district map with three or four majority-minority districts would be representative of the diversity of the state. As explained in this report, such a district map would prevent the state from the level of political gerrymandering that has created a 6/1 Democrat/Republican delegation (and may create a 7/1 delegation under the new map)." *Id.*

However, what distinguishes the population distribution in Maryland is that in order to accomplish this political goal, the white politicians in the state needed to intentionally break up and fracture minority communities in order to do so.  (Decl. of Eberly at 25-30).  This is precisely the intentional discrimination found to violate Section 2 in *Garza*, 918 F.2d 763, *Black Political Task Force*, 300 F. Supp. 2d 291, *Clark*, 293 F.3d at 1271-72, and *Ketchum*, 740 F.2d at 1408.

All of the previous political gerrymandering claims that have been dismissed by the courts have not had or examined an intentional invidious racial component such as this one.  This changes the character of the political gerrymandering claim so that the political gerrymandering claim is essentially the mirror image of the Fourteenth Amendment claims described, *supra*.  The two claims are interlocked.  Because of this intentionally invidious racial component, what were strictly political claims become judicially manageable because the remedy of the racial gerrymandering claim will necessarily resolve the political gerrymandering claim.

As Justice Kennedy said:

> The ordered working of our Republic, and of the democratic process, depends on a sense of decorum and restraint in all branches of government, and in the citizenry itself. Here, one has the sense that legislative restraint was abandoned. That should not be thought to serve the interests of our political order. Nor should it be thought to serve our interest in demonstrating to the world how democracy works. Whether spoken with concern or pride, it is unfortunate that our legislators have reached the point of declaring

> that, when it comes to apportionment: "`We are in the business of rigging elections.'"

*Veith v. Jubelirer*, 541 U.S. 267, 316-17 (2004) (Kennedy, J. concurring).  The concerns reflected in Justice Kennedy's concurrence are mirrored in these statements of Maryland Senate President Mike Miller: "Congressman Sarbanes lived in Baltimore County, but wanted to continue to represent the capital city Annapolis..." and "Maryland is a small state ... and it doesn't have many rural, conservative areas that would vote for Republicans that could comprise a district of 700,000 people." and "the change is quite modest."  (Decl. of Eberly at 34-36).  Professor Eberly stated, "Sen. Miller publicly acknowledged that the GRAC committed a political gerrymandering."  *Id.* at 34.

This is not the simple partisan gerrymandering claims dismissed by the district courts in the recent unpublished opinions in Texas and Illinois. *Radogno v. Illinois State Board of Elections* No. 11-4884 (N.D. Ill. Nov. 22, 2011) (three-judge panel) (unpublished opinion); *Perez v. Texas*, No. 11-360 (W.D. Tex. Sept. 2, 2011) (three-judge panel) (unpublished).  Rather, this count, buttressed by analysis of experts on Maryland politics such as Todd Eberly to demonstrate how partisan motivations lead to intentional discrimination against minority voters by combining many urban, liberal minority communities with rural, conservative communities.  (Decl. of Eberly).

Professor Cain's October 20, 2011 report admits that the state created a number of so called "coalition"[12] or "influence" districts with targeted racial percentages to improve the election prospects of white Democrats.  However, as Justice Kennedy noted in his concurrence in *Georgia v. Ashcroft*, "considerations of race that would doom a redistricting plan under the

---

[12] "Coalition" in this case refers to a district designed to elect a white Democrat using black support.  They are not a "coalition" district in the sense that they are coalitions of minority voters who control the political party nominating process in these districts, and so are able to elect minority candidates of choice.

Fourteenth Amendment or § 2 seem to be what save it under § 5." *Georgia,*, 539 U.S. at 491 (Kennedy, J., concurring).   Essentially, what Justice Kennedy was criticizing is the majority's acceptance of the concept of districts with targeted racial numbers to create "influence" districts that could be considered under the Section 5 review necessary for Georgia.   Rather, it appears that Justice Kennedy's position is that the purposeful creation of districts through racial gerrymandering with targeted minority percentages under 50% violate the Fourteenth Amendment and Section 2. *Id.* at 469-71.

