# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## GREENBELT DIVISION

|  |  |  |
|---|---|---|
| PATRICIA FLETCHER, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No:  RWT 11-3220 |
| LINDA H. LAMONE, *et al.*, | * | |
| Defendants. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

DOUGLAS F. GANSLER
Attorney General of Maryland

ADAM D. SNYDER (Bar No. 25723)
STEVEN M. SULLIVAN (Bar No. 24930)
Assistant Attorneys General
Office of the Attorney General
Civil Division
200 St. Paul Place
Baltimore, Maryland  21202
(410) 576-6326
(410) 576-6955 (fax)
asnyder@oag.state.md.us

DAN FRIEDMAN (Bar No. 24535)
KATHRYN ROWE (Bar No. 09853)
Assistant Attorneys General
104 Legislative Services Building
90 State Circle
Annapolis, Maryland 21401
(410) 946-5600 (telephone)
(410) 946-5601 (facsimile)
dfriedman@oag.state.md.us

Attorneys for Defendants Linda H. Lamone and Robert L. Walker

Dated: December 13, 2011

## TABLE OF CONTENTS

Page

I.   THE NO REPRESENTATION WITHOUT POPULATION ACT GENERATES POPULATION DATA THAT IS MORE ACCURATE THAN CENSUS DATA AND *KARCHER* ALLOWS ITS USE ...................................................................................... 1

II.  PLAINTIFFS HAVE NOT MET THE *GINGLES* PRECONDITIONS TO BRINGING AN ACTION UNDER SECTION 2 OF THE VOTING RIGHTS ACT, EITHER FOR THE AFRICAN AMERICAN COMMUNITY OR FOR THE LARGER MINORITY COMMUNITY ............................................................................................. 9

    A.   Plaintiffs' Plans Do Not Meet the *Gingles* Preconditions for a Third Majority *African American* District ..................................................... 9

    B.   Plaintiffs' Plans Do Not Meet the *Gingles* Preconditions for a Third Majority *Minority* District ................................................................. 12

III. PLAINTIFFS HAVE NOT ESTABLISHED A CLAIM FOR INTENTIONAL RACIAL DISCRIMINATION UNDER THE FOURTEENTH AMENDMENT .................................... 15

IV.  PLAINTIFFS' PARTISAN GERRYMANDERING ARGUMENT IS FORECLOSED BY SUPREME COURT PRECEDENT................................................................................. 22

CONCLUSION ................................................................................................................. 24

**DEFENDANTS' REPLY IN SUPPORT
OF MOTION TO DISMISS OR, IN THE ALTERNATIVE,
FOR SUMMARY JUDGMENT**

Plaintiffs have failed to undermine the essential point of the State Defendant's case: that the redistricting plan adopted by the Maryland General Assembly complies with all constitutional and statutory requirements and that, therefore, this court should allow the forthcoming election to proceed as scheduled.

**I.     THE NO REPRESENTATION WITHOUT POPULATION ACT GENERATES POPULATION DATA THAT IS MORE ACCURATE THAN CENSUS DATA AND *KARCHER* ALLOWS ITS USE.**

Plaintiffs misunderstand the analysis required by *Kirkpatrick v. Preisler*, 394 U.S. 526 (1969), and *Karcher v. Daggett*, 462 U.S. 725 (1982), and how it applies to the use of adjusted census data required by the No Representation Without Population Act ("the Act"). 2010 Md. Laws, ch. 67 (codified at Md. Code Ann., Art. 24 §1-111, Election Law ("EL") § 8-701, and State Government § 2-2A-01). Step one of the two-part *Karcher* analysis focuses on whether the State has achieved "precise mathematical equality" or made a "good faith effort" to do so. *Karcher*, 462 U.S. at 730. Only if the Court concludes that the redistricting is not the result of such a good faith effort does the analysis proceed to step two, which requires the State to "justify" any avoidable deviation from mathematical equality by reference to "some legitimate goal." *Id*. at 731.

Maryland has achieved "precise mathematical equality" and has no need to proceed to step two of the *Karcher* analysis, provided, of course, that its use of census data adjusted by the Act is constitutionally permissible. That inquiry, however, falls under *Karcher* step one because it involves the predicate issue of which population

data—adjusted or unadjusted—is the "best population data available," *id*. at 738, and not a "justification" of mathematical inequality.  In *Karcher*, the Court rejected New Jersey's redistricting under step one—"the first question described above," *id.*. at 731—and, in doing so, addressed New Jersey's argument that inaccuracies in the census data should allow for *de minimis* deviations from mathematical equality.  The Court rejected the argument because, "unless some systematic effort is made to correct the distortions inherent in census counts of total population, deviations from the norm of population equality are far more likely to exacerbate the differences between districts."  *Id*. at 732 n.4.  In the absence of such a "systematic effort," "the census data provide the only reliable—albeit less than perfect—indication of the districts' 'real' relative population levels."  *Id.* at 738.

The Act *is* the "systematic effort" at correcting inherent distortions within the census that *Karcher* anticipated as part of step one of its analysis.  Plaintiffs do not dispute this, at least insofar as counting prisoners in the place where they will likely vote upon their release from prison would generate a *better* "indication of the districts' 'real' relative population levels." *id*.  They merely contend that it is not *completely* accurate, first, because not all prisoners return to their last known place of residence when released at the end of their terms, Plaintiff's Response Memorandum to Defendants' Motion to Dismiss or in the Alternative for Summary Judgment, and Reply to Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction, ECF Doc. No. 43 ("Response") at 26, and, second, because Maryland did not similarly count college

students and military personnel at a place other than their "group quarters," *id.* at 24. Neither point affects the constitutionality of the Act.

