IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARLAND
GREENBELT DIVISION

| | | |
|---|---|---|
| MS.PATRICIA FLETCHER, *et al.*, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civ. Action No.: RWT-11-3220 |
| Plaintiffs, | | |
| v. | | |
| LINDA LAMONE in her official capacity as State Administrator of Elections for the State of Maryland; And ROBERT L. WALKER in his official capacity as Chairman of the State Board of Elections, | | |
| Defendants. | | |

**PLAINTIFFS' SURREPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND SUBMISSION OF REBUTTAL EVIDENCE**

Plaintiffs, through Counsel, hereby submit the following Memorandum and accompanying declarations in support of Plaintiffs' Motion for Preliminary Injunction and in response to Defendants' pleadings filed on December 13, 2011 and in accordance with the Court's scheduling order of December 1, 2011.

**I.     Plaintiffs Have Established and Proven Intentional Discrimination Under *Gomillion v. Lightfoot*, *Shaw v. Reno* and under *Garza v. Los Angeles County*.**

Defendants' continued reliance on the *Shaw v. Reno* line of cases as a defense is ironic, and the State's rejection and failure to address the intent elements established by the *Garza* and *Galvin* line of cases demonstrate the State's real issues in defending its actions.

**A.  Maryland's Maps and This Case Present The Racial Flip Side of *Shaw v. Reno*.**

1

In *Shaw v. Reno*, 509 U.S. 630 (1993) and in the *Hunt v. Cromartie*, 526 U.S. 541 (1999), *Miller v. Johnson*, 515 U.S. 900 (1995) and *Bush v. Vera*, 517 U.S. 952 (1996) cases, the issue presented before the Supreme Court in each circumstance was a bizarrely shaped majority-minority district drawn to increase the number of majority-minority districts. The challenge in each of these cases was brought by white voters. In each of these cases, the Court found liability essentially because the state violated the Fourteenth Amendment by going out of its way and contorting the district lines to draw majority African American districts. If white voters were permitted to bring these claims under the Fourteenth Amendment and prevail, certainly the Fourteenth Amendment applies with equal force here where the Plaintiffs are African American and claim intentional discrimination by white officials. *See generally Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), and *Gomillion v. Lightfoot*, 364 U.S. 339 (1960).

In this case, Maryland managed to draw bizarrely shaped white districts for the purpose of minimizing the impact of Maryland's growing minority community. This was done despite the fact that non-Hispanic whites are on their way to becoming a minority of the population, and where the state legislature and statewide elected officials are overwhelmingly white, and where minority voters are underrepresented as a portion of their population. Here, the challenge is brought by African American voters who allege that in the absence of the State's violation of the Fourteenth Amendment, neutral district lines in Maryland would result in a third majority African American district. In a state with a 54.7% non-Hispanic white population as of April 1, 2010, the State has managed to produce a congressional district map where non-Hispanic white voters will be a majority of the voting age population in 75% of the districts. This is a stunning result, and demonstrates exactly the sort of incumbency protection undertaken to the detriment of

minority voters that constituted intentional discrimination in cases such as *Hunt*, 526 U.S. at 549, and *Garza v. County of Los Angeles*, 918 F.2d 763 (9th Cir. 1990).

While the State attempts to justify its maps on race neutral terms, it is clear that the State had before it during the line drawing alternatives that better complied with the Voting Rights Act, as demonstrated *supra*, and the Fourteenth Amendment. With respect to the State's other alleged criteria, the Pipkin map, as just one example of possible configurations, maintained compliance with essentially this same criteria if not to a greater degree than the State. In fact, an analysis of the state's claimed criteria when compared to the Pipkin map makes it appear that the state's goals are pretextual.

