**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| **PATRICIA FLETCHER,** *et al.*, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Case No.:  RWT-11cv3220 |
| | * | |
| **LINDA H. LAMONE,** *et al.*, | * | |
| | * | |
| Defendants. | * | |
| | * | |

_____

Jason Brett Torchinsky, Warrenton, Virginia, and James Paul Mayes, Jamestown, North Carolina, for plaintiffs.

Dan Friedman, Annapolis, Maryland, and Steven M. Sullivan, Baltimore, Maryland, Assistant Attorneys General, Office of the Attorney General for the State of Maryland, for defendants.

Filed:  December 23, 2011

Before Niemeyer, Circuit Judge, and Williams and Titus, District Judges:

<u>OPINION OF THE THREE-JUDGE COURT</u>

Judge Niemeyer wrote the opinion, in which Judges Williams and Titus joined.  Judges Williams and Titus wrote concurring opinions.

NIEMEYER, Circuit Judge:

After the 2010 decennial census, Maryland enacted a new redistricting plan in October 2011 for its eight congressional districts.  The plaintiffs, nine African-American residents of Maryland, commenced this action against election officials of Maryland ("Maryland" or "the State"), contending that the

redistricting plan violates their rights under Article I, § 2, of the U.S. Constitution; the Fourteenth and Fifteenth Amendments of the U.S. Constitution; and § 2 of the Voting Rights Act of 1965 because the plan dilutes African-American voting strength within the State and intentionally discriminates against African-Americans. For the same reasons, plaintiffs also challenge Maryland's "No Representation Without Population Act" ("the Act"), which purports to correct census data for the distortional effects of the Census Bureau's practice of counting prison inmates as residents of their place of incarceration.

This three-judge court, convened pursuant to 28 U.S.C. § 2284(a), heard arguments on December 20, 2011, on the plaintiffs' motion for preliminary injunction and Maryland's motion to dismiss or for summary judgment, as well as on the merits of the case. By agreement of the parties, the court received the testimony of all witnesses by affidavit.

For the reasons given herein, we deny Maryland's motion to dismiss based upon an inappropriate convening of the three-judge court, deny the plaintiffs' motion for an injunction -- preliminary or permanent -- and grant Maryland's motion for summary judgment, obviating its motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).

I.  Factual Context

The 2010 census determined Maryland's population to be 5,773,552.  This number entitled the State to eight congressional seats, the same number it had after the 2000 census.

On July 4, 2011, Governor Martin O'Malley appointed the Governor's Redistricting Advisory Committee (the "GRAC"),[1] and that committee held twelve public meetings across the state between July 23 and September 12, 2011.  Over the course of these meetings, the GRAC received more than 350 comments from members of the public.  Among these comments were several proposed redistricting plans from third-party groups, including one from the Fannie Lou Hamer Political Action Committee.  The Fannie Lou Hamer plan differed from all the other third-party submissions in that it proposed the creation of three, rather than two, majority African-American districts.

The GRAC presented its proposed plan to the Governor on October 4, 2011.  (Compl. Attach. B.)  After posting the plan online and receiving additional comments from the public, the

---

[1]  The GRAC's five members were:  Chairperson Jeanne Hitchcock, Maryland's Secretary of Appointments, State Senate President Thomas V. Mike Miller, State House Speaker Michael Busch, Prince George's County businessman Richard Stewart, and James King, a small business owner and former member of the House of Delegates.

Governor announced that he would submit to the legislature a plan that was "substantially similar" to the GRAC proposal.

The Governor's proposed redistricting map (Compl. Attach. C) was introduced as House Bill (H.B.) 1 and Senate Bill (S.B.) 1 in an emergency legislative session beginning October 17, 2011. H.B. 1 was assigned to the House Rules Committee but was never reported out of committee. The Senate Committee on Reapportionment and Redistricting, however, held a joint hearing on S.B. 1 with the House Rules Committee on the same day the bill was introduced. After the hearing, the Senate Committee approved the bill and sent it to the floor of the Senate. While the bill was being debated, State Senator E.J. Pipkin moved to amend the bill. Like the Fannie Lou Hamer plan, Senator Pipkin's proposed amendment created three majority African-American districts. (Compl. Attach. C.) Specifically, the Pipkin map proposed the creation of a new Fifth District that would stretch from the southern portion of Charles County, through Prince George's County, and into the western Baltimore suburbs. The Senate rejected Pipkin's amendment and, after adopting minor technical amendments, passed the bill. The bill was then sent to the House of Delegates on October 18, 2011.

During the House debate, several substantive amendments to the bill were proposed and rejected. On October 19, after

4

making some technical amendments, the House passed the bill.  It
then returned the bill to the Senate, which concurred in the
House's technical amendments and enacted the bill on October 20,
2011.  The Governor signed S.B. 1 into law later that day.

Like the redistricting plan passed after the 2000 census,
the enacted State Plan creates two majority African-American
congressional districts.  The Seventh District, which includes
large portions of Baltimore City and its surrounding suburbs,
has an African-American voting age population ("VAP") of 53.75%,
and a non-Hispanic white VAP of 35.75%.  The Fourth District,
which is centered in Prince George's County, has an African-
American VAP of 53.72% and a non-Hispanic white VAP of 28.65%.

The plaintiffs in this case, who are African-American
residents of Maryland, commenced this action on November 10,
2011, naming Linda H. Lamone in her official capacity as
Maryland's Administrator of Elections and Robert L. Walker in
his official capacity as Chairman of the State Board of
Elections.  In their complaint, the plaintiffs allege that the
State Plan was deficient in several respects, claiming
specifically (1) that the State Plan's creation of two, rather
than three, majority African-American districts intentionally
discriminates against minorities, in violation of the Fourteenth
and Fifteenth Amendments (Counts 1 and 2), and unlawfully

dilutes African-American voting strength in violation of the Voting Rights Act of 1965, 42 U.S.C. § 1973 (Count 5); (2) that the State Plan is unconstitutionally malapportioned (Counts 3, 4, and 6); and (3) that the State Plan is a partisan gerrymander, in violation of the Fourteenth Amendment (Count 7). At the time the plaintiffs filed their complaint, they also filed a motion under 28 U.S.C. § 2284 to convene a three-judge court to adjudicate their claims, as well as a Motion for a Preliminary Injunction on Counts 3 and 6.

The State opposed convening a three-judge court. And after it was convened, the State filed a Motion to Dismiss for Failure to State a Claim or, in the Alternative, for Summary Judgment, and a Request for Review of the Order Convening a Three-Judge Panel.

The parties thereafter filed responsive and reply briefs and, upon agreeing to present the testimony of witnesses by affidavit, the affidavits of numerous witnesses.

## II.  Three-Judge Court

At the outset, Maryland requests that we review the single-district judge's ruling that the plaintiffs' complaint is sufficiently substantial to justify convening a three-judge court under 28 U.S.C. § 2284.  It argues that the ruling failed

to take into account the Fourth's Circuit's precedent in
Duckworth v. State Administration Board of Election Laws, 332
F.3d 769 (4th Cir. 2003).  In that case, the Fourth Circuit held
that when a complaint fails to state a claim upon which relief
can be granted, as required by Federal Rule of Civil Procedure
12(b)(6), "by definition [it is] insubstantial and so properly
[is] subject to dismissal by the district court without
convening a three-judge court."   Id. at 772-73.   The State's
argument rests on an assumed distinction between a complaint
that "does not state a substantial claim for . . . relief" and
the Rule 12(b)(6) standard.   For purposes of construing § 2284,
we find no material distinction, and deny Maryland's motion.