Justice Kennedy's position in this concurrence with respect to Section 2 was essentially affirmed by the full court in *Bartlett v. Strickland*.   In that case, Justice Kennedy wrote the opinion and held that only numeric majority-minority districts could be cognizable under Section 2 and drawn with race in mind to prevent a violation of the Fourteenth Amendment.   *Bartlett*, 556 U.S. at 39-40.   Said Justice Kennedy, "If Section 2 were interpreted to require crossover districts throughout the Nation it would unnecessarily infuse race into virtually every redistricting, raising serious constitutional questions.   That interpretation would result in a substantial increase in the number of mandatory districts drawn with race as the predominant factor motivating the legislature's decision."   *Id.*

A number of other courts have stated goals similar to those advanced by Justice Kennedy in the congressional redistricting context.   In *Smith v. Clark*, 189 F. Supp. 2d 529, 538 (S.D. Miss. 2002), the court said, "The standards applicable to court-ordered congressional redistricting plans are fairly well-established: Courts must satisfy constitutional and statutory criteria and, to the extent feasible, certain neutral, secondary criteria."   In *Colleton County Council v. McConnell*, 201 F. Supp. 2d 618, 630 (D.S.C. 2002)  the court said of congressional redistricting, "[C]onstrued in its historical context  the Supreme Court has held the command ... that

Representatives be chosen `by the People of the several States' means that *as nearly as is practicable* one man's vote in a congressional election is to be worth as much as another's." (emphasis in original, internal citations and quotations omitted).  *See also*, *Anne Arundel County Republican Central Committee v. State Advisory Board of Election Laws*, 781 F. Supp. 394 (D. Md. 1991).

This cause of action challenges districts much like that the court struck down in LULAC, as a result of combining distant communities without connected interests.  *League of Latin American Citizens,* 548 U.S. at 423-24.  For example, SB1's 8th District takes close-in, urban, minority neighborhoods on the D.C. border, and combines them with the farms of northern Frederick County on the Pennsylvania border, where you find more conservative voters.  Similarly, SB1's 3rd District runs from western Montgomery County, through the urban minority I-95 corridor, and reaches over to include conservative voters from Anne Arundel County on the Chesapeake Bay and swoops north in another fork to combine these same voters with urban minority voters in Baltimore City and Baltimore County.  Furthermore, District 2 in SB1 sweeps in the minority community along the I-95 corridor between Baltimore and Washington (incidentally the same corridor of minority voters the state seems to suggest makes plaintiffs proposed maps into a *Shaw* violation), and combines those voters with voters in suburban northern Baltimore County and up along the western shore of Chesapeake Bay to sweep in more conservative white voters.

The entire design of this map intentionally breaks up minority communities – in violation of Article One, Section 2 of the Constitution, the 14th Amendment and Section 2 of the Voting Rights Act, to attempt to achieve a political purpose. This is sufficient to state a claim, and is a valid claim under which this Court should find the state liable for intentional discrimination.

**VII.    Conclusion**

For the foregoing reasons, Plaintiffs respectfully ask this court to grant their Motion for a Preliminary Injunction (or a permanent injunction in accordance with FRCP 65(a)(2)), and deny the Defendants' Motion to Dismiss or in the alternative to grant Summary Judgment.

Respectfully submitted,

\_\_\_\_/s/ Jason Torchinsky_____

**Law Office of James P Mayes**
James Paul Mayes (Bar No. 10414)
mayesfedlaw@aol.com
Law Office of James P Mayes
4721 Chesterfield Place
Jamestown, NC   27282
Tel: (202) 255-2031
Fax: (336)841-5275

**Holtzman Vogel PLLC**
Jason Torchinsky, *pro hac vice*
jtorchinsky@holtzmanlaw.net
HOLTZMAN VOGEL PLLC
45 North Hill Drive, Suite 100
Warrenton, VA 20186
Tel: (540) 341-8808
Fax: (540) 341-8809

Counsel for Plaintiffs