With respect to plaintiffs' first point, the Legislature had a clear understanding of where incarcerated people reside and where they are counted by the Census Bureau. A report that is part of the Act's legislative history, *Importing Constituents: Incarcerated People and Political Clout in Maryland*, includes detailed information on the number of people incarcerated in State legislative districts and a table with the incarceration rates for each county and Baltimore City.[1] It is clear from this data—and illustrated in a graph in the report—that most of the State's incarcerated population comes from a few urban jurisdictions, while the majority of the State's prison cells are located in a small number of rural counties.

Plaintiffs do not contest these facts, but instead cite a different study—*Baltimore Prisoners' Experience Returning Home* (Urban Institute, Washington, D.C. March 2004) (attached as Exhibit 13 to Attachment L to plaintiffs' Response)—that indicates that only 27.7% of prisoners released return to their own homes on their first night after release. As plaintiffs themselves are forced to acknowledge, however, the same study reports that an additional 42% stay with family that evening—very likely within the same home

---

[1]   Peter Wagner & Olivia Cummings, *Importing Constituents: Incarcerated People and Political Clout in Maryland*, (Prison Policy Initiative, Mar. 4, 2010) (available at http://www.prisonersofthecensus.org/md/report.html), with the appendix available at http://www.prisonersofthecensus.org/md/appendix.html (last visited Nov. 30, 2011) and at Environmental Affairs Committee, Bill File: 2010 Md. S.B. 400, at 18, 21. (The report consists of two pages which were separated in compiling the file, page 1 is on page 18 of the file, and page 2 is at page 21). These documents are attached hereto as Exhibits 30 and 31.

community.  But this data only reflects where released prisoners stay on their *first* night after release.  Other reports analyze this issue in greater depth and establish that released prisoners disproportionately return to the same urban communities that disproportionately send people to prison, with 59% of inmates returning to Baltimore City upon their release.[2]  Nevertheless, whether the rate at which released prisoners return to their pre-incarceration homes is 27.7%, 59%, or 70%, the adjusted data used under the Act accounts for that movement in a way that the Census Bureau's total population figures do not and, therefore, generates a more accurate indication of "real" relative population levels.

Accounting for non-resident students and military personnel as plaintiffs suggest might make the State's adjusted census figures more accurate still, but there are good reasons why such an account is not feasible.  For starters, not all students and military personnel are non-residents of the State, so categorically removing them from the census figures would cause as much harm as good.  Moreover, just as the Census Bureau opted not to assign prisoners to their pre-incarceration addresses because of the high cost of doing so, *see* Defendants' Memorandum in Support of Motion to Dismiss or, in the Alternative, for Summary Judgment, ECF Doc. No. 33-1 ("Memorandum") at 25, re-assigning college studies and military personnel would impose a financial burden on the State that, at present, it is unwilling to carry.

---

[2]     *A Portrait of Prisoner Reentry in Maryland* (Urban Institute, Mar. 2003) at 39; *see also Baltimore Prisoners' Experience Returning Home* at 7 (summarizing findings of *Portrait*).

More importantly, because of the significant differences between college students and military personnel on the one hand, and incarcerated persons on the other, Maryland is not constitutionally required to treat them similarly, as plaintiffs seem to believe. Unlike incarcerated persons, other group quarters populations—those in colleges and universities, nursing facilities, shelters, military bases and the like—typically move to these residences on a voluntary basis, and are generally able to establish domicile and residency for voting purposes at the group quarters location.[3]   Moreover, other populations such as students and military personnel are free to interact substantially with the community—shopping, going to restaurants, using recreational facilities, and attending community events.  For all intents and purposes, they are a part of the voting community in which they are counted.

By contrast, a prisoner can have *no* contact with the surrounding community and is prohibited from developing any relationships with it.[4]  A prisoner is not present in a particular county by choice, but rather is placed at a particular facility at the discretion of the Department of Corrections, and can be transferred as the Department deems necessary.  *See* Md. Code Ann., Correctional Services § 9-103(b) ("Each individual

---

[3]    *United States v. Texas*, 445 F. Supp. 1245 (S.D. Tex 1978) (three-judge court) (enjoining registration procedures that burdened ability of students to establish residency for voting purposes), *aff'd sub. nom. Symm v. United States,*439 U.S. 1105 (1979); *Carrington v. Rash*, 380 U.S. 89 (1965) (striking down state constitutional provision barring members of armed forces from establishing  residency for voting purposes).

[4]    *See* Nat'l Research Council, *Once, Only Once, and in the Right Place: Residence Rules in the Decennial Census* 83 (Daniel L. Cork & Paul R. Voss eds., 2006) (available at http://print.nap.edu/web_ready/0309102995.pdf.) (last visited Dec. 13, 2011).

sentenced to the jurisdiction of the Division [of Correction] . . . shall be held by, confined in, assigned to, or transferred to . . . a correctional facility in the Division, as the Division orders. . . ."); *Watkins v. Secretary, Dep't of Public Safety and Correctional Services*, 377 Md. 34, 52 (2003).

Counting prisoners at their place of residence, and not their place of incarceration, makes the adjusted census data that Maryland used more accurate than the Census Bureau's "total population" count.[5] Maryland, then, is not seeking to justify deviations from the unadjusted ideal Census population through the "legitimate secondary objectives," 462 U.S. at 739, that *Karcher* indicates are accommodated through step two of its analysis. All such objectives—whether it be "making districts compact, respecting municipal boundaries, preserving the cores of prior districts, [or] avoiding contests between incumbent Representatives," *id*. at 740—are pursued *at the expense* of the one person/one vote principle, not in furtherance of it. The objective that the Act pursues, by contrast, is the one person/one vote principle *itself*. That bedrock constitutional principle requires no justification, much less the "justification" required under step two of the

---

[5]    Plaintiffs do, at one point, suggest that the Act's "systematic[]" adjustment of census data was carried out "for the purpose of advantaging one group over another," Response at 17, but provide no factual support for this assertion. Moreover, the "particular part[s] of the state" that plaintiffs believe will benefit by the Act's provisions are Baltimore City and Prince George's County, *i.e.*, the "two jurisdictions with generally high minority population." Response at 24, 25. It is hard to figure how plaintiffs can reconcile faulting the Act for unfairly *increasing* the voting strength of minority communities while claiming elsewhere that the State Plan unfairly *dilutes* minority voting rights.