First, the State's assertion that it wanted to preserve county lines is actually not borne out by its map. As noted in the split reports attached hereto as part of the Declaration of Keith Gaddie, the Pipkin map splits only 6 counties for a total of 15 splits, and only a single county split more than twice. The State's map, by contrast, splits 9 counties for a total of 25 splits, including 3 counties split 3 times, and two counties split 4 times. (Decl. of Keith Gaddie 17)

With respect to communities of interest, the most neutral evaluation of these available are "census designated places," and a split report is attached hereto as part of the Declaration of Keith Gaddie.[1] SB1 splits 88 CDPs, including 73 split in two and 15 split in three for a total of 191 splits. By contrast, the Pipkin map splits only 25 CDPs, including only 24 split in two and 1 split in three for a total of 51 splits. On the CDPs, it is interesting to note that many majority minority places in northern and southern Prince Georges county were split in the state's plan

---

[1] According to the Census Bureau, "Census designated places (CDPs) are delineated for each decennial census as the statistical counterparts of incorporated places. CDPs are delineated to provide data for settled concentrations of population that are identifiable by name but are not legally incorporated under the laws of the state in which they are located. The boundaries usually are defined in cooperation with local or tribal officials. These boundaries, which usually coincide with visible features or the boundary of an adjacent incorporated place or other legal entity boundary, have no legal status, nor do these places have officials elected to serve traditional municipal functions." *See* http://www.census.gov/geo/www/cob/pl_metadata.html#cdp (visited December 15, 2011).

(including Beltsville, Hyattsville, East Riverdale, Woodlawn, New Carrolton, Glenn Dale, South Laurel, Konterra in the north, not to mention any in the south), but keeps College Park and University Park, which are right on the border of the districts and predominately non-Hispanic white intact.  In fact, of the nine non-Hispanic White census places in Prince Georges County only one is split.  That is the previously mentioned Andrews Air Force Base District that has no population in one part of the portion split.  Meanwhile numerous black CDPs are split throughout the map along the CD4 and CD5 border as if they are not regarded at all.

Furthermore, Defendants erroneously assert that they drew congressional districts that which confined the many military institutions within Congressional Districts 2 and 5. (Defs.' Reply in Supp. of Mot. to Dismiss or Summ. J. 17).  Andrew's Air Force Base is actually located primarily in Congressional District Four, but unpopulated parts of the base are located in Congressional District Five. *See* (Decl. of Sheehy, Attach. E).  Furthermore, Maryland emphasized that Congressional District Two was to be composed of the military bases affected by the BRAC process. (Defs.' Reply in Supp. of Mot. to Dismiss or Summ. J. 17).  If this district is intended to be a BRAC district then the Defendants are admitting to placing minority voters in an otherwise predominantly white "community of interest" which has clear and distinct purposes unique from those of the minority. This can be seen by the tail that emerges from Congressional District 2 containing a significant concentration of minorities. *See* (Decl. of Sheehy, Attach E).  Maryland had several—better—options at its disposal and instead chose to dilute the effectiveness of minority voters.

The Pipkin map actually adheres to the policy of keeping more military installations concentrated in a smaller number of Congressional districts.  In this proposed map, 4 military installations are contained in Congressional District 3, and 2 military installations are contained

4

in Congressional District 5 (including all of Andrews Air Force Base).  Once again, options that more closely adhered to the state's claimed priorities were available and were disregarded.

Even so, as noted by Professor Eberly, the State needed only to move 174,000 persons in order to equalize populations, but instead moved nearly one-third of the State's residents – some 1.4 million people – into different districts.  The State promotes its 70% number, but as Professor Gaddie demonstrates in his Declaration, the Pipkin map maintains more than 61% of the State's population in the same congressional district as under the 2000 map.  The differences between the two plans on this point are essentially minimal in light of the lack of residency requirements for congressional districts.

The defendants utterly fail to account for the desire of the third majority-minority district presented before the GRAC and the legislature.  This utter disregard as reflected in the observations of lay witnesses and the lack of any demonstration by the State on this point get to exactly the type of intentional discrimination in *Garza* where the county board intentionally chose district lines that would preserve white incumbents, and the type of discrimination in *Bush v. Vera* where the Court found that intentionally drawing districts with specific minority population percentages were at issue.  *Bush*, 517 U.S. at 960-62.  Professor Cain readily admits to racial targeting of districts that fall below the majority-minority level, and essentially highlights these so-called "opportunity" districts in his October 20, 2011 analysis. (ECF No. 13-5 7).

Professor Eberly's Declaration neatly summarizes how the racial and political gerrymandering issues intertwine in this case to create the maps before the Court.  In this particular case, the political and racial gerrymanders are blended together, and should be considered by this Court in tandem.