The Rule 12(b)(6) standard is a threshold condition for
proceeding with an action, testing the sufficiency of a
complaint to state a claim for relief.   See Brzonkala v. Va.
Polytechnic & State Univ., 169 F.3d 820, 829 (4th Cir. 1999) (en
banc).   In applying the standard, we have required more than
formulaic, conclusory allegations.   See Duckworth, 332 F.3d at
774-75.   Indeed, the Supreme Court has required that a complaint
must have sufficient "heft" in alleging facts so as to state a
"plausible" claim for relief.   Bell Atlantic Corp. v. Twombly,
550 U.S. 544, 555 (2007).

Here, the single-judge court reviewed the complaint and concluded that the claims presented were sufficiently substantial to proceed with convening a three-judge court. Under the standard for convening a three-judge court, which is informed by the standard for granting Rule 12(b)(6) motions, we agree. See Ashcroft v. Iqbal, 556 U.S. 662 (2009); Twombly, 550 U.S. at 555-56; Duckworth, 332 F.3d at 773-75; Simkins v. Gressette, 631 F.2d 287, 295 (4th Cir. 1980) (noting that convening a three-judge court is not required to address insubstantial claims). Accordingly, we deny the State's motion to dismiss the three-judge court.

### III. "No Representation Without Population Act" (Counts 3, 4, and 6)

The plaintiffs challenge as unconstitutional Maryland's "No Representation Without Population Act" ("the Act"), 2010 Md. Laws, ch. 67, codified at Md. Code Ann., Art. 24 § 1-111, Election Law ("EL") § 8-701. They contend that the adjustments made under the Act result in malapportionment, in violation of Article I, § 2, of the Constitution, and racial discrimination, in violation of the Fourteenth Amendment.

Maryland enacted the "No Representation Without Population Act" in 2010. According to the State, the Act is intended to "correct for the distortional effects of the Census Bureau's

8

practice of counting prisoners as residents of their place of incarceration." (Defs.' Mot. Summ. J. 1.) These distortional effects stem from the fact that while the majority of the state's prisoners come from African-American areas, the state's prisons are located primarily in the majority white First and Sixth Districts. As a result, residents of districts with prisons are systematically "overrepresented" compared to other districts. In other words, residents of districts with prisons are able to elect the same number of representatives despite in reality having comparatively fewer voting-eligible members of their community.[2]

To rectify this perceived imbalance, the Act requires that for purposes of drawing local, state, and federal legislative districts, inmates of state or federal prisons located in Maryland must be counted as residents of their last known residence before incarceration. Prisoners who were not Maryland residents prior to incarceration are excluded from the

---

[2] The manner in which counting prisoners where they are incarcerated results in overrepresentation can be seen most clearly at the local level. For example, District 1 of the Somerset County Council was created as a majority-minority district in order to settle a Voting Rights Act lawsuit brought in the 1980s. However, because the largely minority population of Eastern Correctional Institute was counted in the district's population for redistricting purposes, only a small number of African Americans who "reside" in the district were actually eligible to vote. As a result, an African-American was not elected to fill the seat until 2010.

population count, and prisoners whose last known address cannot be determined are counted as residents of the district where their facility is located.

The Maryland Department of Planning (the "MDP") accomplished the necessary population count adjustments by performing a multistep analysis of the records for prisoners housed in the Maryland Division of Correction.[3] As a result of the MDP's analysis, 1,321 inmates who reported a pre-incarceration address outside of Maryland were excluded from the redistricting database. Other prisoners were reassigned to their prior residences. The largest changes from these reassignments occurred in the Sixth District, which contains the majority of the prisons and lost 6,754 individuals, and the Seventh District, which includes Baltimore City and gained 4,832 individuals. In no case did the adjustments made by the MDP exceed 1% of a district's population. (Defs.' Mot. Summ. J. 10.)

After the 1,321 out-of-state prisoners were excluded, Maryland's adjusted population base for redistricting fell to

---

[3] Because the Federal Bureau of Prisons rejected Maryland's Freedom of Information Act request for information on the home addresses of individuals incarcerated in federal prisons within Maryland, the MDP counted approximately 1,500 individuals in federal custody as residents of the Federal Correctional Institute Cumberland and Camp Cumberland facilities.

5,772,231.  This figure resulted in a new ideal Congressional district size of 721,528.875 individuals.  Because the new ideal district size was not a whole number, the State set the size of the Eighth District to 721,528 individuals and the size of the remaining districts to 721,529 individuals.

The plaintiffs first contend that Maryland's adjustments to the census data result in malapportionment, in contravention of the "One Person, One Vote" standard established in Reynolds v. Simms, 377 U.S. 533 (1964), under Article I, § 2, of the Constitution.

Article I, § 2 provides that the members of the House of Representatives are to be chosen "by the People of the several States."  U.S. Const. art I, § 2.  As interpreted by the Supreme Court, this provision mandates that "as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's."  Wesberry v. Sanders, 376 U.S. 1, 7-8 (1964).  "[T]he 'as nearly as practicable' standard requires that the State make a good-faith effort to achieve precise mathematical equality."  Kirkpatrick v. Preisler, 394 U.S. 526, 530-31 (1969).  "Unless population variances among congressional districts are shown to have resulted despite such effort, the State must justify each variance, no matter how small."  Id. States do not have unlimited discretion in performing the

11

calculations required to meet the "One Person, One Vote" standard. In Kirkpatrick and again in Karcher v. Daggett, 462 U.S. 725 (1983), the Supreme Court concluded that because the census count represents the "'best population data available,' it is the only basis for good-faith attempts to achieve population equality." Karcher, 462 U.S. at 738 (internal citation omitted) (quoting Kirkpatrick, 394 U.S. at 528).

Relying on these statements in Karcher and Kirkpatrick, the plaintiffs contend that "for determining congressional districts the only [population] number that can be used is the number generated by the U.S. census." (Pls.' Mot. Supp. Mot. Prelim. Inj. 7.) Accordingly, they argue that Maryland's decision to adjust the census number is unconstitutional.

We believe that the plaintiffs fail to read the Karcher and Kirkpatrick statements in their fuller context. Although Karcher and Kirkpatrick do require states to use census data as a starting point, they do not hold, as the plaintiffs maintain, that states may not modify this data to correct perceived flaws. A more complete reading of the opinion in Karcher makes this point clear. The Court there recognized that "the census may systematically undercount population, and the rate of undercounting may vary from place to place." 462 U.S. at 738. It cautioned, however, that "[i]f a State does attempt to use a

12

measure other than total population or to 'correct' the census figures, it may not do so in a haphazard, inconsistent, or conjectural manner." Id. at 732 n.4 (citing Kirkpatrick, 394 U.S. 534 – 35). Thus, the New Jersey redistricting plan at issue in Karcher was rejected not because the state used adjusted census data, but because the state failed to perform its adjustments systematically. See id. at 738 ("Attempts to explain population deviations on the basis of flaws in census data must be supported with a precision not achieved here" (emphasis added)). Taken together, these Karcher statements suggest that a State may choose to adjust the census data, so long as those adjustments are thoroughly documented and applied in a nonarbitrary fashion and they otherwise do not violate the Constitution.