*Karcher* analysis.[6]

As described in the State Defendants' Memorandum, the federal cases addressing the issue have concluded that the states are "free to adjust census figures for redistricting in the census year, as long as the adjustment is 'thoroughly documented' and applied in a 'systematic' manner." *Young v. Klutznick*, 652 F.2d 617, 625 (6th Cir. 1981); *see also, e.g., City of Detroit v. Secretary of Commerce*, 4 F.3d 1367, 1374 (6th Cir. 1993). Plaintiffs seek to distinguish these cases on the grounds that they involve the *addition* of population to the census totals, not the *removal* of population, as the Act does with respect to the 1,321 prisoners who, prior to their incarceration, were residents of other states. *See, e.g.,* Response at 20, 21. Aside from tacitly conceding that states *can* use adjusted census data, the distinction between adding and subtracting population is the proverbial distinction without a difference. The goal here is "one person/one vote," achieved through the "best population data available," and it makes no logical (or constitutional) difference if a state arrives at that goal through addition or subtraction. [7]

---

[6] Because pursuit of the one person/one vote principle requires no justification, even if plaintiffs were correct and the use of adjusted census data were subject to step two of the *Karcher* analysis, all that the State would be required to show is that its "correct[ion of] the census figures" was not carried out in a "haphazard, inconsistent, or conjectural manner," *Karcher*, 462 U.S. at 732 n.4, a standard Maryland easily meets here. *See* Memorandum at 21-23.

[7] None of these plaintiffs is among the 1,321 incarcerated persons from other states who are not counted by the current redistricting plan and, accordingly, none has standing to raise any claims on their behalf. *See* Memorandum at 64 (and cases cited therein); *see also Little v. New York State Task Force on Demographic Research and Reapportionment*, No. 2310-2011 (N.Y. App. Div., Dec. 1, 2011), Exhibit 22 at 9 (holding that plaintiffs lacked standing to complain that New York reallocated prison population, but no other group quarter population, because no plaintiff was a resident of a group quarter).

The fact that some of the cases allowing for census adjustment arise in other contexts just shows that the principle allowing the states to adjust census data through systematic measures is widely recognized by courts and applied across a wide spectrum of cases. Plaintiffs, by contrast, cannot identify a *single federal case* following the one unreversed decision—*Travis v. King*, 552 F. Supp. 554 (D. Haw. 1982)—that they believe resolves this issue in their favor.[8]

With the clear weight of authority in the State Defendants' favor, there is no basis to delay the upcoming primary election and create the "great disruption in the election process in Maryland" that the Fourth Circuit has previously warned against. *See Maryland Citizens for a Representative General Assembly v. Governor of Maryland*, 429 F.2d 606, 611 (4th Cir. 1970). That disruption will extend well beyond the work schedules of the State and local elections officials who have to do what is necessary to ensure that the election takes place on time and efficiently. As Bernard J. Sadusky, the Interim State Superintendent of Schools describes in his Declaration, 1044 of the 1641 polling places are located in schools, Exhibit 29, ¶9, and each of those schools has already planned their academic calendars around the fact that they will be closed on April 3, 2012, the date of the primary election. *Id*., ¶¶ 10, 11. Any change in the primary date will add an extra day to the school year, which would impose "additional costs" on

---

[8]    Plaintiffs rely on *Gaffney v. Cummings*, 412 U.S. 735 (1973), for the proposition that congressional redistricting "is analyzed under a more rigorous lens" than legislative redistricting. Response at 13. That is, of course, true when evaluating deviations from mathematical equality, but the Supreme Court has never held that that greater "rigor," *Karcher*, 462 U.S. at 732, applies to each and every aspect of redistricting, as plaintiffs appear to believe.

the school system.  All told, moving the primary date "will have a negative impact on 22 of the 24 school systems in Maryland, the 800,000 students they serve, and the whole school community, including parents and employers." *Id.*, ¶13.  The weakness of plaintiffs' claim, the fact that only one of the plaintiffs is even at risk of injury, and the public harm of election delay do not permit injunctive relief here.

## II. PLAINTIFFS HAVE NOT MET THE *GINGLES* PRECONDITIONS TO BRINGING AN ACTION UNDER SECTION 2 OF THE VOTING RIGHTS ACT, EITHER FOR THE AFRICAN AMERICAN COMMUNITY OR FOR THE LARGER MINORITY COMMUNITY.

It is well-established that the Voting Rights Act does not require the creation of as many majority-minority districts as are possible. *Abrams v. Johnson,* 521 U.S. 74, 90 (1997); *Johnson v. DeGrandy*, 512 U.S. 997, 1012 (1994).  In fact, the Supreme Court has found attempts to create as many minority districts as possible to be evidence of intentional racial discrimination. *Miller v. Johnson*, 515 U.S. 900, 917 (1995); *Shaw v. Hunt*, 517 U.S. 899, 906 (1996); *Bush v. Vera*, 517 U.S. 952, 960-61 (1996).  As a result, plaintiffs cannot establish their case simply by showing that it is possible to draw a third majority African American district; they must show that a third district can be drawn that meets the factors set out in *Thornburg v. Gingles*, 478 U.S. 30 (1986).  This, however, they cannot do.