Finally, with respect to Cain's claim that District 5 in SB1 will become majority-minority during the decade, no support is provided for this claim. Therefore, there was no data available for Plaintiffs' experts to analyze and thus properly assess this claim.

## II. No Population Without Representation Act Is Not Constitutional As Applied to Congressional Districts Because it Violates Article One, Section Two.

Defendants repeatedly attempt to rely on cases which do not address the question presented in this case. Precisely, Maryland deviated from the total population numbers determined by the U.S. Census by selectively changing people's "usual place of residence" within the state, and outright eliminating people from the count all together. The Census Bureau's instructions to enumerators state specifically:

> **WHOM TO COUNT:** Count people at their usual residence, which is the place where they live and sleep most of the time, with a few exceptions….
>
> **SPECIAL LIVING SITUATIONS:** Do not include on the EQ:
> - People in correctional residential facilities on April 1, 2010;
> - People in federal detention centers on April 1, 2010.
> - People in federal and state prisons on April 1, 2010.
> - People in local jails and other municipal confinement facilities on April 1, 2010.
> - People in military disciplinary barracks and jails on April 1, 2010.
> - People in correctional facilities intended for juveniles on April 1, 2010.
> People in these places will be counted at the facility.

U.S. Census Bureau, *2010 Census Nonresponse Followup*: *Enumerator's Manual*, 147-48 (2009). (Decl. of Sheehy, Attach. G).

The Constitution requires that total population as determined by the U.S. Census is the best available data for determining redistricting. *See Karcher v. Dagget*, 462 U.S. 725, 738 (1983) ("[B]ecause the census count represents the best population data available it is the only

basis for good-faith attempts to achieve population equality.") (internal citations and quotations omitted). The only number that can be used to determine congressional districts is the number generated by the U.S. Census. *See Department of Commerce v. United States House of Representatives*, 525 U.S. 316, 334 (1999) ("Because the census count represents the 'best population data available...it is the only basis for good-faith attempts to achieve population equality.") (quoting *Karcher*, 462 U.S. at 738) (internal citations and quotations omitted).

The history of Article One, Section Two's meaning also demands that total population as determined by the U.S. Census is the only appropriate count to use for congressional redistricting. *See Preisler v. Secretary of State*, 279 F. Supp. 952, 998 (W.D. Mo. 1967). Said the court in *Kirkpatrick*:

> The constitutional history of Art. I, § 2 would seem to make it apparent that the Founders included the decennial census in that section as a central instrument specifically designed to control and adjust the constitutionally required future apportionments of the House of Representatives. It would seem historically incongruous not to require the use of the constitutional decennial census in the establishment of congressional districts within the States. *A rejection of the federal decennial census as the exclusive guideline for congressional districting would have grave and particular significance in future congressional reapportionment cases….*
> The idea of apportionment of representatives among the States based on the federal census and *the notion that the districting within the States for election of federal representatives may be based on some sort of state census would seem to be basically inconsistent with the primary reason for the Founder's insistence that the constitutionally required decennial census be a federal census.* **The self-interest of at least sectors of particular States to manipulate their own local census figures would obviously have a drastic impact on the composition of the House of Representatives.**

*Preisler*, 279 F. Supp. at 1002-03 (first and third emphasis added).

And the most recent case to address the issue, *Travis v. King*, 552 F. Supp. 554 (D. Haw. 1982) squarely rejected the type of adjustment Maryland is attempting. The three-judge panel concluded:

> [W]e hold that pursuant to article I, § 2 of the Constitution states must depend on total federal census figures to apportion congressional districts within their boundaries.

*Travis*, 552 F. Supp. at 571. To the best of Plaintiffs' knowledge and research, no other state has attempted to use adjusted census figures for congressional redistricting in the last 30 years since *Travis* was decided. This is why, as Defendants correctly note, there appears to be no other case adopting the holding of *Travis* in a similar scenario.