Although the case law on this issue is sparse, the majority of the courts to consider the issue have similarly concluded that Karcher and Kirkpatrick do not bar the use of adjusted census data. For example, in City of Detroit v. Franklin, 4 F.3d 1367 (6th Cir. 1993), the Sixth Circuit considered a challenge to the Census Bureau's alleged undercounting of the primarily African-American residents of the City of Detroit. The court held that the plaintiffs lacked standing to pursue their claim against the Census Bureau because the allegedly

harmful act -- the decision to use unadjusted census data in the redistricting process -- had been made by the Michigan legislature. In reaching this conclusion, the Sixth Circuit rejected the plaintiff's argument that the Michigan legislature was constitutionally compelled to use unadjusted census data:

> The Court in Karcher did not hold that the states must use census figures to reapportion congressional representation. The Supreme Court merely reiterated a well-established rule of constitutional law: states are required to use the "best census data available" or "the best population data available" in their attempts to effect proportionate political representation. Nothing in the constitution or Karcher compels the states or Congress to use only the unadjusted census figures.

Id. at 1374 (quoting City of Detroit v. Franklin, 800 F. Supp. 539, 543 (E.D. Mich. 1992)); see also Senate of State of Cal. v. Mosbacher, 968 F.2d 974, 979 (9th Cir. 1992) (stating in dicta that "[i]f the State knows that the census data is unrepresentative, it can, and should, utilize noncensus data in addition to the official count in its redistricting process"); Perez v. Texas, No. 11-CA-360-OLG-JES-XR, slip op. at 24 (W.D. Tex. Sept. 2, 2011) (holding that "the State could enact a constitutional amendment or statute that modifies the count of prisoners as residents of whatever county they lived in prior to incarceration . . . [but] there is no federal requirement to do so").

The plaintiffs' contrary argument rests primarily on the decision in Travis v. King, 552 F. Supp. 554 (D. Haw. 1982), which, they argue, is the only case directly on point.   In Travis, the Hawaii legislature had decided to exclude from its population measure the entire military population, without attempting individual assignment, but allowed "the presence of this large military population . . . [to] aid[] in achieving its two congressional seats."   Travis, 552 F. Supp. at 571.   A three-judge court subsequently held that Hawaii's actions violated the "One Person, One Vote" principle.   But Travis was decided before the Supreme Court's decision in Karcher, and the district court in Travis therefore did not have the benefit of Karcher's elaboration on the requirements of Article I, § 2. Further, after the categorical exclusion of all military personnel in Travis, the congressional districts still varied by over 300, id. at 569, whereas the Maryland legislature in this case drew districts as equally as possible after adjusting the census figures.

The conclusion that States may adjust census data during the redistricting process is also consistent with the practices of the Census Bureau itself.   According to the Census Bureau, prisoners are counted where they are incarcerated for pragmatic and administrative reasons, not legal ones.   The Bureau has

15

explained that counting prisoners at their home addresses would require "collecting information from each prisoner individually" and necessitate "an extensive coordination procedure" with correctional facilities. U.S. Census Bureau, Tabulating Prisoners at Their "Permanent Home of Record" Address, at 10 (2006). Such an effort would likely cost up to $250 million. Id. And although the Census Bureau was not itself willing to undertake the steps required to count prisoners at their home addresses, it has supported efforts by States to do so. For the 2010 census, the Bureau released its population data for prisoners and other inhabitants of "group quarters" early to enable States to "leave the prisoners counted where the prisons are, delete them from redistricting formulas, or assign them to some other locale." So, How Do You Handle Prisons?, Director's Blog, U.S. Census Bureau (March 10, 2010), http://blogs.census.gov/directorsblog/2010/03/so-how-do-you-handle-prisons.html.

The question remains whether Maryland's adjustments to census data were made in the systematic manner demanded by Karcher. It seems clear to us that they were. As required by the regulations implementing the Act, see Md. Code. Regs. 34.05.01 (2011), the MDP undertook and documented a multistep process by which it attempted to identify the last known address

16

of all individuals in Maryland's prisons.  The MDP and its redistricting contractor, Caliper Corporation, then used this information to make the relevant adjustments to the data it had received from the Census Bureau.  (Defs.' Mot. Summ. J. Ex.s 2, 3, 4.)  This process is a far cry from the "haphazard, inconsistent, or conjectural" alterations the Supreme Court rejected in Karcher.

The plaintiffs do not dispute that the MDP followed the prescribed process, but they raise two objections to the result.  First, they argue that if Maryland wishes to correct for prisoner-related population distortions, it must also make similar adjustments to account for the distortionary effects of college students and members of the military.  (Pls.' Resp. Defs.' Mot. Summ. J. 24.)  Second, they contend that contrary to the MDP's assumption, most prisoners do not return to their last known residence after release.  (Pls.' Resp. 26.)

Neither of these objections, however, is probative of whether the adjustments made were proper.  To be sure, Maryland might come closer to its goal of producing accurate data if it assigned college students or active duty military personnel to their permanent home addresses for purposes of redistricting.  But as with prisoners, Maryland is not constitutionally obligated to make such adjustments.  Moreover, the State's

failure to improve its redistricting data <u>even more</u> by determining students' and soldiers' home addresses has little bearing on the merits of the plaintiffs' Article 1, § 2 claim made with respect to prisoners.

We also observe that the plaintiffs' argument on this point implies that college students, soldiers, and prisoners are all similarly situated groups. This assumption, however, is questionable at best. College students and members of the military are eligible to vote, while incarcerated persons are not. In addition, college students and military personnel have the liberty to interact with members of the surrounding community and to engage fully in civic life. In this sense, both groups have a much more substantial connection to, and effect on, the communities where they reside than do prisoners.

As to the plaintiffs' second argument that the adjustments are improper because most prisoners do not return to their last known addresses after release, it would certainly be true that at least some prisoners will return to their old communities even if the plaintiffs are correct. <u>See</u> Nancy G. La Vigne et al., Urban Institute, <u>A Portrait of Prisoner Reentry in Maryland</u> 39 (reporting that 59% of Maryland prisoners returned to Baltimore City after their release from prison). Because some correction is better than no correction, the State's adjusted

data will likewise be more accurate than the information contained in the initial census reports, which does not take prisoners' community ties into account at all.

In sum, we conclude that the State did not violate Article I, § 2 by adjusting the raw census data as it did.

The plaintiffs also contend that the Act's exclusion of incarcerated non-Maryland residents from the population base constitutes intentional discrimination on the basis of race, in violation of the Fourteenth Amendment, because, of the 1,321 prisoners who were excluded, 71.08% are African American. (Compl. ¶¶ 49 – 53, 70.)

We find no support in the record for this contention. It is well-established that allegations of disparate impact alone are insufficient to state a claim under the Fourteenth Amendment. Washington v. Davis, 426 U.S. 229, 239 (1976). Instead, plaintiffs are required to prove purposeful discrimination. Id. Our review of the record reveals no evidence that intentional racial classifications were the moving force behind the passage of the Act. In fact, the evidence before us points to precisely the opposite conclusion. As the amicus brief of the Howard University School of Law Civil Rights Clinic and other civil rights organizations makes clear, the Act

was the product of years of work by groups dedicated to advancing the interests of minorities.

IV.  Section 2 of the Voting Rights Act (Count 5)

The plaintiffs contend, as alleged in Count 5 of their complaint, that the State Plan violates the Voting Rights Act of 1965 (the "VRA"), 42 U.S.C. § 1973, because it fails to create a third majority African-American congressional district.  To support this contention, the plaintiffs recite the census data that show that 30.9% of the Maryland population is African-American, representing 28% of the VAP, and they offer four maps that they contend demonstrate how a third African-American district could be created while still respecting traditional districting principles.  These maps are the Fannie Lou Hamer Plan (Compl. Attach. A), Senator Pipkin's Plan (Compl. Attach. D), and two plans by Antonio Campbell (Pls.' Resp. Ex. 14).  In each of these maps, a third majority African-American congressional district is formed by connecting residents of the Washington, D.C. suburbs with residents of the Baltimore suburbs.