### A. Plaintiffs' Plans Do Not Meet the *Gingles* Preconditions for a Third Majority *African American* District.

Neither of the Fannie Lou Hamer PAC plans proposed by plaintiffs as an alternative to the State Plan meets either the first or third *Gingles* factors, respectively,

that the minority group is "sufficiently large and geographically compact to constitute a majority in a single member district," and that racial voting patterns are sufficiently polarized that the "white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances . . . —usually to defeat the minority's preferred candidate." *Gingles* 478 U.S. at 50-51.

With respect to the first factor, compactness, plaintiffs offer the Declaration of Ronald Keith Gaddie to support their contention that the districts in the initial Fannie Lou Hamer PAC plan and the Pipkin Amendment to the State Plan are more compact than the State Plan itself.  Response at 28 (citing Gaddie Declaration at 6.1).  But "[t]he first *Gingles* condition refers to the compactness of the minority *population*, not to the compactness of the contested *district*." *Vera*, 517 U.S. at 997 (Kennedy, J., concurring) (emphasis added); *Abrams*, 521 U.S. at 111 (Breyer, J., dissenting) (observing that compactness to show a violation of equal protection, "which concerns the shape or boundaries of a district, differs from § 2 compactness, which concerns a minority group's compactness").

The evidence here demonstrates that Maryland has two compact African American populations, one in Baltimore City and suburbs, and one in the suburbs of Washington D.C.  The map included as Figure 2 in the Declaration and Expert Report of Peter Morrison, PhD, attached to plaintiffs' Response, illustrates this clearly with two dark purple patches in these areas.  The third African American district that plaintiffs propose is formed by connecting surplus African American population from these two compact areas and connecting them with the narrowest possible land-bridge running through the

predominantly white areas of Howard County.  This is simply not a compact minority group.[9]

Plaintiffs fare no better with respect to the third *Gingles* factor:  racially polarized voting.  As Professor Cain points out in his rebuttal declaration, plaintiffs' experts do not contest the conclusion that Non-Hispanic White voters "have supported their own party's African American candidates at very high levels in November elections."  Exhibit 26 at 6-7, ¶15.  More generally, plaintiffs' experts "do not dispute that non-Hispanic White support [for African American candidates] varies with the contest and candidates."  *Id*. at 7, ¶18; *see also id*. at 6-7, ¶¶15-17 (discussing variation).  That variability itself establishes that the racially polarized voting patterns required by *Gingles* are not present here.

Plaintiffs attempt to arrive at the opposite conclusion by selectively discounting certain races for a variety of reasons, none of which has substantive justification.  For example, Professor Gaddie brushes aside the strong support that non-Hispanic White voters gave Senator Obama in the 2008 Democratic Primary, ostensibly on the grounds that Obama's "unprecedented fund-raising and organizing" renders that support somehow

---

[9]    Even if compactness of *districts* were the appropriate touchstone, the third majority African American districts proposed in all of plaintiffs' plans have compactness scores that are "far below" the other two African American districts proposed by plaintiffs.  *See* Exhibit 26 at 2-3, ¶¶ 4-7.  As Professor Cain explains, Professor Gaddie "disguises" the non-compactness of these third districts by *averaging* them with the compactness scores of the first two majority African American districts proposed by plaintiffs, thereby diluting the low score for the third district with the relatively higher scores for the other two.  *Id*. at 3, ¶6.  Rather, the analysis should focus on the score for the third African American district alone because that is the one that must meet the *Gingles* factors.  *Shaw*, 517 U.S. at 917.

"questionable." Gaddie Decl. at ¶5.11.  As Professor Cain points out, however, doing so "raises serious questions about the meaning of polarization:  are Non-Hispanic Whites really polarized and motivated by racial animus when their support varies with the funding and organization of the African-American candidates?"  Exhibit 26 at 5, ¶12. Plaintiffs more generally strain to discount data from "bad cases" that do not support their argument, *id*. at 7, ¶18, and, as a result, ignore campaigns involving multi-member seats, coalitional districts, or established incumbents.  *Id*. at 8-9, ¶¶ 19-24.  However, when all of the relevant data is properly considered, Professor Cain's conclusion that Maryland voting patterns are not sufficiently racially polarized to satisfy the third *Gingles* factor remains unrebutted.

**B.**     **Plaintiffs' Plans Do Not Meet the *Gingles* Preconditions for a Third Majority *Minority* District.**

The State Defendants explained in their Memorandum that providing two majority African American districts in the State Plan is as proportional as possible to the total African American population, with African Americans making up 28% of the population and 25% of the district seats.  Memorandum at 46.  In their Response, plaintiffs attempt to get around this by arguing that "an assessment of the state's minority community *as a whole* is the appropriate measure for assessing proportionality."   Response at 42 (emphasis added).  Adding the African American and Latino community allows plaintiffs to claim that approximately 41.6% of the districts must be "majority minority," *see, e.g.,* Complaint ¶41—a figure that, under plaintiffs' proportionality theory, would support the establishment of a third such district.

Plaintiffs' discussion of proportionality is, of course, premature; the Voting Rights Act does not guarantee "a right to have members of a protected class elected in numbers equal to their proportion in the population." 42 U.S.C. § 1973(b).  Rather, proportionality is but one consideration in the "totality of circumstances" analysis that applies *after* a plaintiff has met the three *Gingles* factors.  *League of United Latin Am. Citizens (LULAC) v. Perry*, 548 U.S. 399, 436 (2006).