While other states have attempted to adjust for different population bases for state legislative and local redistricting, no other state adjusts data from the U.S. Census figures for congressional districting purposes. The Defendants submit *Little v. New York State Task Force on Demographic Research and Reapportionment*, No. 2310-2011 (N.Y. Sup. Ct., Dec. 1, 2011) for the proposition that what they have done here is legal, but the New York statute at issue, Part XX of Chapter 57 of the Laws of 2010, (ECF 33-23 pg 3), clearly omits congressional districts from types of offices for which the adjusted numbers are to be used.[2]

Defendants self-servingly state they have achieved "precise mathematical equality" and thus there is no need to shift the burden to Defendants to show justification for their variances under the *Karcher* two prong test. (Defs.' Reply in Supp. of Mot. to Dismiss or Summ. J. 1) *See Anne Arundel County v. State Administrative Board*, 781 F. Supp. 394 (D. Md. 1991) (articulating *Karcher's* two prong test for this Court). This statement ignores the fact that

---

[2] California passed A.B. 420 on October 7, 2011. This statute requires that information about last known addresses of prisoners be provided to the California Citizens Redistricting Commission starting with the 2010 Census and "requests" that the Commission use this information in the drawing of districts, including congressional districts. As of the date of this filing, Plaintiffs are unaware of any litigation over this statute.

Maryland reassigned members of its population from their "usual place of residence" to other locations either within or outside Maryland, based on what was deemed to be their last place of residence. These reassignments and eliminations of residence created a total deviation from ideal of 1.61% among the plan's districts. *See* Plaintiffs' Motion for Preliminary Injunction (ECF No. 13-1, 4). This unconstitutional adjustment from Census total population creates the deviation at issue here. The unconstitutional violation of Article One, Section Two is sufficient to enjoin the maps here. Even if, however, this were not so, Maryland is unable to show justification under the burden shifting step two of the *Karcher* test as well.

Maryland's decision to treat prisoners differently from other similarly situated groups—like college students, military personnel, and federal prisoners[3]--undermines the justification argument.

Rather reassignment of prisoners has an invidious devious design, which is to advance one particular parochial interest. Such reassignment does this by shifting the low voting prisoner population to areas of the state where numbers of other low voting populations actually reside. The result is the ultimate gerrymander: multiple disparate populations, geographically unconnected but amalgamated by administrative adjustment into a single "district." For example, college students nationally over a long series of elections participate in voting at a rate between 20 and 30 percent while the general voting population participates at a rate of between 50 and 60 percent. (Decl. of Sheehy Attach. A 1). Turnout among Maryland's military voters was 1.48% in 2010. (Decl. of Sheehy Attach. B 12).

Maryland now flatly admits it is "unwilling" to similarly adjust college students or military personnel, even though these similarly situated population groups have very low voter

---

[3] Prisoners in State prisons were either moved or eliminated whereas prisoners in federal prison were counted where the federal prison was located. *See* Defendants' Memorandum In Support of Motion to Dismiss or in the Alternative for Summary Judgment, and Opposition to Motion For Preliminary Injunction, ECF No 33-1, 22n 9.

participation rates.[4]  This is the precise local interest the framers of the constitution sought to avoid.  We note that in the 1966 case *Meeks v. Avery*, which pre-dated *Kirkpatrick* and is the only federal court case to decide as Defendants ask this court to rule, the state conducted its own actual enumeration.  In Kansas' actual enumeration, in use since 1899, the state enumerators accounted for prison population as well as military and college student population.  *Meeks v. Avery*, 251 F. Supp. 245, 249, 255-56 (D. Kan. 1966).  In addition, the Kansas actual enumeration was conducted in 1964, after the 1960 national census.  *Id.*  Furthermore, the plaintiffs in *Meeks* stipulated that there was no dispute about the accuracy of the state's count. *Id.* at 249.

The State has now admitted that their reassignment of prisoners back to particular census blocks rests on a series of assumptions for which they have no data to adequately justify.  The State admits that more than 72% of prisoners don't immediately return to their previous address upon release.  *See* (Defs.' Reply in Supp. Mot. to Dismiss or for Summ. J. ECF No. 48 4-5). Further they admit that with regard to Baltimore more than 40% of prisoners don't return at all. *Id*.  Finally, with respect to the 42% that stay with family on the first night of release the State baldly assumes without any proof that this is within the "same urban communit[y]." *Id.* at 5    It does not make sense that arbitrary adjustment of an admitted amount that *could* be—at best— 72% of the people being adjusted is "more accurate" than the actual count done by the U.S. Census.