Section 2(a) of the VRA prohibits the imposition of any electoral practice or procedure that "results in a denial or abridgement of the right of any citizen . . . to vote on account

of race or color." 42 U.S.C. § 1973(a). "A violation of
[§ 2(a)] is established if, based on the totality of the
circumstances, it is shown that the political processes . . .
are not equally open to participation by members of a class of
citizens . . . in that its members have less opportunity than
other members of the electorate to participate in the political
process and to elect representatives of their choice." Id.
§ 1973(b).

In 1982, Congress amended § 2 to make clear that plaintiffs
need not prove intentional discrimination. See Thornburg v.
Gingles, 478 U.S. 30, 35 (1986). Instead, a violation of § 2
may be demonstrated through discriminatory effect alone. Id.
District line-drawing is therefore impermissible where its
result, "interact[ing] with social and historical conditions,
impairs the ability of a protected class to elect its candidate
of choice on an equal basis with other voters." Voinovich v.
Quilter, 507 U.S. 146, 153 (1993) (internal quotation marks
omitted).

In the redistricting of a single member constituency, the
most common means of manipulating the voting strength of a
politically cohesive minority group are "cracking" and
"packing." "Cracking" occurs when redistricting lines are drawn
in order to "divid[e] the minority group among various districts

21

so that it is a majority in none." Voinovich, 507 U.S. at 153. "Packing" occurs when a redistricting plan results in an excessive concentration of minorities within a given district, thereby depriving the group of influence in surrounding districts. Id. at 153–54.

In Thornburg v. Gingles, the Supreme Court established three preconditions (the "Gingles preconditions") that a plaintiff must satisfy in order prove a violation of § 2 of the VRA:

> First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district.
>
> Second, the minority group must be able to show that it is politically cohesive.
>
> Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate.

Gingles, 478 U.S. at 50–51.  Only after all of these three preconditions are met will a court evaluate the totality of the circumstances.

Although the failure to create a majority-minority voting district may be the basis of a § 2 violation, § 2 does not obligate States to create the maximum possible number of majority-minority districts.  See Johnson v. De Grandy, 512 U.S. 997, 1016–17 (1994); Abrams v. Johnson, 521 U.S. 74, 90 (1997).

22

Rather, to succeed on their claim, plaintiffs seeking the creation of an additional majority-minority district must first independently establish the existence of each of the Gingles preconditions for their proposed district. Our analysis will address the first and third.

The first Gingles precondition requires plaintiffs to demonstrate that a minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district." Gingles, 478 U.S. at 50. The Supreme Court has explained that "[w]hile no precise rule has emerged governing § 2 compactness, the 'inquiry should take into account traditional districting principles such as maintaining communities of interest and traditional boundaries.'" League of United Latin Am. Citizens ("LULAC") v. Perry, 548 U.S. 399, 433 (2006) (quoting Abrams, 521 U.S. at 92) (internal quotation marks omitted).

As their primary proof of compactness, the plaintiffs offer two affidavits from Dr. Ronald Keith Gaddie, a political science professor from Oklahoma. (Pls.' Resp. Ex. 16; Pls.' Mot. Prelim. Inj. Surreply Ex. 4.) Dr. Gaddie evaluates the majority-minority districts drawn in the Fannie Lou Hamer and Pipkin plans and concludes that they are sufficiently compact to warrant the creation of a third majority African-American

district.    Dr.  Gaddie's  analysis  also  indicates  that  the additional majority African-American districts in both plans are more compact than several of the districts in the enacted State Plan.

Dr.  Gaddie's  statistical  analysis,  however,  blurs  the meanings  of  the  technical  term  "compactness."   Within  the Supreme   Court's   voting   rights   jurisprudence,   the   word "compactness"  refers  to  two  distinct  concepts.   "In  the  equal protection  context,  compactness  focuses  on  the  contours  of district  lines  to  determine  whether  race  was  the  predominant factor  in  drawing  those  lines."   LULAC,  548 U.S. at 433 (2006). By  contrast,  the  Gingles  "compactness"  inquiry  focuses  on  the compactness of the minority population itself, not the shape of the  proposed  minority  district.   Id.   Thus,  the  evidence  of statistical compactness offered by Dr. Gaddie is of only limited relevance to our § 2 analysis.

Even  focusing  our  review  to  the  statistics,  however,  that evidence  does  not  prove  the  plaintiffs'  compactness  conclusion. On page six of his report on demographic trends in Maryland, the plaintiffs'  expert,  Dr.  Peter  Morrison,  provides  a  graph entitled  "Concentration  of  Population  by  Race  and  Hispanic Origin  in  Maryland's  Jurisdiction."   (Pls.' Resp. Ex. 18.)   The graph  clearly  shows  that  Maryland  has  two  -- and  only  two  --

distinct concentrations of African-Americans, one in the D.C. suburbs and another in the Baltimore area.

The plaintiffs attempt to shore up their § 2 claim by arguing that the areas combined by their proposed third majority-minority district constitute a single "community of interest."   Among other things, they argue that the Baltimore/Washington area forms an integrated transportation corridor and that residents of Howard County -- which links Baltimore and Washington in their proposed plans -- are equally likely to work in Baltimore City and the Washington D.C. area.

This argument is deficient in two respects.   Although the distances at issue here are not as dramatic as in some cases courts have considered -- the two Latino communities connected in LULAC were 300 miles apart, for instance -- the differences between the two areas are real.   While Baltimore's economy has traditionally been based on industry, medical services, and its port, Washington's economic strength derives primarily from the federal government.   The two cities may share an airport, but they have separate cultural institutions and root for rival sports teams.   And most importantly for election issues, both areas are in different media markets and have different newspapers.   In light of these differences, we believe the plaintiffs have not shown sufficiently that residents of their

proposed additional majority-minority district form a single community of interest.

We also emphasize that for purposes of the § 2 analysis, a plaintiff must demonstrate that the <u>minority population</u> at issue is sufficiently compact.  <u>Bush v. Vera</u>, 517 U.S. 952, 997 (1996) (Kennedy, J., concurring).  The crucial weakness in the plaintiffs' evidence is that it concerns residents of their proposed congressional district in general, and not minority residents specifically.  In the absence of this kind of specific evidence, we may not accept bare assertions that the area's African-American residents share the same characteristics, needs, and interests.  See <u>LULAC</u>, 548 U.S. at 433 ("[A] State may not assum[e] from a group of voters' race that they think alike, share the same political interests, and will prefer the same candidates at the polls" (internal quotation marks omitted)) (Op. of Kennedy, J.).

Although the failure of plaintiffs to satisfy the first <u>Gingles</u> precondition is sufficient to dispose of the § 2 issue, we are also skeptical that the plaintiffs have satisfied the third <u>Gingles</u> precondition.  Commonly referred to as "racially polarized voting," this precondition requires plaintiffs to prove that "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred

26

candidate." <u>Gingles</u>, 478 U.S. at 51.   Courts often conduct their review of this precondition on the basis of expert testimony.

The experts for both sides have analyzed a number of federal, state, and local elections in Maryland over the past decade to evaluate trends in racial voting.   The State's expert, Dr. Bruce E. Cain, a resident of Maryland and a professor at the University of California, Berkeley, reports that African-American candidates can in fact win contested elections in predominately white areas.   (Defs.' Mot. Summ. J. Ex. 1 at 7-11.)   Dr. Cain's analysis found high levels of white support for minority candidates in several races, including the 2004 Democratic primary race for the Fourth Congressional District. Dr. Cain further notes that three statewide Democratic primary races in the past decade have paired white candidates against African-American candidates:   the 2006 race for Attorney General, the 2006 race for U.S. Senate, and the 2008 race for President.   In each of these cases, the African-American candidate's share of the white vote differed significantly, suggesting that factors other than race influenced electoral decisions.