The case law establishes that a coalition of minority voters, such as African Americans and Hispanics, could establish a Voting Rights Act violation if the *Gingles* factors are shown.  *Concerned Citizens of Hardee County v. Hardee County Board of Commissioners*, 906 F.2d 524 (11th Cir. 1990); *Bridgeport Coalition for Fair Representation v. City of Bridgeport*, 26 F.3d 271 (2d Cir. 1994).  That, however, is not what plaintiffs' complaint sought to establish.  Plaintiffs are all African American.  Complaint ¶¶ 6–14.  Their claim is that *African American* votes are diluted by the failure of the State Plan to create three *African American* districts, not three majority *minority* districts.  Complaint ¶43.

But even if plaintiffs' complaint did state a claim for a broader, minority-based Section 2 violation, plaintiffs would have to establish each of the three *Gingles* factors with respect to the *minority* population, as opposed to the *African American* population. Plaintiffs, however, have made no effort to demonstrate the "political cohesion" between African Americans and other minority groups, that the second *Gingles* factor requires. Professor Gaddie's analysis of Maryland elections is unable to make the necessary demonstration of cohesiveness because his analysis of Hispanic voting "produced

13

unrealistic results." Gaddie Declaration at ¶5.2; *see also id.* at ¶5.1 (observing that the "Hispanic vote estimates are highly unrealistic").

Professor Cain did not have the same trouble with Hispanic voting estimates and was able to establish that, in fact, there was little or no cohesiveness between African American and Hispanic voters. Exhibit 26 at 5-7, ¶¶ 11-14. Professor Can also evaluated the possibility of African Americans forming a voting coalition with Asian Americans, a rapidly growing segment of the Maryland population that plaintiffs do not even discuss. Exhibit 26 at 4, ¶9. Professor Cain concludes, however, that, at least at present, African Americans and Asian Americans are not sufficiently cohesive to satisfy the first *Gingles* factor. Exhibit 1 at 7, ¶18; Exhibit 26, at 4-5, ¶10.

Nothing in Professor Gaddie's Declaration rebuts Professor Cain's conclusion that there is no support for cohesion among the African American and other minority communities. And while the Declaration of Dr. Peter Morrison discusses generally African American and Hispanic population trends and socioeconomic conditions, Dr. Morrison makes no attempt to show that the two groups are *politically* cohesive. Exhibit 26 at 4-5, ¶¶ 9-10.

As stated in *Growe v. Emison*, even assuming "that it was permissible for the District Court to combine distinct ethnic and language minority groups for purposes of assessing compliance with § 2, when dilution of the power of such an agglomerated political bloc is the basis for an alleged violation, *proof of minority political cohesion is all the more essential*." 507 U.S. 25, 41 (1993) (emphasis added). Professor Cain's

analysis on this point is unrebutted and demonstrates conclusively that "minorities as a whole are not a cohesive bloc." Exhibit 26 at 6, ¶14.

### III. PLAINTIFFS HAVE NOT ESTABLISHED A CLAIM FOR INTENTIONAL RACIAL DISCRIMINATION UNDER THE FOURTEENTH AMENDMENT.

To make a claim for intentional racial discrimination, it is not enough for Plaintiffs to show that race was a consideration in the redistricting decision. Rather, they must show that racial discrimination was "the '*predominant* factor' motivating the legislature's districting decision," *Easley v. Cromartie*, 532 U.S. 234, 241 (2001) (quoting *Bush*, 517 U.S. at 959 and *Hunt v. Cromartie*, 526 U.S. 541, 547 (1999) (emphasis in original)), and that other, legitimate districting considerations were subordinated to race. *Bush*, 517 at 959. Plaintiff has not and cannot satisfy this level of proof.

The record is clear that (1) the Governor's Redistricting Advisory Committee in proposing its plan to the Governor, (2) the Governor in proposing his plan to the legislature, and (3) the legislature in adopting the final State Plan, all considered and gave effect to a variety of traditional, legitimate redistricting considerations, many of which exist in tension with others:

- *Obtaining Population Equality*. Obtaining equal population required major changes from the previous plan as the largest district, District 5, had nearly 47,000 too many residents, while the smallest, District 7, had 57,000 too few. *See* Exhibit 33 at 3 (*Senate Floor Debates* (Oct. 17, 2011) (Remarks of Sen. Robey)).

- *Complying with the Voting Rights Act*. The State Plan accomplished the goal of compliance with the Voting Rights Act by protecting the existing two African American majority districts (District 4 and District 7) and by maintaining the voting strength of the African American community in another district (District 5). *See* Exhibit 33 at 4; Exhibit

35 at 4-5 (*House Floor Debates* (Oct. 19, 2011) (Remarks of Del. Jones)).

- *Minimizing the number of counties a district crosses and the number of districts in each county*. Minimizing border crossings helps promote good working relationships between federal, State, and local government and representatives. The State Plan accomplishes this goal by reducing the number of congressional districts in Prince George's County and Harford County, respecting the border between Montgomery and Prince George's County, and eliminating the District 1 crossing of the Chesapeake Bay at the Bay Bridge. Exhibit 33 at 6 (discussing "sealing the border" between Montgomery County and Prince George's County); Exhibit 32 at Slide 11 (GRAC Presentation) ("proposed map eliminates the current overlap of districts in Prince George's and Montgomery Counties"); *id*. at Slide 4 ("District [1] no longer crosses the Chesapeake Bay into more urban parts of Anne Arundel County"); *id*. ("Harford County is no longer split into 3 Congressional Districts, a desire expressed by residents"); *id*. at Slide 13 ("the Plan reduces the number of Congressional Districts in Prince George's County from 3 to 2").