---

[4] It is Maryland's choice to deny persons incarcerated in prison the right to vote.  Md. Code Ann., [Elec. Law] § 3-102(b)(1).  The National Conference of State Legislatures reports, "State approaches to felon disenfranchisement vary tremendously. In Maine and Vermont, felons never lose their right to vote. In Kentucky and Virginia, felons and ex-felons permanently lose their right to vote absent a pardon from the governor. The remaining 46 states have 46 different approaches to the issue."
http://www.ncsl.org/default.aspx?tabid=16719#Categories_of_Disenfranchisement (visited December 15, 2011).

In the context of the current map, this further illustrates the problems for Congressional districts caused by the arbitrary and empirically unsupported reassignment of prisoner populations. The State's evidence submitted on December 13, 2011 presents a chart showing numbers of incarcerated persons by jurisdiction. The State's SB1 splits the jurisdictions with the most incarcerated persons, as outlined by the State in their incarcerated prisoner count and by comparing this count to SB 1 as follows:

| | |
|---|---|
| Baltimore City: | 3 Districts |
| Baltimore County: | 4 Districts |
| Prince George's County: | 2 Districts |
| Anne Arundel County: | 4 Districts |

Without certainty provided by the U.S. Census, the State's movement is arbitrary and not sufficiently justified to support the deviations from the total population numbers devised by the Census. The assignment of one or more persons to a particular census block in Baltimore City could have put that person in any one of three districts and by that same token could have assigned someone to one of four districts had that person been assigned to a census block within Baltimore County.

The State's reassignment of more known persons who cannot vote back into this district only further exacerbates rather than ameliorates the "one person, one vote" issue. While the population of the current 2001 congressional districts was equal at the start of the decade, election results over the decade illustrate that they were not equal in terms of actual voters. In the one person, one vote context, it is the districts that are overpopulated where individuals suffer harm. When looking solely at votes cast in Maryland, and comparing this map the State's provided evidence of where the State is moving prisoners to and from, interesting trends are

revealed.  Under the 2000 map, Congressional District 6 contains the most prisoners.  In the 2004 presidential election, CD6 has the second highest number of votes cast in the state.[5]  In the 2008 presidential election, CD6 had the third highest numbers of votes cast.[6]  Averaging the two years, 335,053 people voted to elect one member of Congress from this district.  By contrast, Congressional District 7 in the 2000 map had the lowest number of votes cast in the 2004 presidential election, and the second lowest number of votes cast in the 2008 presidential election.[7]  This Congressional District under the 2000 map that contained most of Baltimore City.  Again, averaging the two elections, only 280,956 votes elected a member of congress here.

There was a significant disparity between these two districts with respect to the actual votes cast in the presidential elections, yet, each district elected one member of congress.  Thus, a vote cast in CD 7 had the weight of 1.29 times that of a vote cast in CD 6.  While it may be that One Person, One Vote applies to CD 6, the "one person" portion is 1.29 the "one vote" in CD 7.  The election results are illustrative of the situation with respect to the universe of potential voters.  The proportion of the overall population in any district who are potential voters can only decrease by the assignment of persons who cannot vote and thus result in an increase in the vote weight in the recipient district.  The State's reassignment actually exacerbates rather than ameliorates the one person, one vote issues in Maryland when looking at actual votes cast.[8]  Particularly in Congressional District 6, the state's absolute removal of persons from assignment to the district and the state itself further exacerbates this one person, one vote issue.

To the extent that the State argues that they are "improving" the accuracy of the census by making their adjustments, they make the argument that there is no difference between adding

---

[5] See http://www.elections.state.md.us/elections/2004/election_data/index.html (Visited December 16, 2011).
[6] See http://www.elections.state.md.us/elections/2008/election_data/index.html (Visited December 16, 2011).
[7] Id.
[8] For additional information, see James Campbell, "Cheap Seats: The Democratic Party's Advantage in U. S. House Elections," (Ohio University Press, 1996).

people into the Census and subtracting people from the Census. We submit that this is in fact a very substantive difference. In *Karcher*, the Court notes that while the case was proceeding, the Census Bureau continued to release the Count Question Resolution changes to the Census numbers where the Bureau agreed to add in known people who were omitted from the count. *Karcher*, 462 U.S. at 728 n. 1. Maryland here instead claims to be improving the accuracy of the Census by actually removing known people from the count without reassigning them to another state. This cannot be a "more accurate" national census.