The results of the 2006 Democratic primary elections in Montgomery County are of particular interest, as they provide,

27

what Dr. Cain terms, a natural social science experiment. In that election, African-American Attorney General candidate Stuart Simms received 25% of the white vote in Montgomery County against a white opponent. In the same election, African-American candidate for County Executive, Ike Leggett, who was also running against a well-funded white opponent, received 65% of the white vote in Montgomery County. Thus, the evidence at the local level also demonstrates a pattern of varying support for African-American candidates among the white electorate.

Dr. Gaddie offers a competing take on the electoral evidence. He contends that Barack Obama's primary victory over Hillary Clinton was atypical and should be attributed to resource and organization. More instructive, Dr. Gaddie insists, is the low share of the white vote received by then-Congressman Kweisi Mfume, an African-American, during his 2006 U.S. Senate campaign. Dr. Gaddie also points out that most African-Americans who hold state legislative offices have been elected from majority African-American districts.

To be sure, the evidence suggests that some instances of racial voting occur in Maryland. Even Dr. Cain concludes that Maryland experiences "moderate" racial polarization. But proof of occasional racial block voting is insufficient to fulfill the third Gingles precondition, which requires the showing that the

28

white majority must be able "usually to defeat the minority's preferred candidate." <u>Gingles</u>, 478 U.S. at 51; <u>see also</u> <u>Rollins v. Fort Bend Indep. Sch. Dist.</u>, 89 F.3d 1205, 1213 (5th Cir. 1996) (concluding that although special circumstances "<u>may</u> explain a single minority candidate's victory . . . [e]very victory cannot be explained away as a fortuitous event").

On the record before us, we cannot conclude that the white electorate in Maryland is sufficiently racially polarized to satisfy the third <u>Gingles</u> precondition for a § 2 claim.

V.  Equal Protection Violations (Counts 1 and 2)

The plaintiffs also contend that Maryland's redistricting plan violates the Fourteenth and Fifteenth Amendment.[4]  They assert that the state has intentionally discriminated against minorities by splitting minority communities when drawing district lines.  According to the plaintiffs, the "bizarre" shapes of some of Maryland's congressional districts and the State's decision to create two minority influence districts in the Second and Fifth District, are only explainable by

_____

[4] It is unclear whether the Fifteenth Amendment applies to vote dilution claims like the one being brought by the plaintiffs here.  The Supreme Court has raised the issue, but has not yet issued a definitive holding.  <u>See</u> <u>Voinovich v. Quilter</u>, 507 U.S. 146, 159 (1992).  But we need not resolve this question in the present circumstances.

discriminatory intent.   The plaintiffs also maintain that the
Pipkin map better serves many of the State's alleged
redistricting goals.   Specifically, they argue that Pipkin map
splits fewer county lines and "census designated places," and
that the Pipkin map concentrates Maryland's military
installations in fewer districts.

     As interpreted by the Supreme Court, the Equal Protection
Clause prohibits states from using race as the sole or
predominant factor in constructing district lines, unless doing
so satisfies strict scrutiny.   Easley v. Cromartie, 532 U.S.
234, 241 (2001); Bush v. Vera, 517 U.S. 952, 958-59 (1996)
(plurality op. of O'Connor, J.).   At the same time, however, the
Court has held that the Equal Protection Clause does not
preclude any consideration of race in the redistricting process.
Indeed, the Court has acknowledged that "[r]edistricting
legislatures will . . . almost always be aware of racial
demographics."   Miller v. Johnson, 515 U.S. 900, 916 (1995).
The question presented here is whether the State has
subordinated traditional, legitimate districting principles to
racial considerations.   Vera, 517 U.S. 959.

     The plaintiffs have submitted several affidavits and
reports discussing lamentable incidents of racism in Maryland.
They also highlight various areas on the map where they claim

the line-drawing has moved African-Americans in and out of districts in order to strengthen the Democratic Party's advantage. For example, Professor Todd Eberly, a political scientist working in Maryland, suggests that African-American voters were used to balance out the effect of Republican-leaning white voters in the Baltimore suburbs. (Pls.' Resp. Ex. 16.)

But this evidence does not suggest, much less prove, that the political process in general or the redistricting process in particular is so infected with racial considerations that a desire to dilute African-American voting strength was the predominate factor in the creation of the State Plan.

As an initial matter, we note that the plaintiffs have not shown that the State moved African-American voters from one district to another because they were African-American and not simply because they were Democrats. Moving Democrats for partisan purposes does not establish a violation of the Fourteenth Amendment under Shaw v. Reno, 509 U.S. 630 (1993), "even if it so happens that the most loyal Democrats happen to be African-American Democrats and even if the State were conscious of that fact." Hunt v. Cromartie, 526 U.S. 541, 551 (1999). Distinguishing racial from political motivations is all the more important in a State like Maryland, where the vast majority of African-American voters are registered Democrats.

31

Moreover, the plaintiffs offer little evidence suggesting that African-Americans are especially disadvantaged by the State Plan.  The State Plan makes two out of the eight congressional districts majority African-American districts.  This ratio of minority/majority seats -- 25% -- is thus in proportion to African-Americans' share of the total voting-age population -- 28%.  The State Plan also creates two districts, the Second and the Fifth, with significant and growing minority populations. Assuming population trends remain consistent, both of these districts could conceivably elect minority candidates on the basis of majority/minority coalition voting.  Thus, while the State Plan may not be maximizing African-American political power in Maryland, it does give the African-American community a strong electoral position, which will continue to strengthen according to current trends.

This result is unsurprising given that the redistricting map drew the support of many members of Maryland's African-American community.  Indeed, even a brief review of the process leading to the State Plan's enactment reveals that Maryland's African-American political leadership played an integral part in its creation.  Both GRAC Chair Jeanne Hitchcock and GRAC member Richard Stewart are African-American.  While the GRAC was developing its initial proposal, Maryland's Legislative Black

Caucus submitted two proposed redistricting plans, both of which contained only two majority African-American congressional districts.   The Legislative Black Caucus also submitted a document outlining its goals for the redistricting process, which included:

> Maintain[ing] the existing opportunity for Black voters to elect candidates of their choice in current District 7 . . . .
>
> Maintain[ing] the existing opportunity for Black voters to elect candidates of their choice in current District 4 . . . .
>
> Unify[ing] Prince George's County into Districts 4 and 5.

(Defs' Mot. Summ. J. Ex. 14.)   Each of these requests was fulfilled in the enacted State Plan.   Furthermore, during the legislative hearings on S.B. 1, the Redistricting Committee heard testimony from several prominent African-Americans who spoke in favor of the bill -- Prince George's County Executive Rushern Baker, Montgomery County Executive Ike Leggett, and Baltimore Mayor Stephanie Rawlings-Blake.

Of course, not every member of the African-American community supports the State Plan.   The plaintiffs in this case clearly do not.   But as counsel for the State suggested at oral argument, accepting the plaintiffs' argument that discriminatory motivations predominated in the redistricting process would require us to conclude that "the entire African-American

leadership in the State of Maryland was hoodwinked." We cannot reach such a conclusion on this record.

Our finding that the plaintiffs have failed to carry their burden of proof should not be read as a complete endorsement of the State Plan. Admittedly, the shapes of several of the districts in the State Plan are unusually odd.[5] Many obvious communities of interest are divided. For instance, Baltimore City, which could be placed in one congressional district given its current population, is instead split between three. Other districts combine citizens with widely divergent interests. That a farmer in Oakland should share a Representative with a federal contractor living in Potomac is, we think, a suspect proposition.