- *Keeping communities together to the extent possible*. Testimony at GRAC's Western Maryland public hearing was overwhelming: residents felt that they had more in common with northern Montgomery County than with residents of Carroll County and northern Baltimore County. Based in part on that testimony and on demographic trends showing population growth up the I-270 corridor, the State Plan reorients the 6th Congressional District from an East-West axis to a Southeast-Northwest axis. Exhibit 33 at 6-7 (describing substantial public testimony regarding commonalities along the I-270 corridor); Exhibit 32 at Slides 13-14.

- *Maintaining the stability of representational relationships*. Many citizens testified that they wanted to remain in the districts that they had been in under the prior plan. Thus, rather than start with a clean slate, GRAC began its work with the existing map and tried, to the extent possible, to retain the "core" of existing districts. The State Plan succeeded in keeping more than 70% of residents in their current districts. Exhibit 33 at 5-7 (reciting the percentage of district residents that will remain in newly constituted districts); Exhibit 35 at 4 ("Over 70 percent of Marylanders keep their current member of Congress"); Exhibit 32 at Slide 3.

- *Keeping incumbent congressional representatives.*  GRAC wished to avoid the contentiousness that accompanies campaigns in which incumbents are pitted against each other, irrespective of party affiliation. For that reason, no incumbent member of Congress was moved out of the district from which he or she was elected.  Exhibit 32 at Slide 3 ("Plan does not draw any incumbent member of Congress out of his/her district").

- *Maintain important substantive relationships with federal government programs.*  The State Plan seeks to maintain the important substantive relationships with federal programs and installations that are located in Maryland.  For example, GRAC sought to keep together in District 2 the federal military sites that will be most affected by the federal Base Realignment and Closure ("BRAC") process, including Aberdeen Proving Grounds to the Northeast and Fort George G. Meade at the South end of that district.  Similarly, GRAC wanted to maintain in a single congressional district, District 5, important federal research facilities at the Patuxent River Naval Air Station, Indian Head Naval Surface Warfare Center, Joint Base Andrews Naval Air Facility, the National Oceanic and Atmospheric Administration, the Food and Drug Administration, the U.S. Census Bureau, USDA Beltsville Agricultural Research Center, NASA's Goddard Space Flight Center, the National Archives II and the Smithsonian Environmental Research Center, the National Harbor waterfront development, and the related research and economic development resources at the University of Maryland, College Park—all of which have similar representational interests.  These GRAC priorities were accomplished in the State Plan.  Exhibit 33 at 3 (describing growth and development concerns related to BRAC), 6 (erroneously identifying federal installations in District 5 as being in District 4); Exhibit 32 at Slide 7 (describing District 2 as a "BRAC corridor district"), Slide 12 (describing federal installations in District 5).

- *Accounting for demographic changes.*  Two areas of the State have experienced particularly robust growth over the past decade:  (1) the I-270 corridor, where over 43,000 Montgomery County residents have migrated to Frederick County; and (2) Southern Maryland, where nearly 40,000 Prince George's County residents have moved to Charles County.  These shifts are reflected in the State Plan in the form of two districts based in Southern Maryland/Prince George's County (*i.e.*, Districts 4 and 5), and two more districts running between Montgomery County and Western Maryland along the I-270 Corridor (*i.e.*, Districts 6 and 8).   Exhibit 35 at 4 (remarks of Del. Jones); Exhibit 32 at Slides 3, 10.

▪ *Partisan political considerations.* Maryland's registered voters are more than 2 to 1 Democrats over Republicans. GRAC reviewed several partisan maps, including, at one extreme, a map that was projected to produce four Democratic-majority districts and four Republican-majority districts[10] and, at the other extreme, a map that would have produced eight majority-Democratic districts.[11] Rejecting both extremes, GRAC drew a map that makes five of the eight districts (*i.e.*, Districts 2, 3, 5, 6, and 8) more politically competitive than they were under the prior plan. GRAC members understood that, of the remaining three districts, District 1 was expected to perform as a consistently safe Republican district, while Districts 4 and 7 were expected to remain safely Democratic. *See generally* Exhibit 34 (*Senate Floor Debates* (Oct. 18, 2011)) (Remarks of Sen. Raskin) (discussing partisanship in redistricting).

These are all legitimate redistricting considerations that do not support plaintiffs' allegations of racial animus. Moreover, the compromise reached between all of these various considerations was overwhelming approved by the State's African American elected officials. *See* Memorandum at 46-47 (describing Black Legislative Caucus' requests); *id.* at 46 (describing testimony by Mayor Rawlings-Blake and County Executives Leggett and Baker); and *id.* at 47 (describing overwhelming support of the State Plan by members of the Black Legislative Caucus).

In the face of this, Plaintiffs continue to argue that incumbency protection, the shape of non-minority districts, and the failure to adopt any of their plans constitute proof

---

[10]   Maryland Republican Party Congressional Plan (available at   http://www.mdp. state.md.us/PDF/Redistricting/3rdPartyPlan2010/map091911-CDGOP.pdf) (last visited Dec. 13, 2011).

[11]   Annie Linskey and John Fritze, "Two maps emerge in redistricting discussions," Baltimore Sun (Sept. 30, 2011) (available at http://articles. baltimoresun.com/2011-09-30/news/bs-md-draft-redistricting-maps-20110930_1_current -congressional-boundaries-first-map-congressional-districts) (describing so-called "Option 2" plan that was purported to create eight Democratic-leaning districts) (last visited Dec. 13, 2011).

of racially discriminatory intent with respect to the State Plan, Response at 44-45—all propositions that the State Defendants rebutted in their opening Memorandum. *See* Memorandum at 40-50.  They also continue to argue that at least part of the intent behind the State Plan was "to reduce the number of Republicans in the Maryland congressional delegation to one," Response at 50, but ignore the fact that partisan considerations in general, and incumbency protection in particular, are legitimate goals that can rebut a claim of intentional racial discrimination, at least where, as here, African American incumbents are protected as well. *Hunt*, 526 U.S. at 551 ("Our prior decisions have made clear that a jurisdiction may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were conscious of that fact."); *Easley*, 532 U.S. at 242 ("Caution is especially appropriate in this case, where the State has articulated a legitimate political explanation for its districting decision, and the voting population is one in which race and political affiliation are highly correlated."); *Bush*, 517 U.S. at 967-968 ("In some circumstances, incumbency protection might explain as well as, or better than, race a State's decision to depart from other traditional districting principles, such as compactness, in the drawing of bizarre district lines.").