Furthermore, approval of Maryland's adjustment for congressional districts would have significant precedent implications thereby opening the door to other parochial adjustments and reassignment and removal of people from the census count for congress on the national level. Said one U.S. District court:

> "To allow local governments to gain control over the national census by applying to the courts for readjustment, recalculation, substitution and replacement of the Bureau's figures and techniques under the guise of judicial review is to sacrifice the national program to the exact dangers of local manipulation and bias, no matter how well intentioned, the Framers sought to avoid."

*City of Philadelphia v. Klutznick*, 503 F.Supp. 663, 677 (E.D.Pa.1980).

**III.     Maryland's Congressional Districting Map Violates Section 2 of the Voting Rights Act and Plaintiffs meet the *Gingles* Preconditions.**

The Supreme Court has held that vote dilution occurs when minority voters are concentrated in a few districts to outweigh minority voter power elsewhere. Voter dilution can also occur, as the Supreme Court has held where minorities are scattered among several districts. *See Johnson v. De Grandy*, 512 U.S. 997, 1007 (1994). Maryland has concentrated African American voters in two districts and, rather than make a third congressional district, scattered minorities among several majority districts, thus diluting African American voting power.

**A. State's Expert Concedes The Existence of the *Gingles* Preconditions**

In Bruce Cain's most recent report, he neatly summarizes his position with respect to his review of the application of Section 2 of the Voting Rights Act in the State of Maryland's congressional district plan.  He says:

> I maintained in my earlier declaration that the State ***fulfilled its Section 2 VRA obligations*** by drawing two majority African-American Congressional districts centered in the two regions of highest African-American concentration, Baltimore to the North and Prince Georges County in the DC suburbs.

(Rebuttal Decl**.** of Cain ECF No. 48-1, 1) (emphasis added).  This neatly summarizes Cain's acknowledgement that the *Gingles* preconditions exist in Maryland in the precise geographic area raised by the Plaintiffs.  If compact populations, racially polarized voting and majority block voting were not present, there would be no Section 2 Voting Rights Act obligation at all.  Yet it appears that Professor Cain spends much of his time providing conclusory statements attempting to show that racial block voting and white majority block voting does not occur in Maryland.

The State cannot have it both ways.  Either a Section 2 obligation exists in the state or it does not.  Under Supreme Court precedent, no such Section 2 obligation exists in the absence of the preconditions.  *See Thornburg v. Gingles*, 478 U.S. 30, 48-51 (1986).

Having conceded that the preconditions exist and that the state was required to maintain its two majority African American VAP districts, Cain repeats his conclusion to the Court three times that the only outstanding question is whether a third majority African American VAP district is required:

1. "The relevant legal question is whether the State is compelled to create another one…" (ECF No. 13-5, 8).

    2. "The central VRA question is whether the state is obliged under the Gingles criteria to create a third majority African American Congressional district…" (Declaration of Cain, ECF No.33-2, 2)

    3. "I concluded and advised that the State had to maintain two majority African-American VAP districts….The question then is what is the obligation to create a third majority VAP African American district?" (Decl. of Cain, ECF No. 48-1, 9).

Boiled down to its core, Cain's argument is really that the State has staked out a "proportionality" defense under Section 2's totality of the circumstances evaluation by focusing on the 28% African American alone voting age population figure as reported in the 2010 U.S. Census.[9] As noted in Dr. Morrison's prior submission, Cain focuses solely on the lowest number he could identify to assess the state's African American population, and does not take into account what are patently obvious trendlines and makes no attempt to assess either the current population proportions or project those trendlines into even the near future.