Yet the Supreme Court has made clear that "[t]he Constitution does not mandate regularity of district shape";

---

[5] Maryland's Third Congressional District merits special discussion. The District begins in Pikesville, a northwest suburb of Baltimore City; leaks eastward to capture the northeast suburbs of Baltimore City; then drops down into Baltimore City, taking a slice of the City on its way to Montgomery County, a northwest suburb of Washington, D.C.; then veers eastward in a serpentine manner to include Annapolis, a city on the Chesapeake Bay. In form, the original Massachusetts Gerrymander looks tame by comparison, as this is more reminiscent of a broken-winged pterodactyl, lying prostrate across the center of the State. The Third District is rated at or near the bottom of all congressional districts in multiple measures of statistical compactness. See Redistricting the Nation, Top 10, http://www.redistrictingthenation.com/top10.aspx.

rather, for strict scrutiny to apply, "traditional districting criteria must be <u>subordinated to race</u>." <u>Vera</u>, 517 U.S. 962. In its briefs and during oral argument, the State offered several plausible, nonracial reasons why the districts ended up looking as they do. For example, the decision to split majority African-American Prince George's County between two districts was necessary because the county is more populous than the ideal district. Additionally, the basic shape of some districts has not changed substantially since the last redistricting, suggesting that incumbent protection and a desire to maintain constituent relationships might be the main reasons they take their present forms.

And even if the plaintiffs are correct that the Pipkin map is more effective than the State Plan in vindicating some legitimate redistricting interests, that fact alone does not render the State Plan illegitimate. As the Supreme Court has explained, States may consider a wide variety of factors during the redistricting process. <u>Easley</u>, 532 U.S. at 242 ("[T]he legislature 'must have discretion to exercise the political judgment necessary to balance competing interests,' and courts must 'exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race'" (quoting <u>Miller</u>, 515 U.S. at 915)). The State's constitutionally

permissible decision to prioritize certain interests over others, without more, does not establish that racial motivations predominated in the state's decisionmaking.

Accordingly, we conclude that the plaintiffs failed to carry their burden.

VI.  Political or Partisan Gerrymandering (Count 7)

In the final count of their complaint, the plaintiffs allege that Maryland's redistricting plan is an impermissible partisan gerrymander.  Specifically, they argue that the redistricting map was drawn in order to reduce the number of Republican-held congressional seats from two to one by adding Democratic voters to the Sixth District, which covers Western Maryland and portions of the Washington, D.C. suburbs.

Although this claim is perhaps the easiest to accept factually -- Maryland's Republican Party regularly receives 40% of the statewide vote but might well retain only 12.5% of the congressional seats -- it is also the plaintiffs' weakest claim legally, if they have standing to assert it at all.  Since it first recognized the issue's justiciability in Davis v. Bandemer, 478 U.S. 109 (1986), the Supreme Court has struggled to define the parameters of a successful partisan gerrymandering claim.  Recent cases have reaffirmed the conceptual viability of

such claims, but have acknowledged that there appear to be "no judicially discernible and manageable standards for adjudicating political gerrymandering claims." Vieth v. Jubilirer, 541 U.S. 267, 281 (2004) (plurality opinion of Scalia, J.); see id. at 307-08 (Kennedy, J., concurring); see also LULAC, 548 U.S. 447 (op. of the Court by Kennedy, J.) (finding no "reliable measure of impermissible partisan effect"). Faced with "an unbroken line of cases declining to strike down a redistricting plan as an illegal partisan gerrymander," Henderson v. Perry, 399 F. Supp. 2d 756, 761 (E.D. Tex. 2005), all of the lower courts to apply the Supreme Court's Vieth and LULAC decisions have rejected such claims. See, e.g., Perez, et al. v. Texas, No. 11-360, slip. op. at 21-22 (W.D. Tex. Sept. 2, 2011); see also Radogno v. Ill. Bd. of Elections, No. 11-4884, slip op. at 5-7 (N.D. Ill. Nov. 22, 2011) (reviewing seven proposed standards the Supreme Court has rejected).

The plaintiffs here likewise offer no reliable standard by which to adjudicate their gerrymandering claim. At best, they appear to argue for a sort of hybrid equal protection/political gerrymandering cause of action, which would be judged under the standards applicable to discrimination challenges. The Supreme Court, however, has previously dismissed similar claims, emphasizing that although "[r]ace is an impermissible

37

classification . . . [p]olitics is quite a different matter."
<u>Vieth</u>, 541 U.S. at 307 (op. of Kennedy, J.).  Absent a clear
standard to apply, we must reject the plaintiffs' arguments on
this count.

VII.  Conclusion

Based on the foregoing findings and conclusions, we
conclude that the plaintiffs have not satisfied their burden of
proof with respect to any of the Counts alleged in their
complaint.  Accordingly, we will deny the State's motion to
dismiss the three-judge court; deny the plaintiffs' motion for a
preliminary injunction; and grant the State's motion for summary
judgment.  A separate paper entering judgment for the State is
filed herewith.

                              Paul V. Niemeyer
                              Alexander Williams, Jr.
                              Roger W. Titus


                              _____/s/_____
                              by Paul V. Niemeyer, for the
                              court

December 23, 2011

TITUS, District Judge

I concur in the excellent opinion for the Court by Judge Niemeyer, but write separately to express concerns about the current, unsatisfactory state of the law on claims of political gerrymandering.

Count 7 of the Complaint alleges that five of the congressional districts were politically gerrymandered in violation of the Fourteenth Amendment and are the result of "gross partisan gerrymanders, which violate the United States Constitution's Fourteenth Amendment equal protection guarantee by fragmenting cohesive communities of interest and political subdivisions between districts in support of no legitimate, consistently applied state policy." Compl. ¶ 78. Count 7 goes on to allege that "[n]o legitimate consistently applied state policy is supported or furthered by these plans' needless division of these communities." *Id.* ¶ 79.

In their papers and in oral argument before the Court, however, the Plaintiffs premised their claim of political gerrymandering on allegedly improper racial motivations in the drawing of the congressional district boundary lines, and eschewed the more general allegations in the Complaint of a partisan gerrymander. Since the Plaintiffs' claims are tethered to a claim of racial animus in the drawing of congressional

district boundaries, and because the Court has found that claim wanting, it is difficult for the Court to address the more basic question of whether Maryland has engaged in improper partisan gerrymandering in its recently adopted congressional districting plan.

Had the Plaintiffs pressed the issue, they would, of course, have run headlong into the confusing, at best, nature of the decisional law on this subject by the Supreme Court.   At least four members of the Court in *Vieth v. Jubelirer*, 541 U.S. 267 (2004) would have eliminated entirely the justiciability of political gerrymandering claims.   *Vieth* was only decided by the concurrence of Justice Kennedy in the result, but he would not join in abandoning justiciability of such claims.   The inability of the Supreme Court to agree upon a standard for evaluating claims of partisan gerrymandering is chronicled in the plurality opinion of Justice Scalia in *Vieth*, and as yet, a discernable standard has not been developed and approved by the Supreme Court.

This is a tragic and unfortunate circumstance.   Never before has the United States seen such deep political divisions as exist today, and while the courts are struggling in their efforts to find a standard, the fires of excessive partisanship are burning and our national government is encountering deadlock

as never before.   In his concurrence in *Vieth*, Justice Kennedy
invited the formulation of standards, and for the sake of the
country, one should be developed lest the extreme political
divisions plaguing this country continue.