Plaintiffs have made no effort to show that the State intentionally moved African Americans, as opposed to *Democrats*, to achieve partisan aims.  The distinction is significant because moving Democrats for partisan purposes does not establish a violation of the 14th Amendment under *Shaw v. Reno* "even if it so happens that the most

loyal Democrats happen to be black Democrats and even if the State were conscious of that fact." *Hunt*, 526 U.S. at 551.

Nor have plaintiffs established that a racially discriminatory intent lies behind the State Plan, as they are required to establish a violation of the Fourteenth and Fifteenth Amendments.  Plaintiffs devote pages of their Response to establishing that Maryland, like many other states, has a history of racism.  That history, as this Court has observed, reaches up into the 1980s, s*ee Marylanders for Fair Representation v. Schaefer*, 849 F. Supp. 1022, 1061-62 (D. Md. 1994), but it reaches no farther than that.[12]  Nor does that history implicate voting rights in Maryland, at least with respect to the areas of the State at issue in this case.  *See id.* at 1061 (noting that, although "we cannot turn a blind eye to the Eastern Shore's 'history of official discrimination' that impaired blacks' rights to register and vote," on a "statewide basis Maryland's voting rights record is in many respects an admirable one").  Thus, while many of the anecdotal accounts of private

---

[12]  Plaintiffs similarly rely on the State of Maryland's acknowledgment in unrelated litigation that it "has a shameful history of operation its system of public higher education in a segregated manner."  Response at 33 (quoting Maryland Higher Education Commission's "Statement of the Case," in *The Coalition For Equity and Excellence in Maryland Higher Education, Inc. v. Maryland Higher Education Commission*, No. 06-CV-2773 (D. Md. Oct. 29, 2010) (ECF Doc. No. 178 at 2-3)).  Plaintiffs, however, tell only half the story set forth in the Statement: "Maryland has met its legal obligation to dismantle its dual system of higher education by either purposefully eliminating all policies and practices that were traceable to that former system or because the passage of time and structural change within higher education have erased those connections permanently."  ECF Doc. No. 178 at 4.

racism that plaintiffs provide may well be true,[13] they do not establish that the State Plan was itself infected by racist motives.

In the end, plaintiffs conclude that, "[i]f you drew a map in central Maryland using the traditional compactness and community interest criteria of Maryland, you would in all likelihood draw three majority minority districts or two majority minority districts and a third that would almost certainly become majority minority within the first half of the decade." Response at 45. That is, essentially, what the State Plan achieves: It produces two African American districts (*i.e.*, Districts 4 and 7) and a third district, District 5, that will likely soon become majority minority. In fact, District 5 could elect an African American now if Steny Hoyer, the House Minority Whip, did not already hold the seat. But straining to create a third majority African American district during this redistricting was neither required by the U.S. Constitution or the Voting Rights Act, nor advocated by the African American leadership, which overwhelmingly supported the State Plan.

---

[13] Some of these accounts are *not* true. For example, the "[n]ews reports" indicating that Michael Steele was "pelt[ed]" with Oreo cookies during a campaign appearance, Response at 37, have been thoroughly debunked as false reports. *See* Andrew A. Green, *Ehrlich bristles at Oreo skeptics*, Balt. Sun (Nov. 13, 2005) (available at http://articles.baltimoresun.com/2005-11-13/news/0511130130_1_oreo-cookies-ehrlich-kathleen-kennedy-townsend) (last visited Dec. 13, 2011). Furthermore, Senate President Thomas V. Mike Miller, Jr., emphatically denies the allegations made by Patricia Fletcher and has provided an affidavit of his own contradicting Ms. Fletcher's claims, as has Secretary of Aging Gloria Lawlah. Exhibits 27 and 28. Senator Miller's affidavit is limited, however, to events that occurred many years ago and is not intended nor should be it be construed as a waiver of the legislative and other privileges that attach to President Miller's service on the GRAC and in the General Assembly.

IV.   **PLAINTIFFS' PARTISAN GERRYMANDERING ARGUMENT IS FORECLOSED BY SUPREME COURT PRECEDENT.**

The Plaintiffs' Response Memorandum attempts to evade the federal courts' unanimous rejection of partisan gerrymandering redistricting challenges by conflating plaintiffs' own partisan gerrymandering claim (Count 7) with their intentional race discrimination claims (Counts 1 and 2).   That argument does not rescue the partisan gerrymandering claim from the standardless void to which all such claims have been consigned in the wake of the Supreme Court's decisions in *Vieth* and *LULAC*.