**B. Compactness**

Defendants argue that Plaintiffs have not met the first (compactness) and third (minority voting bloc) of the *Gingles* preconditions.[10] With respect to compactness the State continues to appear to argue, with very little support, that the African American communities surrounding

---

[9] On Friday, December 16, 2011 at approximately 7:00pm, the GRAC released its proposed legislative map. The proposed map increases the number of majority African-American districts to 12 of 47. This ratio is still only 25.5%, and below even Dr. Cain's lowest possible black population proportionality number. Although not at directly at issue in this case, the state's proposal to continue to have African-Americans underrepresented in the state legislature for the next decade can be considered by this court as part of its totality of the circumstances analysis. See Declaration of Sheehy, (Attachment H).

[10] Plaintiffs presume that the Defendants have conceded the existence of racial block voting among African American voters in Maryland and compactness generally or the two existing majority black districts would not be required as the state concedes they are.

Washington DC and Baltimore and its surrounding communities are essentially alien to each other and cannot form a compact third congressional district.[11] The State cannot dispute the fact that more than 80% of the African American population of the state lives in the bordering counties of Baltimore, Howard, Prince George's, Montgomery and Charles County, and the City of Baltimore. *See* (Decl. of Gaddie 4, 15).

Despite this, Cain makes assertions that these are "disparate" communities. (Decl. of Cain ECF No. 48-1 2-4, 7). The State has provided no evidence other than simple assertions related to sports teams, and a vague assertion without support that there are different arts communities for Baltimore and Washington. (Defs.' Mem. In Support Mot. to Dismiss or Summ. J. ECF No. 33-1 35). By contrast, we have previously provided information highlighting the existence of a functionally integrated commutershed, defined by massive numbers of Maryland workers commuting daily the District of Columbia and other employment centers via mass transit links in the metropolitan area. A further indication of functional integration is the presence of shared airports used by Maryland travelers and State provided, regularly scheduled commuter rail services throughout the areas. We supplement this information today with Dr. Morrison's analysis of data related to commuter patterns for the metropolitan region.[12] *See* (Decl. of Morrison 1, 3, 5 and 8). Just one fact to note from this declaration is Howard County's own assessment that 1/3 of its population commutes to Baltimore for work, 1/3 of its population commutes to Washington, DC for work, and 1/3 of its population remains in Howard County for

---

[11] Defendants also attempt to discredit the third majority-minority district drawn in the proposed maps by claiming that the compactness of the third such district is far below that of the other two such districts. However this completely ignores the fact that the third such district is more compact than all but one of the eight districts in the State's approved map including both of the African American majority-minority districts defended by the State. Cain's argument on this point is essentially that African American districts must meet a higher standard of compactness than white districts.

[12] Plaintiffs note that Dr. Morrison's analysis is primarily based on data publicly available from State of Maryland websites. Despite the availability of this data Defendants failed to alert the court of its existence, and made assertions contrary to information the state itself had publicly released.

work. This demonstrates the existence of a functioning "daily urban system" (as defined by geographers) and regular link between both cities, providing further support to the federal government's treatment of the region as a single metropolitan statistical area. The Office of Personnel Management also treats these areas as one for the purposes of federal pay scales. See http://www.opm.gov/oca/11tables/locdef.asp#w (visited December 15, 2011).

For more details on the compactness comments of Professor Cain, the attached Declaration of Gaddie provides some detailed replies. Professor Cain compares the compactness of the Pipkin map's CD 5 with the other two majority-African American CDs in the Pipkin map. CD 5 compares poorly in that context. He ignores the evidence that the Pipkin CD5 is more compact than all but one of the districts in the State's plan on the Polsby-Popper measure. The Pipkin map CD 5 is more compact on Polsby-Popper than either of the majority-African American districts in the State's plan. On the Reock measure, the Pipkin CD 5 scores lower than 7 of 8 districts in the State's plan but is only marginally lower than 4 of the State's districts (CDs 1 – 4) and is within one standard deviation of the mean for the State plan. Succinctly, the State's position according to its expert may be summarized as: *Black districts must meet a higher standard of compactness than white districts.* Despite the assertions of Cain, there is no judicial support for this position. These factors together demonstrate the Plaintiffs have met their burden of proof and satisfied the first *Gingles* precondition for the third majority minority district.