It is clear that partisan considerations in the development
of reapportionment plans are something that will not go away
and, standing alone, cannot serve as a basis for striking down a
reapportionment plan.   The question, as posed by Justice
Kennedy, is whether, in a given case, "*de facto* incorporation of
partisan classifications burdens rights of fair and effective
representation (and so establishes the classification as
unrelated to the aims of apportionment and thus is used in an
impermissible fashion." *Id.* at 312 (Kennedy, J., concurring).
In determining whether the rights to fair and effective
representation have been impacted by a reapportionment plan,

41

as never before.   In his concurrence in *Vieth*, Justice Kennedy
invited the formulation of standards, and for the sake of the
country, one should be developed lest the extreme political
divisions plaguing this country continue.

While a claim of political gerrymandering, untethered to a
claim of racial discrimination, was not pursued by the
Plaintiffs, it is clear that the plan adopted by the General
Assembly of Maryland is, by any reasonable standard, a blatant
political gerrymander.   If the claim had been pressed by the
Plaintiffs and an acceptable standard existed for judging it, I
would not have hesitated to strike down the Maryland plan.   The
question, however, is on the basis of what standard?

It is clear that partisan considerations in the development
of reapportionment plans are something that will not go away
and, standing alone, cannot serve as a basis for striking down a
reapportionment plan.   The question, as posed by Justice
Kennedy, is whether, in a given case, "*de facto* incorporation of
partisan classifications burdens rights of fair and effective
representation (and so establishes the classification as
unrelated to the aims of apportionment and thus is used in an
impermissible fashion." *Id.* at 312 (Kennedy, J., concurring).
In determining whether the rights to fair and effective
representation have been impacted by a reapportionment plan,

41

Justice Kennedy noted that First Amendment concerns may be appropriate for consideration, especially "where an apportionment has the purpose and effect of burdening a group of voters' representational rights." *Id.* at 314.

I would suggest that the focus of the inquiry should steer away from whether partisan interests have been advanced or suppressed, and focus instead on communities and whether the voters in these communities have seen their right to fair and effective representation compromised by having their community of interests ignored. I realize, of course, that during the redistricting process partisan considerations and incumbency protection inevitably play a role, but the blatant actions taken here demonstrate to me an impermissible political gerrymandering that "crossed the line."

Two perfect examples are found in the plan before this Court: the sixth and third districts. First, it is not a well-kept secret that the plan for the sixth congressional district was developed for the purpose of disadvantaging an incumbent Republican legislator and, as previously noted, that is insufficient, standing alone, to strike down a gerrymander. However, when creating a legislative district for such a purpose, community interests simply cannot be completely disregarded as they were in the case of this district.

42

Prior to the reapportionment, the sixth district consisted of predominately mountain, rural, farming or low density suburban communities that had a broad commonality of interests. The new district dramatically differs from the old in that several hundred thousand residents of far more densely populated Montgomery County were added to the district, in the process fracturing Montgomery County into three separate congressional districts. The result is to create a district in which any commonality of community interests has been shattered.

Citizens of Garrett County are at a higher altitude, have a different climate, root for different sports teams, and read different newspapers than their counterparts in Montgomery County. As a result, the interests of two widely diverse regions of the state are paired, and both are compromised in their right to fair and effective representation. Those who have an interest in farming, mining, tourism, paper production, and the hunting of bears, are paired with voters who abhor the hunting of bears and do not know what a coal mine or paper mill even looks like. Both of their interests thus have been compromised.

The shape of congressional district three is almost impossible to describe. It includes a snippet of Baltimore City, portions of Baltimore County, a small segment of

Montgomery County, a large chunk of Anne Arundel County, and an isolated snippet that includes Annapolis that is detached from the rest of the district and can only be reached by water.  To suggest that there is a community of interest between residents of Brookeville in Montgomery County, Owings Mills in Baltimore County, and Annapolis in Anne Arundel County is absurd.  One reason for this Rorschach-like eyesore is the fact that the incumbent Congressman lives in Baltimore County, but still "wanted to continue to represent the capital city Annapolis." Pls.' Resp. to Defs.' Mot. to  Dismiss or for Summ. J., Ex. 16, Decl. of Prof. Eberly ¶ 34 (quoting Maryland State President Thomas V. Mike Miller, Jr.).

As has already been chronicled by Justice Scalia in his opinion in *Vieth*, numerous standards have been proposed, and rejected, by the Supreme Court.  And, while congressional district three would probably be a prime candidate for the "I know it when I see it" test,[6] that test has already been rejected by the Supreme Court.

There are, however, fairly neutral and objective standards that could and should be considered for adoption by the Supreme Court.  Had a claim of partisan gerrymandering been pursued in

---

[6] *See Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Potter, J., concurring).

this case, untethered to a claim of racial discrimination, I
believe that a finding of political gerrymandering could have
been made applying a rational standard that could be utilized in
future cases.   In my judgment, the question of whether political
considerations played a role is both irrelevant and naïve.
Politics will always play a role in the establishment of
congressional boundaries.   The real question is whether those
considerations "though generally permissible, were applied in an
invidious manner or in a way unrelated to any legitimate
legislative objective" so as to interfere with the right of fair
and effective representation.   *Vieth*, 541 U.S. at 307 (Kennedy,
J., concurring).   In other words, did "politics" go too far?

    In resolving that question, a number of benchmarks should
be considered similar to those that are already contained in
Maryland's Constitution in Article III, Section 4, pertaining to
reapportionment of the state legislature.   Those criteria
clearly were not applied in this case, and had they been, it
would be difficult to conceive how the plan adopted by the
General Assembly could have passed muster under the State's own
Constitution.   Maryland's Constitution sets forth reasonable and
objective standards for reapportionment of the General Assembly,
including substantial equality of population, compactness,

contiguity and giving due regard to natural boundaries and the boundaries of political subdivisions.

When voters go to the polls to elect a representative to the national legislature, their rights to fair and effective representation are compromised when they are jumbled together with persons with whom they have little, if any, community of interest.   Had Maryland's own constitutional standards for reapportionment of the General Assembly been applied, we would likely not be in the unfortunate situation we are in today.

What I would propose for consideration in future cases is a burden-shifting process similar to that embraced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).   Where a partisan political gerrymander is alleged and the Plaintiff demonstrates that the districts chosen have been drawn with substantial disregard of political boundaries or natural boundaries, or are not compact,  and the result has been the separation of identifiable communities, there should be a presumption that the right to fair and effective representation has been violated. The burden would then shift to the state to demonstrate a compelling governmental interest (other than incumbent protection or endangerment) that supports the boundaries chosen based on a legitimate public policy.

Had such a test been available to this Court and had the Plaintiffs pressed their claim of a partisan gerrymander separate and distinct from racial discrimination, I would have invalidated the redistricting plan without hesitation. Unfortunately that is not a choice available to this Court because we have neither a ship for the voyage nor a compass to guide us.

Williams, District Judge

Although I join the Court's comprehensive and well-reasoned opinion, I write separately to articulate my own views in reference to these sensitive and politically charged issues. This action—brought by nine African-American voters against a state plan favoring Democrats—fostered a unique and complex coalition of interests. It was this strange and oft-contradictory interplay of interests that ultimately toppled Plaintiffs' racial and partisan gerrymandering claims. Although my friend and respected colleague in his concurring opinion voiced concern at what he terms a "blatant political gerrymander," I emphasize that the Court, upon finding that the map withstood constitutional scrutiny, properly employed its judicial restraint in upholding the State Plan in its entirety.