In affirming the dismissal of the partisan gerrymandering claims, the Supreme Court in *Vieth* expressly rejected the possibility that such claims could be resolved based on principles derived from the case law applicable to race discrimination claims.   Instead, *Vieth* insists upon a clear distinction between a race discrimination claim and a partisan gerrymandering claim:   The two "are quite different," and necessarily so, given "the reality that setting out to segregate voters by race is unlawful and hence rare," whereas "setting out to segregate them by political affiliation is (so long as one doesn't go too far) lawful and hence ordinary."   *Vieth v. Jubilirer*, 541 U.S. 267, 293 (2004) (plurality opinion); *see id.* at 307 (Kennedy, J., concurring) ("That courts can grant relief in districting cases where race is involved does not answer our need for fairness principles [to determine partisan gerrymandering claims].   Those controversies implicate a different inquiry. . . . Race is an impermissible classification.   Politics is quite a different matter.") (citations omitted).   Five justices in *Vieth* then went on to hold that it is not possible to determine when political motivations "go too far," *id.* at 293, because there are "no

judicially discernible and manageable standards for adjudicating political gerrymandering claims," *id.* at 281 (plurality opinion); *see id.* at 307-08 (Kennedy, J., concurring).

Rather than separate the two types of claims, as the Supreme Court has insisted, the plaintiffs acknowledge that their argument necessarily merges their intentional racial discrimination claims and their partisan gerrymandering claim into a single claim, "because the remedy of the racial gerrymandering claim will necessarily resolve the political gerrymandering claim." Response at 51. As explained in the State Defendants' Memorandum and also above, plaintiffs' Counts 1 and 2 fail to state a claim of intentional race discrimination under the Fourteenth Amendment, and, alternatively, there is no genuine issue of material fact that would preclude summary judgment in the State Defendants' favor. As the State Defendants have also explained, Count 7 of the complaint fails to state a claim of partisan gerrymandering. Their attempt at a partisan gerrymandering claim, like all such claims that have come before it, should be dismissed.[14]

---

[14] The Olson *amici* contend, much like plaintiffs, that the Constitution bars partisan considerations in congressional redistricting and their claims in this respect have no merit for the reasons provided in text. There is likewise no merit to the other arguments the Olson *amici* make. The Guarantee Clause, which directs the United States to "guarantee to every State in this Union a Republican Form of Government," U.S. Const., Art. IV, § 4, has never been the basis for a voting rights claim and every case to construe it has found claims presented under it to be nonjusticiable "political questions." *See, e.g., New York v. United States*, 505 U.S. 144, 184 (1992) (collecting cases); *United States v. Vazquez*, 145 F.3d 74, 83 (2nd Cir. 1998); *Baker v. Carr*, 369 U. S. 186, 224 (1962) (stating in a redistricting case that the Court "has consistently held that a challenge to state action based on the Guaranty Clause presents no justiciable question"). Article III, Section 4, of the Maryland Constitution likewise does not apply here because it governs only *State* legislative districts, not congressional districts. *See Duckworth v. State Admin. Board of Election Laws*, 213 F. Supp. 2d 543, 552 (D. Md. 2002), *aff'd*, 332 F.3d 769 (4th Cir. 2003). The placement of this provision between Article III, Section 3

## CONCLUSION

For the reasons set forth above, Plaintiffs' motion for injunction should be denied and the Complaint dismissed or, in the alternative, summary judgment should be entered in favor of the State Defendants.

Respectfully submitted,

DOUGLAS F. GANSLER
Attorney General of Maryland

_____/s/_____

| | |
|---|---|
| ADAM D. SNYDER (Bar No. 25723) | DAN FRIEDMAN (Bar No. 24535) |
| STEVEN M. SULLIVAN (Bar No. 24930) | KATHRYN ROWE (Bar No. 09853) |
| Assistant Attorneys General | Assistant Attorneys General |
| Office of the Attorney General | 104 Legislative Services Building |
| Civil Division | 90 State Circle |
| 200 St. Paul Place | Annapolis, Maryland 21401 |
| Baltimore, Maryland 21202 | (410) 946-5600 (telephone) |
| (410) 576-6326 | (410) 946-5601 (facsimile) |
| (410) 576-6955 (fax) | dfriedman@oag.state.md.us |
| asnyder@oag.state.md.us | |
| | Attorneys for Defendants Linda H. |
| Dated: December 13, 2011 | Lamone and Robert L. Walker |

---

(which relates to the division of the State "into legislative districts for the election of members of the Senate and the House of Delegates") and Article III, Section 5 (which sets out specific procedures for that division) makes clear that the phrase "legislative district" refers to *State* legislative districts, not congressional districts.  The Olson *amici*'s final argument—that the legislation encompassing the State Plan is rendered invalid by § 1-201 of the Election Law Article—runs afoul of familiar principles of statutory construction making it clear that the State plan, which is after all a law, cannot be rendered invalid by reason of inconsistency with a *previously* adopted, more *general* law. *Mamsi Life & Health Ins. Co. v. Kuei-I Wu*, 411 Md. 166, 184-85 (2009) ("Ordinarily, a specific enactment prevails over an incompatible general enactment in the same or another statute."); *Carroll County Education Association, Inc. v. Board of Education of Carroll County*, 294 Md. 144, 152 (1982) (observing that, "to the extent the provisions of the two statutes are irreconcilable, the later statute governs").

## **EXHIBIT LIST**

Exhibit 26:          Rebuttal Declaration of Bruce E. Cain

Exhibit 27:          Affidavit of Gloria G. Lawlah

Exhibit 28:          Affidavit of Thomas V. Mike Miller, Jr.

Exhibit 29:          Affidavit of Bernard J. Sadusky

Exhibit 30:          Importing Constituents: Prisoners and Political Clout in Maryland
                     Prisoners of the Census

Exhibit 31:          Importing Constituents: Prisoners and Political Clout in Maryland
                     data table

Exhibit 32:          Governor's Redistricting Advisory Committee Presentation

Exhibit 33:          Senate Floor Debates, Redistricting Bill Excerpt, October 17, 2011

Exhibit 34:          Senate Floor Debates, Redistricting Bill Excerpt, October 18, 2011

Exhibit 35:          House Floor Debates, Redistricting Bill Excerpt, October 19, 2011