### C. Racial Bloc Voting And Majority Bloc Voting Exist In Maryland To The Detriment Of African Americans.

With respect to election analysis for the purposes of assessing the second and third prongs of the *Gingles* preconditions, Cain attempts to confuse the facts and the law and both admits to the existence of the these factors and tries to deny them at the same time.[13] Given the

---

[13] See statements of Cain at Section III, A, *supra.*

political make-up of Maryland with its tilt towards the Democratic Party in most of the central portion of Maryland, the decisive elections here take place in the Democratic primary.  The winner of the Democratic nomination almost invariably wins regardless of the race or ethnicity of the nominee.  Therefore the better analysis of cohesiveness is seen in primary elections.  In *NAACP v. City of Niagara Falls*, 65 F. 3d 1002 (2d Cir. 1995) the court reviewed a Section 2 claim and held "In light of the language of the Voting Rights Act, we believe that general elections are less probative determinants of the success of the minority's preferred candidate in these circumstances." *Id.* at 1017. *See also White v. Regester*, 412 U.S. 755, 766-67 (1973) (sustaining District Court's judgment that African American community had been effectively excluded from participation in the Democratic primary selection process); *Lewis v. Alamance County*, 99 F.3d 600, 616-17 (4th Cir. 1996) (primary and general elections must be analyzed separately); *Colleton County Council v. McConnell*, 201 F. Supp. 2d 618, 644 (D.S.C. 2002) ("[S]ince a minority candidate cannot win the seat without having an equal opportunity to win the party primary, equal opportunity [to elect a preferred candidate] must be measured at every step in the electoral process.").

The only African American candidates the State identifies who have won primaries outside of majority African American jurisdictions are the 2008 presidential primary and general elections,[14] and the 2006 Democratic primary for county executive in Montgomery County.  The attached Declaration of Gaddie provides an explanation of exogenous and endogenous elections, and why the 2008 presidential election is less probative that Cain admits.

Currently, none of Maryland's 38 African American elected officials is from a majority non-Hispanic white single member district. Thus, the importance of majority-minority districts

---

[14] As noted in numerous reports, the 2008 presidential election resulted in historic turnout.  See e.g. "2008 Election Turnout Hit 40-Year High," http://www.cbsnews.com/stories/2008/12/15/politics/main4670319.shtml (Visited December 15, 2011)

for African Americans is palpable.   As the Supreme Court said in *Gingles*: "Stated succinctly, a bloc voting majority must usually be able to defeat candidates supported by a politically cohesive, geographically insular minority group." *Gingles*, 478 U.S. at 48-49.  Looking at the statewide evidence of actual officeholders provides overwhelming support for the general notion that African American candidates only win office in Maryland in majority African American jurisdictions, and that African American candidates of choice are defeated in primaries in the majority white jurisdictions.[15]

## IV.    Conclusion

For the foregoing reasons, Plaintiffs respectfully ask this Court to grants Plaintiffs motions for a preliminary injunction, to deny Defendants their motions to dismiss or in the alternative for summary judgment, enter judgment for plaintiffs, and grant other such relief as may be reasonable.

Plaintiffs look forward to presenting their case in the upcoming trial before the Court.


Respectfully submitted,

   /s/ Jason Torchinsky

**Law Office of James P Mayes**
James Paul Mayes (Bar No. 10414)
mayesfedlaw@aol.com
Law Office of James P Mayes
4721 Chesterfield Place
Jamestown, NC   27282
Tel: (202) 255-2031
Fax: (336)841-5275

---

[15] The best available evidence here are the 2006 statewide primaries for U.S. Senate and Attorney General, both of which were significantly racially polarized as previously demonstrated.  Governor O'Malley's 1999 primary for the mayor's race in Baltimore was also widely reported to have been racially polarized, with 90% of white voters supporting O'Malley, but O'Malley managing to attract the support of 30% of African American voters against two other African American candidates providing his margin of victory.  *See* Jeffrey R. Henig and Wilbur C. Rich, *Mayors In The Middle: Politics, Race, And Mayoral Control Of Urban Schools*  48-49 (Princeton University Press 2003).

**Holtzman Vogel PLLC**
Jason Torchinsky, *pro hac vice*
jtorchinsky@holtzmanlaw.net
HOLTZMAN VOGEL PLLC
45 North Hill Drive, Suite 100
Warrenton, VA 20186
Tel: (540) 341-8808
Fax: (540) 341-8809

Counsel for Plaintiffs