I.   "No Representation Without Population Act"
     (Counts 3, 4, and 6)

As indicated by the majority, Plaintiffs' claim that the
"No Representation Without Population Act" intentionally
discriminates against African-Americans in violation of the
Fourteenth or Fifteenth Amendment can be summarily disposed
with.[7]

From the outset, Plaintiffs struggled in making any sort of
intentional discrimination claim since a significant portion of
the legislative and community leaders advocating in favor of the
State Plan were African-Americans.  Several African-American
politicians and community members testified in favor of the
State Plan, including: Prince George's County Executive Rushern
Baker, Montgomery County Executive Isiah Leggett, and Baltimore
Mayor Stephanie Rawlings Blake.  The Black Legislative Caucus
proposed two redistricting plans, neither of which called for
the three majority African-American districts proposed by

---

[7]   While Plaintiffs initially premised their intentional
discrimination claims on both the Fourteenth and Fifteenth
Amendments, they conceded at the hearing that their Fifteenth
Amendment claim holds little weight under current jurisprudence.
Post-Gomillion v. Lightfoot, 364 U.S. 339 (1960), the Supreme
Court has consistently focused on the Fourteenth Amendment as
the proper vehicle for resolution of intentional discrimination
claims.

Plaintiffs.  Eight out of nine African-American senators and 31 of 34 African-American delegates voted for the State Plan.  In fact, Defendants contended during the hearing that the very Chair of the legislative redistricting committee was African-American, as were a substantial portion of the individuals on that committee.  It was represented at the hearing that even Representative Donna Edwards, initially a vocal dissident of the State Plan on racial grounds, has now voiced her support.

As indicated by the majority, this Court refuses to entertain Plaintiffs' supposition that all of these individuals—leaders in the African-American community—were somehow bamboozled into promoting a state plan infected by invidious discrimination.  Plaintiffs have produced no other evidence from which the Court could infer that traditional districting principals were subordinated to racial considerations.

Plaintiffs have shown no evidence, and in fact do not even allege in Count IV, that the "No Representation Without Population Act" has a discriminatory purpose.  Nor would Plaintiffs succeed in such a claim; the legislative history of the Act reveals that it was heralded as a civil rights bill focused on eradicating "prison-based gerrymandering."  I found particularly impressive and persuasive Howard University School of Law's amicus brief on the matter.  The Howard Amicus provided

a thorough account of the promulgation and purpose of the Act, emphasizing that the Act received the full support and advocacy of the NAACP of Maryland, the ACLU of Maryland, and the Legislative Black Caucus of Maryland. Given Plaintiffs' failure to plead or prove a discriminatory purpose or invidious discrimination in the promulgation of the law, Plaintiffs' claims fail to meet even the threshold showing required by Washington v. Davis, 426 U.S. 229, 239 (1976). Although I decline to reach the issue of discriminatory effect here, the Howard Amicus has persuasively demonstrated that the Act empowers all voters, including African-Americans, by counteracting dilution of votes and better aligning districts with the interests of their voting constituents.

I find especially thorough the majority's analysis of Plaintiffs' Article I, Section 2 claim with regard to the "No Representation Without Population Act" and address it no further here.

II.  Political or Partisan Gerrymandering (Count 7)

One of the most striking aspects of Plaintiffs' partisan gerrymander claim is its strange alliance between African-American voters and Republican officials. Plaintiffs allege

that Maryland's redistricting plan diminishes Republican influence by reducing Republican-held congressional seats from two to one.

Although Plaintiffs never specify their political affiliation, the pleadings, briefs, and record contain all the trappings that would lead one to plausibly conclude that Plaintiffs are Democrats.  Plaintiffs themselves proclaim, "African-Americans are the most reliable Democratic voting bloc . . ." (Doc. 16 at 22).  Furthermore, Plaintiffs detail the State's purported plot to move politically cohesive African-American voters to the Sixth District—currently a Republican-controlled seat—to secure seats for White Democrats.  This conjecture presumes that Plaintiffs, and the African-Americans on whose behalf they speak, are dependable Democrats.  This atypical dynamic—where the plaintiffs argue a plan benefiting their party constitutes unconstitutional political gerrymandering—differs from other partisan gerrymander claims. See, e.g., Vieth v. Jubilirer, 541 U.S. 267 (2004); Davis v. Bandemer, 478 U.S. 109 (1986).

Setting aside this fusion of unexpected bedfellows, I agree with the Court's opinion that Plaintiff's inability to articulate a justiciable standard for constitutionality defeats their political gerrymander claim.  In fact, Plaintiffs'

Case 8:11-cv-03220-RWT Document 54 Filed 12/23/11 Page 52 of 55

proposed standard—incorporating an intentional invidious racial component—mirrors previous standards already rejected by the Supreme Court. See Vieth, 541 U.S. at 286, 292-95 (rejecting both appellants' and Justice Stevens's proposed standards because racial and political gerrymandering are not analogous).

While the concurring opinion of my respected colleague Judge Titus characterizes the State Plan as a blatant political gerrymander, I take a different view. It is important to bear in mind that the Supreme Court has recognized that politics is an inherent part of any redistricting plan, and that partisan gerrymandering is unconstitutional only when it is so excessive as to violate the Fourteenth Amendment. Here, the evidence was too scarce to confidently assert that Maryland's redistricting plan constituted patently unconstitutional political gerrymandering.

Taking into account the enormous challenge of crafting an acceptable standard, it is unclear that the standard proposed in my colleague's concurrence would be acceptable to the Court. First, the concurring opinion focus on the preservation of particular communities is not a requirement found in the Constitution, pertinent statutes, or applicable precedents.[8]

---

[8] Although communities of interest is one factor that a legislature may consider in redistricting, no provision of the

Nevertheless, the Court has rejected standards that "are not discernible in the Constitution" and have "no relation to Constitutional harms" See Vieth, 541 U.S. at 295.   Second, the Vieth plurality rejected Justice Souter's proposal requiring a five-step *prima facie* showing by the plaintiffs, which the state would then rebut with evidence of a legitimate governmental interest.   According to the plurality, each of the findings required by the *prima facie* test was overly vague and immeasurable.   See Vieth, 541 U.S. at 295-97.   ("What is a lower court to do when, as will often be the case, the district adheres to some traditional criteria but not others?").   One of Justice Souter's requirements for establishing a *prima facie* case was the state paid little or no heed to traditional districting principles, such as those advocated by the concurring opinion (i.e. disregard of political boundaries or natural boundaries, separation of identifiable communities). Moreover, this standard requires the state to demonstrate a government interest aside from incumbent protection.   However, the Supreme Court has determined that incumbent protection is a legitimate consideration when creating redistricting plans.

---

Constitution or federal law requires states to preserve particular communities when redistricting.

Finally, it bears emphasis that this Court correctly declined Plaintiffs' invitation to tinker with the State Plan. Throughout this action, Plaintiffs' contentions have revealed a complex interplay of racial and partisan interests; interweaving, sometimes inextricably, fully justiciable issues with matters best left to the legislature. Upon determining that the perceived infirmities in the State Plan withstood constitutional scrutiny, my inquiry ended.

Certainly the district lines could have legitimately been drawn in a thousand different and perhaps more coherent ways that would have been more amenable to Plaintiffs, the community, or this Court. These redistricting decisions necessarily involve a sensitive and often complex array of value judgments. When entering this political thicket, one is confronted by the plethora of conflicting interests at play and quickly realizes that it is a zero sum game; the promotion of one legitimate interest inures to the detriment of others. Given the State Plan before this Court and the current state of the case law on political gerrymandering claims, I emphasize that this Court reached the proper outcome in upholding the State Plan in its entirety, rather than unfettering its judicial restraint by directing legislative revisions. In my view, the State Plan and its partisan line-drawing are the product of sensitive political

choices and compromises best vested in the legislature's wise discretion.

For all of these reasons, I join in the opinion and judgment of the Court.